JOHN FRANKOVICH, NV Bar #667
LEIGH GODDARD, NV Bar #6315
McDonald Carano Wilson LLP
100 West Liberty Street, 10th Floor
P.O. Box 2670
Reno, NV 89505-2670
Telephone:  (775) 788-2000
Facsimile: (775) 788-2020
Email: jfrankovich@mcdonaldcarano.com
lgoddard@mcdonaldcarano.com

KEVIN JOHNSON (*pro hac vice*)
RAY ZADO (*pro hac vice*)
SAM STAKE (*pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100
Email: kevinjohnson@quinnemanuel.com
rayzado@quinnemanuel.com
samstake@quinnemanuel.com

*Attorneys for Defendant salesforce.com, inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| APPLICATIONS IN INTERNET TIME, LLC, | No. 3:13-CV-00628-RCJ-VPC |
| Plaintiff, | DEFENDANT SALESFORCE.COM, INC.'S SUR-REPLY CLAIM CONSTRUCTION BRIEF |
| v. | |
| SALESFORCE.COM, INC., | |
| Defendant. | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   DISPUTED CONSTRUCTIONS ................................................................... 1

  A.    "automatically detecting" ................................................................... 1

    1.    AIT's Attempts to Read in Human Intervention Based on Operations
          Other than the Claimed Automatic Detection Should Be Rejected .............. 1

    2.    Automatic Detection Requires Intelligent Agents ........................................ 5

  B.    "changes that affect" ........................................................................ 8

    1.    The Invention Monitors Changes in Third-Party Repositories ..................... 8

    2.    The Claimed Changes Are to "Regulatory, Technological, or Social
          Requirements" .............................................................................................. 11

  C.    "dynamically generate" .................................................................... 11

    1.    Dynamic Generation Occurs "Without Any Modification … by a
          User" .............................................................................................................. 11

    2.    Dynamic Generation Occurs "Immediately and Concurrently" .................. 12

  D.    "layer" / "portion of the server" or "portion" ................................... 14

  E.    "unique" / "common" ........................................................................ 16

  F.    "business content database" ............................................................ 17

  G.    "logical design" / "physical design" / "physical structure" .................. 18

  H.    "builder module" ................................................................................ 19

**<u>TABLE OF AUTHORITIES</u>**

**Page**

<u>Cases</u>

*3M Innovative Properties Co. v. Tredegar Corp.*,
      725 F.3d 1315 (Fed. Cir. 2013) ............................................................................ 5

*ACTV, Inc. v. Walt Disney Co.*,
      346 F.3d 1082 (Fed. Cir. 2003) .......................................................................... 17

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
      637 F.3d 1324 (Fed. Cir. 2011) .......................................................................... 10

*And Retractable Technologies, Inc. v. Becton, Dickinson & Co.*,
      653 F.3d 1296 (Fed. Cir. 2011) ............................................................................ 8

*AstraZeneca AB v. Hanmi USA, Inc.*,
      554 F. App'x 912 (Fed. Cir. 2013) ..................................................................... 11

*Aventis Pharma S.A. v. Hospira, Inc.*,
      675 F.3d 1324 (Fed. Cir. 2012) ............................................................................ 9

*BASF Corp. v. Johnson Matthey, Inc.*,
      875 F.3d 1360 (Fed. Cir. 2017) .......................................................................... 16

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
      616 F.3d 1249 (Fed. Cir. 2010) .......................................................................... 14

*Blackboard, Inc. v. Desire2Learn, Inc.*,
      574 F.3d 1371 (Fed. Cir. 2009) .......................................................................... 20

*Chicago Bd. Options Exch., Inc. v. Int'l Secs. Exch., LLC*,
      677 F.3d 1361 (Fed. Cir. 2012) .......................................................................... 12

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
      418 F.3d 1225 (Fed. Cir. 2005) ............................................................................ 5

*Computer Docking Station Corp. v. Dell, Inc.*,
      519 F.3d 1366 (Fed. Cir. 2008) ...................................................................... 5, 11

*Continental Circuits LLC v. Intel Corp.*,
      915 F.3d 788 (Fed. Cir. 2019) .............................................................................. 6

*Elec. Co., Ltd. v. Polygroup Macau Ltd. (BVI)*,
      777 F. App'x 495 (Fed. Cir. 2019) ..................................................................... 14

*Eyetalk365, LLC v. Zmodo Tech. Corp. Ltd.*,
      No. 2:17-CV-02714-RCJ-PAL, 2018 WL 2292529 (D. Nev. May 17, 2018) ............. 14, 15

*Finisar Corp. v. DirecTV Group, Inc.*,
      523 F.3d 1323 (Fed. Cir. 2008) .......................................................................... 13

-ii-

*Gemstar-TV Guide International v. ITC*,
    383 F.3d 1352 (Fed. Cir. 2004) ................................................................................ 7

*Hill-Rom Services, Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014) ........................................................................... 6, 9

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*,
    222 F.3d 951 (Fed. Cir. 2000) .............................................................................. 15

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ................................................................................ 8

*Linear Tech. Corp. v. Int'l Trade Comm'n*,
    566 F.3d 1049 (Fed. Cir. 2009) ............................................................................ 15

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ...................................................................... 13, 14

*Poly-America, L.P. v. API Industries, Inc.*,
    839 F.3d 1131 (Fed. Cir. 2016) ......................................................................... 6, 12

*POSITA. See Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .............................................................................. 9

*Powell v. Home Depot U.S.A., Inc.*,
    663 F.3d 1221 (Fed. Cir. 2011) ......................................................................... 4, 15

*Power Integrations, Inc. v. ON Semiconductor Corp.*,
    396 F. Supp. 3d (N.D. Cal. 2019) ........................................................................ 11

*Schoenhaus v. Gensesco, Inc.*,
    440 F.3d 1354 (Fed. Cir. 2006) ............................................................................ 14

*Seachange Int'l, Inc. v. C–COR Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005) ............................................................................ 11

*Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*,
    753 F.3d 1291 (Fed. Cir. 2014) ............................................................................ 14

*SRI International, Inc. v. Cisco Systems, Inc.*,
    930 F.3d 1295 (Fed. Cir. 2019) .............................................................................. 5

*SynQor, Inc. v. Artesyn Technology, Inc.*,
    709 F.3d 1365 (Fed. Cir. 2013) ........................................................................... 3, 4

*Tech. Props. Ltd. v. Huawei Techs. Co.*,
    849 F.3d 1349 (Fed. Cir. 2017) .............................................................................. 5

*Techtronic Indus. Co. v. ITC*,
    944 F.3d 901 (Fed. Cir. 2019) ................................................................................ 8

*Thus, Absolute Software, Inc. v. Stealth Signal, Inc.*,
    659 F.3d 1121 (Fed. Cir. 2011) .............................................................................. 8

*Thus, Kara Technology Inc. v. Stamps.com Inc.*,
    582 F.3d 1341 (Fed. Cir. 2009) ............................................................................ 5

*Trustees of Columbia University v. Symantec Corp811 F.3d*,
    1359, 1366-67 (Fed. Cir. 2016) ......................................................................... 14

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
    659 F.3d 1376 (Fed. Cir. 2011) ......................................................................... 20

*Vehicle IP, LLC v. Werner Enterprises, Inc.*,
    4 F. Supp. 3d 648 (D. Del. 2013) ........................................................................ 5

*Wastow Ent's, LLC v. Truckmovers.Com, Inc. et al.*,
    No. 2020-2349, 2021 WL 1942350 (Fed. Cir. May 14, 2021) ........................... 8

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ............................................................................... 5

*Z4 Technologies, Inc. v. Microsoft Corp.*,
    507 F.3d 1340 (Fed. Cir. 2007) ........................................................................... 5

<u>Statutory Authorities</u>

35 U.S.C. § 112 ..................................................................................... 19, 20

## I.   **INTRODUCTION**

Defendant salesforce.com, inc. ("Salesforce") hereby submits the Sur-Reply Claim Construction Brief in Support of its Responsive Claim Construction Brief.

## II.   **DISPUTED CONSTRUCTIONS**

### A.   **"automatically detecting"**

#### 1.   **AIT's Attempts to Read in Human Intervention Based on Operations Other than the Claimed Automatic Detection Should Be Rejected**

AIT concedes that "[t]here is no dispute that the step of automatically detecting changes . . . must be performed automatically, *i.e.* without human intervention."  Dkt. 158 ("Reply") at 1. This concession alone dictates that AIT's construction—which allows unspecified "indirect" human intervention in the automatically detecting limitation—must be rejected.

None of AIT's arguments support the construction it is proposing, as they are not about the automatically detecting step.  Rather, AIT engages in a shell game with the claim language, arguing that "Salesforce's construction fails to inform the jury[1] that some level of human interaction is permitted ***preceding and following the detection of changes***, *i.e.*, in the steps leading to or resulting from the claimed detection step," and then trying to use the ***other*** steps to impermissibly broaden the meaning of ***this*** limitation.  *Id.*  Salesforce's construction properly addresses the "detecting" step—*i.e.*, the actual claim term being construed.  AIT's does not.

AIT furthers its shell game with selective misquotation and elision.  AIT points to alleged "concessions" made by Salesforce (Reply at 1), but fails to quote the actual language from Salesforce's brief—which makes no such concessions.  Opp. at 4 ("However, Salesforce's construction is explicit: the detection—not other steps to which AIT is pointing in its argument, such as 'claimed and unclaimed steps or functions …' is done without any [human] intervention").  AIT misquotes Salesforce as supposedly arguing that "the asserted claims . . . are incompatible with initiation by a human," but what Salesforce referred to was that "AIT ignores ***the role of***

---

[1]  AIT's argument is also misplaced: AIT's own construction fails to inform the jury of the supposed concept it endorses re: unrelated claim limitations, instead introducing unnecessary ambiguity by referring to unspecified levels of "indirect" human intervention, which further would render the claim indefinite.  Dkt. 154 ("Opp.")  at 4.

*"automatically detecting changes'* in the asserted claims," and that it is this automatic "detecting of changes" which is "inconsistent with initiation by a human."  Opp. at 8.

AIT has no answer to, and simply ignores, Salesforce's evidence confirming that the plain meaning of "automatic" to a person of ordinary skill in the art (POSITA) is "without human intervention."  Bederson Declaration, Dkt. 153-2 ("Bederson") ¶¶ 80-82; Dkt. 68-12 at 41; Dkt. 68-13 at 66; Dkt. 68-14 at 47.  Instead, AIT's position is that "[t]he claim language specifies that only one limitation requires automation," Reply at 1, but Salesforce's construction is directed squarely to that one "automatically detecting" limitation—the one before the Court for construction, which AIT has already conceded "requires automation."[2]

AIT falsely claims that "Salesforce does not dispute that the claim language permits the use of manual steps as long as they are not *directly involved* in the detecting step."  Reply at 2.  Salesforce never says this, but rather has been consistent that no manual steps—direct or indirect—can be part of the automatic detection.  Opp. at 8 ("No 'human initiation or interruption element' is claimed in connection with the automatic detection, and adding one would vitiate the advantages of automatically detecting relevant changes.").  As Salesforce repeatedly notes, allowing for such manual steps would defeat the purpose of the invention.  Bederson ¶¶ 83-90.

AIT mistakenly alleges the specification "teaches that automated processes can be initiated manually."  Reply at 2.  AIT points to 10:57-58, but that passage is about what happens *after* a change has already been automatically detected by an IA, i.e., generating of recommendations based on the detected change.  Col. 10:50-60.[3] Configuration of recommendations generated after change detection is separate and distinct from the change detection itself. Bed. 2 ¶ 8.[4]  AIT further mischaracterizes the specification, which does not teach that the "user initiates automatic changes."  Read in context, this passage merely states that the user "can choose to automatically configure the preceding recommendation based on a set of default conditions, or can manually

---

[2] AIT drops its previous (misplaced) reliance on the preamble's use of "comprising."
[3] All patent citations are keyed to the '482 patent (*e.g.*, "Col."), unless otherwise noted.  All emphases are also added unless noted.
[4] "Bed. 2 ¶ _" refers to the Second Declaration of Dr. Bederson, filed herewith.

1   implement the configuration using a . . . toolkit."   10:57-60.   In other words, the user selects

2   whether to configure recommendations automatically or manually, which recommendations are

3   later generated by the system after an IA detects a change—there is no manual initiation of any

4   automated process.  Bederson ¶ 88; Bed. 2 ¶ 8.

5       AIT next claims that Salesforce does not dispute that Fig. 2 shows "that a user can control[5]

6   automatic processes to e.g. automatically configure changes (which may be automatically

7   detected)."  AIT is wrong on multiple counts.  First, Salesforce did dispute AIT's characterization

8   of Fig. 2.  Opp. at 6.  Second, AIT relies on "configuration," which is not automatic detection of

9   changes, nor does the configuration of recommendations control automatic detection.  Bed. 2 ¶ 9.

10  Third, AIT's cites do not show "automatic" operations can be "initiated manually":  deciding to

11  configure recommendations manually, or let the system do the configuration automatically, is not

12  initiating anything.  *Id.*  AIT's other citation to 20:15-20 similarly involves a configuration step (of

13  alert conditions) well in advance of the automatic action.

14      AIT also incorrectly contends that Figure 8 and 19:61-67 teach "two ways in which

15  automated detection may be initiated."  Reply at 2 (raised for first time in reply).  Not so.  First,

16  Fig. 8 includes no illustration of the submenus on which AIT relies, much less any reference to

17  intelligent agents ("IAs").  Bed. 2 ¶ 3-5.  Second, launching or scheduling the execution of an IA

18  program as described in 19:61-20:6 is not the claimed automatic detection step.  Under AIT's

19  logic, every software system would require "human intervention" to execute, and all actions the

20  system ever performs would be with "human intervention."  *Id.* ¶ 6.  Third, this launching or

21  scheduling takes place well before the IA process begins detecting any changes, and thus does not

22  relate to the claimed automatically detecting step.  *Id.* ¶ 7.  Salesforce's construction does not

23  preclude turning on a device or launching background processes, so no embodiment is excluded,

24  and *SynQor, Inc. v. Artesyn Technology, Inc.*, 709 F.3d 1365 (Fed. Cir. 2013) is inapposite.

25

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [5]  AIT's analysis, which began with the concept of whether manual steps "initiate" change
27  detection, subtly devolves even further from the claim language into an undefined level of
    "control" over automatic change detection - a concept which never appears in the specification in
28  the context of such change detection, and is a pure invention of AIT.

In asserting that the specification's discussion of a "closed loop" system for automatic detection contemplates human intervention (Reply at 3), AIT fails to respond to Salesforce's evidence regarding a "closed loop approach to identifying changes using IAs"[6] and how the central advantages of the invention's closed loop approach derive from eliminating human intervention in the change detection step.  Reply at 3; Bed. ¶¶ 83-84.  AIT contends that "closed loop" refers only "to a system that does not require 'the use of programmers and/or programming," Reply at 3, but that assertion is belied by the specification's explicit link between the "closed loop" system and "identifying changes using intelligent network agents," as well as the understanding of the term "closed loop system" to a POSITA.  *Id.*; Col. 7:62-64; Stake Ex. 1.

Turning to the prosecution history,  AIT again raises a supposed lack of disclaimer when discussing a "re-architecting" system in the Eager reference, Reply at 3, but that portion of the prosecution history is not relevant—AIT only raises it to muddy the waters.  Opp. at 6-8.  When the applicant discussed a separate aspect of Eager, its "***re-engineering system***," the applicant drew a sharp distinction between systems with human intervention and systems that could perform the claimed "automatically detecting changes that affect an application."  Dkt. 68-7 at 14.

AIT claims that "the issue with respect to Eager's 're-engineering system' was whether the manner in which Eager taught 'modifying application screens and messages' ***taught away*** from a step of detecting changes automatically."  Reply at 4.[7]  This is incorrect, and ignores the distinction applicants drew (which again, AIT fails to quote in full).  The applicant was clear that if humans intervened ***in the automatic detection step*** by modifying screens and messages, the step would not operate automatically:

> Further, the Appellants note that Eager explicitly teaches that in the reengineering system, it is "application developers and maintenance personnel" that "modify application screens and messages", ***thus teaching away from any means*** that

---

[6] AIT says "any claim construction that precludes all human interaction as part of a 'closed loop' system would exclude the preferred embodiment."  Reply at 3.  But the regulatory system as a whole is not closed loop, rather it is the particular aspects of change detection.

[7] AIT criticizes Salesforce for referring to the disclosure of Eager, but that disclosure is necessarily a part of the file history, and thus relevant to claim construction.  *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231 (Fed. Cir. 2011) ("[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.") (internal quotations omitted).

would operate "automatically", and in particular *that would allow 'automatically detecting changes that affect an application' as recited in claim 2*.

Dkt. 68-7 at 14.  AIT further alleges that "Eager's re-engineering system was never urged by the examiner to detect changes at all," Reply at 4, but that is false.  The examiner cited the re-engineering system portion of Eager and its role in change detection.  Dkt. 154-3 at 105, 107; Dkt. 154-3 at 92-93.   AIT raises *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315 (Fed. Cir. 2013) and *SRI International, Inc. v. Cisco Systems, Inc.*, 930 F.3d 1295 (Fed. Cir. 2019) for as requiring "both clear and unmistakable" prosecution disclaimer, but that *is* the case here: AIT argued, clearly and unmistakably, that the "automatically detecting" step could not include human intervention, and so disclaimed its construction.  Bed. ¶¶ 91-93.  By distinguishing the prior art, AIT prohibited human intervention, like the cases cited by Salesforce which AIT failed to distinguish on reply.  *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008); *Tech. Props. Ltd. v. Huawei Techs. Co.*, 849 F.3d 1349, 1357-58 (Fed. Cir. 2017).

AIT repeats its reliance on *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225 (Fed. Cir. 2005); *Vehicle IP, LLC v. Werner Enterprises, Inc.*, 4 F. Supp. 3d 648 (D. Del. 2013); *Z4 Technologies, Inc. v. Microsoft Corp.*, 507 F.3d 1340 (Fed. Cir. 2007); and *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10 (Fed. Cir. 2012).  Reply at 1, 4-5.  Salesforce distinguished all of these cases, including because each involved an explicit claim step for manual action, in contrast to the claims here.  Opp. at 8-10.  AIT fails to address these distinctions.  When it does purport to respond, it again misrepresents the cases by ignoring the key differences in the claim language.  *See id*.  AIT fails to discuss a single one of the numerous cases Salesforce raised where "automatically" was construed to exclude human intervention.  Opp. at 10.

## 2.    Automatic Detection Requires Intelligent Agents

AIT relies primarily on the doctrine of claim differentiation, but concedes that "claim differentiation is not an ironclad rule."  Reply at 5-6 (failing to address any of Salesforce's cited authority).[8]  Thus, *Kara Technology Inc. v. Stamps.com Inc.*, 582 F.3d 1341 (Fed. Cir. 2009), a

---

[8] AIT's citation to the prosecution history, Reply at 7, is simply a variation of this argument.

run-of-the-mill claim differentiation case, is inapposite.  Here, there are strong reasons claim differentiation should not be rigidly applied.  The specification repeatedly describes "the invention" as requiring automatic detection of changes using one or more IAs.  Opp. at 10-11; Cols. 8:50-54; 9:33-37; 10:21-49; Figs. 1-2.  The repeated characterization of "the invention" as limited to IAs—and the criticism of prior art that did not use them—compels the adoption of Salesforce's construction.  Opp. at 11 (collecting cases).

AIT asserts some extra verbiage is required beyond the patents' repeated confirmations that "the invention" uses IAs.  Reply at 5 (contending that language like "the invention requires" or "all embodiments of the invention" is needed).  AIT is wrong as a matter of law.  No such extra language is required, and AIT conveniently ignores numerous cases cited by Salesforce setting forth the appropriate legal standard.  Opp. at 11; *Poly-America, L.P. v. API Industries, Inc.,* 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("While disavowal must be clear and unequivocal, it need not be explicit…For example, an inventor may disavow claims lacking a particular feature when the specification describes 'the present invention' as having that feature.") (internal citations omitted). AIT cites to *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367 (Fed. Cir. 2014) for the proposition that a disavowal of claim scope requires clear language, but it ***again*** ignores that *Hill-Rom* itself says that statements about "the present invention" alone may disavow claim scope. AIT's citation to *Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788 (Fed. Cir. 2019) leaves out the court's recognition that "descriptions of the present invention as a whole could limit the scope of the invention."  *Id.* at 798.  Here, the descriptions of the role of IAs in the invention are not restricted to particular embodiments or optional features.  *E.g.*, Col. 10:41-42.

AIT's attempts to creatively recast the specification's description of the invention fail. AIT contends that Figure 1's statement that "changes are identified on the Internet using intelligent agents and provided for configuration" is not limiting purportedly because 8:50-51 says that "FIG. 1 schematically illustrates the relationship of four layers that are the primary components of the invention" rather than "the intelligent agents are primary components of the invention."  Reply at 6.  This is a distinction without a difference: the specification describes the four layers in Figure 1 as "the primary components of the invention" and one of those layers

1   requires automatic change detection with IAs.  That is more than enough to unambiguously restrict

2   the scope of the invention and claims as viewed by a person of ordinary skill in the art.  Bed. ¶¶

3   96-101.  AIT attempts to distance itself from Figure 2's statement that an "IA identifies one or

4   more relevant changes on a network" by characterizing 8:52-54 as "apply[ing] to aspects of the

5   invention that follow automatic detection of changes."  This reading is divorced from the plain

6   language of the specification and a POSITA's understanding.  Bederson ¶¶ 96-101.  Finally, AIT

7   criticizes 10:21-49 for being an "example," but ignores the context.  The "example" in that section

8   is "a federal regulation, governing disposal of hazardous waste in landfills."  Col. 10:31-32.  IAs

9   are nowhere reduced to a mere "example" for the automatic change detection step; instead, "[t]he

10  ***invention*** begins tracking change using one or more intelligent agents ('IA's')."  Col. 10:41-42.

11  IAs for change detection are an indispensable aspect of the invention.

12      AIT next argues that despite the repeated criticism of the prior art for not employing IAs,

13  the criticism was actually "based on multiple technical features."  Reply at 6.  Although it is true

14  that the specification also criticizes other aspects of the prior art, the specification repeatedly and

15  specifically calls out the lack of IAs as a particular deficiency of the prior art.  *E.g.*, Cols. 7:47-53;

16  7:62-64; 9:64-10:10.  AIT's argument is akin to saying that "I don't like X or Y" does not criticize

17  X because Y is also mentioned.  AIT's citation to *Gemstar-TV Guide International v. ITC*, 383

18  F.3d 1352 (Fed. Cir. 2004) is also inapposite—it concerned bland statements in the prosecution

19  history, rather than the much stronger criticism in the specification found here.  And again, AIT

20  fails to distinguish a single one of Salesforce's cited cases.  Opp. at 11; Reply at 6-7.

21      Finally, AIT incorrectly contends that parts of the specification teach "that an intelligent

22  agent is not required in all embodiments."  Reply at 7.  AIT fails to show a single instance or

23  embodiment that does not employ IAs for automatic change detection.  There are none.  Nor is

24  there "permissive language" that contemplates different ways of performing automatic detection

25  of changes.  20:3-6 describes the capabilities of an IA, which can perform many functions beyond

26  change detection, but nowhere says or implies that they are optional for change detection.  The

27  lone embodiment—described in detail at 16:65-22:17—uses IAs, but does not describe them as

28  optional to the invention.  A list of "Change Configuration Functions" in 10:6-14 fails to suggest

-7-

1   that IAs are optional for automatic change detection according to the invention; the references to

2   "screens, fields, reports, [and] documents" are never linked to automatic change detection.  Thus,

3   *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121 (Fed. Cir. 2011) is distinguishable

4   because portions of the specification raised by AIT are fully consistent with "the invention"

5   necessitating the use of IAs.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004)

6   does not apply because it did not contain statements in the specification characterizing "the

7   invention."  And *Retractable Technologies, Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1306

8   (Fed. Cir. 2011) supports Salesforce, not AIT.  Id. at 1305-06 (finding claim term "body" should

9   be limited in light of statements about "the invention")

10          **B.      "changes that affect"**

11                  **1.      The Invention Monitors Changes in Third-Party Repositories**

12          AIT offers nothing more than attorney argument to assert that the language of the claim

13   has nothing to do "with a repository at all."  Reply at 8.  However, AIT fails to cite any evidence

14   or otherwise rebut Salesforce's evidence regarding the understanding of a POSITA regarding the

15   plain language of the claim and how the term "affect" indicates that the change source is one step

16   removed from the claimed system, not incorporated within it.  Bederson ¶¶ 109-10.

17          AIT again mischaracterizes Salesforce's position, claiming "Salesforce argues that its

18   construction is not directly contradicted by the Specification."  Reply at 8.  As Salesforce made

19   clear, the sole embodiment of the specification repeatedly and consistently discloses the changes

20   as coming from repositories outside the described and claimed "integrated system," such as the

21   Web.  Opp. at 14;  Cols. 1:6-9; 8:9-9:48; 10:21-26.  The detection of changes from external data

22   sources is central to this sole embodiment and the purpose of the invention.  Opp. at 13-14.  The

23   justification for the invention is the impact of external changes in third-party repositories on a

24   business.  Cols. 7:47-67; 8:28-46; Bed. ¶ 115.  This goes far beyond the construction being "not

25   directly contradicted by the specification" or "not directly inconsistent" with Salesforce's

26   construction.  Reply at 8.  *See Techtronic Indus. Co. v. ITC*, 944 F.3d 901, 907-10 (Fed. Cir.

27   2019); *Wastow Ent's, LLC v. Truckmovers.Com, Inc. et al.*, No. 2020-2349, 2021 WL 1942350, at

28   *3 (Fed. Cir. May 14, 2021).

In improperly dismissing Salesforce's citations to the specification, AIT appears to take the position that lexicography or express disavowal is required for the specification to inform a construction or the understanding of a POSITA. Reply at 8-9. This is not correct: the specification is always relevant to the understanding of a POSITA. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). However, even if AIT's reading of the cases were correct—it is not—the specification does contain such a disavowal or definitional statement, when it expressly states what the invention is and what it monitors: "***This invention monitors***, responds to, ***and incorporates changes in, federal, state and local laws, statutes, ordinances and regulations (referred to collectively herein as "regulations") and changes in technology in one or more regulated areas of commercial activity*** . . . ."). Col. 9:10-16. There are two key aspects to this definitional statement. First, the invention not only monitors, but "incorporates" changes. "Incorporate" shows that changes from a source outside the claimed integrated system are being brought into the system. Second, the types of changes monitored—regulations and changes in technology in one or more regulated areas of commercial activity—again are the types of changes not within a business's control, but rather, are promulgated by third parties (such as governmental organizations and other entities that regulate areas of commercial activity but that affect the business). Col. 1:56-16; 7:47-55. The remaining statements in the specification, including the reference to the system "receiv[ing]" changes, and IAs "cruising the web," are in accord with this definition. Opp. at 16-17.[9]

AIT's final attempt to muddy the waters is to reiterate its argument about "intranets," incorrectly asserting that "Salesforce cannot dispute that changed may involve either an intranet." *Compare* Reply at 10 *with* Opp. at 14-15. Indeed, it is AIT who takes the specification's reference to intranets out of context, as the primary passage on which AIT relies ***never states that the system monitors intranets for changes***: "[t]he change layer primarily involves an intranet or the Internet and uses one or more intelligent agents (IA's) that continually search on the Web for relevant

---

[9] Accordingly, *Aventis Pharma* and *Hill-Rom Services* are inapposite because here there is an express definitional statement using the term "the invention" that dictates that the source of changes comes from outside the claimed system.

1    changes in a selected business area."  Col. 16:18-22.  Indeed, this passage makes clear on its face

2    that the change management layer / IAs are not searching a company's internal intranet by instead

3    pointing to "the Web" as the source of the changes being searched.  The reference to intranet here

4    merely refers to the location of the change layer itself.  Opp. at 14.[10]

5         AIT's additional specification cites miss the mark.  For 10:26-28, AIT notably omits that

6    the passage expressly refers to "the invention," and is therefore definitional.  *See also* Opp. at 14.

7    19:66-67 contains nothing more than a reference to "internal . . . web activities," but then further

8    defines IAs broadly in a way that makes clear that there are IAs that perform other activities

9    beyond the claimed change detection.  Opp. at 15.  And 22:29-31 talks about the location of the

10   claimed system, not where IAs are searching for changes.  Opp. at 14.

11        Moreover, during prosecution, the applicant's sole disclosure of the claimed change

12   detection was IAs searching third-party repositories.  Opp. at 15.  AIT claims these were

13   "exemplary specification support for the 'change management layer' and 'automatically detecting'

14   limitations, not the 'changes that affect an application' limitation," Reply 11, but the relevant

15   claim language is "automatically detect changes that affect an application"—the two are linked.

16        Finally. AIT's own conduct in the IPRs puts to rest any dispute that the invention is

17   directed to detecting changed in third party repositories:  AIT argued to the Board that the claimed

18   changes "arise from changes external to the application program" or are "external changes that

19   impact how the application should operate."  Dkt. 154-4 at 3; Dkt. 154-5 at 27-28.  AIT now

20   protests that it later said in later—after the Board had instituted the IPR—that "changes are

21   external to the application but may be internal to an overall system that includes the application."

22   *Id.*  However, that is not the law: as a matter of public policy and public notice, AIT cannot avoid

23   the implications of its express statement by later contradicting itself, and must be held to its

24   representations to the Board that were made with the intent of avoid the prior art.  *See, e.g.*, *Am.*

25   *Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011); *Seachange Int'l,*

---

[10] AIT argues that "regardless of whether an intranet is connected to the web, changes on an intranet are not from a third party repository."  This is wrong: if the system accesses a third party's intranet via the Web, that intranet is a "third party repository."  Opp. at 14.

*Inc. v. C–COR Inc.*, 413 F.3d 1361, 1374 (Fed. Cir. 2005).  AIT's citation to *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366 (Fed. Cir. 2008) in fact supports Salesforce: the Court found the totality of circumstances **did** warrant a disclaimer, as here.  AIT's citation to *Power Integrations, Inc. v. ON Semiconductor Corp.*, 396 F. Supp. 3d (N.D. Cal. 2019) also misses the mark because it was primarily decided on the grounds that the defendant had failed to raise its argument during claim construction.  *Id.* at 863-64.

### 2.      The Claimed Changes Are to "Regulatory, Technological, or Social Requirements"

AIT asserts that "plain claim language does not limit the 'changes,'" and that "regulatory, technological, or social requirements" are not present in the claims verbatim.  AIT misses the point.  The changes must, according to the claim language, "affect" the business with sufficient materiality to require the change to be incorporated into the system, and thus cannot simply be any sort of changes, as AIT contends.  Opp. at 16-17.

The specification confirms that the claimed changes must be regulatory, technological, or social.  *Id.*  "The invention" is defined as monitoring "changes in, federal, state, and local laws, statutes, ordinances, and regulations . . . and changes in technology"—specific types of changes, not completely unbridled as AIT's construction would allow.  Col. 9:10-32.  This express statement of the invention limits the scope of the claims.  *AstraZeneca AB v. Hanmi USA, Inc.*, 554 F. App'x 912, 915-16 (Fed. Cir. 2013).  The rest of the specification agrees with this definition—not only must they materially affect the business, but are further limited to regulatory, technological, or social changes.  Opp. at 16-17; Cols. 8:66-9:2; 22:34-39; 1:27-7:52.

### C.      "dynamically generate"

### 1.      Dynamic Generation Occurs "Without Any Modification ... by a User"

AIT's assertion that Salesforce does not "explain how the [intrinsic evidence] support a disclaimer of any software that merely permits reprogramming" is incorrect.  Reply at 13.  One of the primary purported advantages of the invention is the elimination of "continual reprogramming" of software that was "not cost effective and, in effect, mortgages the database maintainer's future."  Opp. at 17-18; Col. 8:2-8.  The invention purports to solve the problem by

*eliminating* any modification of software by the user and instead "dynamically generating" the software. Col. 8:36-44; 12:46-50 ("This approach eliminates the need to write new code or to modify existing code …"); Bed. ¶ 135. Indeed, the applicant repeated this distinction throughout the prosecution history. Opp. at 18; Dkt. 68-7 at 2-3; Dkt. 68-3 at 2-3. Allowing user programming as part of "dynamically generating" the user interface would vitiate one of the primary stated benefits of the invention, and would repeat the same mistakes of the prior art that the specification repeatedly criticizes. Opp. at 18; *Chicago Bd. Options Exch., Inc. v. Int'l Secs. Exch.*, LLC, 677 F.3d 1361, 1372 (Fed. Cir. 2012); *Poly-America*, 839 F.3d at 1136.

AIT attempts to draw a distinction between modifications not being required and being prohibited, but ignores the focus of the invention and its benefits over the prior art. Reply at 13; Opp. at 17-18. AIT does not explain how it could be consistent with the aims of the invention to allow user modification of software and its consequent time, complexity, and expense. Finally, AIT's reliance on "using small code segments to define business logic" is misplaced: that passage is not referring to dynamically generating the user interface (*i.e.*, the claimed functionality at issue), but instead is describing "business logic." Reply at 13; Col. 12:50-52.

## 2.   Dynamic Generation Occurs "Immediately and Concurrently"

AIT claims that its analysis "begins with the language of the claims," Reply at 11, but in fact it fails to do so: the express claim term used is "dynamically," which has a well understood meaning to a POSITA that AIT disregards. Indeed, the meaning is confirmed by ***AIT's own evidence***. "Dynamically" means "immediately and concurrently," and thus "dynamically generated" would mean to a POSITA that the user interface is generated immediately and concurrently with some event. Dkt. 65-7; Dkt. 153-7 ¶ 48; Dkt. 68-14. AIT seeks to bury its previous briefing and evidence that it put before this Court, characterizing its own prior evidence and statements as "certain extrinsic evidence which is inconsistent with other extrinsic evidence." Reply at 12.[11] For example, AIT attempts to refocus on an article about "dynamic software

---

[11] AIT's citation to *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323 (Fed. Cir. 2008) is inapposite because (1) it did not involve a situation, as here, a patentee endorsed a particular raised a dictionary definition as the basis for its construction but later sought to reverse course; (2)

(Footnote continues on next page.)

updating" from Wikipedia and repeated without context by its expert.  Reply at 12.  AIT omits the immediately preceding sentence from its expert, which endorses Salesforce's construction.  Dkt. 65-2 ¶ 48.  Also, AIT's "dynamic code generation" definition does not state that the code is generated "when needed," and notably, AIT's expert never makes this claim.  *Id*.  Dynamic code generation must occur immediately and concurrently in order to accomplish its function.  Bed. 2 ¶ 10.  AIT also falsely claims that Salesforce "simply ignores . . . its own dictionary."  Reply at 12.  Salesforce addressed this: "the 'when and as needed' portion of the definition simply refers to the fact that the 'immediate and concurrent' operation can happen at any given time (or put another way, can be triggered at any given moment based on a particular condition)."  Opp. at 19.

AIT argues that "the claim language on its face expressly specifies when the 'dynamically generat[ing]' is performed, *i.e.*, 'when the client computer connects to the server computer.'" Reply at 12.  But that statement is at best incomplete.  The generation does not simply happen "when" the client computer connects with the server computer, but must happen "immediately and concurrently" with that connection.  AIT's construction leaves open the timing of the generation and would allow various operations to take place between connection and user interface based on the inherent ambiguity of the term "need," in a manner inconsistent with the purpose of the claimed invention.  Opp. at 19.  AIT's argument effectively reads out the term "dynamically" from the claim: if dynamically means "when needed," and the claim language completely specifics the "need," the term "dynamically" adds nothing to the claim.  Such a reading is plainly incorrect.  *See Merck & Co. v. Teva Pharms. USA, Inc*., 395 F.3d 1364, 1372 (Fed. Cir. 2005).

AIT's relies on a single sentence from the specification, 15:26-29, but that fails to describe what conditions could be "as needed," nor is it linked to the meaning of the term "dynamically," which does not occur in the specification.  Bed. ¶ 139.  A construction including "as needed" would not provide any ascertainable boundaries, rendering the asserted claims indefinite.  *Id.*

---

(Footnote continued from previous page.)

*Finisar* did not even involve the application of dictionary definitions to claim construction; and (3) there is no "more persuasive intrinsic evidence" here that would dictate a different result.

1

    **D.**    **"layer" / "portion of the server" or "portion"**

2        AIT claims that "a separation requirement [between different layers] is nowhere to be

3  found in the intrinsic or extrinsic record."  In so doing, AIT ignores the intrinsic record. First,

4  Claim 1 of the '482 Patent recites each layer as separate elements, where each claimed layer has

5  distinct, non-overlapping functions, and thus indicates that each layer is separate and distinct from

6  each other. Opp. at 20.  "Where a claim lists elements separately, the clear implication of the claim

7  language is that those elements are distinct component[s] of the patented invention." *Becton,*

8  *Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (quotation

9  omitted); *see also Hamilton Beach Brands, Inc. v. f'real Foods, LLC*, 908 F.3d 1328, 1340 (Fed.

10  Cir. 2018); *Elec. Co., Ltd. v. Polygroup Macau Ltd. (BVI),* 777 F. App'x 495, 498 (Fed. Cir. 2019).

11        Ignoring the claim language, AIT pivots to arguing that Salesforce's construction "cannot

12  be correct" because AIT's only means of avoiding indefiniteness for claim 3 is that some

13  undefined overlap is allowed between layers (and in particular, between the first layer (the

14  business content layer/business content database) and the second layer (the metadata layer)

15  because "the second layer comprises a business content database").   *See* Reply at 14; Opp. at 20,

16  26-27.  AIT then cites *Schoenhaus v. Gensesco, Inc.*, 440 F.3d 1354 (Fed. Cir. 2006) to assert that

17  any claim construction resulting in a nonsensical result is incorrect; however, this principle does

18  not apply when—as here—the intrinsic evidence dictates the claim interpretation, even if the

19  construction renders the claim indefinite.  *See, e.g.*, *Trustees of Columbia University v. Symantec*

20  *Corp*811 F.3d 1359, 1366-67 (Fed. Cir. 2016); *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753

21  F.3d 1291, 1301 (Fed. Cir. 2014). Salesforce's construction (i) reflects how the claim recites each

22  layer as separate and distinct elements (Opp. at 20); and (ii) as AIT ignores, is dictated by the

23  specification's express definition of "the invention," which is defined in terms of the particular

24  relationship of the layers in Figure 1.  *Id.* at 21-22.

25        AIT's other case citations miss the mark.  AIT argues that unless the patentee explicitly

26  ruled out overlap between layers, such a construction would deviate from the plain and ordinary

27  meaning of "layer."  Reply at 14 (citing *Eyetalk365, LLC v. Zmodo Tech. Corp. Ltd.*, No. 2:17-

28  CV-02714-RCJ-PAL, 2018 WL 2292529, at *2 (D. Nev. May 17, 2018)).  But this erroneously

assumes that the plain and ordinary meaning of "layer" permits an overlap between each layer, whereas a POSITA would have understood "layer" requires a group of data and/or functions that is separate and distinct from other such groups.  Opp. at 20.  As such, *Eyetalk365* is inapposite.  AIT also cites two cases where courts rejected constructions requiring elements to be separate and distinct.  Reply at 14.  In each case, unlike here, the specification expressly taught that the claimed elements could be part of the same structure or share common components.  *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231-32 (Fed. Cir. 2011) (specification disclosed that the "cutting box" may also function as a "dust collection structure");  *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1055 (Fed. Cir. 2009) (specification disclosed that "the 'second circuit' and 'third circuit' can share common components").  By contrast, in this case, in addition to the claim language reciting the layers separately, during prosecution the patentee argued that each layer must be separate and distinct from each other.  Opp. at 21.

Turning back to the specification, AIT next argues that "[i]t would be illogical to conclude that the spaces between the boxes [in Figure 1 depicting each layer] were intended to reflect a requirement for separateness when Figure 1 does not describe physical components."  Reply at 15.  This is a red herring: Salesforce's construction nowhere requires or implies **physical** separation, but simply mean **logical** separation.  Opp. at 21-22.  AIT also argues that Figure 1 cannot be relied upon since "patent drawings do not define the precise proportions of the elements . . . if the specification is completely silent on the issue."  *Id.* (*citing Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000)).  But *Hockerson* is inapposite because Salesforce's construction is not based on the "precise proportions of the elements" in Figure 1 as was the case there, but rather on how those layers are depicted as separate and distinct elements consistent with their operation as expressly defined in the specification (*i.e.*, in terms of how Figure 1 represents the different layers).  Opp. at 20-22; Col. 8:50-54, 9:26-48.

AIT incorrectly argues that the patentee's statement during prosecution that a single layer "can be one of t[wo] layers, but not both of them together" only means that "the layers cannot be **one and the same**."  Reply at 15.  But AIT ignores the implications of the prosecution argument. By arguing that the "functionality layer" in Eager can *only* be *either* the "third layer" *or* "change

management layer" but not both, the patentee was arguing that only another layer—separate and distinct from the functionality layer—could disclose the other layer.  Thus, the prosecution history shows that each layer must be separate and distinct from each other. Opp. at 21.

Finally, AIT argues that its construction should not render the claims indefinite, but in so doing, never addresses that its construction fails to give any guidance to a POSITA as to how much overlap is allowed.  Opp. at 22.  Contrary to AIT's contention, Salesforce does not argue that the claims are indefinite simply because "AIT's construction [of layer/portion] permits 'two separately claimed layers/portions . . . to share . . . *all* of the same components.'"  Reply at 15 (emphasis in original).  It is also because AIT's construction of layer/portion would allow an ***unspecified degree of overlap*** between each layer or portion.  Opp. at 22; Bed. ¶ 150.

In response to this argument, AIT cites case law that "breadth is not indefiniteness" as allegedly demonstrating an unspecified degree of overlap is permitted.  Reply at 15 (citing *BASF Corp. v. Johnson Matthey, Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017)).   *BASF* does not stand for that proposition.  *Id*. (faulting the lower court because the "crucial sentence in the district court's analysis" regarding whether a POSITA could determine whether a material falls within one of two separate limitations was "entirely unsupported," and finding specification did give guidance to allow a POSITA to make this determination.  By contrast, here the claims recite each layer as separate elements, where each claimed layer has distinct, non-overlapping functions.  Similarly, the specification describes the distinct data within, and functions performed by, each layer.  *See, e.g.*, Col. 9:32-63; 12:16-41; 14:21-16:33.  And unlike the asserted patent in *BASF*, the '482 Patent does not provide any guidance as to the scope of "layer"—*i.e.*, how much overlap is allowed between layers.  Opp. at 22; Bed. ¶ 150.   As such, a person of ordinary skill the art would not be familiar with how much the layers could overlap in data and functions, and thus could not reasonably determine its scope. Bed. ¶¶ 150-53.

### E.     "unique" / "common"

AIT's arguments that "unique" and "common" are not indefinite are based on the erroneous premise that these terms refer to the term "information" within the claims.  But the claim recites "unique aspects of a particular application" and "functions common to a variety of

applications," which shows that "unique" and "common" refer to the "aspects" and "functions" of applications, respectively.  Col. 32:16-20.  As such, AIT's arguments that "information . . . is common when it is 'common to a variety of applications'" and "[t]he manner in which 'common' and 'unique' information is generated has no bearing on whether information is 'common to a variety of applications'" are irrelevant.[12]  The specification provides no criteria for determining whether an aspect or function of an application is "common" or "unique."  Opp. at 23-24.  As a result, the terms "unique" and "common" are indefinite.

### F. "business content database"

AIT attempts to divorce the term "business content database" from its use in the specification, attempting to define each term individually. *Cf. ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms."). The term, however, is not simply used to refer to any generic database that includes business content. Bederson ¶¶ 38, 168, 173.  Rather, the specification—which uses the term only once—characterizes the business content layer, which is the claimed first layer, specifically as a "business content database" (Col. 12:28-29) and further describes this layer as including "business knowledge, logical designs, physical designs, physical structures, relationships, and data associated with a selected area of business activity." *Id.* at 12:17-20.

Critically, ***nowhere*** does the specification refer to any other layer as this "business content database" or as including a "business content database."  Indeed, to do so—as in Claim 3's conflation of the metadata layer and business content database—would defeat the purpose of the claimed invention.  Bederson ¶¶ 30-32, 34-38.  The purported invention of the '482 Patent relies on the principle of design abstraction:  separating the working details of individual system components from the underlying business data populating that system, which principle is embodied in the use of separate layers for business content, metadata, and change management as

---

[12]   For the same reason, AIT's argument regarding how the "voice command" function example provided by Salesforce does not make sense because "[t]he 'ability' of software to do something is not 'information'" is also inapposite.

disclosed in the specification and defined as the "invention." *See, e.g.*, Col. 8:50-54, 9:26-63, 12:16-41, 14:21-16:33. This separation facilitates the reuse of the components, increases interoperability between systems, and decreases the likelihood that changes to one part of a system will affect other parts. Bederson ¶¶ 30-32, 34-38.

The use of a separate metadata layer to generate the user interface allows for "data mapping" to the business content layer "with no hard-wired coding as is typical in a conventional program." Col. 15:17-22. Indeed, what the specification emphasizes as "[t]he most important aspect of the server-based, programming-free model . . . the system's ability to create, change and (re)configure the application system," relies on the separation of the metadata and business content layers. Bederson ¶¶ 30-38. Claim 3's conflation of these two layers is antithetical to these necessary aspects of AIT's purported invention, rendering the claim indefinite. *Id.*

Turning to AIT's specific arguments, AIT does not dispute that (i) the "first layer" in claim 1 is the "business content layer," (ii) the specification describes the "business content layer" as a "business content database," or (iii) the specification does not refer to a "business content database" as being part of any other layer. *See* Reply at 16-17. Accordingly, there is no dispute that the "first layer" at least includes the "business content database." AIT's argument that "claim 1 is an open-ended claim that permits both the 'first layer' and 'second layer' to comprise a 'business content database'" relies on interpreting "layer" to permit overlaps between each layer. But as explained in Section II.D. above, the proper definition of "layer" requires each layer to be separate and distinct. Indeed, allowing these two layers to overlap as to the business content database in particular is inconsistent with the disclosures and definitional statements of the specification (*see* col. 8:50-54, 9:32-48, 12:16-28), and would also defeat the purpose of the invention. Bederson ¶¶ 30-38. Accordingly, AITs attempts to distinguish *Multilayer* and *Columbia* fail.

### G.   "logical design" / "physical design" / "physical structure"

AIT criticizes Salesforce's constructions as based on an Oracle manual, and asserts that the "business content database" was not implemented using an Oracle database. Reply at 17-18. Not so. First, Salesforce's constructions are not solely based on an Oracle manual. The constructions

rest on the claims and intrinsic evidence.  Opp. at 27-28.  Further, Oracle database systems are referenced three times in the specification, but AIT only cited the one stating that "[t]he metadata architecture is created using Oracle or a similar database system."  AIT ignored the specification's disclosure that "[t]he invention . . . has been reduced to practice using a Java programming language and using a relational database system such as Oracle to create links between the different components of the software package."  Col. 16:61-65.  Here, the "invention" includes the "business content database," and it naturally follows that this database was implemented using Oracle.  Bederson ¶ 181.  The Oracle manual is thus indisputably relevant.  Opp. at 28.  And as such, AIT's argument that the Oracle manual is "purely extrinsic evidence" which merits little consideration is misplaced given its direct link to a disclosed implementation of the invention.

### H.     "builder module"

AIT fails to acknowledge that since the prior claim construction briefing, numerous courts have confirmed that "module" is a nonce word that can be a substitute for "means" and is often found to be subject to 35 U.S.C. § 112, ¶ 6.  Opp. at 29.  Salesforce's new proposed construction of "builder module" reflects this evolution of patent law because the intrinsic evidence shows that it should be construed in accordance with 35 U.S.C. § 112, ¶ 6; and is indefinite.  Opp. at 29-30.  AIT cites several cases where 35 U.S.C. § 112, ¶ 6 did not apply.  Reply at 18.  But the claims in those cases—unlike here—were directed to a specific class of structures, recited other terms imparting sufficient structure, recited a modifier to the term "module" that had established meaning to a POSITA, and/or recited a "module" term with an added modifier (*e.g.*, "memory module") that conveyed sufficiently definite structure to a POSITA.  *See* Reply at 18.  However, in this case, the term "builder module" does not connote structure, and is in fact defined by a function: something that builds.  Opp. at 29-30; Bed. ¶¶ 185-87.

AIT also incorrectly argues that the term "module" has a specific meaning in the patent and is therefore not a nonce word.  Reply at 19.  AIT asserts that "module" means "data entry forms, reports, and documents," but AIT's proposed construction of "builder module"—which requires a "module" to be a "software tool"—is inconsistent with what AIT reads the specification to require (further demonstrating it does not connote any definite structure to a POSITA).  Dkt.

153 at 29-30 ("the builder module must be software that is used as a tool, *i.e.*, 'a software tool,' to construct, *i.e.*, 'build,' the user interface . . . using the second layer.'").  Thus, AIT's own construction recognizes that in the patent's context, "module" refers to generic software for performing various recited functions (*e.g.*, "build").  AIT now claims that "'module' is not used as a generic reference to any means for performing a function" but is a "software tool that allows for the entry and receipt of information."  Reply at 19.  But this definition of "module" conveys no structural meaning to a POSITA and is no different from generic software for performing various functions because software receives information in order to perform its functions.  Bed. 2 ¶¶ 16-18.  Accordingly, the term "module" is still a nonce word in this patent.  *Id.*

AIT also argues that Salesforce and both parties' experts recognize that "module" has structural meaning.  Reply at 19.  But AIT fails to identify any type of structure suggested by Salesforce or its expert.  Bed. 2 ¶¶ 12-13. Similarly, Salesforce's prior interpretation of "builder module" as a "self-contained unit of software capable of generating part of an application" also does not suggest any type of structure.  Instead, that construction merely recites a function performed by the "builder module."  The opinion of AIT's expert that "modules are particular constructs that receive information," this interpretation of "module" does not suggest any structure, especially since software receives information for performing functions.  *Id.* ¶¶ 16-18.  AIT argues that, even if "builder module" falls under 35 U.S.C. § 112, ¶ 6, it is not indefinite because the specification discloses a "three-step algorithm" for performing the claimed function—*i.e.*, "permitting a user to build a user interface for a particular application using the second layer."  Reply at 20-21.  AIT contends that "the patent need only disclose sufficient structure for a person of skill in the field to provide an operative software program for the specified function."  *Id.* at 20 (quoting *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011)).  But, for an algorithm to be sufficient, "there must be some explanation of how ***the computer*** performs the claimed function."  *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009) Here, the three-step algorithm fails to explain how the builder module performs building a user interface for a particular application using the second layer; instead, each step describes actions taken by a ***user*** of the builder module.  Bed. 2 ¶¶ 19-20.

1

2  DATED:  May 19, 2021                Repectfully submitted,

3                                      QUINN EMANUEL URQUHART &
                                       SULLIVAN, LLP
4

5                                      By  /s/ Ray R. Zado
                                          Ray R. Zado
6                                         Attorney for Defendant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-21-

**CERTIFICATE OF SERVICE**

I hereby certify, under penalty of perjury, that I am an employee of Quinn Emanuel Urquhart & Sullivan, LLP and that pursuant to LR 5-3 I caused to be electronically filed on this date a true and correct copy of the foregoing document with the Clerk of the Court using the CM/ECF system which will automatically e-serve the same on all attorneys of record.

DATED: May 19, 2021

/s/ Ian Wang
Ian Wang

Case No. 3:13-CV-00628-RCJ-VPC
DEFENDANT SALESFORCE.COM, INC.'S SUR-REPLY CLAIM CONSTRUCTION BRIEF