```
 1

 2                    IN THE UNITED STATES DISTRICT COURT

 3                        FOR THE DISTRICT OF NEVADA

 4

 5   APPLICATIONS IN INTERNET       )
     TIME, LLC,                     )
 6                                  )   Civil Case No.
                  Plaintiff,        )   3:13-cv-00628-RCJ-CLB
 7                                  )
     vs.                            )
 8                                  )   Tuesday, March 14, 2023
     SALESFORCE, INC.,              )
 9                                  )
                  Defendant.        )
10   _____

11

12                   TRANSCRIPT OF MOTION HEARING
                 HONORABLE ROBERT C. JONES PRESIDING
13                  UNITED STATES DISTRICT COURT

14

15

16

17

18

19

20

21

22

23   Official Court Reporter:      Donna Prather
                                   410 S. Virginia Street
24                                 Reno, NV  89501

25   Proceedings taken by Certified Stenographic Reporter and
     transcribed using Computer-Assisted Translation
```

```
 1                        A P P E A R A N C E S

 2   For the Plaintiff:          Andrea Pacelli
                                 King & Wood Mallesons LLP
 3                               500 5th Avenue, 50th Floor
                                 New York, NY 10110
 4
                                 Charles Wizenfeld
 5                               715 Queen Anne Road
                                 Teaneck, NJ 07666
 6
                                 Michael A Burke
 7                               Robison, Sharp, Sullivan & Brust
                                 71 Washington St.
 8                               Reno, NV 89503

 9                               Michael DeVincenzo
                                 King & Wood Mallesons LLP
10                               500 5th Avenue, 50th Floor
                                 New York, NY 10110
11
                                 Dominick Vitaliano, Assistant
12
     For the Defendant:          Ray R Zado
13                               Quinn Emanuel Urquhart & Sullivan
                                 LLP
14                               555 Twin Dolphin Drive
                                 Ste 5th Floor
15                               Redwood Shores, CA 94065

16                               Ognjen Zivojnovic
                                 Quinn Emanuel Urquhart &
17                               Sullivan, LLP
                                 50 California Street
18                               22nd Floor
                                 San Francisco, CA 94111
19
                                 Philip Mannelly
20                               McDonald Carano LLP
                                 100 W Liberty St, 10th Floor
21                               Reno, NV 89501

22                               Sam S. Stake
                                 Quinn Emanuel Urquhart &
23                               Sullivan, LLP
                                 50 California Street, 22nd Flr.
24                               San Francisco, CA 94111

25
```

```
 1          (Proceedings commenced at 9:57 a.m.)

 2          THE COURT:  We're here in Applications in Internet

 3   Time, LLC, versus Salesforce, Inc.  Appreciate your

 4   appearances today for this summary judgment argument.  We've

 5   got motion regarding discovery dispute, motion for summary

 6   judgment, and motion for summary judgment.

 7          Let's start with your appearances, please.

 8   Plaintiff.

 9          MR. BURKE:  Good morning, Your Honor, Michael Burke

10   on behalf of plaintiff.

11          THE COURT:  Thank you.

12          MR. DeVINCENZO:  Michael DeVicenzo on behalf of

13   plaintiff.

14          THE COURT:  Thank you.

15          MR. PACELLI:  Good morning, Your Honor.  Andrea

16   Pacelli on behalf of plaintiff.

17          THE COURT:  Thank you.

18          THE WITNESS:  Charles Wizenfeld on behalf of

19   plaintiff.

20          MR. DeVINCENZO:  And we have with us our parallel,

21   Dominick Vitaliano.

22          THE COURT:  Thank you, sir.

23          Defendants, please.

24          MR. MANNELLY:  Good morning.  Philip Mannelly from

25   McDonald Carano on behalf of Salesforce.  And I have with me
```

1    Ray Zado, and he'll do the rest of the introductions for us.

2    MR. ZADO:  Good morning, Your Honor.  We have also

3    with me Ognjen Zivojnovic, also from Quinn Emanuel, and Sam

4    Stake also from Quinn Emanuel.

5    THE COURT:  Thank you.

6    All right.  I think I'd like to proceed on the

7    motions for summary judgment.  You know, I have a predilection

8    on discovery, and I want you to argue that too.  But, my

9    normal inclination at this point in time is to deny motions to

10   limit or exclude experts on both sides.  That's my inclination

11   here too.  I want to you argue it to convey otherwise.

12   I am inclined to agree with defendant's argument

13   that, you know, any new theories are excluded under our time

14   rules.  The question, I guess, is whether this is a new

15   theory, that is, that the overall -- what do we call it? --

16   the deploy module overall includes an intelligent agent.  But,

17   you know, I haven't quite made up my mind on that yet, and I

18   just think it's a little too early.

19   So, in other words, what I'm telling you is if we do

20   go to trial, then that would be appropriate for a separate

21   little motion in limine before we start as to limitation on

22   what the expert on either side can testify about and/or

23   objection at trial.

24   So that's my inclination.  But the motion for

25   summary judgment I take seriously.  And there are some very

1    good substantial issues, including infringement with or

2    without the experts' testimony to be excluded or not to be

3    excluded as well as on obviousness and anticipation.

4            I've read all the briefs, several times, and I've

5    read a lot of the exhibits attached thereto, including the

6    PTAB's analysis.  And, of course, those PTAB orders are

7    stricken.  They're nothing more than a brief at this point in

8    time.  But they are serious issues, and so I'll treat them as

9    such.  You can assume that I'm up to -- I think up to speed

10   with you on this patent.

11           You, of course, have well-prepared, I'm sure,

12   Powerpoints to show me, and I'll appreciate that, it will

13   emphasize your most important points.

14           So, I think what we'll do is we'll start with

15   defendant's motion for summary judgment, response and similar,

16   and response and replies.

17           I'm going to give you roughly an hour.  I'm not

18   going to cut you off, but, you know, we all get hungry and

19   have to stop, and you might put me to sleep.  So roughly an

20   hour each, please.  Use that as a template.  But I'm not going

21   to cut you off solid.  So let's proceed.  Plaintiff's motion

22   for summary judgment.

23           I'm sorry, defendant's motion for summary judgment.

24   I get confused with the parties, not with the patents '482 and

25   '111.

```
 1              MR. ZADO:  Good morning, Your Honor.

 2              THE COURT:  Good morning.

 3              MR. ZADO:  Ray Zado on behalf of Defendant

 4    Salesforce.  And just to clarify, the one hour would be for

 5    the entire motion for summary judgment which includes not just

 6    the intelligent agent aspect, but the -- there's an invalidity

 7    aspect to it as well as certain subsidiary non-infringement

 8    arguments.

 9              THE COURT:  Yes, please.  And you just need to touch

10    briefly on those dependent claims.  You know, you've touched

11    briefly on them in the briefs, and you don't need to -- the

12    real critical issues are '482, and, of course, '111, so.

13              MR. ZADO:  Understood.  Just for Your Honor's

14    edification, initially lead counsel Kevin Johnson had intended

15    to be here to argue this motion.  Unfortunately, I believe

16    he's actually undergoing his medical procedure right now, so

17    Mr. Zivojnovic and I will be splitting that motion and doing

18    that.

19              THE COURT:  Very good.  Best of wishes to him.

20              MR. ZADO:  So Your Honor, the first aspect of

21    Salesforce's motion for summary judgment is one of not

22    infringement because the accused products lack the claimed

23    intelligent agent.

24              THE COURT:  Now, let me add for the record, too, so

25    the appellate court understands.  Intelligent agent is a word
```

1    that I added to the construction.  I did that, so that the

2    appellate court knows where my mind was at, because of the

3    limitation provided in the prosecution history.

4         Remember, there was original rejection of these

5    patents, and there was limiting language added.  And it

6    occurred to me that the real -- because of that limiting

7    language and because of the prior art, the real invention here

8    was an automatic seeker of the Internet on relevant items.  Of

9    course, you would input, or the user would input, the criteria

10   for searching the Internet, just Medicare regs, or just this

11   or that.  But that intelligent agent would determine which of

12   those changes out there on the Internet they wanted to pull

13   in.  So that's why we added the words.  I'm just reminding you

14   and reminding myself and the appellate court, that's why we

15   have that explicit language, intelligent agent.

16        MR. ZADO:  Thank you, Your Honor.  And we certainly

17   concur with everything you just said.  In fact, in the first

18   slides here, you can see we're quoting from Docket 172, which

19   is your claim construction order where you specifically

20   identify the express disavowal that resulted in this

21   particular claim limitation.

22        So, Your Honor, if this is a little too redundant or

23   material you're already comfortable with, please ask me to

24   proceed through this.  I just --

25        THE COURT:  I'll signal, yeah.

1          MR. ZADO:  So we're going to just offer a quick

2    refresher --

3          THE COURT:  Okay.

4          MR. ZADO:  -- on use of intelligent agents.  And

5    this is from our technology tutorial, as you may recall.

6          THE COURT:  Yeah.

7          MR. ZADO:  And, specifically, the specification

8    provides a description and/or definition of intelligent agent,

9    where, "An 'intelligent agent' is a specialized program that

10   makes decisions and performs tasks based on predefined rules

11   and objectives."

12          And you'll hear later in the presentation that both

13   parties have agreed with that and have adopted -- and the

14   experts have adopted that for purposes of their analysis.

15          And in particular, an intelligent agent can be used

16   to identify changes in, for example, laws, statutes,

17   ordinances, regulations, and related issues, changes in

18   technical requirements, and to provide feedback and to perform

19   change configuration tasks.  So the intelligent agents, as

20   referenced herein, specifically provide for a plethora of

21   changes that can be identified by the intelligent agent and

22   brought back to the system.

23          THE COURT:  And this is a very important issue here

24   for both sides.  Because, because what happens here in the

25   accused product is it just sees whether the employee name is

1   the same or changes it and then otherwise deploys.  And, of

2   course, the expert seemingly has said I agree that's not an

3   intelligent agent, but overall the deploy function functions

4   as an intelligent agent, so, of course -- when we're talking

5   about prior art, so -- and when he's mapping to the accused

6   product.  So that's an important issue that you'll address, of

7   course.

8           MR. ZADO:  Certainly, Your Honor.  But in the -- in

9   the preface of that, you were correct that there is an issue

10  with respect to Mr. Zatkovich identifying for the first time

11  in deposition that the deploy function constitutes an

12  intelligent agent.  And we'll address why that's not

13  appropriate either from a timeliness perspective or from a

14  merits perspective.

15          So here we're just providing an example of the use

16  of intelligent agents to detect changes.  Again, this is an

17  example.  You can see, for example, on the web there's a

18  server that's run by the government, for example, that's

19  promulgating certain safety regulations that are public

20  facing.  And then there's certain -- within the enterprise,

21  there are certain, for example, applications or functionality

22  that also relate to those safety regulations.

23          And so what happens in this circumstance is that the

24  government here is promulgating an update to that particular

25  safety regulation.

1          Now, the intelligent agents on the system go, as the

2     specification -- in the context of the specifications

3     explanation, cruise the web to identify these particular

4     changes.  In this instance, the intelligent agent is detecting

5     a change to this safety regulation that's been promulgated.

6     The intelligent agent then captures that change in the

7     regulation and then brings it back to the system.

8          So the parties agree in the -- at the level of the

9     applicability of the Court's construction.  In other words,

10    the claims require a change management layer that detects

11    changes without human intervention through the use of one or

12    more intelligent agents.  That's the Court's claim

13    instruction.

14         However, as we'll discuss in more detail, there are

15    certain flaws in AIT's expert report, and I'll highlight three

16    now and we'll discuss them in more detail.  The first is that

17    the expert report doesn't actually identify any intelligent

18    agents.  There are only two passages that refer to intelligent

19    agent, but doesn't say what the intelligent agent is.  And in

20    particular and what's critical is the expert report lacks any

21    analysis comparing for a particular software component to

22    those requirements for an intelligent agent.

23         THE COURT:  Now we're talking about the mapping

24    issue infringement.

25         MR. ZADO:  That's correct, Your Honor.  And as we

1    discussed earlier, you know, the intelligent agent is the

2    specialized program that makes decisions and performs tasks

3    based on predefined rules and objectives.  That analysis, that

4    what I'll call connective tissue between what an intelligent

5    agent is and what the accused products how they work is

6    missing, entirely absent from the expert report.

7            And then finally, to the extent that there's a newly

8    promulgated theory in deposition as to deploy function, that's

9    inconsistent with the claim language.

10           So first, this is just rehashing what we discussed,

11   how the intelligent agent is defined in the specification.

12   And what we can see here is that Mr. Zatkovich, Mr. Zatkovich

13   being the plaintiff's infringement expert, expressly agrees

14   with, and he says he applies that in his infringement

15   analysis.  So he has adopted this what I'll call definition

16   for intelligent agent for purposes of his analysis.

17           Now, I'd like to turn to the substance of what's

18   disclosed in Mr. Zatkovich's report.  This is an appendix to

19   his report, which we'll call a flow diagram, where he explains

20   the operation of certain source code that comprises what he

21   refers to as the deploy function.  Now, you'll see that within

22   this -- and I'll talk about it in more detail shortly.  But

23   within this slide, there is a -- there's a block that's

24   labeled in red, so this is the only part that's emphasized

25   anywhere, and that's referring to a function called

1   FilterOutUnchangedFiles.  And as we'll discuss shortly,

2   filterOutUnchangedFiles is the actual function that performs

3   change detection.

4          Now, for purposes of the motion for summary

5   judgment, the parties largely agree on the operation of

6   relevant code with respect to the overall flow of the deploy,

7   the deploy function.  Now, the Metadata API overall -- the

8   deploy function is part of the overall what's referred to as

9   the Metadata API.  The Metadata API is comprised of two

10  components:  Retrieve and deploy.  Mr. Zatkovich does not

11  provide any analysis of the retrieve, so we're simply focused

12  on the deploy function.

13         So a key aspect here -- and this is, again,

14  emphasizing from Mr. Zatkovich's testimony -- he confirms that

15  the particular file that he calls out in red,

16  "filterOutUnchangedFiles" -- or a particular function, I

17  should say, filterOutUnchangedFiles is the function where

18  change detection actually happens.  And that's his opinion.

19         But then he further admits that

20  filterOutUnchangedFiles is not an intelligent agent,

21  unambiguously admits in deposition.

22         So with that setup, this provides the background for

23  why Salesforce is entitled to summary judgment of

24  non-infringement with respect to intelligent agent limitation.

25  And there's three aspects to this.

1          The first aspect is that in the context of the

2    report, in the description of the deploy function or in

3    anywhere a description of the operation of the Salesforce

4    products, there's no opinion that the deploy function or any

5    particular subcomponents of the deploy function are an

6    intelligent agent.

7          The second basis is that the expert, potentially

8    realizing this was a problematic issue, attempted to correct

9    this deficiency in deposition by identifying for the first

10   time that the deploy function as a whole could constitute both

11   the change management layer and the intelligent agent.

12          However, even taking -- putting aside whether that

13   testimony should even be considered since it was not in the

14   report, even taking that at face value, the expert's testimony

15   does not provide that connective tissue, that analysis

16   explaining why the deploy function constitutes an intelligent

17   agent.

18          And then finally, with respect to this deploy

19   function as a whole constituting the intelligent agent, that's

20   simply not consistent with the Court's claim construction as

21   it was phrased.  The claim construction as stated that it

22   requires a change in management layer that uses one or more

23   intelligent agents to detect changes.  And just from plain

24   grammar and plain language English, it doesn't make sense to

25   say that the change -- that the deploy function uses itself to

```
1    detect changes.  What it's really using is the file,
2    filterOutUnchangedFiles.
3           So now I'd like to turn on the body of
4    Mr. Zatkovich's report.  And admittedly, Mr. Zatkovich's
5    report is several hundred pages.  There's a lot of content in
6    there.  But in terms of the infringement analysis itself,
7    there are only two paragraphs that refer to intelligent agent
8    or autonomous agent.  They're here, paragraphs 813 and 818.
9    And neither of these identify any particular software
10   mechanism that allegedly qualifies as an intelligent agent.
11          Now, there is some also -- there's a number of
12   passages that relate to more generally the change management
13   layer.  And those are identified in paragraphs 539 to 542, and
14   811 to 835 in Docket 297, but identified in Docket 297, which
15   is -- those paragraphs from the Zatkovich --
16          THE COURT:  Now, just a clarification.  I understand
17   the issue on intelligent agent.  And intelligent agent I have
18   incorporated into the construction.  But it would be error,
19   would it not, for me to also incorporate autonomous into the
20   construction?  In other words, I'm pulling back from the
21   specifications into the claim an additional limitation
22   autonomous.
23          MR. ZADO:  I don't believe that would be error,
24   Your Honor, if you found and expressed disavowal of claim
25   scope --
```

1          THE COURT:  But I haven't constructed it that way so

2     far.  So if I were to add that, I would be pulling from the

3     specification additional limitation.

4          MR. ZADO:  Again, Your Honor, I think Your Honor

5     could comfortably state that that's within the disavowal of

6     claim scope.

7          THE COURT:  Okay.

8          MR. ZADO:  And so I don't believe it would be error

9     to do that.

10          THE COURT:  All right.  So you won't concede that,

11     but you'll argue it.

12          MR. ZADO:  17, please.

13          And, again, where I'd left off is referring to these

14     two particular paragraphs where the only passages that

15     actually mention autonomous agent or intelligent agent.  And

16     as I was explaining, there's no tying to any of that

17     particular functionality or code.  And critically what you

18     don't see in these paragraphs is any analysis of what makes

19     something an intelligent agent.  So we're not seeing anything

20     about specialized program, mixed decisions performs on tasks,

21     and performs tasks based on predefined rules and objectives.

22     So there's no substantive underpinning of any opinion that

23     something is an intelligent agent.

24          And, again, now turning to the source code flows

25     that are attached to the appendix in Mr. Zatkovich's report,

1    those source code flows also don't ever mention anything being

2    an agent or intelligent agent.  And, again, the only thing

3    that's highlighted, called out, is this

4    filterOutUnchangedFiles, which is in big red, you know,

5    clearly differentiated from the rest of the code which both

6    appears agree, that's where the change detection occurs.  But,

7    again, it's conceded that that's not an intelligent agent.

8        Now, AIT also cites to certain paragraphs in its

9    briefing, it cites to certain paragraphs in Mr. Zatkovich's

10    rebuttal report to Salesforce's non-infringement defense on

11    intelligent agent that are set forth in interrogatory

12    responses.  So to restate that, Salesforce submitted

13    interrogatory responses that had some discussion of the

14    intelligent agent limitation, but those paragraphs in

15    Mr. Zatkovich's report don't relate to any of the issues that

16    the Court has to decide for this motion.

17        So, specifically, Mr. Zatkovich disagrees with

18    certain characterizations of certain alleged requirements for

19    an intelligent agent, but those characterizations aren't at

20    issue here.  We're still just focused on the idea of the

21    specialized program makes decisions, performs tasks based on

22    predefined rules and objectives.  So none of that analysis in

23    paragraphs 1208-1214 relates to that, to deficiencies in those

24    particular requirements.

25        Another issue that's going to come up is there's

1    going to be -- and I'll discuss this in more detail during the

2    presentation as well -- that Mr. Zatkovich has a doctrine of

3    equivalents theory.  Again, the doctrine of equivalents theory

4    that Mr. Zatkovich articulates is not one the Court -- that

5    impacts the issues the Court has to rule on in this motion.

6    It relates to very specific non-infringement argument that's

7    ancillary to the issue of what is an intelligent agent.  And

8    specifically, you can't use that doctrine equivalent theory to

9    cure the complete lack of analysis with respect to comparing

10   any specific operation of the accused products to the

11   intelligent agent requirement.

12            Now, I think this touches on one of the issues that

13   you might have highlighted at the start of the discussion,

14   Your Honor, with respect to expert opinions and when expert

15   opinions are needed or not.  And there's some back and forth

16   in the case law, I'm sure you've seen from the briefing, we're

17   highlighting from the *Centricut* case, but the general

18   principles are if the invention is a complex one, that one

19   will require expert testimony.  And particularly, it will

20   require expert testimony to bridge that gap between what's the

21   operation of the product and what's the claim limitation.

22            If you have a simpler case, we'll show you an

23   example shortly, then at that point you don't necessarily need

24   that level of expert disclosure.

25            And in particular, in *Centricut*, it highlights that

1   if you're a patent law plaintiff who presents complex suggest

2   matter without inputs from experts, you have to present that

3   on all welded points at issue, and that includes connecting

4   the operation to the claim language.

5           Now, AIT argues that *Centricut* is inapplicable

6   because there the patentee attempted to prove infringement

7   without submitting any expert testimony at all.  Now, we'd

8   agree that on its face, that's true.

9           Now the critical issue there was -- and the critical

10  comparison to here is there was a description of the operation

11  of the accused products, just like there's a description of

12  the operation of the accused products in Mr. Zatkovich's

13  report.  We accept that.  That's given.  But what's missing

14  there and what's missing here is there is no description of

15  how the operation of the accused products relates to the claim

16  language, which is what an expert has to give.

17          And this is just, you know, it just ties to the

18  basic principle that the patentee has to prove that each and

19  every claim limitation is met, and that's one of the aspects

20  of that.

21          Now the case that AIT cites in opposition to that is

22  the *Moleculon* case that you say you don't need expert

23  testimony to prove infringement.  But, as I read earlier, it's

24  readily distinguishable and it's consistent with the overall

25  case law that when you have a simpler case, which this is not,

1    you don't need to have an expert fill in all those gaps.  So

2    the *Moleculon* case was about a Rubik's cube.  It's something

3    any lay person can pick up, manipulate, and you understand

4    what it is.  So *Centricut* was the patent directed to an

5    electrode plasma arc torches and a method for fabricating the

6    electrode.  Again, much more technical.

7         Here again we're talking about complex software

8    technology about using concepts like intelligence agents.

9    These are not things that are readily understandable to a lay

10   person.  This is where the expert testimony needs to come in.

11        And now I'd like to talk briefly about the change in

12   the infringement theory.  As I walk through the body of the

13   report itself, there's nothing that's identified as the

14   intelligent agent.  There's no analysis of what -- there's no

15   analysis of the factors that make something an intelligent

16   agent.  So there are two flaws in the report itself.

17        So, in the deposition, similar testimony was brought

18   in, and the attempt was to address at least one of those

19   flaws, identifying what is the intelligent agent.  And here,

20   you can see that the testimony reflects -- the newly stated

21   position for the first time in deposition is that the deploy

22   function as a whole is the intelligent agent.

23        Now, I understand, Your Honor, that the *Daubert*

24   motions are not at issue in this hearing, and I understand

25   also you had certain predilection as to how you rule on those,

1    so I'm not going to --

2        THE COURT:  They are at issue, but my inclination is

3    to deny those on both sides at this stage.

4        MR. ZADO:  Understood.  I just want to clarify

5    Your Honor, because when we confirmed the scope of this

6    hearing, we were informed that the *Dauberts* were not being

7    heard.

8        THE COURT:  That's fine.  I'll make the decision

9    myself on *Dauberts*.  And I'll ask you, respectfully, to raise

10   them in separate in limine motion or at the time of trial,

11   even before trial, objecting or requesting a limitation on the

12   experts' testimony.

13       MR. ZADO:  Understood.  Then with that instruction,

14   Your Honor, I think you can tell that we certainly intend to

15   seek preclusion through a motion in limine or otherwise as to

16   this newly raised testimony.

17       And just the one thing that we would highlight,

18   Your Honor, is that this is not the first time that

19   Mr. Zatkovich's opinions have been challenged in this way.  In

20   particular, in the LivePerson matter it was very substantially

21   similar to the case we have here where there was an attempt in

22   deposition to bridge gaps for content that was not included in

23   the expert report.  And in that case the testimony was

24   stricken.

25       Now, one of the arguments AIT makes is that, well,

1    Salesforce, you must have had some understanding when we were

2    using intelligent agent because you responded to it.  And

3    that's actually not true.  And Mr. Schmidt's expert report

4    makes that very clear.  He expressly stated that, and this is

5    in paragraphs 343 and 353, that Mr. Zatkovich failed to

6    disclose any theory.  So Mr. Schmidt had to go into the code

7    and do his own independent analysis.  He says I don't know

8    what they say is the intelligent agent, there's no disclosure

9    of that.  I see you have red highlighting on this

10   "filterOutUnchangedFiles", but you don't say that's an

11   intelligent agent.  And so Mr. Schmidt walks through his

12   analysis and he engages in that from scratch.  There was

13   nothing that was in particular informing his understanding as

14   to what specifically is the intelligent agent that was

15   included in the AIT expert report.

16           And then you'll hear -- here you'll see the example

17   of what kind of analysis should have been in AIT's expert

18   report.  And this is now taken from the Schmidt -- again, from

19   the Schmidt report where he's comparing MetadataDeployer.java,

20   essentially that's the deploy function.  He says it is not and

21   does not use an intelligent agent under that term's plain

22   meeting to POSITA, because it does not call any -- sorry, is

23   not a specialized program, it's not intelligent, it doesn't

24   make decisions and perform tasks based on predefined rules and

25   regulations.  And within each of those steps there's a

```
 1    particular analysis of those features.
 2            So that's the kind of analysis that AIT's expert
 3    should have done.  They should have gone and said X, whatever
 4    you call X to be, it is an intelligent agent and here's why.
 5    And here's the predefined rules and objectives.  Here are the
 6    tasks it performs.  Here's why it's specialized.  None of that
 7    content is in the Zatkovich expert report.
 8            Now, with that said, Salesforce's motion doesn't
 9    present a battle of the experts because we're not saying our
10    expert is right and they're wrong.  We say there's -- we say
11    there's an intelligent agent here, there's no intelligent
12    agent here, they say there's an intelligent agent there.  What
13    this says is AIT has made a complete failure of proof in its
14    expert report.  And all Mr. Schmidt did is point out where
15    those failures are.  And to the extent he points out where
16    that's wrong, that's not necessary for Your Honor to reach a
17    conclusion on summary judgment here.  Because there's -- AIT
18    simply has not adduced the evidence by which it can meet its
19    burden to show infringement.  It just simply hasn't bridged
20    that connective tissue between what's the operation of the
21    product and what's the claim language.
22            And so because of that, you may have seen there's
23    some cases cited in AIT's expert reports -- I'm sorry, AIT's
24    briefing.  Again, those battle of the expert cases, they're
25    all inapplicable because we're not talking about experts
```

1    competing over whether a particular block of code is an

2    intelligent agent or not, there's just the failure of proof.

3            And, again, this -- we are -- this is just

4    reiterating here the intelligent agent requirements and how

5    the parties agreed on the requirements of the intelligent

6    agent.

7            Again, Mr. Zatkovich says, I agree, this is the --

8    this is what the interpretation of intelligent agent that

9    should apply.  So it's not as if this would be a surprise to

10   Mr. Zatkovich that he should have included this level of

11   analysis or analyzed these particular factors in his report,

12   he knew that was what the standard was, but he didn't pursue

13   it.

14           And, again, this just reiterates there's no

15   statement of whether the deploy function -- and now I'm

16   turning to the new testimony with respect to the deploy

17   function.  So in the context of Mr. Zatkovich's deposition

18   testimony where he attempts to cure the defects about the lack

19   of expert opinions in the report, his deposition testimony

20   admittedly says, "I stated the deploy function as a whole as

21   an intelligent agent."  What it doesn't do is engage in that

22   particular analysis that we highlighted that's also missing in

23   the report.  His -- neither his report nor his deposition had

24   the explanation as to why deploy function is a specialized

25   program, how that makes decisions and performs tasks based on

```
 1    predefined rules and objectives.
 2            So either under what we would call an improperly
 3    broad view of these limitations or these requirements,
 4    Mr. Zatkovich made no effort to show it, either in his report
 5    or in deposition.
 6            And what I'm sure -- when counsel for AIT gets --
 7    provides their discussion, they're going to highlight all the
 8    details for its credit analysis that Mr. Zatkovich did, all
 9    the laying out of the flows, how you proceed through the
10    deploy function, how you get to filterOutUnchangedFiles, how
11    you get to the end.  That's not a replacement for the actual
12    infringement analysis.  That's just a description of the
13    operation of the product.
14            And, again, the only source code -- the only
15    software component that's emphasized anyway,
16    filterOutUnchangedFiles, is admittedly not an intelligent
17    agent.
18            And there is some interesting things that also came
19    up in Mr. Zatkovich's deposition.  So, for example, he claimed
20    in deposition that at some point in time he did an analysis of
21    whether the deploy function meets the requirement of
22    intelligent agent.  But he admits that he did not write down
23    that explanation comparing the deploy function to an
24    intelligent agent, nor did he disclose it in his deposition.
25    So purportedly, there was some analysis that was done at some
```

1    point in time.  But he concedes, no, I did not write that

2    analysis done.  The analysis is just not in the report.

3            And, again, here's looking with respect to his

4    analysis of the deploy function, he also concedes he didn't

5    look at the individual components of the deploy function in

6    considering whether the various characteristics of an

7    intelligent agent are met.

8            So the best quote that Mr. Zatkovich presented in

9    his deposition is not -- is not expert analysis; it's

10   speculation.  He speculates that it will be difficult to write

11   a program of this complexity without having some type of

12   decisions or rules involved in it.  And that's just not

13   sufficient to withstand summary judgment.  Speculation at a

14   deposition on a particular analysis that was not embodied in

15   his report can't overcome summary judgment standard.

16           And, again, this is now just some case law,

17   particularly the Arthur Collins case, where it emphasizes

18   that, "An expert's unsupported conclusion on the ultimate

19   issue of infringement is insufficient to raise a general issue

20   of material fact."  So, ultimately concluding, yes, there's an

21   intelligent agent in there doesn't get you there.  You need

22   the analysis that underpins that conclusion.  And that's

23   what's still missing.

24           Now, AIT also attempts to rely on Mr. Schmidt's

25   analysis.  Specifically, they claim that -- I'm sorry,

1    Dr. Schmidt's analysis.  Specifically they claim that

2    Dr. Schmidt's report recognizes that rules and objectives are

3    performed by the deploy function.  This is on their opposition

4    brief, Docket 297-1 at 9-10, and citing to paragraphs 346-348.

5    However, when you read that analysis and you read his

6    conclusion, which AIT admits from their discussion,

7    Dr. Schmidt says the exact opposite.  He says, "The deploy

8    function does not make decisions and perform tasks based on

9    predefined rules and objectives."  So to the extent they cite

10   Dr. Schmidt for that proposition, his opinion, as expressly

11   stated, was the exact opposite.

12         Now the third aspect that I had highlighted at the

13   start of this presentation is that AIT's theory is

14   inconsistent with the claim language.  And, again, when I'm

15   referring to claim language here, now I'm referring to both

16   the claim language and the Court's construction in context as

17   a whole.  And this, specifically, is a requirement that

18   incorporates the change management layer location, the change

19   management layer that detects changes, and then the aspect the

20   Court found in its construction without human intervention

21   through the use of one or more intelligent agents.

22         So here we're just looking now at the -- again, this

23   is some testimony that relates to the particular claim

24   limitation -- or the particular blocks of that claim language

25   and how they try to map or not map those.  So, for example,

```
1    you see that with respect to the change management layer,

2    the -- Mr. Zatkovich maps the change management layer to the

3    deploy function.  And then with respect to detect and change,

4    he then maps that to the filterOutUnchangedFiles, that

5    particular function within the deploy function.  And then

6    without human intervention, that, again, maps to what's the

7    filterOutUnchangedFiles and how that's detecting the changes.

8    But then we get to the, you know, the file aspect through the

9    use of one or more intelligent agents,

10   filterOutUnchangedFiles, which is doing all this, it's doing

11   the detect and changes through without human intervention.

12   It's not the intelligent agent.

13            In addition, the argument that Mr. Zatkovich

14   presents in deposition doesn't make sense grammatically when

15   you look at the Court's construction as a whole instead of

16   breaking up into pieces in a vacuum.  So grammatically, the

17   deploy function does not detect changes for the use of the

18   deploy function.  The deploy function detects changes through

19   the use of an intelligent agent, which it grammatically

20   doesn't make sense to say it's detecting through the use of

21   itself.

22            And this is where we have the analogy that AIT

23   points to the idea of an electronic drill and argues that an

24   electronic drill and argues that an electronic drill -- at

25   least Salesforce's argument is akin to contending an electric
```

1    drill does not make holes because the specific component that

2    actually drills the holes is the drill bit, not the drill as a

3    whole.  And the key failure in this analogy is it doesn't

4    reflect claim language accurately in terms of how the Court

5    construed it as a whole.

6            Now, AIT's description analogy just basically is the

7    object that is used to make the holes, the electronic drill

8    and drill bit.  Now the claim requires both the object used to

9    detect changes, intelligent agent, and the subject using that

10   object, which is the change management layer.  The change

11   management layer is the subject that uses the object, the

12   intelligent agent.  It's the same thing.  The electronic

13   drill, the subject, uses the drill bit to drill the hole.

14           In other words, when you map the analogy and the

15   infringement theory, it's akin to saying that an electronic

16   drill makes holes through the use of an electronic drill.

17   This dramatically affects people who express that concept.

18           Now, there's also a kind of a bedrock principle.  In

19   patent law when you have certain elements that are simply

20   recited in our claim, they refer to distinct components.  I

21   won't belabor this too much.  We have a couple cases here:

22   Becton Dickenson CEE.  But generally where these elements are

23   being listed separately, they should be viewed as separate

24   elements.  That's the presumption.

25           And then whether that presumption could be overcome,

1    you look at the intrinsic evidence.  There's nothing in the

2    intrinsic record specifically with respect to disclosure and

3    specification that would overcome that limitation.

4           Again, the description and specification, this is,

5    again, in column 9 and in column 16, it talks about the change

6    management layer includes an intelligent agent.  It doesn't

7    comprise, include is a narrower concept.  Same thing, the

8    changes primarily involve Internet that uses one or more

9    intelligent agents.  So the intelligent agent is the object

10   that's used by the change management layer.

11          So AIT's rebuttal doesn't challenge Salesforce's

12   claim interpretation per se.  So a change management layer can

13   be made of software components which are intelligent agents,

14   but that doesn't mean that the change management layer and

15   intelligent agent can be coextensive.

16          Now one of the things that AIT -- with respect to

17   dependent claim eight, this only specifies the change

18   management layer further comprises one or more intelligent

19   agents, meaning their clear implication is it includes other

20   software since it's further comprised of additional

21   components.

22          Now, AIT does point to some testimony -- I'm sorry,

23   some content of the expert report of Dr. Bederson where the

24   same component for both -- where the same component maps both

25   the change management layer and the intelligent agent.

```
 1    However, in those instances, Mr. Bederson was clear that he is
 2    relying on AIT's construction or interpretation of a change
 3    management layer for that particular issue.  So under the
 4    proper interpretation of the claims, that's not appropriate.
 5            Now, finally, I'll just address briefly the doctrine
 6    of equivalents theories.  They can't come to the rescue, both
 7    because DOE doesn't apply as a matter of law, and even if they
 8    were to apply, the scope of the DOE doesn't apply to the gaps
 9    in the expert report.
10            So first, AIT admits that Mr. Zatkovich's DOE
11    opinions are limited to addressing a particular argument made
12    by Salesforce:  That an intelligent agent must be an
13    autonomous, stand-alone, or background program.  So that's one
14    aspect that Salesforce believes is naturally inferred from the
15    language in the specification.  And I'm sure the parties
16    dispute that, but Your Honor doesn't need to reach that issue.
17    Because the foundational issue of whether the concepts that
18    are required for intelligent agent under both parties'
19    viewpoint are not met.  Again, the specialized program,
20    predefined rules and regulations, objectives, et cetera.
21            And, again, one of the things to point out is this
22    is why DOE is not available here.  Because the Court and
23    Your Honor found that there was an express disavowal in this
24    specification.  Once there is an express disavowal, as the
25    Court found, you can't use DOE to try and recapture anything
```

```
1    that was given up by the express disavowal.  The DOE is not
2    available.
3            And here, again, we have a couple cases.  This is
4    where the disavowal is in the specification, whether it's
5    explicit, whether it's implicit, under all of those
6    circumstances DOE is not available.
7            And finally, AIT cites a laundry list of cases.
8    They all relate to, for example, there's no disclaimer or
9    disavowal in the specification.  There might be industries of,
10   for example, a prosecution history estoppel or there's no
11   finding of a disavowal.  But once the Court finds disavowal in
12   the specification, implicit or explicit, no DOE.
13           And finally, with respect to the doctrine of
14   prosecution history estoppel, that can preclude application of
15   doctrine equivalents and is actually applicable in this case,
16   so estoppel stops you from invoking the DOE through capture
17   surrendered ground in prosecution.
18           Now, during prosecution the applicant specifically
19   amended the independent claims to incorporate this limitation,
20   a change management layer for automatically detecting changes
21   that affect an application.  So the key limitation at issue,
22   this is the one that Your Honor construed and found required
23   the intelligent agent limitation, was incorporated into the
24   claims which gives rise to a presumption of prosecution
25   history estoppel.
```

1           And, again, I just distinguish all the claims based

2    on this particular limitation.  And, in fact, the examiner in

3    the notice of allowance specifically relied on the amendments

4    that AIT made to add this limitation to overcome the prior

5    art.

6           Now, AIT attempts to overcome this presumption by

7    arguing that it's inapplicable because they could not have

8    foreseen a, quote/unquote, claim construction or an argument

9    that stand-alone programs can be intelligent agents.

10          That's not the standard for determining whether an

11   equivalent is foreseeable.  The standard is whether -- it's

12   whether the equivalent itself is foreseeable or unforeseeable;

13   not the construction a court would reach.  So it's just the

14   wrong legal standard they have applied.  And the alleged

15   equivalent, for example, using intelligent agents is expressly

16   disclosed in the specification as a preferred embodiment, and

17   that's clearly foreseeable.

18          Thank you, Your Honor.

19          THE COURT:  Thank you.

20          MR. ZADO:  Should we continue with the motion for

21   summary judgment, Your Honor?

22          THE COURT:  Yes.

23          MR. ZIVOJNOVIC:  Good morning, Your Honor.  This is

24   Ognjen Zivojnovic here for Defendant Salesforce.

25          And I would like to address the dispute under third

1    layer limitation as it pertains specifically to Lightning UI.

2            And just to set for some context, the accused

3    products include the platform that's hosted by Salesforce.

4    But one of the key aspects to the infringement analysis is how

5    users actually access this platform, what is generated, what

6    do they see.  And here we have really two different

7    generations that users can use.  They can access it through

8    the Classic user interface, also called Aloha, or through the

9    Lightning user interfaces, also called Aura.

10           THE COURT:  The distinction is that the Lightning is

11   a direct computer mobile application to the server as opposed

12   to the Internet browser.

13           MR. ZIVOJNOVIC:  So, Your Honor, that is one of the

14   distinctions.  I believe that it is possible to access

15   Lightning through the mobile application.  The bigger

16   distinction for purposes of this particular dispute, though,

17   that I would like to highlight is the processing involved in

18   generating what it is that you actually see.  So regardless

19   whether you use a browser or mobile application, the key

20   distinction is how is the screen actually generated on the

21   back end, on the server.  And there's no dispute that these

22   two users interfaces are generated using different processes.

23           This is from AIT's expert report, paragraph 66

24   through 67, where Mr. Zatkovich actually highlights and

25   analyzes some of these differences.  And he readily admits

1     that there are rendering differences for UIs from differences

2     in how the application window is generated.  And at a high

3     level, the main differences are that in Classic, the server

4     assembles the entire page that you see, and then the entire

5     page is sent to the user.  In Lightning, the client assembles

6     the page.  The server sends you bits and pieces that you need,

7     and the client puts it together.

8            And ultimately, again, as with the intelligent agent

9     dispute, in terms of the general operation of the products,

10    the parties do not dispute much.  In fact, Mr. Zatkovich

11    agrees and admits that he does not have any disagreement with

12    our expert, Salesforce's expert's diagrams of how these two

13    processes function.  And I'm not -- we don't need to go into

14    detail on every one of these blocks, but I do want to

15    highlight that there are clear distinctions between them.  And

16    one of them that's most important for this motion, is that

17    Classic uses page dispatcher and Lightning uses user interface

18    API.  It's agreed, they use different software on the server

19    to perform this process.

20            Why does this matter?

21            Well, the claims are directed through four layers.

22    You have a first layer that has unique information for an

23    application.  You have a second layer that has common

24    information from multiple applications.  And then you have a

25    third layer that puts together the unique and the common and

1    generates the functionality and user interface elements of the

2    application.

3        And one of the requirements of these different

4    layers, pursuant to the Court's claim construction order,

5    Docket 172, is that these layers are a set of functionally or

6    logically separated software components.  So just finding some

7    software component and calling it a third layer is not enough.

8    You need to determine is this functionally or logically

9    separated?

10        And so, to summarize, the claims require a third

11    layer.  It needs to be treated data from the first and second

12    layers, and it needs to generate functionality and user

13    interface elements.

14        And the reason why we move for summary judgment is

15    that AIT's expert performed some of this analysis for the

16    Classic user interface, but he did not do the same analysis

17    for Lightning user interface.  And so in his report,

18    Mr. Zatkovich says, admits that the Classic UI uses what he

19    calls the PageDispatch process.  And then when he actually

20    does his analysis, he writes, "These functionalities

21    practicing Limitation (1F)," that's the third layer, "include

22    any application functionalities generated from the

23    PageDispatch process."

24        He's talking about Classic UI, not Lightning UI.

25    And he admits that in his deposition.  Page dispatcher is,

1    quote, "Never called when generating a Lightning page."

2    That's what I asked him.  And he said, "I mean, that is

3    correct."  He agreed.

4         And he also analyzed the source code for Classic UI

5    and included in his Appendix C, but he did not include

6    corresponding source code analysis for Lightning UI.

7         Now, in his deposition, and I'm sure we'll address

8    this in more detail when we get to the motions in limine

9    stage, but he presented a new theory that Metadata API, which

10   is one of the components in Lightning UI, allegedly retrieve

11   data form the first and second layer to generate a bundle.

12   And then his other from that deposition, this one is actually

13   the more important one, is that the third layer includes this

14   user interface API that generates the functionality in user

15   interface in the form of the JSON payload.  These words, user

16   interface API and JSON payload, those are the ones I want -- I

17   would like if you could please focus on, Your Honor.

18        Because as we go through his report, Mr. Zatkovich

19   does not mention user interface API once.  He mentions JSON

20   payloads exactly twice.  Never identifies any software

21   component that generates these payloads.  Never analyzes

22   whether these software components are functionally or

23   logically separated third layers, as required under

24   Your Honor's construction.

25        AIT cites a number of paragraphs, but none of them

1   have this missing analysis.  So AIT cites paragraph 534 from

2   Mr. Zatkovich's report a couple of times.  And it has

3   description of some aspects of how Lightning UI operates, but

4   clearly missing is any discussion mapping Metadata API and,

5   specifically, user interface API, and how generating JSON

6   objects qualifies and meets the requirements of the third

7   layer.  That is, again, similar to what we saw of intelligent

8   agent.  That mapping of operation to claim language is what's

9   missing.

10          AIT cites conclusory statements from Mr. Zatkovich.

11  And, again, it's -- this is in paragraphs 535 and 788 where he

12  asserts that the accused products not limited to either UI

13  meet the third lay limitation, but that's just a conclusory

14  assertion.  It's not a substitute for substantive expert

15  analysis that's required to survive summary judgment.

16          Paragraph 799 and 802, again, it doesn't actually

17  address Lightning UI.  And, in fact, if you look between

18  those, what AIT admits in his deposition, paragraphs 800 and

19  801, these -- this whole section is talk about generating a

20  page, the whole page.  That's how Classic UI works.  That's

21  how Mr. Zatkovich admits Classic UI works.  He's not talking

22  about Lightning UI.

23          So this is -- and I understand Your Honor this will

24  be addressed separately and later, but, again, this is a

25  pattern of conduct of Mr. Zatkovich of trying to supplement

```
 1    testimony that's not in his report with deposition testimony.
 2            So I do want to briefly address a couple of AIT's
 3    counter responses.  And the first one is that AIT talks about
 4    how there are certain similarities between Classic UI and
 5    Lightning UI.  And they focus on how Metadata is retrieved
 6    from a database.  If we go back a few slides, what they're
 7    talking about is the bottom, the UDD, the thing that interacts
 8    with the Oracle database, the bottom of the stack.  That's not
 9    what they're pointing to for generating user interface and
10    functionality.  They don't have an analysis or any allegation
11    that the part that meets the requirement of generating
12    functionality user interface, that that piece is similar, much
13    less identical in Classic UI and Lightning UI.  And that's
14    what's missing.
15            And so AIT also cites a number of cases on the
16    representative products.  But, again, in all those cases,
17    there was either an admission by party or substantive detailed
18    expert analysis explaining why you would rely on one product
19    to express infringement of the second product.  They were
20    substantially identical.  And we don't have that here.
21            And so, ultimately -- and then AIT also argues that
22    Salesforce did not raise this non-infringement argument during
23    fact discovery.  But it's AIT's burden to prove infringement.
24    Salesforce could not have predicted that Mr. Zatkovich would
25    entirely skip in analyzing one of the two ways of accessing
```

1  the accused's platform during fact discovery.  That's a motion

2  for expert discovery.

3          Also, AIT never sought leave to serve a supplemental

4  report on this.  And that's not surprising, there are no new

5  facts here that would warrant such a supplemental report.

6  Mr. Zatkovich just did not do the required analysis.

7  Dr. Schmidt called him out on it.  And then Mr. Zatkovich

8  tried to fix that at his deposition.  And that should not be

9  permitted.

10          And then finally, AIT argues that claim construction

11  allows for parts of the third layer to be performed at the

12  client.  And that is irrelevant here, because that's not what

13  Mr. Zatkovich's infringement theory is.  He points to the user

14  interface API for performing the generating functionality and

15  user interface elements, and that's on the server, and he did

16  not analyze that.  So construction is also not relevant here.

17          And ultimately -- and so this part here, Your Honor,

18  is independent of the motion to strike.  So I do want to

19  emphasize that.  Mr. Zatkovich admitted that he did not

20  perform any source code analysis for the user interface API.

21  And he admitted that his expert report contains no source code

22  analysis for Metadata API.  So ultimately, there's no

23  disclosure, in his deposition or in his report, of actual

24  substantive source code analysis for either one of the two

25  main pieces that he points to for the third layer in Lightning

1    UI.  And this matters because -- even setting aside

2    Mr. Zatkovich's attempts to supplement the record at

3    deposition, which we understand Your Honor is not deciding

4    today, even if all his deposition testimony is considered,

5    there was nothing except Mr. Zatkovich's conclusory assertion

6    on these user interface API and Meta API components meeting

7    the third layer limitation.

8         And that's just not enough to survive summary

9    judgment of non-infringement.  And so for those reasons,

10   Salesforce is entitled to summary judgment that at least the

11   Lightning UI interface and accessing the accused platform

12   through the Lightning UI interface does not infringe AIT's

13   patents.

14        THE COURT:  Thank you.

15        MR. ZIVOJNOVIC:  And I'll briefly touch on the other

16   similar dispute relates to their mobile app.  And here again

17   you can access the platform through the web browser or the

18   mobile app.  There's limitations that require not just what's

19   up on the server, but relate to what's generated and how to

20   distribute it to the client.

21        And Mr. Zatkovich admits he didn't do that analysis

22   for mobile, for the mobile app.  Every single independent

23   claim, he says, he does not have opinions that Salesforce's

24   mobile application infringes those independent claims.  And in

25   his deposition he also admits to not doing the specific

1    analysis for mobile application.  So there's no evidence in

2    the record that accessing the accused platform through the

3    mobile app infringes any claim.

4            Again, you need expert testimony in cases involving

5    complex technology.  We heard that when discussing intelligent

6    agent.  And this is from the *Centricut* case.

7            So AIT's response to this is, first, they point and

8    they say claim one of the '482 patent and claim 13 of the '111

9    patent are apparatus claims.  Their theory is you can infringe

10   an apparatus claim if it has capabilities, even if you don't

11   use it.  But AIT's infringement allegations are not limited to

12   just capabilities.  They're not limited to accusing Salesforce

13   of infringement because it's providing the system.  AIT

14   accuses also Salesforce of infringing these patents because

15   employees are developing, testing, demonstrating and using

16   Salesforce's products, and the third party's access can use

17   those products.  For use, it matters whether you use the

18   mobile application for the web browser to access the platform.

19   And, again, there's no evidence that the user accessing the

20   platform through the mobile app infringes any claim.  And so

21   at least for claim one of the '482 patent and claim 30 of the

22   '111 patent, at least as it pertains to AIT's allegations of

23   infringement through use, Salesforce is entitled to summary

24   judgment.

25           And then on claim 12 of the '482 patent, AIT argues

 1    asymmetrically, so you can only infringe it through use.  So

 2    their argument apparatus claim does not apply there.  Instead,

 3    AIT says, well, this claim doesn't require a browser

 4    application.  It doesn't say browser.  But the problem is,

 5    even for the other claim limitations, limitations that are

 6    indisputably present in claim 21, such as the third layer,

 7    such as distributing the functionality and user interface

 8    elements, there is no evidence that accessing Salesforce's

 9    platform through the mobile app meets any of those

10    limitations, and, thus, the use of the mobile app infringes

11    claim 21 of the 281 -- of the '482 patent.

12            THE COURT:  Were you going to address the other

13    parts of your motion for summary judgment, including

14    anticipation and obviousness?

15            MR. ZIVOJNOVIC:  I believe so, Your Honor.  With

16    that, I will turn it over to my colleague.

17            THE COURT:  Okay.  It needs to be brief, because

18    your time's about gone.  You'll have a reply opportunity, of

19    course.

20            MR. ZADO:  Thank you, Your Honor.

21            Thank you, Your Honor.  So I will attempt to be

22    brief, but, again, Your Honor, to the extent I'm covering

23    ground you're already familiar with, I certainly encourage you

24    to tell me to get a move on.

25            THE COURT:  Okay.

```
 1              MR. ZADO:  So the premise of Salesforce's invalidity

 2    motions are twofold.  One is that taking AIT's interpretation

 3    of the claims, and particularly the claim limitation -- or

 4    claim requirement of intelligent agents that Your Honor found,

 5    that the claims of the asserted patents are anticipated by the

 6    Popp reference by itself.  If under the Salesforce

 7    interpretation of the intelligent agent requirement, then the

 8    asserted claims are rendered obvious by the combination of

 9    Popp and Amati.  I won't belabor the particular general

10    descriptions of the invalidity analysis, but what I would like

11    to focus on are the reasons why we selected the Popp reference

12    and, in particular, the admissions that were received from

13    Mr. Zatkovich when testifying about Popp and how that impacts

14    the anticipation and/or obviousness analysis.

15              So just briefly, there were four layers that are

16    identified by Salesforce's experts, Dr. Bederson and Popp.

17    The first layer is what's referred to as the database.  The

18    second layer is the object tree.  The third layer is --

19              THE COURT:  Tell me a little bit more about the

20    object tree.

21              MR. ZADO:  Certainly, Your Honor.

22              So the object tree contains information about user

23    interface elements such as -- such as data entry, data entry

24    element function, such as --

25              THE COURT:  There you go.  Elements that define the
```

```
 1   page.

 2            MR. ZADO:  That's correct, yes.

 3            THE COURT:  Okay.

 4            MR. ZADO:  There are common various web pages,

 5   including particular web page application data as stored in

 6   the database.

 7            THE COURT:  How do these correspond to the patents?

 8   For example, 481's elements of the claim, how do these two

 9   layers, first two of layers correspond with those layers?

10            MR. ZADO:  So the first -- so the first layer in

11   Popp which refers to the database that it contains the

12   content -- the specific contents of the web pages for a

13   particular application, for example.  And then the second

14   layer, which is the object tree, the object tree has

15   information about the user interface elements, like, the

16   second layer is disclosed in the patent that could be common

17   across different applications.

18            THE COURT:  Was Popp -- now we've got here claims 1

19   and 21, a system claim; and in 21, a methods claim.  What was

20   Popp?  Describe it generally.

21            MR. ZADO:  I'm sorry, what was Popp?  Popp was

22   describing a particular system, but it's an article that

23   describes a system.

24            THE COURT:  So, for example, for pulling up cars for

25   sale.
```

```
1           MR. ZADO:  That's one example, yes, Your Honor,
2    that's used in the specification.
3           And then the third layer --
4           THE COURT:  The user inputs the model or make or
5    whatever, and then the system just focuses on those web pages
6    that are out there that offer those types of vehicles.
7           MR. ZADO:  That's one of the functionalities that
8    the application provides for, Your Honor.  There are other
9    functionalities including with respect to taking requested
10   data, writing data back to the database or writing back into
11   the first layer based on push or pull queries.
12          THE COURT:  Okay.  The third layer, go back to the
13   third layer.
14          MR. ZADO:  Yes, Your Honor.  The third layer is
15   referred to -- it particularly corresponds to the dynamically
16   generating of the application.  And there is what's referred
17   to as the internal application, which is the third layer,
18   dynamically generates the functionality of the user interface.
19   So it dynamically generates that red page that will have, for
20   example, the particular auto informs that you were referring
21   to.
22          THE COURT:  Okay.
23          MR. ZADO:  And then just as a point, because this is
24   becoming sort of a dispute -- I'm sorry, let me rephrase that.
25   There was a reference made to this in AIT's briefing that Popp
```

1  repeatedly characterized its disclosure as dynamic generation

2  of Web pages and dynamic generation of applications.

3          THE COURT:  And how does dynamic application, or,

4  for example, involving an AI, what it's searching are just the

5  web pages already created.  Let's say it's a Cadillac dealer

6  that's using this software.  It's simply generating web pages

7  that are already available from the Cadillac GM system for

8  particular vehicles.  It's generating that.  It's not

9  searching the Web generally.

10          MR. ZADO:  Well, for example, it does meet

11  Your Honor's -- let me respond to that in two phases.  One, as

12  Your Honor may recall in the Court's claim construction order,

13  there was no specific requirement that it would search the Web

14  externally, that could comprise intranets and extranets.  And

15  so this the example where you're searching on an Internet.

16          THE COURT:  That was the big thing before the PTAB

17  was whether it's -- you were searching the broadest possible

18  in favor of anticipation of obviousness, you were searching

19  for the broadest interpretation which would include external

20  and internal.  Plaintiff was seeking the contrary, limiting

21  it.

22          MR. ZADO:  Yes, that's correct, Your Honor.  The

23  plaintiff attempted -- the plaintiff made statements during

24  that IPR to limit the scope of where that work was done.

25  Ultimately, as I recall though, that wasn't found to be

1    dispositive in the IPR.

2         And finally, the change management layer in Popp,

3    which performs the automatically detecting changes is an

4    element that's referred to as inputControl 664.  And one of

5    the examples of the inputControl 664 can do is it can detect

6    changes both within a field and to the set of fields in an

7    application.  So it detects -- it detects changes in various

8    circumstances both the fields and sets of fields.  It's just

9    one example.

10        THE COURT:  Is this contradictory?  You argue on

11   infringement that -- you argue on infringement that there is

12   no intelligent agent in the deploy because the deploy is just

13   sampling internally to the client's change in the employee

14   name.  But here, of course, you're arguing a little

15   differently.  You're arguing that -- you're arguing that --

16   well, it just seems those two arguments contradict each other.

17        MR. ZADO:  I apologize, Your Honor, I didn't follow

18   with respect to the deploy and the limitation on the apparent

19   non-infringement position.  At least there wasn't something

20   that was brought up in the --

21        THE COURT:  No intelligent agent on the

22   infringement.  The argument was no intelligent agent simply --

23        MR. ZADO:  Right.

24        THE COURT:  -- in the deploy, because the deploy

25   everybody thinks that just the -- or at least you argue that

 1    just the change in the name --

 2              MR. ZADO:  Oh, you're talking about

 3    filterOutUnchangedFiles function?

 4              THE COURT:  Right.

 5              MR. ZADO:  That's actually admission by both

 6    parties, so.

 7              THE COURT:  You bet.  So how does -- how is that

 8    argument different from this argument?  You're arguing now

 9    what?

10              MR. ZADO:  Well, because that argument isn't

11    premised specifically on, as I understood Your Honor

12    articulating, where you're looking for the particular changes

13    in the context of the deploy function.

14              THE COURT:  Yeah, but when we're talking about

15    anticipation, aren't you arguing that in Popp the same thing.

16    You're arguing, but opposite.  You're arguing that the simple

17    insertion by a user of different parameters, different

18    vehicles.  I want a Yukon instead of a -- instead of a

19    Cadillac SRX, that that -- that does, in fact, constitute an

20    intelligent agent as a fourth layer.

21              MR. ZADO:  In the context as you just described it

22    with respect to the Popp reference, that's correct,

23    Your Honor.

24              THE COURT:  Mm-hmm.  Okay.  Just seems to me that

25    those two arguments are contradictory, but that's okay.

1          MR. ZADO:  Well, I'll try and address that in more

2     detail as we get through the presentation as well.

3          THE COURT:  Okay.  Go for it.

4          MR. ZADO:  And then this is just the obviousness.

5     The only element that is added through the obviousness

6     combination is that instead of using the particular element

7     for the intelligence agents for the change detection, we

8     substitute in the Amati reference, which AIT does not dispute

9     disclosed as an intelligent agent.  And from Salesforce's

10    perspective constitutes an intelligent agent under both

11    parties' construction.

12          And maybe that's one of the --

13          THE COURT:  And just for the record, describe

14    generally Amati and how it uses an intelligent agent.  And

15    most importantly, why a person of understanding in the art

16    would see those two and connect them.

17          MR. ZADO:  Certainly.  So, and maybe, Your Honor,

18    let me start with a predicate point.  With respect to your

19    contention on the tension between whether what's disclosed in

20    Popp is an intelligent agent vis-à-vis what's accused of

21    infringement.  Again, to make it clear, we're saying that Popp

22    is an intelligent agent only under AIT's construction, not

23    under Salesforce's construction.  So there's a little bit --

24    so maybe that helps resolve some of the tension there.  It's

25    only when you incorporate the intelligent agents, Amati, does

1    Salesforce contend that the intelligent agent limitation --

2              THE COURT:  And why would a person of understanding

3    in this area, computer science degree and two years'

4    experience, why would they link these two?  Combined them?

5              MR. ZADO:  Because they're directed to the same

6    field of endeavor, which in this case was information

7    processing.  The -- a person of ordinary skill in the art

8    would be motivated to combined these references because, as

9    specifically taught by Amati, you have an intelligent agent,

10   which in disclosure of Amati is referred to ABIS agent.  That

11   can act -- is capable of acting autonomously, facing

12   unexpected events, and cultivating what's called a truthful

13   relationship with the user.

14              So a person of ordinary skill in the art would have

15   found that a combination would reasonably expect to proceed

16   and it would project a predictable result, because you can

17   simply take that intelligent agent and use that to perform the

18   functionality of the inputControl 664.  But in that

19   circumstance you've now broadened the scope of functionality

20   and be more efficient for that particular process.

21              And this is just -- I won't belabor this, but as

22   Your Honor noted, this is one of the references that the

23   patent office in the IPR found was anticipating and sustaining

24   the asserted claims.

25              So turning to specifics of the claims, there are two

1  limitations that are not in dispute:  The server and the

2  client computers.  And during his deposition, Mr. Zatkovich

3  made certain --

4        THE COURT:  You're talking about anticipation now.

5        MR. ZADO:  That's -- it applies to both anticipation

6  and obviousness.

7        THE COURT:  Okay.

8        MR. ZADO:  So, specifically with respect to

9  certain -- whether certain limitations are met by --

10  essentially they're all going to be Popp, but they also apply

11  to a combination of Popp and Amati.

12        THE COURT:  And participation, of course, requires

13  claim element by claim element.

14        MR. ZADO:  Yes, that's correct.

15        So I'm starting with the first two claim elements.

16  Now moving through to the -- I'm going to come back to the

17  first layer.  But moving to the second layer, Mr. Zatkovich

18  was asked in deposition:  "Does Popp disclose the requirements

19  of the second layer?"  And then he concedes, "I think the

20  information in case it meets the second layer."  So we have an

21  admission that the second layer limitation is met.  Again, he

22  further emphasized this, "So you no longer dispute that Popp

23  disclosed the second layer?

24        "Correct."

25        So now the second layer is fully addressed as well.

1          So now with respect to the third layer, the preamble

2     of the third layer and dynamically generating, all these

3     relate to the concept of dynamic generation.  And they all

4     devolve into what's really a single dispute, and it has to do

5     with the first layer.  So I'll start with the dispute is

6     whether, based on the first layer information, can you update

7     the functionality of the application is one example of the

8     dispute.

9          And when we specifically try to get clarification

10    from Mr. Zatkovich, he confirmed that the reason the

11    dynamically generating limitations aren't met is because of

12    the lack of first layer limitation.  So there's no additional

13    independent reason to say there's not dynamically generation.

14    It's all dependent upon the first layer information and

15    whether first layer information is present.

16          So then turning back to the, the undisputed

17    elements, second layer is met.  Third layer and change

18    management layer -- I'm sorry, third layer in the preamble and

19    dynamically generated limitation are all not disputed except

20    with respect to the first layer limitation.  So, really, all

21    of those elements devolve to first layer dispute.

22          Just quickly, AIT has indicated they may try to walk

23    away from this deposition testimony.  But, ultimately, you

24    can't create an issue of fact by contradicting your own

25    expert.

```
 1            And Dimension One is one case that shows it, for

 2    example.

 3            So, again, this now shows that we have a second

 4    layer, the third layer, and the dynamically generating

 5    limiting and the preamble are all met, except for the first

 6    layer requirement, because they're dynamically generating,

 7    it's dependent upon the first layer limitation, in his view,

 8    and then the change management layer for automatically

 9    detecting changes.

10            So in context of the first layer --

11            THE COURT:  You need to begin a windup.

12            MR. ZADO:  Understood, Your Honor.

13            THE COURT:  Especially if you want a reply

14    opportunity.

15            MR. ZADO:  So I'll briefly address the issue on the

16    first layer.  This is a dispute that's also going to be

17    addressed in the context of AIT's motion for summary judgment.

18    Mr. Zatkovich promotes a construction that's inconsistent with

19    the plain language of the claim.  So the language discusses

20    information about the unique aspects of the particular

21    application.  He replaces that with the requirement that it

22    has to be features and functionality of a particular

23    application.

24            And that's just not the plain and ordinary meaning.

25    He's rewriting the claim language to incorporate this
```

1  limitation.

2          Now, here's a key point, Your Honor, is that during

3  the context of the tutorial when counsel for AIT was trying to

4  explain this limitation to you and what this information is,

5  and whether it could just be data or not, here's what they

6  said.

7          The information that's in the first layer, the

8  information that's unique to this particular business could be

9  airline name, flight number, class, seat number, et cetera,

10  this is just a bunch of data.  So AIT representing what could

11  be in the first layer and constitutes the first layer

12  information, that could just be data and that's sufficient.

13          And, again, the specification is consistent with

14  that, that the information in that first layer can just be

15  data.

16          And, again, with respect to the changes that affect

17  the functionality, so this is now we're getting into how the

18  first layer information bridges into the other limitations.

19  His view is that the change management layer must detect

20  changes that affect the functionality of the application.

21          THE COURT:  Okay.  I've got that point.  In other

22  words, you're saying, of course, that everybody should have

23  agreed that it's just a data first layer.

24          MR. ZADO:  It could just be data, yes.

25          THE COURT:  But Mr. Zatkovich is now adding it has

1    to be including data that affects the functionality of the

2    application.

3            MR. ZADO:  Or it's not even necessarily just data,

4    it's actually something that could be metadata or forms, et

5    cetera, that would be, quote/unquote, affect the

6    functionality.

7            And the one thing we would point out is that there's

8    no support for this construction.  He's not -- Mr. Zatkovich

9    is not relying on prosecution history disclaimer,

10   lexicography, or disavowal, or any meaning to -- or any basis

11   to limit the plain and ordinary meaning.  There's no citation

12   to any of that in support of that construction of changes that

13   affect.

14           If I can just make two more points, Your Honor.  I

15   know you want me to move it along.

16           The first is that AIT when we talk about the plain

17   and ordinary meaning of changes that affect, this is what's

18   from their claim construction brief.  This is what they state

19   that is the plain and ordinary meaning in that brief.  And

20   they state that, "The specification broadly describes the

21   change management layer..." and "the term 'changes' is used

22   expansively."

23           "Any ... factor that materially affects operations

24   and information management requirements of a particular

25   business," and provides a wide range of examples, referring to

1    the specifications.

2          So when you talk about this functionality

3    limitation, that's diametrically opposed to what AIT said is

4    the plain and ordinary meaning during the claim construction

5    process.

6          And, again, here's just some examples of how using

7    data to change the appearance of an application or a web page

8    that necessarily affects the application.

9          THE COURT:  Okay.  I've got this point.  I

10   understand.

11         MR. ZADO:  So the last point that I want to bring up

12   is, and this will also be discussed in the context of the

13   AIT's motion, is that with respect to Dr. Bederson and his

14   opinions on changes that affect, one of the things that AIT

15   relies on is a declaration that he submitted during the claim

16   construction process.  However, that declaration ultimately

17   was not adopted in terms of a construction by the Court.

18   Instead, the Court adopted a narrow construction necessary,

19   plain and ordinary meaning.  Interpretation for changes to

20   that effect, and that's the one that Dr. Bederson expressly

21   applies in his claim construction order.

22         And then the last is that AIT attempts to create

23   some fact issues by talking about either motivation to combine

24   or secondary indicia of not obviousness.  Each of these are

25   flawed.  So with respect to motivation to combine, there are

 1     three fundamental failures.  The first is that with respect to

 2     several paragraphs -- with at least paragraph 152,

 3     Mr. Zatkovich refers -- he confuses Popp and Kerschberg.  He

 4     essentially confuses.  He doesn't talk about Popp and Amati at

 5     all and doesn't opine that, in this paragraph, that Popp and

 6     Amati can't be combined.  He refers to Kerschberg in a

 7     different reference, and the -- he uses to define the field

 8     that Kerschberg is in, Enterprise Information Architectures,

 9     that's the field of Kerschberg; that's not the field of Amati.

10     So that attempts to say that a fact issue fails.

11          And in the next paragraph, he says that -- he

12     confuses what the base reference is and the incorporated

13     reference.  So he says there's no reason to incorporate Popp

14     into Amati, that's not the combination.  That's not the

15     opinion that's at issue.  It's the incorporation of the

16     intelligent agent of Amati into Popp.  So, again, this can't

17     reiterate a fact at issue because it's not the opinion that

18     Dr. Bederson expressed as far as what the common issue is.

19          And then the third argument he makes, it's just a

20     rehash of the changes that affect position.

21               THE COURT:  Why don't you cut it off at that point.

22               MR. ZADO:  Thank you.  I appreciate your indulgence,

23     Your Honor.

24               THE COURT:  Do we need a break, or can you go ahead?

25               MR. DeVINCENZO:  I'm happy to go now, if you'd like.

```
 1              THE COURT:  Anybody else need a break?
 2              Okay.  Let's proceed.
 3              MR. DeVINCENZO:  Your Honor, before I begin, I'd
 4    like to hand up the written analysis of the intelligent agent
 5    program.
 6              THE COURT:  Fine.  It's not being received as an
 7    exhibit, you understand.
 8              MR. DeVINCENZO:  Exactly.
 9              THE COURT:  It's just simply for demonstration
10    purposes.
11              MR. DeVINCENZO:  It is an exhibit to the briefs, but
12    I'm going to be going through it a lot.
13              Okay.  The first thing I'm going to do is I'm going
14    to explain why a reasonable juror could and should find that
15    the deploy function automatically detects changes that affect
16    an application; why it's an intelligent agent.
17              And before I do that, we're going to go through the
18    claims a little bit.  The claims are different.  Salesforce
19    has one argument that only goes to the layer claims.  The
20    argument where they have to be distinct and non-coextensive,
21    that only concerns the change management layer.  None of the
22    arguments regarding coextensive address claim 21 or claim 13.
23    Those claims simply require an intelligent agent that
24    automatically detects changes that affect an application.  So
25    the first thing I'm going to do is I'm going to tell you how I
```

1    intend to prove it to a jury.

2         The first thing we're going to do is not start with

3    the conclusions or deposition testimony.  We're going to

4    explain to the jury what an intelligent agent is.  And there's

5    not a lot of dispute on this.

6         I have the Court's construction.  "Detecting without

7    human intervention through the use of one or more intelligent

8    agents."  So we intend to show that Salesforce's servers are

9    programmed to perform detecting without human intervention

10   through the use of one or more intelligence agents.  And once

11   we show a question of fact exists on that, with respect to the

12   '482 patent and '111 claim 13, the other arguments on distinct

13   and separate, those are only relevant to the '482 claim 1.

14        Now, what are intelligent agents?  And all the

15   evidence I'm going to go through is in Mr. Zatkovich's report.

16   So I'm -- except some -- I'll go through a little bit of the

17   deposition testimony, but first I'm going to go what's in his

18   report.  Well, he says what intelligent agents are.  He says

19   he understands them as rules and constraints.  It's not

20   intelligence like artificial intelligence or machine learning.

21        His understanding is consistent with the

22   specification.  And that's lines -- column 16 to 23.  "Each

23   intelligent agent is defined by rules and constraints..."  And

24   then he -- and then two other times in the specifications,

25   "capable of performing decisions and tasks based on rules."

1    "Decisions and tasks based on predefined rules and

2    objectives."  Specialized program.  And I'm going to tell you,

3    we're going to teach the jury how the deploy function is a

4    specialized program that makes rules -- that makes decisions

5    and performs tasks based on predefined rules and objectives.

6             THE COURT:  You're losing me a little bit, because

7    what you're describing is any computer program.  We input the

8    code and it performs functions through the code language.  So

9    I don't quite follow you.

10            MR. DeVINCENZO:  I understand that.  We're going to

11   prove it's an intelligent agent for automatically detecting

12   changes that affect an application, obviously.  But first

13   we're going to teach the jury what an intelligent agent is.

14   And I think we agree, it's a specialized program that makes

15   decisions and performs -- the narrowest definition in the

16   specification is a specialized program that makes decisions

17   and performs tasks based on predefined rules and objectives.

18   That's the narrowest.

19            And Mr. Zatkovich's report says, "Under any

20   reasonably definition in the specification, Salesforce's

21   servers would have intelligent agents for automatically

22   detecting changes."

23            And some of this is not disputed.  Here is the

24   entire definition from the specification.  In their reply at

25   four, they don't dispute for purposes of the motion

1    specialized is irrelevant.

2            So specialized we don't have to worry about.

3    There's at least a question of fact.

4            Similarly, their expert said, "Well, all software is

5    based on rules."  So now we're going to go through the deploy

6    function itself and the detailed analysis in Exhibit 11 and

7    explain why a reasonable jury could find that the deploy

8    function is an intelligent agent as defined in the

9    specification used for automatically detecting changes that

10   affect an application.

11           Now, this is the written analysis of the deploy

12   function.  This was written by Dr. -- Mr. Zatkovich.  It was

13   Appendix C to his report.  It's three pages of detailed

14   analysis regarding why the deploy function -- strike that.

15   Describing the deploy function, each of its components, the

16   task they perform, the objectives they perform, and how

17   they're used to automatically detect changes that affect the

18   application.

19           These -- and there are eight software components,

20   and he explains why each of them are used for automatically

21   detecting changes.  And I'm going to go through it.

22           But I want to start at the top.  If you see,

23   Salesforce says, well, we didn't know the deploy function was

24   the intelligent agent or that's where the analysis was.  This

25   is attached to his report.  It's fourth layer and change

 1    management-deploy package.  A starting point for the present

 2    analysis is the deploy method of the MetadataDeployer class.

 3    And then the specific lines of code he identified for the

 4    intelligent agent are in the top sentence.

 5            Along with his written analysis of the source code

 6    and the specific software components, which Salesforce didn't

 7    mention in their presentation and resorted to a footnote in

 8    their brief, he provided the code flow.  The code flow was not

 9    provided alone like Salesforce suggested, it was provided

10    along with the written analysis.

11            Now the deploy function is used to automatically

12    detect changes in four basic steps.  And I'm going to show you

13    how the written analysis supports this.  First, it sets up

14    files for change detection, then it determines unchanged

15    metadata, then it removes unchanged metadata, then it deploys

16    only changed metadata.  So it's not -- they don't type in a

17    field and recognize text has been entered.  You do a

18    comparison between the existing application that's running and

19    something that's potentially changed.  And the potentially

20    changed thing is an entire application.  And you compare them

21    and you say what metadata is different and then you deploy

22    only what has changed.  And that's not in dispute.

23            Now, the deploy method is called by the

24    MetadataDeployer.  Because initially at claim construction

25    they said it had to be called automatically.  So it's called

 1    by the MetadataDeployer, as Mr. Zatkovich explained.  Again,

 2    it's in his report, Appendix C at 24.

 3          So what does the deploy function do and how could a

 4    reasonable jury determine that it makes decisions and performs

 5    tasks and objectives as, and it's used to automatically detect

 6    changes?  Well, Mr. Zatkovich went through the various lines

 7    of code in the deploy function.  And as you see on the right,

 8    he identified each line of code used as part of the

 9    intelligent agent, and he goes through each line of code in

10    the written analysis.

11          So, what is the first objective?  The first it's

12    going to do is set up files for change detection.  Well, what

13    are the tasks it performs?  And he went through each of the

14    tasks.  It extracts content from files containing applications

15    with possible changes, and you'll see that's line 287 which is

16    green.  And if you see in the written analysis, it's what it

17    says there, I just put it in a little English, it's a little

18    easier for me to read.

19          But he went through each of the tasks, and he

20    explained how it's used.  So you extract content, you create

21    data structures used for change detection.  And that's

22    line 295.  And the name of that kind of file used for change

23    in section is "upsertFilesByType."

24          Then the next task it performs, it processes the ZIP

25    entry and organizes by type.

1    So then what happens next?  And this is exactly how

2    we plan to explain to the jury.  Well, now you have this file

3    that could or could not be changed and may or may not have

4    changed.  It's not like data entry where anything you type in

5    is a change.  You have an entire file that could or could not

6    change the application, and you compare it to the application.

7        Well, what's the next step of the deploy function?

8    Now we're not talking filter out files yet, we're talking

9    about deploy function.  The deploy function calls filter out

10   files to help determine what has been changed.

11       And what does filter out files do?  Contrary to what

12   Salesforce says, FilterOutUnchangedFiles does not alone detect

13   changes that affect an application.  The first thing

14   FilterOutUnchangedFiles does is it calls another routine,

15   which is also used along with FilterOutUnchangedFiles as part

16   of the deploy function as a whole.

17       The other routine, and, again, this is all from his

18   report.  This is all evidence that there's no dispute the jury

19   is going to hear.  They didn't move to strike it.  So it calls

20   compareVersions routine.  So then it goes to four.

21       Well, what's the objective of compareVersions

22   routine?  It determines what information metadata blobs from

23   current version, which is what was set up by the deploy

24   function on lines 300 to 311.  So it determines what from that

25   was in previous version, what was the same.  So that's the

 1    next step of compare.

 2          And then he went through compareVersions, he went

 3    through that subroutine.  He identified the specific

 4    decisions, tasks, and objectives performed by that routine,

 5    the compareVersions.  He explained how it creates a

 6    fileCompareResults with specific keys for identifying

 7    unchanged information.  He explained how it uses the

 8    upsertFilesbyTypeMap which was created as part of the deploy

 9    function, how it determines what information has remained the

10    same, and how and where it stores determinations in

11    fileCompareResults.

12          Well, then what happens next?  Well, he says,

13    decisions are made if the files are different.  Again, not

14    like data entry.  If the files are different, line 921 --

15    line 929, then it iterates back, you see the little circle

16    there, 2, 3, filterOutUnchangedFiles.  What does

17    filterOutUnchangedFiles do next?

18          Oh.  As he explained in his written analysis in

19    Exhibit 11, that receives the entity metadata that is not

20    changed and it calls two subroutines.  So, again,

21    filterOutUnchangedFiles itself doesn't do the change

22    detection, it does it as part of the deploy function as a

23    hole.

24          Well, what are the two subroutines it calls?  Well,

25    you'll see line 878 and 879, remove same entries from file

```
 1   lists and remove same entries from package method.  And,

 2   again, this is all part of the deploy function which he

 3   identified as the starting point in his written source code

 4   analysis, and these are all subroutines as part of the deploy

 5   function.

 6           He then explained exactly how the changes are

 7   detected or removed using those subroutines of the deploy

 8   function.  They remove same entry -- sorry, I'm going a little

 9   fast.  The removeSameEntriesFromFileList removes from

10   unchanged files the files that did not change.  And how does

11   it do that?  By iterating through key values in up

12   upsertFilesbyType Map instance, which was the first file

13   created in the deploy function lines 300 to 301 as part of his

14   written analysis.

15           He went through each of the decisions, each of the

16   tasks, and each of the objectives of the deploy function as

17   part of his written analysis.

18           So what's the result?  Line 341.  Only the changed

19   metadata that was detected based on a file compare, a program

20   comparing two files, only the changes detected are deployed.

21           We submit --

22           THE COURT:  No, you have the contradictory argument,

23   too, between this mapping in the infringement argument to the

24   anticipation issue in Popp.  Because what you're arguing is --

25   you know, what I initially perceived at the end of
```

 1    construction as the invention is your ability through a NIA to

 2    go out to the Web and search, and then automatically, in the

 3    third layer, to automatically make the changes to the

 4    application being used without preprogramming, without

 5    interference.

 6              MR. DeVINCENZO:  Yeah.

 7              THE COURT:  So what you're saying is that any change

 8    here input by the user under the deploy function, change in

 9    employee name, now constitutes use of an independent agent.

10    So they don't even need to add Amati.  What you're arguing is

11    contrary to the anticipation argument that you make.  And

12    there the tension is, suggested by your argument, is that the

13    simple function performed by Popp of searching for cars

14    available in response to a user's input is also the use of an

15    intelligent agent.

16              MR. DeVINCENZO:  But what we're talking about in the

17    context here is an intelligent agent for detecting changes

18    that affect an application.  So what we have here is the

19    changes, the programming, is not entered into the application

20    itself.  It's entered into a designer's sandbox.

21              Now, the difference between going and searching the

22    Web which we said was not required -- well, it's all

23    Salesforce's operations are all up on the Web.

24              THE COURT:  Sure.

25              MR. DeVINCENZO:  But the changes aren't entered into

1   the application.  So we have sandbox; we have application.  In

2   Popp, what they allege, like, when you type in a computer the

3   car name, that goes directly into the database.

4          THE COURT:  How is their application under your

5   argument different from Popp?  How is the accused product

6   different from Popp?  It's just broader.  Basically what Popp

7   did, as I understand it, is it allows a dealer or nationwide

8   dealer, GM, for example, to call up its own web pages.

9          MR. DeVINCENZO:  Yeah.

10         THE COURT:  How is, other than being broader,

11  searching the Web generally for sales products or whatever,

12  how is there accused product, under your argument of

13  intelligent agent, different from Popp?

14         MR. DeVINCENZO:  Okay.  What's being detected when

15  you do a compare is not data, it's metadata.  It's data about

16  the application itself.  And that's what's different.  It's

17  not just detecting a name has been typed in from a field.  And

18  that's clear from -- there's no dispute changes that affect an

19  application.

20         And I can get -- the issue for summary judgment was

21  whether he provided decisions, performed tasks, and

22  objectives.  So that's what I came -- they didn't say the

23  changes are different, and we'll get to that on theirs.

24  Because the changes in Popp is not metadata that affects the

25  application in any way.  And the application was defined in

1    this case and agreed as a program with functionality.  So here

2    there's no dispute because what's being detected is not -- I

3    know I used file compare, because I said that in the context

4    of like a Word document, and that's what comes to mind, but

5    it's not comparing a Word document.  It's comparing the

6    metadata associated with a running program, so that -- and

7    it's looking at something else that I did in sandbox that's

8    not part of the running program, and it's not saying what's --

9    that is different.  This program is running and saying, okay,

10   what of the programming elements are different so I can

11   incorporate those.  And that's how it's different than Popp.

12   And that's a significant difference, and I'm going to get to

13   it in Popp.  Because what they're arguing, and what they

14   argued during claim construction, and kind of why understood

15   intelligent agent was read in, was because it had to

16   distinguish from someone just entering it into the application

17   itself.

18          Because just merely detecting someone entering it

19   into the application itself, well, that wouldn't be detecting

20   changes.  Even if you entered the code right into the

21   application itself, I think we would all agree, it would not

22   be into the, you know, operating, it would not be detecting

23   changes that affect an application.

24          And -- one second.  I'm almost done with this slide.

25   I'll show you from the claim construction hearing, counsel

1   agreed at the claim construction hearing that it had to be

2   something like a file compare.  That's what we're talking

3   about, our programs, or at least that's what we understood.

4   We were talking about it had to be a program for automatically

5   detecting changes that affect the application of the program

6   and not just typing in a software change such that the

7   program's then affected.

8           So should I keep on going on performs tasks and

9   decisions, or should I move ahead to where I can address --

10  I'll move ahead.

11          We believe, based on his analysis in the written

12  source code, which Salesforce ignored in its brief, ignored in

13  its presentation, a reasonable juror could find based on the

14  written analysis that deploy function makes decisions and

15  performs tasks and that it's used to automatically detect

16  changes.

17          Mr. Zatkovich, he reviewed the source code, his

18  team, for six months, 65 days.  He directed and personally

19  joined the inspection.  Now, we believe just on the

20  understanding of intelligent agents and the deploy function

21  description in the written analysis, a reasonable juror could

22  find that the deploy function satisfies the definition of

23  intelligent agent and also is used to automatically detect

24  changes that affect an application.  But in addition to source

25  code analysis, we have Mr. Zatkovich's written report.  And

1    Mr. Zatkovich's written report is a lot easier to understand

2    in the context of the written analysis of the source code,

3    which Salesforce never explained.

4         When he says in paragraph 818, "I conclude that the

5    accused products practice automatically detecting aspect of

6    this claim, because the accused products detect metadata, for

7    an application, has changed through software mechanisms,"

8    Salesforce claims we don't know what those are.

9         But the exhibit I handed up, Exhibit 11, there are

10   eight specific subroutines identified, and the deploy function

11   as a whole is identified.

12        Now, I understand the complexes -- the technology is

13   complex, but it really seems like they're trying to sow

14   confusion by never referring to the written analysis.  When

15   you see software mechanisms, and they say, we don't know what

16   that is, well, once you look at the written analysis, well,

17   now you know what it is.  He identified the starting point,

18   and he identified the eight components, and he wrote

19   specifically what they're required to do, the tasks they

20   performed and how each of them are used as a whole as part of

21   change detection.

22        And 832, "Each of the features discussed above,

23   identified as change management (fourth) layer features."

24   That's almost identical to the copy of that change management

25   (fourth) layer features.  If you look at the exhibit, that's

```
 1    an almost identical description.  I think it says fourth
 2    layer/change management-deploy.  Well, that's what's being
 3    discussed in 832.
 4           And their answer is that we don't know what he's
 5    talking about, and we should get summary judgment because we
 6    don't know.
 7           Well, a reasonable juror, at least if he presents
 8    his written description source code analysis in the way I did,
 9    I think they'll be able to understand he's talking about the
10    deploy function, even if he didn't say it expressly at trial.
11    I don't think someone can fairly characterize that as new, and
12    I don't think that testimony is required.
13           Fourth layer/change management deploy package.  A
14    starting point for the present analysis.
15           And he even explained, "My source code analysis for
16    the claimed layer four includes a code description and code
17    flow chart for source code reflecting fourth-layer
18    functionality.  What's the functionality?  Automatically
19    detecting changes that affect an application.
20           And what did he identify?  The deploy package; the
21    deploy function.  There's nothing else identified.
22           Now at his deposition they said, "Do you list
23    specific reasons why..."
24           And he said, "The fact that it acts in performing
25    decisions and rules are described in Appendix C where I
```

```
 1    described the process of the deploy function."
 2             That's not testimony that should be stricken as
 3    outside the report; that's the further logical explanation of
 4    what's in his report.
 5             And then they say, "You didn't specifically say that
 6    the deploy function is an intelligent agent."
 7             And he said, "I did.  In paragraph 818, I indicated
 8    in order to meet this limitation, you must adhere to the
 9    Court's construction, which is detecting without human
10    intervention through the use of one or more intelligent
11    agents."
12             The issue isn't that he didn't use the Court's
13    construction, they wanted him to use one of the specific
14    definitions in the spec.  But those aren't part of the
15    construction.  So what he did is he said it meets the --
16    Court's construction and any reasonable interpretation of
17    intelligent agents.  And then he described exactly what it --
18    each of the components of the intelligent agent did so that
19    any reasonable jury could know, regardless of what
20    Salesforce's expert's position takes, it's performed
21    sufficient rules with sufficient complexity in the context of
22    detecting changes to metadata that affect an application and
23    not typing changes into an application.
24             THE COURT:  You know, you put me between a rock and
25    a hard place, because basically you've agreed on a definition
```

```
 1    for intelligent agent.  But you're arguing now, you have
 2    clearly contrary interpretations of that term.  Like I should
 3    have interpreted that term as well that we added.  So you're
 4    putting me between a rock and a hard place.  You're expanding
 5    that definition far beyond what they're defining it as, and
 6    that's -- you're asking me now to make that decision.
 7              MR. DeVINCENZO:  I understand that, but we have to
 8    go back to claim construction.  The big issue on claim
 9    construction was whether they had to be external.  That was
10    the issue.  Unintelligent agent, they never asked for a
11    specific definition.  And they certainly never asked for
12    something as narrow as they're interpreting it now.  In
13    fact --
14              THE COURT:  What he asked for was the inclusion of
15    that language because in the prosecution history, these
16    patents were denied.  And the patent office mandated that --
17    what is it? -- the language two words.
18              MR. DeVINCENZO:  Intelligent agent.
19              THE COURT:  No.
20              MR. DeVINCENZO:  Automatically detect.
21              THE COURT:  Pardon?
22              MR. DeVINCENZO:  Automatically detect.
23              THE COURT:  That's it.
24              They required that, and you put it in as embodying
25    the true nature of the invention and how it's different from
```

 1    prior art.

 2            MR. DeVINCENZO:  Your Honor, respectfully, during

 3    the prosecution we did not add the term intelligent agent to

 4    get over a prior art reference.

 5            THE COURT:  No, that's in the specification.

 6            MR. DeVINCENZO:  Yes, it's in the specification.

 7            THE COURT:  You added the language "automatically

 8    detect."

 9            MR. DeVINCENZO:  Oh, we added automatically detect,

10    that's right.

11            THE COURT:  In other words, without the human hand.

12            MR. DeVINCENZO:  A hundred percent.  Correct.  And

13    that detection does occur without the human hand.

14            It's doing --

15            THE COURT:  Okay.

16            MR. DeVINCENZO:  Yeah.  Now Salesforce requests

17    several unreasonable inferences in its favor.  Here,

18    Salesforce's alighted over the key word in question/answer

19    here.  Their entire argument about filtering out unchanged

20    file is simply based on an unreasonable inference in their own

21    favor.  The filterOutUnchangedFile, here's the exact question

22    and answer which was never read.

23            "And you did not dispute that the

24    filterOutUnchangedFile alone is not an intelligent agent."

25    Alone, that's an important part of the question.

1          Here's his written software analysis of the

2     intelligent agent and all the routines that are used for part

3     of change detection.  FilterOutUnchangedFile is one of those.

4     So his testimony is consistent with his report.

5          As he explained at his deposition, "Does Step 3

6     detect using intelligent agents?

7          "Step 3 is one of the steps performed by the deploy

8     process as a whole, which I contend is an intelligent agent."

9          Now, I would like to go back to -- I'll go forward.

10          And then they ask, "Well, Step 3, filter unchange --

11     "is where detection actually happens; right?"

12          And he said, "Yeah, that's my opinion."  Of course,

13     he said that.  Because Step 3 is part of the deploy function,

14     and that's where you first see the changes.  That's why it was

15     highlighted, because you could see them here.  But that

16     doesn't mean, and this is the inference they're asking for,

17     it's the only part of the software code used for change

18     detection.  We know that's not the case.

19          And that's an unreasonable inference.  It's not the

20     only part of the code used for change detection.  And that's

21     what the construction of automatically detection requires.

22     It's detecting without human intervention through the use of

23     an intelligent agent.  Well, the entirety of the intelligent

24     agent is used for change detection, not merely

25     filterOutUnchangedFiles.  And, in fact,

1  filterOutUnchangedFiles itself merely calls other subroutines

2  that do the change detection forward.

3          As you'll see, it calls -- and I mentioned these,

4  removeSameEntries and removeSameEntriesFromFileList, and

5  that's 878 and 879.  And those were described in detail in

6  Mr. Zatkovich's report.

7          Step 3 alone, Step 3 by itself, it's not an

8  intelligent agent because it doesn't automatically detect

9  changes by itself.  It's where you first see the changes, but

10  it doesn't do it by itself.  And that's important because --

11  because infringement is not avoided if a claim feature,

12  meaning the deploy function as a whole, performs not only as

13  shown in the patent but also performs additional functions,

14  because that's basically what they're saying.  They're saying

15  you have to only do Step 3.  If the intelligent agent does

16  anything else, it can't be a program used to automatically

17  detect changes.  That's inconsistent with the law on

18  infringement.  And it's also inconsistent with the intelligent

19  agents of the specification.  They're not -- the intelligent

20  agents of the specification don't only detect changes.  They

21  search for change -- the same intelligent agent, it will

22  search for a change, discover a change, obtain information

23  concerning a change and deliver that information.  One

24  intelligent agent.

25          Well, what happens in the specification?  It

 1   identifies metadata about an application that may have been

 2   changed.  So here's an application that could have been

 3   changed.  It determines whether -- what was the same.  It

 4   removes what was the same, and it deploys only what's changed.

 5   They're very similar to the functions of the intelligent

 6   agents with one difference, we don't search third-party

 7   repository.  But during claim construction, we agreed that's

 8   not required.  It still searches the Internet or intranet or

 9   the person's own computer for these changes as Salesforce's

10   applications are all Web-based.

11          Now the disputed testimony relied on by Salesforce

12   doesn't compel judgment in its favor.  They said it cannot be

13   a static program.  And this is Schmidt's rebuttal at 349.

14   That's what he opined.  So he's saying it has to be

15   intelligent in learning.  And that wasn't argued during claim

16   construction.  And Mr. Zatkovich disagrees, as I said earlier,

17   that machine learning is required.

18          Second, they said, it has to make autonomous

19   decisions and autonomously perform tasks.  And I thought the

20   Court rejected that at claim construction when they said no,

21   no, no, it can't be used or initiated.  It's got to always be

22   running.  It's like the change detection has to automatically

23   detect the changes, you can't type them in.  But that doesn't

24   mean that a person can't have something in their sandbox that

25   may or may not have changed an application and then have a

 1  comparison done to see if it's changed.  That's very different

 2  from detecting it as I'm typing it into the sandbox.

 3          THE COURT:  Would you explain to me, please, what

 4  effect, if any, if any, the additional term added after the

 5  rejection by the PTO.  What significance, if any, did that

 6  have?  Was it a narrowing of your limitations or your

 7  invention or no?

 8          MR. DeVINCENZO:  Yes, I need to know which one

 9  you're talking about.

10          THE COURT:  I'm talking about this one we've already

11  been talking about.

12          MR. DeVINCENZO:  Oh, yes.  Intelligent agent.

13          Could you go to slide -- oh, wait.  Let me just do

14  this one quick, and then I'll explain it.

15          The Court asked during claim construction, this is

16  to counsel, "Just out of curiosity, how does an intelligent

17  agent do that?  Does it compare new language to old language?"

18          And counsel said, "One mechanism may well be one

19  that compares language in different versions."  And that's

20  exactly what we pointed to.

21          THE COURT:  That's not my question.

22          MR. DeVINCENZO:  Okay.

23          THE COURT:  My question:  What significance, if any,

24  does the added language after the rejection by the PTO have on

25  limiting the claim?

```
 1              MR. DeVINCENZO:  Okay.  Okay.  We're going to get
 2    to -- so we have a change management layer for automatically
 3    detecting changes.  And the term "layer" -- because we have
 4    two different terms that were added -- we have "layer" and --
 5              THE COURT:  What was the term before the change?
 6    Before the addition of the language "automatically detecting"?
 7              MR. DeVINCENZO:  I don't know the -- I don't know
 8    the prosecution history statement you're talking about.
 9              THE COURT:  There was a rejection, wasn't there?
10    Are we all on the same page?
11              MR. DeVINCENZO:  I don't think so.
12              THE COURT:  No.  There was no rejection --
13              MR. DeVINCENZO:  There were rejections -- sorry.
14              THE COURT:  Okay.  Okay.  We're just on different
15    pages.
16              MR. DeVINCENZO:  I'll explain automatically
17    detecting changes.  The term "intelligent agent" is distinct
18    from "layer" and "portion".  They have different meanings.
19    And the intelligent agent has to be a program that does the
20    detecting, and that's what we understood, instead of data
21    entry type changes.  Like, changing a name in a database.  So
22    that's what we understood.  And I'll explain the differences
23    between layers.  Layer is set up functionally or logically
24    separated software components.  So, for example, here's the
25    change management layer on the right.  It's made of four
```

1    components, and the claims require four different layers.  And

2    here it's four different layers with each component.

3         Now before we added in the requirement of

4    intelligent agent, the change management layer could be

5    anything that -- any software component that detected any kind

6    of changes.  So, in other words, arguably, if I type words

7    into Microsoft Word, that's detecting changes in -- before we

8    added intelligent agent.  Even though it's not a program that

9    compares anything, I'm just typing things in.

10        THE COURT:  That's what Popp was doing is --

11        MR. DeVINCENZO:  That's --

12        THE COURT:  -- is Popp was allowing to consider

13   with, presumably under your definition, using an intelligent

14   agent, it was using an intelligent agent incorporated into the

15   software to detect whether a change had been made in the

16   employee name.

17        MR. DeVINCENZO:  Yes, that's before we added

18   intelligent agent.

19        THE COURT:  Right.

20        MR. DeVINCENZO:  So this Court adds intelligent

21   agent.  Well, what's the difference?

22        THE COURT:  No.  No.  The PTO required that you add.

23        MR. DeVINCENZO:  PTO required that you add it.

24        THE COURT:  They didn't require that you add

25   intelligent agent, they required you to add the term

1    "automatic detecting."

2            MR. DeVINCENZO:  Yes.

3            THE COURT:  Why?  What significance does that change

4    have?  It cuts out Popp; right?

5            MR. DeVINCENZO:  Yeah, it cuts out Popp.  And this

6    is exactly what we're doing with our read, we're cutting out

7    Popp too.  We're not reading it on Popp.  We're reading it on

8    a file compare.  Popp doesn't do a file compare.  As you can

9    see, this could read on Popp.

10           THE COURT:  Popp does do a file compare.  It reads

11   the -- it reads the change in the employee name and -- no,

12   Popp is the automobile search; right?  It detects the changes

13   in the vehicle being sought.

14           MR. DeVINCENZO:  Yes.  And how does it do that?  It

15   has a data entry field that you type in, which is not a

16   program that compares anything.

17           THE COURT:  Okay.

18           MR. DeVINCENZO:  It's just data entry.  So that's

19   what I was going to say.  When we added in detecting through

20   the use of one or more intelligent agents, how is that now?

21   What did that add?  Well, now the components still --

22           THE COURT:  Because I need to give you guys a break,

23   I've got a revocation hearing, a criminal proceeding right now

24   at noon by Zoom.  And it will take me 15, 30 minutes to do

25   that.

 1              So that you can recoup and come back strong, I think
 2    I need to give you a break.
 3              Does anybody have conflict air reservations?  If we
 4    give you, for example, an hour for lunch -- you tell me, an
 5    hour and 15 minutes or an hour?
 6              MR. DeVINCENZO:  An hour is fine with us.
 7              MR. ZADO:  Whatever your preference is, Your Honor.
 8              THE COURT:  Let's go -- let's go about an hour, a
 9    few minutes beyond.  I won't jump on you if you come back from
10    the cafe a little bit late.  So let's recess until 1:15, okay?
11    Are we all okay with that?  That way I don't have to cut you
12    short.
13              MR. DeVINCENZO:  Thank you, Your Honor.
14              THE COURT:  All right.  Thank you.  We'll recess.
15              And you may be excused.  This is tele video; right?
16              THE CLERK:  Yes.
17              THE COURT:  There will be no other counsel, no other
18    parties, so all of your papers may remain.  We're not going to
19    look at them, none of us, and the courtroom is locked during
20    the interim period, so.
21              Thank you, counsel.  Enjoy a brief lunch break.
22         (Break taken 12:03 p.m. to 1:24 p.m.)
23              THE COURT:  Let's go again with plaintiff, please.
24              And I just need to ask you a quick question before
25    we continue.  Since we, obviously, have two different

```
 1    understandings of the term automatically -- what is it --
 2    automatically --
 3            MR. DeVINCENZO:  Detecting.
 4            THE COURT:  -- and intelligent agent.  We,
 5    obviously, are using two definite understandings.  We were
 6    supposed to, of course, interpret it to a layman's level.
 7            So here's my question:  Are you saying, in other
 8    words, under your understanding of intelligent agent and
 9    automatically, are you saying that any software program that
10    is designed to detect input changes from either an internal
11    source or an external source and to make those changes into
12    the production, whether AIT's form or a web page or the
13    functionality of the program, is an intelligent agent?
14            MR. DeVINCENZO:  No, Your Honor.
15            THE COURT:  What are you saying?
16            MR. DeVINCENZO:  Okay.  Here.
17            They have characterized that as AIT's
18    interpretation.  That's a false characterization.  Let me take
19    you through it.  We're not saying when programmers enter
20    changes into an application itself, that's automatically
21    detecting changes.  Salesforce's use --
22            THE COURT:  Programmers, you used the word
23    programmers.
24            MR. DeVINCENZO:  Programmers or other people
25    entered.  Anyone --
```

1          THE COURT:  How about client?

2          MR. DeVINCENZO:  Not -- a client entering the change

3    directly into the application.  That's only automatically

4    detecting under Salesforce's invalidity view.  That's not what

5    we're contending.  And I think I could clarify here.  And this

6    is the either, where we added intelligent -- sorry.

7          And it said, "Application developments and

8    maintenance personnel that modify applications in screens thus

9    teaching a way from any means that would operate

10   automatically."  And we agree with that.  Both sides agree

11   with that.  The only one taking a different position is

12   Salesforce for invalidity.

13          And let me explain further.

14          THE COURT:  Go back to the last slide.

15          Appellates -- no, this was the appeal.

16          MR. DeVINCENZO:  Yeah.

17          THE COURT:  Prosecution history.  Okay.

18          MR. DeVINCENZO:  So in the Ford example you gave,

19   Ford would have a website, and its developers and maintenance

20   personnel would modify that website.  Not automatically

21   detecting changes.

22          Now let me tell you the difference for infringement.

23          Okay.  Well, this was from -- claim construction, we

24   distinguished that between something with a compare language

25   in different versions.  So you have two different versions of

```
 1   an application.  I enter changes in one.  That doesn't have a
 2   program for automatically detecting changes because, like, the
 3   other example --
 4          THE COURT:  Who's the client?
 5          MR. DeVINCENZO:  No.  Let's say me Ford.
 6          THE COURT:  Me programmer.
 7          MR. DeVINCENZO:  You programmer.  Yeah, me
 8   programmer enter changes into Ford website.
 9          THE COURT:  Okay.
10          MR. DeVINCENZO:  Not detecting changes.  Website B,
11   goes, looks at website A, compares changes, what changes is
12   the metadata.  Program.  Now that's detecting changes.  The
13   changes aren't entered into the -- here, I'll show you the
14   evidence.
15          As Mr. Zatkovich explains, the changes are entered
16   into application A, but that's not the application that -- but
17   the automatic detection changes is from application B.  So
18   here's what he says.
19          "The change management functionality operates on
20   metadata and, specifically, through the Metadata API and the
21   Tooling API, as discussed below.  The operation detects
22   changes between metadata for a first version of an application
23   and metadata for a second version of an application."
24          And then it goes and updates, regenerates the
25   application, so the second one, in response to the metadata
```

```
 1   changes.  So this is different from Eager where what was
 2   detected -- it was in the application itself.  So for Ford,
 3   you're not entering it into the live one.  You could enter it
 4   into a different application, and then the live one would go
 5   and say are there any changes that affect my programming at an
 6   application level?  And if there are, let me detect which
 7   ones -- what the changes are, and incorporate them.
 8            Now that's very different from Eager.
 9            THE COURT:  Well, I'm having difficulty, as you can
10   tell.  I'm having real difficulty with following your
11   analysis.  Because if Eager taught that application developers
12   and maintenance personnel that -- these are developers; these
13   are programmers --
14            MR. DeVINCENZO:  Yeah.
15            THE COURT:  -- that modify application screens and
16   messages, thus teaching away from any means that would operate
17   automatically, I don't think the appellate court here, PTO, is
18   talking about the term "automatically" to be excluding what
19   Eager had taught.  Eager is teaching that it is application in
20   Eager, application developers and maintenance personnel modify
21   the application, screens, and messages.  I think what the
22   appellate PTO here is talking about is you can search
23   internally or externally for changes to the program.  And I
24   don't understand how the entry, just like Popp, searches for
25   an element input by a user, internal.
```

```
 1                MR. DeVINCENZO:  Okay.

 2                THE COURT:  Different vehicle.  Not a 1982, a 1983.

 3      And then it repopulates the web page with a different vehicle,

 4      price, condition, et cetera.  And, basically, what I

 5      understand you to be saying is that's an intelligent agent.

 6                MR. DeVINCENZO:  No, Popp's not an intelligent

 7      agent.  Popp's not an intelligent agent, we agree on that.

 8      Popp's not a program.  It doesn't do any comparison between

 9      any versions of applications.  It's not detecting changes

10      that --

11                THE COURT:  But it actually, according to your

12      understanding of automatically detects, that's exactly what

13      Popp is doing.  And input -- a person is inputting the change,

14      a user, 1983 instead of 1982.  And the program internally

15      restructures the web page.

16                MR. DeVINCENZO:  Okay.  That's not what we're

17      talking about.  In ours, application A is done.  You know,

18      application A, you have application A; you have application B.

19      It's --

20                THE COURT:  I understand that's what you're talking

21      about, application A and B.

22                MR. DeVINCENZO:  Okay.

23                THE COURT:  Your expert has said the combined

24      system --

25                MR. DeVINCENZO:  Yeah.
```

 1          THE COURT:  -- detects the changes and re-implements

 2     the result.  That's what Popp did.

 3          MR. DeVINCENZO:  Popp never detects changes that

 4     affect the programming.  In an application --

 5          THE COURT:  You mean, affect the software for the

 6     program.

 7          MR. DeVINCENZO:  Yeah.  And that's what an

 8     application is defined as.  Agreed definition, a software

 9     program providing a set of end user functions.

10          THE COURT:  We're missing ships in the night but

11     that's okay.

12          MR. DeVINCENZO:  Okay.  With respect to -- there's

13     two different issues.  Popp and -- I have it here.

14          THE COURT:  They aren't different issues.

15          MR. DeVINCENZO:  I understand.  I think part of the

16     problem is they've said AIT's interpretation.  That is not our

17     interpretation.  For infringement, we do not rely on any

18     program that detects anything entered.  We do not rely on

19     that.  We've never relied on that.

20          What we are relying on is if you have an application

21     that's running and then you want to say, just like in the

22     specification where you have an application is running, and

23     then you may have forms modified on the Internet, in the

24     specification to modify by third parties, in the patent and as

25     Salesforce do it, it's just not modified by third parties.

1   But somewhere someone is typing in changes to a form, whether

2   it's in the specification or here.  And what was distinguished

3   in Eager and what distinguishes Popp is the person doesn't

4   enter the changes directly into the application itself.

5           THE COURT:  They're not a programmer.

6           MR. DeVINCENZO:  They're not a programmer.

7           The detection -- yes, they're not a programmer -- or

8   they don't have to be.

9           THE COURT:  So in order for it to be an intelligent

10  agent, it has to take whatever input it is and incorporate it

11  into the program?

12          MR. DeVINCENZO:  In order for it to be an

13  intelligent agent, as we understand it --

14          THE COURT:  Because you've agreed that application A

15  includes a client making the different input.  What you've

16  said is its application B, totally different application,

17  totally different issue, that detects whether there's any

18  change whatsoever and then incorporates it.  That's an

19  intelligent agent.

20          MR. DeVINCENZO:  If a program detects changes to

21  application A --

22          THE COURT:  Uh-huh.

23          MR. DeVINCENZO:  -- compares -- detects changes to

24  application A based on application B.  So here's what we're

25  running, we're going to detect changes to this based on some

1    other application.

2            THE COURT:  Didn't your expert admit and concede

3    that that's not an intelligent agent?

4            MR. DeVINCENZO:  No, Your Honor.

5            THE COURT:  He didn't.  Okay.

6            MR. DeVINCENZO:  No.  And what he admitted was that

7    Step 3 alone, filter out function alone is not an intelligent

8    agent.  And filter out function alone doesn't detect changes

9    automatically alone.  It only does it in the context of the

10   whole program.

11           THE COURT:  Okay.

12           MR. DeVINCENZO:  And I think the comparison, and the

13   comparison done by the compare a file in Step 4 is part of

14   change detection as Step 1.  And the difference between just

15   entering changes there, as in Eager, and actually comparing a

16   program for comparing program changes, which is -- that's the

17   difference between Eager, what Salesforce does as well as what

18   Salesforce does in Popp.  But you have two different programs

19   that you're comparing rather than just detecting what a person

20   typed in.

21           Now, ultimately, when you're comparing programs,

22   someone has to program it either way.  One of them had to be

23   programmed.  But the thing is when you're detecting -- when

24   you're programming the second one, the developer didn't have

25   to enter the changes directly into that one.  They entered

1  them somewhere else and this one detected them.  And that's

2  the key difference.

3          And I hope I explained that well.

4          So the detection actually, the program is here.

5  It's getting the changes from somewhere else.  But no matter

6  what happens, a programmer has got to enter code.  It's not a

7  patent for automatically generating code.  AIT's patent to

8  avoid the need to generate code twice because the forms that

9  were previously taken from the Internet, those forms were made

10 and coded by someone and placed on the Internet.  Here,

11 instead of being made and coded and placed by someone on the

12 Internet, they're made and coded and placed by someone on an

13 internal intranet or on Salesforce's server somewhere else,

14 and then the new application detects differences automatically

15 and deploys them.

16         THE COURT:  Okay.  I'm following you.

17         MR. DeVINCENZO:  Yeah.  So that's the difference.

18         Now, with respect to Popp, Popp is just an input

19 control.  And this is Dr. Bederson, Salesforce's expert.  This

20 is what he said.  And it's Zatkovich's report.  "Input control

21 is the change management layer and intelligent agent."  And

22 then he says, "under AIT's interpretation."  That's false.

23 That's just made up.  We have never taken the position that

24 that input control is an intelligent agent.  And they just say

25 it.  So that's led to some confusion.  Because they're saying

1  it's under AIT's interpretation, but it's clearly not.  And

2  they say it over and over.  They just repeat, "We believe end

3  program detects any changes."  That's not true.

4       If you read our invalidity brief, we take a

5  reasonable position on intelligent agent.  In fact, the

6  experts themselves agree on what an intelligent agent is,

7  basically.  AIT's program with rules and objectives and tasks

8  that automatically detects changes that affect an application.

9       And we had understood at claim construction that the

10  reason it was read in was to distinguish things like Popp and

11  Eager which don't actively detect changes that affect an

12  application.  Instead, they just detect input.

13       And we're not just detecting input into the

14  application, we're detecting input that was input somewhere

15  else and this application is detecting it.  But that's the

16  same as the specification.

17       And as you see, Mr. Zatkovich says, "Bederson claims

18  that under an interpretation of intelligent agent that is

19  contrary to the Court's construction."  He said, that's their

20  expert, said it could be for invalidity, any change of any

21  type.  And Mr. Zatkovich was, like, that's just not true.

22  I've applied the plain meaning of that term.

23       Changes in field two are not changes that affect an

24  application.  It's just data such as an employee's name.  This

25  is our expert.  That's AIT's interpretation.

1     And they said it simply pushes and pulls data.

2   That's data entry.  That's not AIT's interpretation.  That's

3   our expert.  He's saying that's not what I'm relying on.  And

4   that's certainly what we're not relying on for infringement,

5   otherwise that would have been on slide one.  Our expert is

6   not relying on simple push/pull data entry.  He's relying on a

7   program that actually detects changes from a different

8   application.

9     And then he says, "Popp does not teach changes in

10   field 632 that affect applications in any way -- that affect

11   in any way, objects and elements."  And he went on to explain

12   that a change in user data operates at a different level from

13   a change that affects information in the first portion of a

14   server, like, metadata changes.

15     And at bottom, this is what Salesforce asks our

16   expert.  "You disagree that Popp disclosed the change

17   management layer because, in your view, the inputs to an

18   application are not changes that affect an application."

19     And he agreed.  He said, "So, for example, if I

20   change a customer's name from James to Larry, that's not

21   changes that affect an application, how it operates or what

22   features and functions it provides."  That is the intent of

23   the patent; to go, take changes from somewhere else, and we

24   know that because the changes have to affect an application.

25   And an application is defined by the word "software program."

1    So if the change doesn't affect the software program like

2    changing a name from James to Larry, then it's not a change

3    that affects an application.

4         And their theory of invalidity is only based on a

5    manufactured construction that it could be any type of program

6    that detects anything.  That's not our construction.  And

7    we've never said that's our interpretation.  And I do think

8    that's -- a little bit of the confusion may have been because

9    they've been using this term "AIT's interpretation" that is

10   just not supported by the evidence.  And their expert on

11   anticipation, which we'll get to next, just manufactured it.

12   And I'll show you through the evidence on that.

13        Now, for -- importantly, with respect to Popp, when

14   he explained any data that I input an application does not

15   change any logic, does not change any formula, does not change

16   anything about the behavior, there's no evidence to the

17   contrary.  It doesn't change anything.  But Mr. Zatkovich, and

18   this is another thing, he never said Popp discloses

19   unintelligent agent.  He never had to reach that issue,

20   because it doesn't even affect changes that affect an

21   application.  So when they say their expert thinks all of

22   these things disclose the intelligent agent, where's the

23   evidence?  Yes, they could have rules and tasks, but they're

24   not intelligent agents for detecting changes that affect an

25   application.

1          So while the term -- our expert did and their expert

2     did, too, view the word "intelligent agent" as a program

3     broadly, detecting changes that affect an application, he used

4     the ordinary meaning of that phrase, which is what we

5     understood to be discussed at the hearing.  It had to be a

6     program that actually detects changes in something else and

7     not just a program that detects changes when you're typing it

8     in, like Eager and Popp and all those prior art references.

9     That's how we understood it during claim construction, and

10    that's how our expert understood it for purposes of

11    infringement.  And that's what we tried to do.

12          And I'm sorry if it wasn't clear.  I know earlier

13    today I got a little confused on the issue of the prosecution

14    thing.

15          And then they went on, "So you're not disagreeing,

16    though, that changing an input to an application affects the

17    output."  So that's what they're asking, what's a change that

18    affects.  It changes by what is put on the screen, what is

19    output by the application, but does not change the application

20    itself.  No change to program.  And that's undisputed.  Their

21    expert never addressed changes that affect under the proper

22    application.  All they did is make up an interpretation of a

23    claims, call it AIT's interpretation, say it can apply to any

24    changes of any type, even if they're entered in, and then say

25    now you anticipate.  We don't take that position.

1           And if this court needs to clarify it can't be

2   entered directly into, I don't think we'd oppose that, as long

3   as you have a program -- you need a program that goes into --

4   you can't be detecting the thing it's typed in directly.

5           And the application, there was no dispute.  We agree

6   on the construction, it's a software program.  They didn't

7   even mention the definition.  In fact, it's not even in their

8   expert report.

9           Unless you have questions, you know, that's all I

10  have on intelligent agent.  He's going to get up and present

11  on some other.

12           THE COURT:  Thank you.

13           MR. DeVINCENZO:  Thank you.

14           THE COURT:  Please.

15           MR. PACELLI:  Good afternoon, Your Honor.

16           THE COURT:  Thank you.

17           MR. PACELLI:  I will give my colleague a break so we

18  can briefly cover the two issues of Lightning and the mobile

19  application.  As Your Honor pointed out, they are related.

20           So starting point, let's start with Lightning.  The

21  starting point is to understand the difference between the two

22  user interfaces used by Salesforce called Classic and

23  Lightning.  It's a narrow technical difference that does not

24  impact infringement.  Let's start with Classic.  Classic is

25  also known as Aloha.  In Classic, there's a server run by

1    Salesforce, and there's a client, such as a personal computer,

2    provided by the customer.  The Classic server creates a web

3    page that embodies the application.  This web page is encoded

4    in a language called HTML.  So we have this HTML code that is

5    distributed to a client, the client runs a browser such as

6    Chrome or Explorer, and the browser runs this HTML code to

7    present the application to a user.

8         Let's move to Lightning.  Lightning is very similar.

9    There is also server and there is also client.  The difference

10   here is that instead of just HTML, the server sends to the

11   client also what is called JSON code.  And JSON code is also

12   interpreted by the browser, just like in Classic, to present

13   the application to the user.  As part of this process, there's

14   something called DOM, or document object model, that's part of

15   the browser.  So in both cases you have computer code that's

16   sent to the browser and run by the browser, the difference is

17   the type of code that's involved.

18        Now let's see how Classic and Lightning both map to

19   the limitations of the claims.

20        Here's claim one of the '482 patent.  Both claim to

21   have what we call the third layer limitations.  We can blow it

22   up for this representative claim.

23        What does a third layer do?  It retrieves the data

24   in the first and second layers.  The first and second layers

25   include the unique and the common information.  Then there's a

1    second part.  This is done in order to generate the

2    functionality and the user interface elements of the

3    application.

4              It's important to understand what the client does

5    and what the server does.  The third layer is part of the

6    server.  It's associated with a server computer.  And that's

7    the one that retrieves the data in the first and second

8    layers.  So that has to be done by the server.

9              What about the second part, the generation of

10   functionality and user interface?  Well, the claim is silent

11   as to where that happens.  It can happen on a server; it can

12   happen on a client.  This is made clear by dependent claim 2.

13   Dependent claim 2 further narrows the third layer limitation.

14   And here it's saying that the server, third layer, distributes

15   Java applets to the client.

16             What's a Java applet?  Back in 1998 when this patent

17   was written, the Java applet was a piece of code that runs on

18   the client.  And on the client, the Java applet dynamically

19   generates the user functionality and presents it to the user.

20             So what this is telling us is that in this invention

21   the generation of the user interface and functionality doesn't

22   have to begin and end on the server, the client can be part of

23   this process.  And not all claims require the client to be

24   part of the process, but all claims certainly allow a role by

25   the client.

1          So different claims require this dynamic generation

2     to occur either agnostic or as a client or at the server.

3     AIT's expert, Mr. Zatkovich, explained how Salesforce meets

4     the third layer limitation for each of the claims in each of

5     the interfaces, Classic and Lightning.  Salesforce argues that

6     those opinions are unsupported as to Lightning, but that's

7     simply incorrect.  Mr. Zatkovich explains in detail how

8     Lightning meets the third layer limitations.

9          And we can start with the -- a section entitled

10    Salesforce UI frameworks, UI stands for user interface, which

11    is found at paragraphs 234 to 235 of the expert report.

12         Here, Mr. Zatkovich covers Classic and Lightning, as

13    well as an intermediate framework called Aura, which for

14    purposes of today's motion is similar to Lightning.  And he

15    explains that all three user interface frameworks generate --

16    dynamically generate user interfaces and functionality, but

17    they do it differently.

18         Here in paragraph 230, Mr. Zatkovich provides an

19    overview of Lightning.  And he explains that Lightning, like

20    Aura, has a single page application model that involves

21    sending JSON payloads to the client and these modify the

22    document object model, or DOM, which is what we saw in that

23    cartoon earlier.

24         And after explaining the technical differences

25    between the three UI frameworks, he explains that despite

 1    these differences, they work in similar way and rely on the

 2    same UDD infrastructure to manage the underlying metadata.

 3         Now, recall that the third layer, the function

 4    that's recited in the claim for the third layer is to retrieve

 5    the data in the first and second layers.  This is done in the

 6    Salesforce product by something called a UDD, or universal

 7    data dictionary.  It's a piece of software that retrieves the

 8    metadata in the first and second layers.  This is also

 9    referred to as the Metadata API or UDD API.

10         Importantly, Salesforce doesn't dispute that this

11    type of retrieving information in the first and second layers

12    is the same for Classic and Lightning.  The same UDD

13    infrastructure is used by both frameworks.  So there is no

14    dispute that with respect to the recited limitation of the

15    first layer of retrieving the data in the first and second

16    layers, there is no material difference between Classic and

17    Lightning.

18         The next section is entitled Infringement Overview.

19    This is found at paragraphs 441 to 549.  And this section

20    discusses aspects of the asserted claims that exist in similar

21    formulations in all asserted claims.  So this cuts across all

22    claims and cuts across all user products and user interfaces.

23         Here, Mr. Zatkovich explains, this is paragraph 534,

24    which is referred to in the briefs.  He refers -- explains

25    single page applications which, as he explained in the

previous section, refers to Lightning.  He talks about
components or bundles.  These are incorporated into the
browser's document object model, again, the DOM, and these are
inserted into an appropriate location within the browser's
memory so that the browser can present the application to the
user.  And he draws this conclusion, "That the differences
between the two above-described processes," meaning Lightning
and Classic, "will generate an application user interface or a
page."  While reflecting some differences are not relevant --
are not different in ways that are relevant to the claims and
the results created by these technologies, Classic and
Lightning, both map easily to the third future limitations.

           So then, Mr. Zatkovich goes into each claim.  It's a
very long part that's the bulk of the expert report, because
he needs to go through each limitation on each claim.  And as
part of this analysis, he talks about the third layer.  So,
for example, for claim -- this is claim 1 of the '482, he
explains what the third layer does.  It retrieves metadata for
the custom components, which is the first layer; it retrieves
metadata for the common components and functions.  That is the
second layer.  And then he says, "As discussed above, this
metadata is converted, by functionality in the claimed third
layer as discussed above, into information that reflects a
custom application."  So this simply refers back to the
explanation of the information that was presented earlier.

1    He doesn't have to repeat the entire discussion,

2    because that would triple the size of the expert report.  So

3    he says, "As discussed above, the information takes different

4    forms for Lightning and Classic.  In Classic it's a web page

5    as HTML.  In Lightning it's HTML, plus the JSON object.

6    The last relevant section really responds to one of

7    Salesforce's non-infringement arguments.  And again, this is

8    found at paragraph 1245.  And he says, "As I have explained

9    elsewhere in this report," meaning in the overview,

10    "client-side rendering in the Aura and Lightning frameworks,

11    meets the claim language based on the provision of both the UI

12    ensuring sufficient functionality to the browser in the form

13    of JSON payloads."

14    So that is the information mentioned above, which

15    for Lightning takes the form of JSON payloads sent to the

16    client.

17    Then he notes, "Indeed, this is exactly how the

18    patents preferred embodiment works."  And recall the

19    embodiments of claim 2 where the Java applet does the dynamic

20    generation.  That's exactly what happens in the Lightning

21    today.  All that changes is the type of code that's sent to

22    the client.

23    Now, in forming his opinions, Mr. Zatkovich relied

24    on a wealth of evidence, including documents, and also

25    including the testimony of witnesses on technical issues.  For

 1    example, Mr. Harley, Walter Harley, is -- was Salesforce's

 2    Rule 30(b)(6) witness, and he's a vice president of

 3    engineering at Salesforce.  He explained that, "Regardless of

 4    the specific UI framework, you will expose through

 5    EntityInfo," which is a piece of software that's part of the

 6    UDD, "common and org-specific," meaning unique, "metadata that

 7    will be used to generate the app; correct?

 8             "That is correct."

 9             So he's basically explaining how the Lightning,

10    regardless -- Lightning and Classic, regardless of the

11    framework, that meets the claim language.

12             He also explained the way the server provides, in

13    this case in Lightning, a custom user interface is by

14    transmitting information that modifies the DOM in the browser.

15    That would be JSON objects.

16             So based on this evidence, including documents and

17    testimony, a reasonable jury can certainly find that the

18    Lightning user interface needs the third layer of limitation.

19    And because this evidence also supports Mr. Zatkovich's

20    opinions, a reasonable juror is entitled to adopt those

21    opinions.

22             And, again, contrary to what counsel stated, there

23    was no point in serving supplemental reports on this point.

24    It's all fully covered in the expert reports.

25             So let me go to the deposition testimony.

1          At deposition, Mr. Zatkovich simply repeated these

2     same facts in different words.  He talked about retrieving

3     metadata regarding user interface and functionality from the

4     UDD creating Lightning component bundles, generating JSON

5     objects, then a Lightning applet which is the piece of

6     software that runs on client.  It takes a JSON object and

7     converts them to DOM objects.  And then summed it up occurs as

8     follows:  "So a portion of that app generation process on the

9     server, and then a portion occurs on the client."  This is

10    simply a summary of the same analysis that we saw earlier.

11    And Salesforce takes issue with the summary, but that's

12    exactly what Mr. Zatkovich had in his report, he just used

13    different words.

14          For example, this was paragraph 1245.  He explained

15    that Lightning meets the claim language based on providing

16    user interface and functionality in the form of JSON payloads.

17    This is just to paraphrase.  So Salesforce is here just taking

18    advantage of the complexity of this matter, of course, to

19    create an appearance that there's a difference between what's

20    in the deposition testimony and the what's in the actual

21    reports.

22          And one final thing, here, this is really a

23    disagreement between experts.  Salesforce's expert,

24    Dr. Schmidt opined that the claim generating happens at the

25    client because that's where the browser converts JSON objects

1    to the DOM objects.  So for that reason he's just disregarded

2    everything that happens on the server and on the basis he

3    concluded that Lightning lacks the claimed third layer.  Of

4    course, that's inconsistent with the claim language, and at

5    deposition Dr. Schmidt had to concede that in the claim 2

6    embodiment, the generation can be done at the client.  But

7    even setting that aside, Salesforce is simply asking the Court

8    to adopt the disputed opinions of that expert.  And that's

9    inappropriate at the summary judgment stage.

10            So if Your Honor has no questions on Lightning, I

11   can briefly cover the other issue of the mobile, which is

12   related.

13            THE COURT:  Please.

14            MR. PACELLI:  Oh, okay.  Here it is.  All right.

15   I'll try to keep this very short.

16            Again, there's another cartoon which looks very much

17   like the previous one.  Here we need to distinguish the two

18   ways that a customer can use these software products.  The

19   main way a customer can use a Salesforce product is through

20   the web.  And, again, there's what we call the web client,

21   which is some kind of personal computer or an Internet

22   browser.  And, again, as we saw a few minutes ago, the server

23   sends the application to the browser, and we call this web

24   access.  All the accused products can be used this way.  In

25   addition, for the customers' convenience, customers can also

```
 1    use a phone or a tablet or device to access the same products.
 2    Now on a tablet, you can also run a browser, in which case
 3    there is no difference.  It works the same way.  However, some
 4    mobile devices can run a specialized app, and we call this
 5    mobile access.  Mobile access is just an additional feature,
 6    an add on to web access.  And the law is clear that if
 7    Salesforce infringes the claim using web access, having
 8    additional ways of accessing the same product doesn't prevent
 9    infringement.
10          It's important to note that Salesforce has not
11    alleged that any of the products are mobile only, like,
12    something like TikTok or something, applications that are only
13    accessible on a phone.  But that's not the case for
14    Salesforce, and we'll get back to that point later.
15          So here there's -- we need to get into the specifics
16    of the claims.  And Salesforce says -- sorry, AIT is asserting
17    both apparatus claims and method claims.  Apparatus claims
18    recite a structure, a thing, that's described in a claim.  And
19    if Salesforce makes or sells or uses that thing, they
20    infringe.  And the claw is clear, again, if you're adding more
21    bells and whistles to that thing doesn't prevent infringement.
22          Other claims are method claims.  And method claims
23    recite a sequence of steps, so Salesforce has to perform each
24    of these steps in order to infringe.
25          Starting with the apparatus claims, these are the
```

 1    two independent apparatus claims, claim 1 and 13 of the '111.

 2    They both describe a system.  That's the thing that they

 3    describe.  In both cases there is a server, claim 1, of the

 4    '482 patent also recites computers.  Claim 13 does not express

 5    or recite client computers as part of the system.  However, in

 6    claim 1, the -- each computer basically -- paraphrasing, runs

 7    a browser, and the user interface and functionality is

 8    distributed through a browser.

 9         For claim 13, you have a server accessible by a

10    browser, and, again, the server sends the functionality user

11    interface to the browser.  So we have these browser

12    limitations.  So importantly, there is no question that there

13    is sufficient evidence for a reasonable jury to find that the

14    browser limitations are met.

15         So all Salesforce argues is that when they do

16    something else, they don't infringe.  So when someone doesn't

17    use the browser, they don't infringe.  But, again, the law

18    is -- sorry.  I don't know what happened.

19         Sorry, clicker malfunction.  Apologize, Your Honor.

20         So the addition of features does not avoid

21    infringement.

22         Salesforce also argues that the infringing system is

23    not used when accessed via mobile device.  But, again, any use

24    of a device that meets those structure limitations will

25    infringe the apparatus claims.

1        So in summary, with respect to the apparatus claims,

2    there's no dispute that there's sufficient evidence for a jury

3    to find that the browser limitations are met.  In that

4    scenario, as a matter of law, the alternative mode of access

5    is not relevant, doesn't avoid infringement.

6        Now, very quickly on the method claims.  Okay.  The

7    method claims, this is claim 21 of the '482 patent.  Unlike

8    the apparatus claims, the method claims it take a specific use

9    of a method.  However, the key thing to note here is that the

10    method claims do not recite a browser.  So the method claims

11    don't care whether a user uses a browser or not, that's just

12    irrelevant.  All that matters is that the distributing of user

13    interface and functionality to the mobile device in this case

14    happens.  And there is sufficient evidence for a reasonable

15    juror that that limitation is met.

16        For example, one of Salesforce's witnesses,

17    Mr. Hansma, executive vice president of engineering, testified

18    that it's the same technology that powers both desktop and

19    mobile.  Again, the way he explained that the way it works, it

20    works on both browser and on mobile.

21        And Salesforce documents show that the overlap

22    between the desktop and mobile access is almost complete when

23    it comes to Lightning.

24        Based on this and other evidence, AIT's expert

25    concluded that the same Lightning architecture enables both

desktop and mobile access using the same mechanisms, and that's because it's the same product.  It's the same accused product that gets accessed in both ways.  The only difference is that for mobile access there is no browser, possibly.

But this difference is now relevant to the method claims, because those claims don't require a browser application.  So at the very minimum there is a question of fact for the jury to decide.  Even discounting all the evidence, even if Your Honor draws all the inferences in Salesforce's favor, which is not proper at this stage, but even then, that wouldn't really affect the outcome of the case.  Salesforce has not alleged that any of the products are mobile only or that any of the customers only use the mobile access, or that you could have at any time replaced web access with mobile access.  So in short, without web access, Salesforce doesn't have a business model.  And mobile access is just bells and whistles on top of web access, and that doesn't move the needle on Internet liabilities or damages.  And again, these distinctions are at best relevant to the method claims, and they don't affect, again, as a matter of law, infringement and liability on the apparatus claims.

THE COURT:  Thank you.

MR. PACELLI:  So unless Your Honor has questions, I will yield back to my colleague.

THE COURT:  Okay.

```
1              MR. DeVINCENZO:  I'm going to address Popp briefly,
2     and then I'll do -- or if you -- I'll address Popp and then --
3     first.
4              Popp does not invalidate any other claims as a
5     matter of law.  And that's for the reasons stated in our
6     summary judgment motion.  Salesforce has to demonstrate that
7     every limitation is satisfied.  And there is at least three
8     limitations that just aren't in Popp.  Two of -- one of which
9     isn't there as a matter of law.
10             So this is Popp.  The first thing a reasonable juror
11    does not have to find, and frankly shouldn't find, is that
12    Popp discloses a first layer containing -- and this is
13    important, because the words matter -- unique information
14    about an aspect of an application.  And there's two things --
15    two parts to the claim -- and I'm going to go through claim 1
16    of the '482, but the other claims are similar with respect to
17    information about an aspect of an application.
18             That information must also be unique information
19    used to generate the functionality and user interface
20    elements.  And all three claims are generally similar.
21             Now, again, what is an application?  A software
22    program providing a set of end user functions for performing
23    tasks.
24             So what does Salesforce contend is the first layer
25    containing unique information?  Data retrieved from an
```

```
 1    external source such as a database.

 2            And I would like to address, we don't dispute that

 3    data can be the information in the first portion of the

 4    server.  However, whatever is in the first portion of the

 5    server has to be about describing, defining, an aspect of a

 6    program, such as metadata or other things that define the

 7    program itself and not mere data like a person's name.  I

 8    don't think anyone would define, say, a person's name is data

 9    about an aspect of a program.  And that's what Salesforce

10    asked the Court to accept as a matter of law.  They're saying

11    a reasonable juror could not find otherwise.  And now I

12    haven't even gotten into our expert testimony and the -- but a

13    reasonable fact finder does not have to accept their position

14    or their expert without any evidence to the contrary because

15    it's illogical.

16            So this is Dr. Bederson -- this is Mr. Zatkovich.

17    The generated web pages -- this is, he first quotes what

18    Dr. Bederson says.  "The generated web pages meet the claimed

19    particular application, and the database containing contents

20    of the web pages meets the claimed first layer."  So it's

21    content of the web pages.  That's all.

22            And he said, "I disagree because the database

23    contains the data on which a conventional application

24    operates."  So it doesn't concern anything about the program

25    itself or an aspect of the program, it concerns information on
```

1    the data the program operates on.

2            So, for instance, if I type my name into an Excel

3    spreadsheet, my name would be data operated on by Excel.  But

4    my name would not be -- would not be information about a

5    unique aspect of Excel, and that's what Salesforce claims the

6    Court should accept as a matter of law.

7            Now, Mr. Zatkovich explained, "For example, in the

8    case of the Automobile Shopper, such data includes model,

9    price, and type information for several vehicles."  And he

10   goes on to quote the exact portion of Popp identified by

11   Dr. Bederson.  But the information in Popp is data about a car

12   for sale.

13           And he explained, "That's not data about unique

14   aspects."  And he explained what would be data about unique

15   aspects, "such as, database schema, business logic, or other

16   metadata.  It is not merely data stored by the application --

17   oh, "it is merely data stored by the application.  It does not

18   define any aspect of the application user interface or

19   application functionality."

20           That's a reasonable opinion given the words of the

21   claim and Popp itself.  And a reasonable juror could accept

22   that opinion.

23           And then, Mr. Zatkovich went on.  He said, "Popp's

24   disclosure of car information is not used to generate

25   functionality."  Because in the claims it's not required

 1    merely to generate the user interface, it has to be the

 2    functionality.

 3           And Salesforce doesn't dispute that in its motion.

 4    Instead, they said functionality is irrelevant.  And they

 5    actually moved to strike Mr. Zatkovich's opinions that tried

 6    to explain, well, what would be a bad access of an

 7    application?  And he said something about the functionality

 8    would be like that, and they sought to strike it.  Well, not

 9    only shouldn't it be stricken, it's a reasonable opinion,

10    especially when an application is defined as a program with a

11    set of user functionalities.  That's what a program is.

12    That's what an application is in this context.

13           See, on the left, the unique information must be

14    used to generate the functionality and user interface

15    elements.  And now, Salesforce contends that their expert

16    reads this and says, well, it only needs to generate -- be

17    used as part of the user interface.  That's not what the claim

18    language says.

19           And then Mr. Zatkovich at his deposition further

20    explained.  They said, "You're reading aspects as meaning

21    features and functionality."  He said, "I would say that's a

22    reasonable description.  I'm trying to see if I can expand

23    that broader than features and functionalities that would

24    still relate to the aspects for a particular application."

25           His opinions, he was explaining his opinion in the

1   context of the claim language.  He wasn't redefining the claim

2   language.  He was explaining at deposition what he meant.  And

3   he said, "I would say that is a fairly complete scope of what

4   I consider aspects, but I think it's more accurate to say I

5   distinguish aspects of the application or program from data

6   that's stored by the application," like the Excel example I

7   gave with my name.  That's a reasonable opinion.

8         And then he went on when they asked, "In your view,

9   Popp's information in the first layer is merely data stored by

10   the application."

11         And he said "yes."

12         And then they asked, "And that is because Popp's

13   information in the first layer does not define any aspect of

14   the application user interface or functionality?"

15         And he said, "Among other reasons, yes.  That's why

16   I do not believe the changed information about any aspect of

17   an application."

18         Next, Popp does not disclose automatically detecting

19   changes that affect an application.  Now, first

20   Mr. Zatkovich's opinion is based on his understanding.  So

21   this is AIT's interpretation.  If you want to know AIT's

22   interpretation, it's Mr. Zatkovich's interpretation.

23         At trial the parties don't get to present

24   interpretations, we get to do opening statements and argue,

25   but the interpretations are the witness testimony.  So when

1    they get up and they argue AIT's interpretation is any program

2    that covers any changes, that's not evidence.  That's

3    argument.  The evidence of AIT's interpretation is

4    Mr. Zatkovich's opinions and nothing else.

5         So what did Mr. Zatkovich say about change manager?

6    He said, "Input control -- well, first they're relying on the

7    input control.  And then I underlined under AIT's

8    interpretation, because that's the manufactured

9    interpretation.  So their expert only believes this is met

10   under a manufactured interpretation of something that we all

11   agree is not an intelligent agent that automatically detects

12   changes that affects.

13        Their expert looked at an input, said, AIT

14   interprets it that way, and, therefore, that's what it is.

15   That's not our interpretation.

16        This is what Mr. Zatkovich said.  "Changes in field

17   are not changes that affect an application or a program.

18   Rather, field 632 includes data such as an employee's name.

19   Object inputControl simply pushes and pulls data."

20        That's exactly what was distinguished in Eager.

21   We're not -- we're not switching theories, in other words.

22   And the accusation that we're expanding it to cover something

23   that's just merely data entry is not right.

24        And then he went on to say, "Such data does not

25   affect an application, but rather is data on which the

 1    application operates.  The application itself," the software

 2    program, "is entirely unaffected."  That's a reasonable

 3    opinion.

 4          And then he went on to say, "Popp does not teach

 5    changes in field 632 affect in any way the HTML objects or

 6    elements in the second layer identified by Salesforce's

 7    experts.  Rather, as explained, changes in field 632 are

 8    changes in the data Popp's application operates on."

 9          Then he was asked, "So you disagree -- "So you

10    disagree that Popp disclosed the change management layer

11    because, in your view, the inputs to an application are not

12    changes that affect an application?"

13          So notice how they changed the words.  It's not --

14    so now they're saying, they're arguing, aren't inputs to an

15    application when you type it in or anything typed?  And he

16    said no.  "For example, if I change a customer's name in a

17    database from James to Larry" -- and I added in the database,

18    but I'm just giving it as an example, "that's not changes that

19    affect the application, how it operates, or what features or

20    functions it provides."

21          Well, how can changes that affect an application

22    affect an application if it doesn't affect how the application

23    operates or what features and functions an operation -- an

24    application provides?  That's certainly not an unreasonable

25    position to take that if a -- that if something is merely

1    typed into an Excel file that that doesn't affect the

2    application, how it operates, or what features and functions

3    it provides.  That's not an unduly narrow understanding of

4    changes that affect an application in the context of one's

5    skill level.

6            And not any data that I input into the application

7    in Popp does not change any logic, does not change any

8    formulas, does not change anything about the behavior of the

9    application.

10           Now, then, what is Dr. Bederson's contrary

11   understanding?  And, again, he points to -- and this is one

12   paragraph.  He points to the input name.  And then in the

13   last -- and then he has one sentence, he says, "In other

14   words, inputControl 664 is a change management layer and

15   intelligent agent both."  And I know Salesforce contends that,

16   well, that's under AIT's interpretation.  That's under

17   Dr. Bederson's interpretation as well, and I'll go through

18   that.

19           "In other words, inputControl is a change management

20   layer that automatically detects changes in field 632, which

21   affects the web page application," but then he goes on,

22   "including information in the database, specifically a name."

23           That's not Mr. Zatkovich's rebuttal report, that's

24   Dr. Bederson's, I'm sorry.  But that's the quotes from

25   Dr. Bederson's report.

1          And what he said was, what's the change?  He goes,

2     "including information in the data, a name."  He's saying a

3     change of a name in a database is a change that affects an

4     application.  It's not unreasonable to take the position that

5     that's not a change that affects -- not unreasonable to take

6     the position that that change doesn't affect the database.

7          Now, this is his position on anticipation, and we

8     both agree.  He says, "inputControl is both the change

9     management layer and an intelligent agent."  And, but he

10    applies the claim language the same for obviousness, and I'll

11    get to that.

12         Now, his opinions fail to raise a question of fact.

13    Because when he was asked, does Popp disclose a change

14    management layer under the proper application, or what you

15    believe is the proper application of the -- or is the proper

16    application of the Court's construction.

17         So does he believe it discloses changes that affect

18    an application?  He says, "I don't have a particular myself

19    about whether Popp itself teaches an intelligent agent under

20    the Court's construction."

21         So he didn't even opine that it meets limitation.

22    Then I asked him about automatically detecting changes that

23    affect the application --

24         THE COURT:  Turn it back one slide, please.

25         Okay.

1          MR. DeVINCENZO:  And then I asked him about whether

2    the change to a name is automatically detecting changes that

3    affect a particular application.  And he said, "I believe Popp

4    discloses automatically detecting changes under AIT's apparent

5    understanding" -- again, an understanding that's manufactured

6    by Salesforce -- "of the Court's construction.  But my

7    analysis of that term and what Popp discloses under what I

8    think is the correct instruction is a combination of Popp with

9    another reference."

10          So, again, he doesn't believe it's disclosed.  How

11   could a reasonable jury find that Popp discloses an

12   intelligent agent that automatically detects changes that

13   affect an application when Salesforce's expert doesn't believe

14   it's there, AIT's expert doesn't believe it's there, and no

15   expert believes it's there.

16          This is how Dr. Bederson interprets the claim

17   language.  Deploy function, which is what's accused, is

18   outside of his understanding, and Popp's out -- inputControl.

19          Now, this is what Salesforce alleges for

20   obviousness.  And this is important, because it's directly

21   contrary to their argument, their claim construction argument

22   that an intelligent agent and change layer can't be one and

23   the same.  That belated claim construction argument, the

24   experts agree that they can be one and the same.  And I know I

25   pointed out for obviousness -- I mean, anticipation.  But this

1    is what Dr. Bederson said for obviousness.  So for

2    anticipation, he said, "inputControl is a change management

3    layer and intelligent agent."  And then for obviousness, "It

4    would have been obvious to incorporate these teachings into

5    Popp such that Popp's inputControl is an ABIS agent."

6         Well, that means the ABIS agent is both the

7    intelligent agent and change management layer.  There was no

8    distinction applied by either Salesforce's experts or our

9    experts.  The experts agree, the change management layer can

10   have one intelligent agent and be one and the same.  That's a

11   classic application of the claim language.

12        It's not how I would interpret the two, it's how one

13   in the skill of the arts.  And one in the skill of the arts

14   would agree that the change management layer could be an

15   intelligent agent here.

16        And then lastly, Dr. Bederson intends to offer

17   opinions at trial based on AIT's interpretation.  When I put

18   AIT's interpretation in quotes, because I think that has led

19   to a lot of confusion.  Even if he's allowed to testify about

20   an invalidity interpretation, it doesn't -- it doesn't even

21   satisfy -- it doesn't raise a question of fact in this case.

22        And I'll just go quickly.  This is what he said

23   under AIT's interpretation.  So if we ignore what he calls it,

24   because under any other name it still would not raise a

25   question of fact.  We ignore what he calls it.  He says, "Any

1    software capable of automatically detecting changes is an

2    intelligent agent."  So he admits, he didn't require it to

3    detect changes that affect an application.

4           And he didn't really do it in his report, and that's

5    at 277.  At his prior claim construction, he said he was going

6    to do it.  "It is also my view under plain and ordinary

7    meaning, it appears to encompass any changes of any type."  So

8    he's simply saying, if you don't need an intelligent agent and

9    you don't need to check changes that affect an application,

10   well, then Popp would disclose it.  Well, then, of course, he

11   would disclose it.  But you can't just make up a construction

12   to encompass the prior art.  It has to be tied to the facts of

13   the case.  And they didn't do the rigor necessary.

14          And you'll see here, 01 Communique, it says

15   specifically, Tenth Circuit, "An accused infringer cannot

16   defeat a claim of infringement or invalidity merely by

17   pointing to similarities.  This does not preclude a litigant

18   from arguing if a claim term must be broadly interpreted to

19   read on an accused device."

20          This is the case law they're trying to squeeze into

21   the fact that he made up a construction.  But this case does

22   not support what they're doing.

23          And in that case, *Citrix* was the defendant.  They

24   were accused of infringement.  They had their own product that

25   was out earlier.  It would be like if we were accusing

1  Salesforce based on a previous version of their system.  And

2  what they argued there was something like the deploy function

3  itself was in the prior art.  So there were an earlier version

4  of their product, the BuddyHelp product had that version.  And

5  now you're accusing a different product, but it has the same

6  deploy function.  And you could -- this is from the appendix.

7  This is what the expert said in that case, very different from

8  this case.  It's his opinion that BuddyHelp anticipates or

9  renders obvious.  And then he says, "I understand the

10 underlying functionality of the product -- "of the prior art

11 product continued to be used in the current product."  That's

12 a very different argument than Salesforce is making here.

13         Now, the deploy function itself detects new types of

14 data, customized layouts, et cetera.  This is from

15 Salesforce's opening brief.  That's not what they're pointing

16 to when they say under AIT's construction it can detect any

17 data of any type.

18         Report to metadata, customized layouts.  We point to

19 changes that affect a program as the claim requires.  They say

20 we point to any data and then read it on any data and try and

21 survive summary judgment on that basis.  That's not what we're

22 doing at all.

23         So what is -- what is 01 Communique say?  It says

24 you can take someone else's infringement theory, but to do so

25 you have to show that next step.  That it's required.  You

1    need to prove that for infringement, and, therefore, it

2    encompasses the prior art.  Well, did they do that rigor?

3    What did they do for that?

4              I'll get to that.  I'll get to that on our motion.

5              If you look at statement of fact 19 from our motion,

6    we pointed out that their expert did not analyze their

7    products, didn't analyze the functionality accused of

8    infringement, and made no comparison to our products.  So

9    there's no evidence from which a reasonable juror can

10   determine that it -- an infringement read would be required to

11   encompass Popp.  And simply saying AIT has come up with this

12   construction is insufficient to even raise a question of fact,

13   yet Salesforce is moot for judgment in their own favor.

14             And on dynamic generation, Mr. Zatkovich was clear

15   that Popp is a static application.  It's a dynamic web page,

16   and a web page can be an application, but an application is a

17   software program.  The software program in Popp does not

18   change.  So it's called a dynamic application, and it has the

19   word dynam- -- it's called a dynamic web page and it has the

20   word dynamic, but that doesn't mean it's a dynamic

21   application.

22             Mr. Zatkovich testified, paragraph 251, "I disagree.

23   The scriptedControl object does not generate the feature's

24   functionality and user interface as claimed.  Rather, it is

25   involved in the generation of HTML code for static application

1    with fixed functionality and interface."

2          And he said, "So am I correct, Popp does not

3    dynamically generate the required application because Popp's

4    application does not generate based on first layer

5    information; right?"

6          But he doesn't say, and they rely on that, well,

7    that's the only reason.  So, again, they ask for inferences.

8    Because if you look at the context of that conversation, it

9    was in the deposition, it was in the context of discussing

10   first layer, so they say, am I correct it does not generate

11   it, because it's not generated based on first layer

12   information?  He says right, yes.  And then they interpret

13   that, and they ask the Court to find that's the only reason

14   they found it.  And that's not what he said.

15         Finally, AIT's consistent with Mr. Zatkovich's

16   opinion on first layer.  If you go back to -- they're not

17   relying on the arguments we made for the claim terms.  They're

18   relying on our background.  And before they introduced it, my

19   colleague explained, he was giving examples of how the user

20   would perceive the system more than how the system works.  So

21   he was explaining how the user perceives the system.  A user

22   can only perceive data on the screen.  So, therefore, if I

23   make a change to a metadata field or a program, of course the

24   user is going to see change -- you know, a change on the

25   screen.  But that doesn't mean data doesn't have to affect any

```
 1   aspect of an application.  And you certainly can't read out
 2   words of the claim is based on statements at a Markman
 3   hearing.
 4           With respect to obviousness, questions of fact
 5   abound.  The experts disagree regarding whether Popp and Amati
 6   are in the same field.  And paragraphs 1152 and 1184 of
 7   Mr. Zatkovich's rebuttal, the experts disagree regarding
 8   whether a skilled person would combine Popp and Amati.
 9   Paragraphs in Mr. Zatkovich's report alighted over
10   Salesforce's reply.  The experts disagree on whether the
11   combination of Popp and Amati would work.  Paragraph 1156.
12           The objective indicia of nonobvious are significant
13   and must be considered in this case as well.
14           Then lastly, Dr. Bederson's opinions are not
15   required to be accepted as true.  Dr. Bederson's opinions
16   concerning Popp were copied from another expert's report word
17   for word.  This is the entirety of his opinion concerning the
18   first layer.  It's conclusory.  He never explains how anything
19   is about any aspect of an application.  Doesn't even explain
20   it.  One paragraph.  All he says is, "All contents of web
21   pages is about an aspect of an application."  Well, that's not
22   true and there's no rationale.
23           For change management layer for automatically
24   detecting changes.  No explanation regarding intelligent
25   agent, how changes are detected, or how input affects an
```

1    application.  We just listened for a half hour them explaining

2    why the source code analysis done by Mr. Zatkovich was

3    insufficient to even raise a question of fact on intelligent

4    agent, despite a three-page software code analysis of eight

5    different software components that collectively detect changes

6    from one application to another via comparison of metadata.

7         They're saying that's insufficient to raise a

8    question of fact and at the same time pointing to this single

9    paragraph and saying it must be accepted as true as a matter

10   of law.  We don't think that's a fair position.

11        With respect to the copying.  And this is just one

12   paragraph you can compare.  On the right is a different expert

13   from the PTAB who is applying a different standard.  On the

14   left is Dr. Bederson.  And he simply took every single word,

15   except in my opinion.

16        And he didn't do it for that, he did it for the

17   change management layer as well.  He did it for the preamble.

18   And notably in the preamble, you didn't use the agreed

19   construction, because Dr. Schmidt used a different

20   construction, and he copied it anyway.  Every word.

21        Again, Dr. Schmidt didn't even provide the right

22   standard.

23        In addition, Dr. Bederson's not only conclusory,

24   copied, he did it -- he did a thousand pages of opinions in

25   this case in 250 hours.  He worked only with Quinn Emanuel.

 1   He could not estimate, even estimate the portion of his expert

 2   report prepared by him.  He could not estimate when he began

 3   working on it in 2002.  And I deposed him in August.  And he

 4   didn't -- January, February, couldn't give me a month.  And

 5   we've cited the testimony there.

 6              Now, Salesforce relies on typewriting their reply in

 7   this case.  However, if you look, the sentence after they rely

 8   on, this is what it says:  "Summary judgment is not

 9   appropriate -- summary judgment is not appropriate where the

10   opposing party offers specific facts that call into question

11   the credibility of the movant's witness."  And with respect to

12   Dr. Bederson, I believe we have introduced specific facts that

13   call into question his credibility.

14              That's all I have, Your Honor.

15              THE COURT:  Thank you.

16              Now you presented your motion; right?

17              MR. DeVINCENZO:  I have a little more on mine.  I

18   just presented on Popp, because I want to go through the

19   whole --

20              THE COURT:  No, your time's gone.

21              MR. DeVINCENZO:  For our summary judgment motion?

22              THE COURT:  Yes, sir.

23              Would you like to add a little more?

24              MR. DeVINCENZO:  Yes, I would.

25              THE COURT:  I'll give you a few more minutes.

```
 1              MR. DeVINCENZO:  Ten more minutes.

 2              THE COURT:  Pardon?

 3              MR. DeVINCENZO:  Ten more minutes.

 4              THE COURT:  Okay.

 5              MR. DeVINCENZO:  Yeah, because -- I just want you to

 6    see, because that was like the abbreviated version.

 7              So here's all the references on top, and there's two

 8    aspects to the change management limitations.  And this is

 9    important.  If you look at the statement of undisputed facts,

10    Dr. Bederson did not offer opinions regarding either of these

11    aspects.  So he didn't opine that any reference discloses

12    either an intelligent agent or detecting changes that affect

13    an application.

14              Now, he recognized, paragraph 224, the Court's

15    constructions required detecting changes that affect an

16    application.  And then -- and that the detection must be done

17    using intelligent agent.  So you need two things:  You need

18    detecting changes that affect an application, and detecting

19    done using an intelligent agent.

20              Now, Salesforce hasn't raised a question of fact.

21    And this is what they say in their brief, they say, "Under

22    AIT's interpretation, the prior art anticipates the asserted

23    claims."  And this was in response to our statement of facts.

24    They said, "Under Salesforce's interpretation of the obvious."

25    And now we're moving on anticipation.
```

```
 1              And now, Dr. Bederson, saying these were all -- he
 2   only offered opinions based on what he called AIT's
 3   interpretation.  That's not disputed.  So he offered no
 4   opinions on his understanding.  If he stood up and said, does
 5   this reference disclose these?  The jury couldn't find that
 6   based on his understanding that any of these limitations are
 7   present in any of the primary seven references.  So we have,
 8   the seven primary references are outside of how he would apply
 9   it as well as the accused product.
10              So now as I said before, he defined it, and this is
11   from his report, any program -- "Any software capable of
12   detecting changes -- any changes."
13              And as I said before, any changes of any type.
14   Plain ordinary meaning to him.
15              So what happens?  As I said before, he expands it
16   not only to cover Popp, he just makes up the definition to
17   cover all seven.  So we have the case law, I went to 01
18   Communique.  Now TiVo is similar.  In TiVo, the Third Circuit
19   affirmed the district court, said no, you can't take another
20   expert's infringement read and give your view of it.  And that
21   was -- it refused to allow someone to testify how Mr. Gibson's
22   infringement analysis would affect the issue of invalidity.
23   Now, Your Honor, they haven't even done that.  Their expert
24   didn't look at our infringement analysis, he came up with a
25   construction.  And how do we know that?
```

 1          So before -- so where we were before we get to --

 2   based on TiVo and Communique, merely, merely coming up with a

 3   construction like any program of any type is insufficient,

 4   there must be a comparison, and not just a comparison of

 5   similarities, that's not enough.

 6          So what's the comparison?  What's the other

 7   evidence?  How are they going to prove it?  What could a juror

 8   rely on?  Well, there's none.

 9          Page 11 to 18 of their brief.  Not one single piece

10   of evidence citing to support the contention that a person of

11   skill in the art would find that any of those references

12   disclose either an intelligent agent or automatically

13   detecting changes that affect an application.  All they argue

14   is sometimes experts are allowed to testify regarding an

15   infringement breach.

16          Now, undisputed statement of fact 19, and this is

17   important because this was in our brief, we wrote it as a

18   statement of fact, and this is what the statement of fact

19   says.  "Dr. Bederson's report does not contain any -- "does

20   not contain opinions directed to the accused products, and the

21   aspects of the accused products particularly alleged to

22   perform the change detection limitations."  So both

23   limitations, that's intelligent agent and changes that affect.

24          And then went on, "Dr. Bederson's report does not

25   contain opinions comparing the manner in which the accused

1    product allegedly performed the changes in detection

2    limitations and the manner in which the allegedly anticipatory

3    references do."

4            They didn't respond to it.  They didn't dispute it.

5    So there's no evidence of similarity.  And we know, similarity

6    is not enough.  They need more than that.

7            And that's all in Communique.

8            And then the only other evidence in the record is

9    Mr. Zatkovich's opinion.  But Mr. Zatkovich's opinion is that

10   the deploy process is a program that detects changes that

11   affects an application or program.  It's not an internal

12   change, like, something like Popp.  That was his opinion, so

13   that's how he would construe the claims.  But deploy is in

14   there, Popp's out.  And it's the same for every reference,

15   Kovacevic, and I'm not going to go through them all.  But for

16   every one he went through and he said, "The way you're reading

17   it, you're not reading it consistently with how I believe the

18   claim should be read."  And Mr. Zatkovich is the only one who

19   can apply AIT's interpretation or will be testifying at trial

20   regarding that interpretation.

21           So this is how Mr. Zatkovich infringement and

22   invalidity scope.  Dr. Bederson's invalidity claims scope.  No

23   support and not required for infringement.  And that's what's

24   required.

25           So we're asking for judgment that there's no

1    anticipation.  They'll still be able to argue obviousness to

2    the extent they can.

3        And -- oh, in their brief at page 20, I just -- two

4    more slides.  They said, "His opinions alone dictate denial of

5    AIT's motion."  And then you read, and they say, "Salesforce

6    can explore and proven tips sufficient to cross-examination."

7    But they didn't cite a single page of deposition testimony

8    which would support reading changes that affect or an

9    intelligent agent with changes that affect to read-on data

10   entry.  They didn't cite a single page of his testimony that

11   would support that.

12       And you can't just survive a summary judgment by

13   asking for -- saying, oh, we might be able to get evidence on

14   cross.  And notably, the only thing they cite there is our

15   motion and our statement of undisputed facts.  And if you look

16   at the statement of fact 25, 28, 31 and on, it provides no

17   support for defendant's contention that we're reading the

18   claim so broad that it would cover any program of any type for

19   detecting anything.

20       And, I mean, the law and desire for

21   cross-examination does not suffice to avoid summary judgment.

22       And then lastly, they say, we're going to have the

23   chance to vigorously cross-examine someone.  There's no one

24   for us to cross-examine regarding Popp -- I mean, yeah,

25   regarding Popp or any of the other references.  Everyone

```
1    agrees they don't disclose intelligent agents that are used to
2    automatically detect changes that are affecting any
3    application.
4              Thank you, Your Honor.
5              THE COURT:  Thank you.
6              All right.  Your final reply, please.
7              MR. ZADO:  So I think I'll start with the opposition
8    to AIT's motion for summary judgment.
9              So, Your Honor, there's one aspect that's been
10   running through the discussion by AIT's counsel across the
11   various motions where certain things are getting conflated in
12   ways that aren't appropriate, and that's creating, I think,
13   some confusion as to both what the parties' positions are and
14   what the experts' positions are.
15             So in particular -- and I appreciate that counsel
16   for AIT finally brought this up in the final motion for
17   Popp -- there are two aspects to the Court's construction with
18   respect to this.  Change management layer for automatically
19   detecting the changes that affect an application through the
20   use of one or more intelligent agents.  So there is changes
21   that affect and application and then there's intelligent
22   agents.  And the big mischaracterization that you heard
23   through the non-infringement discussion and also carried
24   through Popp is that the -- for example, Popp purportedly does
25   not include an intelligent agent because it is -- it doesn't
```

 1    detect changes that affect an application.  That's a different

 2    limitation.

 3            Your Honor, you actually submitted two different

 4    constructions for those two limitations.  With respect to

 5    changes that effect, you expressly issued a plain and ordinary

 6    meaning construction.  And with respect to automatically

 7    detecting, that's where the intelligent agents came in.

 8            Now, the issue, therefore, when Salesforce has

 9    expressed its position in the context of applying AIT's

10    construction, and here's where the misnomer comes in, is

11    that -- I mean, here's, Your Honor, two different

12    constructions that Your Honor issued for these different

13    aspects of the term -- of the overall language.

14            THE COURT:  Go back to the last.

15            MR. ZADO:  Sorry.

16            And so the issue with that is that when Salesforce

17    has expressed the position that it is discussing AIT's

18    construction, that aspect is expressly limited to intelligent

19    agents.  It does not cover changes that affect.  For changes

20    that affect, Salesforce -- Salesforce's expert, as did AIT and

21    AIT's expert, attempted to identify a plain and ordinary

22    meaning.  Both parties agree that the term is plain and

23    ordinarily meaning.  So there is no under AIT's construction

24    with respect to change that effect.  And I'll talk about that

25    more in detail.

1          Now, what happens is what you see in the motion is

2     that -- by motion, I mean AIT's motion for summary judgment

3     with no anticipation -- they created this maybe conflation by

4     defining these two terms collectively as the change detection

5     limitations, both with the change management layer for changes

6     that affect an application, et cetera.

7          So let me just briefly, and there's also an issue a

8     little bit of two ships passing in the night.  The opening

9     brief that AIT submitted was heavily focused on the

10    intelligent agent aspect.  And in particular, the reason for

11    that is that AIT focused on the concept of reliance on AIT's

12    proposed construction.

13          And here you can see they argue that in AIT that

14    Bederson was -- applied a claim construction as circular,

15    reads out, intelligent agent, contrary to Court's

16    construction, et cetera.  So they're criticizing Bederson's

17    opinion and seeking to dismiss it at the summary judgment

18    stage specifically based on purportedly applying an incorrect

19    understanding of the construction.

20          But the issue is the -- what Bederson identified

21    with respect to the construction of intelligent agent and the

22    breadth of that construction is not related to the changes in

23    affect limitations.  It's only directed to the particular

24    aspects of an intelligent agent where, for example, as defined

25    in specification, the predefined rules and objectives, et

1    cetera, those are the aspects that -- under which Dr. Bederson

2    is applying AIT's construction.  So what AIT is seeking to do

3    is have a very broad definition of intelligent agent, what

4    qualifies and meets those tests for something that is

5    intelligent agent, but then bar Salesforce from demonstrating

6    how that same interpretation would render the claims invalid.

7         And so, in view of the Court's construction

8    requiring the use of intelligent agents, Dr. Bederson

9    presented alternative invalidity opinions under both:  AIT's

10   interpretation and Salesforce's interpretation.

11        But as to the terms that affect limitation,

12   Dr. Bederson, for those orders where the terms were not

13   construed as with changes that affect, he especially opined he

14   applied plain and ordinary meaning.

15        Now, where's the source of this when we say this is

16   AIT's construction?  This is directly from AIT's infringement

17   contentions.  The quote that was shown in the slides put up by

18   counsel for AIT, that was quoted from their infringement

19   contentions.  So that was the operative document that

20   Salesforce had at the time to understand the scope of what AIT

21   contended the claim meant and the scope of what would be

22   infringing.  And because it's infringing, wouldn't necessarily

23   meet the claims for purposes of anticipation or obviousness.

24   And that's black letter law.  You have to view the claims in

25   the same way both for validity and infringement.

1         And again, I won't belabor the 01 Communique lab

2    case, but it, again, stands for the proposition that if you're

3    attempting to expand the scope of the claims to include

4    systems that -- at the same time argue that they -- those

5    claim limitations do not cover the prior art, that's improper.

6         And, again, there -- that's just the one case.  And

7    I understand that counsel for AIT kind of preloaded that one

8    for you, but there are multiple fed circuit cases that hold

9    the same proposition.  So we have the *Stryker* case, "Nothing

10   prevents -- "precludes the accused infringer from arguing...

11   in the alternative, that if the district court would disagree

12   with constructions, the claim would be so broad as to be

13   invalid."

14        That's a recent fed circuit case.

15        We have in *Network-1 Techs* -- I won't go through the

16   details of all the cases.  But, again, there are literally

17   upwards of ten cases that we've identified in our briefing

18   that all stand for that same proposition.

19        Now, Dr. Bederson's viewpoint of AIT's construction

20   must have had some validity here, because this is when -- when

21   you heard AIT's counsel get up there saying that Mr. Zatkovich

22   said no, no Popp does not disclose intelligent agents.

23   Mr. Zatkovich never opined that.  In fact, what he

24   specifically says, and this is from paragraph 1105 of his

25   expert report, that whether -- that his opinions rely on the

1    reference to teach automatic detection but not whether such

2    functionality is performed by an intelligent agent.

3        Dr. Zatkovich has no opinions that Popp or any of

4    the references do not disclose an intelligent agent.  All of

5    his opinions were directed to a different limitation, changes

6    that affect.

7        Now, just to -- I don't want to belabor this point,

8    but in terms of the cross-examination, this is not a case we

9    are attempting to illicit adverse inferences or adverse

10    testimony from your -- from the other side's expert.  All we

11    need to do is have Mr. Zatkovich confirm what he said in

12    deposition.  I have no opinion.  I can't dispute that

13    intelligent agents are disclosed by these references, which he

14    doesn't do in either his report or his deposition testimony.

15        Now, the reply brief is where AIT shifts the focus

16    from the intelligent agent's requirement to the changes that

17    affect limitation.  And, again, this is where I noted earlier,

18    Dr. Bederson applied the plain and ordinary meaning of this,

19    not an alternative instruction.  And they identified in the

20    opposition.  There's a little mischaracterization at paragraph

21    seven -- I'm sorry, statement of fact seven in Salesforce's

22    opposition that Salesforce did identify specific paragraphs in

23    Dr. Bederson's report where the analysis are located, and it

24    was AIT who did not rebut Salesforce's paragraph Number 7.

25        So this is just an example of how they changed their

```
 1    position and started to focus on the changes that affect
 2    limitation.  Again, this is demonstrating that he applied the
 3    plain and ordinary meaning.
 4            And this touches on some of the statements I made
 5    earlier in the context of our summary judgment motion
 6    invalidity.  And this is where the statements about what's a
 7    reasoned position or what inferences can be drawn from
 8    Mr. Zatkovich are not appropriate here.  Because what
 9    Mr. Zatkovich is articulating is a claim construction that's
10    inconsistent with the plain and ordinary meaning.  That's a
11    pure matter of law.  That does not preclude a finding of
12    summary judgment.
13            So from a preliminary perspective, his claim
14    construction, his interpreted plain and ordinary meaning, is
15    incorrect, and he has no evidence to support it.
16            But regardless, for each prior art reference,
17    Dr. Bederson's report contains detailed analysis showing how,
18    "Changes that affect limitation is disclosed under that
19    reference under the plain and ordinary meaning."
20            And, again, the parties agree that plain and
21    ordinary meaning should apply.  And here, it's literally a
22    complete replacement of the language.
23            Dr. -- I'm sorry, Mr. Zatkovich, in his testimony
24    says that the changes that are detected are changes that must
25    affect the functionality.  There's no reference to the
```

1   functionality in the claim.

2          Now, Mr. Zatkovich concedes that what is displayed

3   or what is output by the application is changed.  So his

4   interpretation requires an understanding that changing such as

5   suspects such as what's displayed or what's output by the

6   application is not changing the aspect of the app- -- it's

7   something that doesn't affect the application.

8          And in particular, Mr. Zatkovich concedes he has

9   nothing he's relying on.  He's not relying on prosecution

10  history disclaimer, lexicography, or disavowal.

11         Now, again, this is what AIT itself said the plain

12  and ordinary meaning of change to that affect means.  And

13  these changes are broadly defined.  "Any factor that

14  materially affects operations and/or information requirements

15  of a particular business."

16         Nothing -- nowhere does a specification indicate

17  that changes are limited by any representative examples.  The

18  term "changes" is used expansively.  They took an extremely

19  broad approach in claim construction saying this is the plain

20  and ordinary meaning.  And then for the first time in their

21  expert reports, they're now walking away from this.

22         THE COURT:  You need to keep moving, counsel.

23         MR. ZADO:  Okay.  Sorry.

24         Again, looking at the disclosure and specification,

25  it's completely inconsistent with the understanding that the

1     first layer includes information about -- information about a

2     particular business or business operations.  There are

3     multiple specification cites on which the parties rely.

4               I'll skip over these slides.

5               So here we go.  AIT is simply wrong that

6     Dr. Bederson did not explain how his reference discloses

7     changes that affect.  You heard that in AIT's statement.  That

8     is just not right.

9               Here's what Dr. Bederson testified.  He opined that,

10    "The elected prior art would anticipate the asserted claims --

11              Now I'll come back down to AIT's interpretation of

12    changes that affect limitation shortly.  But then we identify

13    specific paragraphs, like, for example, 368, 406-407, 522-523,

14    and 570.

15              Now the thing is is that AIT defined the terms

16    "change detection limitations," and Salesforce simply adopted

17    them, which included all of these aspects that we're talking

18    about, both the intelligent agents and the changes that

19    affect.

20              Here's their response to that statement of fact

21    Number 7 where he opines that -- he opines that the elected

22    prior art may anticipate the claims under the AIT's

23    interpretation of the changed detection limitations, the

24    effect of which specifically is based on its premise that

25    AIT's construction is the intelligent agent.  They say, the

```
 1   alleged facts in dispute -- they don't dispute what's stated
 2   in that particular paragraph, in statement of fact seven.
 3   They just say, they do not concern the claim requirement for
 4   the detention of changes that affect, they only address
 5   intelligent agents.
 6              That's wrong.
 7              Here's looking at -- here's a first example.  This
 8   is from Kovacevic --
 9              THE COURT:  You do need to keep moving if you want
10   to respond at all to your motions -- reply to your motions.
11              MR. ZADO:  Okay.  I'll be very brief.  But when you
12   look at these paragraphs that were identified by Dr. Bederson,
13   they all specifically refer to changes that affect an
14   application.  For example, which affects the web page
15   application, enable/disable primitives that affect the
16   application, affect the application by causing UI elements to
17   be enabled or disabled.  So for each of these references he
18   does set forth specific opinions about how these are
19   disclosed.
20              So with that, I'll jump quickly -- I'll wrap up this
21   presentation and turn to address the other aspects.
22              THE COURT:  Okay.
23              MR. ZADO:  So first I'd like to address and open the
24   Zatkovich opening report at 1157.  AIT made the assertion
25   that --
```

```
 1              THE COURT:  We're on infringement, now?

 2          MR. ZADO:  That's correct.

 3              THE COURT:  Mapping element to element.

 4          MR. ZADO:  I'm sorry?

 5              THE COURT:  Mapping element to element.

 6              I'm sorry.  Yes.  They're required to map element --

 7   are we talking about infringement or one of the others?

 8              MR. ZADO:  We're going to be talking about

 9   infringement.

10              I'm speaking specifically on this point as to what

11   are the distinctions between, for example, claim 13 of the

12   '111 patent; claim 21 of the '482 patent; and claim 1, AIT's

13   counsel made an assertion that there's some distinction

14   between the claims as to the over -- I'm sorry, this is now --

15   this is still anticipation of obviousness.  AIT's counsel made

16   some distinctions as between whether those other claims

17   similarly require a change management layer and an intelligent

18   agent such that they're coextensive or not.  That's the

19   parties' dispute.  The way AIT's counsel presented the issue

20   is that only claim one had this co-extensivity issue, but the

21   other independent claims did not.  And that's not correct.

22              And so with respect to claim 13 of the '111

23   patent --

24              THE COURT:  So we're taking anticipation and

25   obviousness.
```

```
 1              MR. ZADO:  That's correct, Your Honor.

 2              THE COURT:  Okay.  And that what -- this is

 3    Mr. Zatkovich's opinion.  He says, on the scope of

 4    limitations, 1G and 1E of the '482 patent, different from the

 5    scope of limitation 13A to the '111 patent, evidence

 6    establishing practice of those limitations in '482 establishes

 7    practice of '111.  And in particular, evidence establishing a

 8    change management layer for automatically detecting changes

 9    with accused products and service is sufficient to establish

10    the fourth portion.  That last part is the most important

11    part, because this equating the fourth portion of summary

12    which is in the '111 patent with the claimed change management

13    layer limitation that's in the '482 patent.  So there's no

14    distinction between the two, the fourth portion of the server

15    in the change management layer.  They are coextensive in terms

16    of their requirements.

17              Then with respect to claim 21 of the '482 patent, if

18    you could go to slide 51 of the infringement slides.

19              So I'll -- while this is couched in terms of

20    doctrine of equivalents, this also applies directly to a

21    disclaimer of claim scope that took place in the prosecution.

22    And in particular, during prosecution the --

23              Can you turn to the next slide, please.

24              The applicant said, "Similar considerations apply to

25    claims 24 and 46, which have been modified by applicants to
```

 1    analogously do what it's done with claim 2."  So claims 24 and

 2    36, they were later independent claims of the '482 patent,

 3    they're modified.

 4            THE COURT:  Later dependent claims.

 5            MR. ZADO:  Independent.

 6            THE COURT:  Okay.

 7            MR. ZADO:  So, in other words, the same issue with

 8    change management layer as was incorporated in claim 2, the

 9    examiner stated that the other claims had been modified to

10    analogously done what's been done with claim 2.  In other

11    words, when the applicant argued to essentially distinguish

12    the prior art, they specifically focused on the change

13    management layer, and the intent of those amendments was to

14    similarly include those kind of limitations --

15            THE COURT:  This is the '482 decision, PTAB

16    decision.

17            MR. ZADO:  No, this is the -- this is from the final

18    history.  This is after -- this is while they're amending in

19    the -- to overcome.

20            THE COURT:  This is the final grant of the patent.

21            MR. ZADO:  I believe this might be the final office

22    acts.  I don't know -- let's see.  Yes, this is the final

23    grant to the patent.  You're correct, Your Honor.

24            THE COURT:  Okay.

25            MR. ZADO:  Can we go to the next slide, please.

```
 1              And, again, the applicant -- the examiner said,
 2     regarding independent claims 2, 24, and 46, what's not
 3     disclosed is -- in one, the layer is a change management layer
 4     that automatically detects changes that affect an application.
 5     The examiner explicitly referenced his allowance of the claim
 6     with the understanding that those other two independent claims
 7     in the '482 included that same limitation of the change
 8     management layer.  So that's a demonstration of the -- issue.
 9              Now, can you show our slide 14 on the
10     non-infringement slides.
11              Now, you recall earlier that AIT's counsel made a
12     lot of statements about how the entire deploy function is
13     involved in the change detection process.  It's all
14     encompassing.  It's sweeping.  That's not what Mr. Zatkovich
15     testified.  He testified specifically that, "By function,
16     Step 3, filterUnchangedFiles is where change detection
17     actually.
18              "Yes.  That's my opinion."
19              Unequivocally, he testified that the changes
20     actually happens in element three.
21              Now, if I could go to Exhibit 9 of the motion for
22     summary judgment.  And to column 22.  And then zoom up on the
23     middle of the column.
24              So I just want to briefly highlight for Your Honor
25     that the particular element inputControl 664, there's a few
```

1    things in the context of Popp.  And one of them is consistent

2    with the statements that Your Honor made as to, for example,

3    the user entering the information into the application, which,

4    you know, it results in that updated data -- that data

5    being -- the change in the data being detected and updated and

6    promulgated to the database, for example.

7              Another thing that inputControl 664 does --

8              And I think you need to scroll up a little bit.

9    Let's see, yeah, starting at line 15.

10             Another thing that inputControl 664 does, it

11   determines based upon an association, in association 606.  Now

12   association 606 is a file that is stored essentially in

13   conjunction with the element table -- I'm sorry, the object

14   tree.  And so there's an association that's generated between

15   these objects called form and employee.  And what happens is

16   the inputControl 664 makes the determination that -- as to

17   whether there, for example -- it first makes the determination

18   that HTML static element should be added to the object tree.

19   As you may recall, the object tree is the second layer.  And

20   then it makes a determination by actually looking at the

21   object tree to see if the text object exists.  If it does not

22   exist, it results in that object being inserted into the

23   object tree.  So it's going to end up resulting in detecting

24   that the object is not there that needs to be there based on

25   the association and then the object tree gets updated.

1         I want to briefly address the Eager reference.

2         So the issue with Eager, and I think Your Honor

3 highlighted on this in terms of some of the -- what was

4 actually being argued in the file history.  You know, Eager

5 was focused on, in particular, the programmers being involved

6 in the actual change detection process.  And as a result, in

7 particular, it had to do with how they manipulated certain

8 aspects of an agree that would result in the change detection.

9 And so the mechanism for avoiding that, avoiding Eager, was in

10 order to -- was to insert the automatically detecting

11 limitation to begin with.

12         THE COURT:  And what was the significance of that?

13         MR. ZADO:  The addition of the automatic -- that

14 would mean that automatic detection could not take place using

15 the kind of human intervention that was discussed in the

16 context of --

17         THE COURT:  Does it mean simply that no programmer

18 will be required to change the program?  Changes out there,

19 internal or external, will be noted, detected, and it will

20 happen automatically.

21         MR. ZADO:  That's correct, Your Honor.

22         THE COURT:  That changes to the program or -- and/or

23 to the display?

24         MR. ZADO:  I believe both could be correct,

25 Your Honor.

```
 1              And then one last issue I wanted to pull up, if we
 2    could pull up the '842 patent, claim 1.  And if you could Zoom
 3    in on the third layer limitation.
 4              So one of the arguments that was made was that --
 5    there was a sense -- there was an attempt to parse how the
 6    third layer limitation should be construed.  Essentially, that
 7    the first layer had to use the generate functionality and the
 8    second layer had to be -- use the generate user interface, for
 9    example.
10              THE COURT:  I beg your pardon?
11              MR. ZADO:  I'm sorry, I apologize.
12              That the first layer had to be used to generate why
13    and the -- has to be able to generate the functionality.
14              But the claim language isn't phrased that way.
15              THE COURT:  I didn't understand your last sentence.
16              MR. ZADO:  I apologize.  Let me try and --
17              THE COURT:  Third layer associated with the server
18    computer retrieves data in the first and second layers.
19              MR. ZADO:  Right.
20              THE COURT:  Both common type form display and such.
21    And the unique second -- unique aspects of this program in
22    order to generate the functionality and user interface
23    elements of the application.
24              MR. ZADO:  That's correct, Your Honor.  And what
25    counsel for AIT used this language to argue was that this
```

```
 1   means that the first layer must include information that
 2   affects functionality.  And that's not correct, and that's not
 3   what this plain language requires.  All it says is the first
 4   and second layers collectively have to generate the
 5   functionality and user interface.  So nothing prevents the
 6   first layer simply being associated with UI and then the
 7   second layer being associated within functionality UI.  That's
 8   perfectly within the scope of the claim, of the plain language
 9   of the claim.
10          Can we go back to claim 1.
11          And just, again, looking at the plain language of
12   the first layer limitation, again, the language is "unique
13   aspects of a particular application."  There's no reference to
14   functionality or that it has to impact the functionality of an
15   application.  And this is consistent with the disclosure in
16   the specification.  I won't belabor the point, Your Honor,
17   it's included in our papers, but there are multiple layers in
18   the specification where the first layer is simply including
19   business data.  And that's consistent with what AIT included
20   in its tutorial where it said it's all just data.
21          And with that, I'll pass.
22          THE COURT:  Okay.  Are we concluded?  I'm going to
23   have to start cutting you off.
24          MR. ZIVOJNOVIC:  Yes, Your Honor.
25          I think I can keep this fairly brief.  So on the
```

 1     third layer limitation --

 2               And if you could please pull that up.

 3               So we heard from counsel for AIT, and they parsed

 4     this language, and they said a third layer associated with the

 5     server computer that retrieves the data in the first and

 6     second layers, and they say, that is what the third -- that is

 7     the only thing the third layer has to do.  The third layer

 8     does not need to then go on in itself generate the

 9     functionality and user interface elements of the application.

10     And if you recall, they had a slide where they colored those

11     two different parts of the claim language in different colors.

12               In an argument about why they showed Lightning

13     interface, Lightning UI, was based on the premise that both

14     Lightning and Classic use the same underlying functions for

15     both -- for retrieving the data.  They both rely on UDD.  And

16     they showed Your Honor deposition testimony, they showed a

17     graph that related to that, but it was directed to this

18     retrieving the data.  And again, their opinion was to generate

19     the functionality user interface elements.  That doesn't need

20     to be done by a third layer.

21               If we could please pull up deposition transcript

22     from Mr. Zatkovich's August 21st, 2022, deposition at page 227

23     lines 6 through 11.

24               So this is what their expert said.  So I asked their

25     expert, "So a third layer must separately retrieve the data in

1    the first and second layer and then generate the functionality

2    and user interface elements of the application; right?

3            "Yes."

4            Unequivocally.

5            And if we could go to claim 13 of the '111 patent.

6            THE COURT:  Counsel, I've got all of this.

7            MR. ZIVOJNOVIC:  All right.  In that case,

8    Your Honor, we rest.

9            THE COURT:  Very good.

10           The matter is submitted.  And I will enter a written

11   order explaining my decisions.

12           I am going to grant the defendant's motions for the

13   following broad reasons.  This isn't an explanation of the

14   result, but we will write a detailed written explanation which

15   we'll enter as a decision.

16           I'm not resolving the discovery dispute at this

17   time, as I told you before, because the issue is moot, really,

18   in light of my decisions here.

19           And, more importantly, this is going to be appealed

20   anyway.  If the appeal sends it back down for trial, I figure

21   the trial judge at that time should resolve the discovery

22   dispute.

23           On infringement.  The problem I have with the

24   plaintiff's case is that there simply is no evidence, in my

25   opinion, that deploy is equal to the use automatically

1    detecting using an information agent.

2         The history of the prosecution file here is very

3    clear.  There were rejections, for various reasons, but the

4    primary reason why, as explained by the patent agent, the

5    primary reason for finally allowing the patents was the

6    addition of this language because the prior art didn't teach

7    automatically detecting.

8         I don't think it's significant when we're talking

9    about this distinction between the experts as to whether the

10   detection affects functionality.  I get the points.  I've

11   heard the points on both sides.  I just don't think there's

12   any evidence here that clearly maps that element,

13   automatically detecting using intelligent agents, to the

14   accused products.

15        It's just absent, as far as I can tell from the

16   expert reports.  I've read the briefs back and forth.  I've

17   heard the response.  And I just don't see the evidence that

18   ought to go to a jury for a jury to decide.

19        Accordingly, I don't think summary judgment is

20   prevented, and I will rule that infringement is not applicable

21   because of that, primarily because -- for the same reason that

22   the PTAB required the addition of the language "automatically

23   detecting."  They wanted to distinguish.  The patent agents

24   realized the prior art, most of what -- which already did this

25   type of work.  But the prior art clearly, according to the

1    patent agent, did not teach automatically detecting, certainly

2    not by an intelligent agent.  So whatever language we use,

3    especially just simply the language of the claims, that was

4    the ground, the final ground on which the patent agent issued

5    the patents, decided to issue the patents.  That has to be

6    critical in the back of the Court's mind when I review the

7    evidence.

8            So, in reviewing it, I realize that we have a wide

9    disparity of understanding on automatically detecting,

10   certainly automatically detecting using an intelligent agent.

11   Clearly plaintiff's expert is on one wavelength, and

12   defendant's experts are on a totally different wavelength.

13           But, in my mind, at the time of claim construction,

14   I was very aware of the PTAB's ruling and the reason for the

15   ruling finally -- not PTABs, I'm sorry -- the original agent's

16   ruling and the reason for the ruling.  And that was certainly

17   in my head when we were talking about adding the term

18   "intelligent agent."  I saw that as the core of this invention

19   as opposed to the prior art.

20           On summary judgments for, first, anticipation and

21   obviousness, I will grant the summary judgment for

22   anticipation based upon Popp and certainly obviousness by

23   associating Amati and other functions or patents that use or

24   uses that use intelligent agents.

25           With respect to anticipation, I see a direct mapping

1    between Popp, especially as to this last use, or at least the

2    use in Popp and what was in the agent's mind, for

3    automatically detecting using the terms used at that time and

4    their meaning at that time.

5         And similarly, the case is made more clear by

6    associating Amati which specifically addresses intelligent

7    agents.  So even if I've got it wrong on anticipation, I think

8    combining the two makes it clearly obvious.  And why would

9    they associate?  Why would a person with understanding in the

10   area, why would they associate those two patents?

11        Because what Popp is doing is trying to make

12   automatic changes based upon -- really, based upon input by an

13   end user.  And why not take the additional step of having an

14   intelligent agent sweep the network, sweep what is input

15   locally, and detect changes which would affect not only

16   functionality of the program but would detect and implement,

17   for example, display of the website that finally comes up

18   after the input, internal or external.

19        And so for those broad reasons and to help you with

20   respect now to concluding discovery in preparation for trial,

21   at least in the interim, I'm telling you what the decision

22   will be.

23        This is not the decision.  I will issue a written

24   report and decision which you can properly frame up for appeal

25   purposes.

1          So the last question I have, really, is in light of
2     these rulings, is there any need to go forward with a trial?
3     Other than damages, I think I'm pretty well wrapping up the
4     record for the appellate court.  Of course, if they send it
5     back for trial, we would need to go back into damages.
6          MR. DeVINCENZO:  Just on invalidity, every claim?
7     Which claim?  I'm just curious.  In its entirety?
8          THE COURT:  Yes.
9          MR. DeVINCENZO:  Even -- okay.
10          THE COURT:  In particular, claim 1 of '482, and the
11     primary independent claim of '111.
12          Basically, what I'm following is the analysis of the
13     PTAB.  I realize that that analysis has no binding effect
14     whatsoever, its been stricken.  But it occurs to me that they
15     got it right.
16          So that will be the ruling.  I'll issue the order.
17     We'll take off calendar the trial, at least for this point in
18     time.  We'll enter a final judgment.  And -- assuming there's
19     nothing else right now for trial -- and we'll let you
20     straighten it out with the federal circuit.
21          Okay.
22          MR. ZADO:  Thank you, Your Honor.
23          THE COURT:  Thank you so much.  Thank you for
24     extensive argument.  It was very helpful.  Some of it was
25     redundant, but by and large it was very helpful.  So I

1    appreciate that.

2              The court will now be in recess.

3         (Proceedings concluded at 3:26 p.m.)

1          **REPORTER'S CERTIFICATE**

2

3          I, DONNA J. PRATHER, do hereby certify that the

4    above and foregoing, consisting of the preceding 157 pages,

5    constitutes a true and accurate transcript of my stenographic

6    notes and is a full, true, and complete transcript of the

7    proceedings to the best of my ability.

8          Dated this 23rd day of March, 2023.

9

10         DONNA J. PRATHER, RMR, CRR, CCP, CBC
          Federal Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25