# Exhibit A

JOHN FRANKOVICH, NV Bar #667
LEIGH GODDARD, NV Bar #6315
PHILIP MANNELLY, NV Bar #14236
McDonald Carano LLP
100 West Liberty Street, Tenth Floor
Reno, NV 89501
Telephone: (775) 788-2000
Facsimile: (775) 788-2020
Email: jfrankovich@mcdonaldcarano.com
lgoddard@mcdonaldcarano.com
pmannelly@mcdonaldcarano.com

KEVIN JOHNSON (*pro hac vice*)
RAY ZADO (*pro hac vice*)
SAM STAKE (*pro hac vice*)
JAMES JUDAH (*pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100
Email: kevinjohnson@quinnemanuel.com
rayzado@quinnemanuel.com
samstake@quinnemanuel.com
jamesjudah@quinnemanuel.com

*Attorneys for Defendant Salesforce, Inc.*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| APPLICATIONS IN INTERNET TIME, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SALESFORCE, INC.,<br><br>Defendant. | No. 3:13-CV-00628-RCJ-CLB<br><br>**[PROPOSED] ORDER GRANTING SALESFORCE, INC.'S MOTION FOR SUMMARY JUDGMENT** |

In this patent infringement action, Defendant Salesforce, Inc. ("Salesforce") moves for summary judgment or partial summary judgment of: non-infringement of claims 1, 10, 20-21, 23-26, 30, and 40 of U.S. Patent No. 7,356,482 (the "'482 patent") and claims 13-17 of U.S. Patent No. 8,484,111 (the "'111 patent") (collectively, the "asserted claims"); non-infringement of the asserted claims by Salesforce's "Lightning" user interface and its mobile application; and invalidity of the asserted claims in view of various prior art references (ECF No. 278). Plaintiff Applications In Internet Time ("AIT") opposes these motions, and affirmatively moves for summary judgment of no anticipation (ECF No. 270), which Salesforce opposes.

Salesforce also moves to exclude certain opinions of AIT's technical and damages experts (ECF No. 272, 275), and AIT moves to exclude certain opinions of Salesforce's damages expert (ECF No. 268), each of which are opposed.

Salesforce further moves to dismiss this action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction (ECF No. 283), and to resolve certain discovery disputes regarding a corrected expert report (ECF No. 351), and AIT further objects to the Magistrate judge's order on a motion to compel (ECF No. 338).

The motions were heard by the Court on March 14, 2023. Having considered the parties' submissions and the arguments of counsel, and for the reasons sets forth below, the Court (i) grants Salesforce's motions for summary judgement of non-infringement and invalidity (ECF No. 278); and (ii) denies AIT's motion for summary judgment of no anticipation (ECF No. 270).

In view of the Court granting summary judgment of non-infringement and invalidity on all asserted claims, Salesforce's partial summary judgment motion of non-infringement by the Lightning user interface and its mobile application, Salesforce's motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, AIT's objections to magistrate judge's order on motion to compel, and Salesforce's motion to resolve discovery dispute regarding corrected expert report are rendered moot, and the Court defers ruling on those motions. The Court also defers ruling on the parties' respective motions to exclude the opinions of their respective experts.

# I.     FACTUAL BACKGROUND

## A.     The Patents and the Claimed Invention

AIT asserts two patents in this litigation: '482 patent and the '111 patent.  ECF No. 1.  Both patents are entitled "Integrated Change Management Unit," and they contain substantially identical specifications.  The application for the '482 patent was filed on March 1, 2001 and issued on April 8, 2008.  The application for the '111 patent was filed on October 26, 2011, is a continuation of U.S. Pat. Appl. No. 12/098,154, which is a continuation of the application for the '111 patent, and issued on July 9, 2023.

The asserted patents describe a "server computer" with four layers.  ECF No. 172 at 6.  The first layer, called the "business content layer," contains information about the "specific business operations of concern to the end used."   '482 patent at 9:56-59[1].   The second layer, called the "metadata layer," contains "information about the user interface and functions common to a variety of applications," including "tools, worklists, data entry forms, reports, documents, processes, formulas, images, tables, views, columns, and other structures and functions."  *Id.* at 9:41-46.  The third layer, called the "Java data management layer," "retrieves the data in the first and second layers in order to generate the functionality and user interface elements of the application."  *Id.* at 15:5-9.  The fourth layer, called the "change management layer," seeks to "automatically detect[] changes that affect an application."  *Id.* at 16:18-21.  The change management layer "uses one or more intelligent agents (IA's) that continually search on the Web for relevant changes in a selected business area." *Id.* at 16:19-21.  The server then "automatically mak[es] application and database changes using intelligent agent routines…" *Id.* at 7:47-53.

The asserted patents describe these "intelligent agents" as an integral component of the claimed inventions.  ECF No 323-3 (Zatkovich 8/24/2022 Tr.) at 492:18-24.  The shared patent specification states that "[a]n 'intelligent agent' is a specialized program that makes decisions and performs tasks based on predefined rules and objectives."  '492 patent at 20:1-3.  AIT's  expert agrees that this description of "intelligent agent" in the specification is consistent with the term's plain

---

[1] For simplicity, citations are made to the specification of the '482 patent.

1   meaning.  ECF No. 297-2 (Zatkovich 8/21/2022 Tr.) at 270:7-10.

2        AIT is asserting infringement of claims 1, 10, 20, 21, 23, 24, 25, 26, 30, and 40 of the '482

3   patent and claims 13-17 of the '111 patent.  Of those, claims 1 and 21 of the '482 patent and claim

4   1 of the '111 patent are independent claims.  All other claims depend, directly or indirectly, from

5   one of those three claims.

6        **B.      Post-Grant Challenges to the '482 and '111 Patents in Light of Popp**

7        On August 17, 2015, RPX Corporation filed petitions for *inter partes* review ("IPR") against

8   the asserted claims of the '482 and '111 patents arguing, among other grounds, that the claims were

9   anticipated by Popp.  IPR2015-01750, Paper 1 (Petition) at 13-23 (PTAB August 17, 2015); IPR2015-

10  01751, Paper 1 (Petition) at 16-13 (PTAB August 17, 2015).  AIT disputed whether Popp disclosed

11  "automatically detecting" changes—not any other element.  *E.g.*, IPR2015-01750, Paper 63 (Patent

12  Owner Response) at 23-24 (PTAB May 20, 2016).  After trial was instituted, the PTAB issued Final

13  Written Decisions rejecting AIT's argument and finding that claims 1, 10, 20-21, 30, and 40 of the

14  '482 patent and claims 13-17 of the '111 patent were anticipated by Popp.  ECF No. 280-14

15  (IPR2015-10751, Paper 82 (Final Written Decision)) at 25-26 (PTAB Dec. 28, 2016); (IPR2015-

16  01750, Paper 80 (Final Written Decision)) at 35 (PTAB Dec. 28, 2016).

17       On appeal before the Federal Circuit, the Court vacated and remanded the PTAB's decision

18  because the PTAB did not apply the proper standard for determining whether Salesforce was a real

19  party in interest.  *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336 (Fed. Cir. 2018).

20  The PTAB's Final Written Decisions were vacated based on the procedural question regarding the

21  identity of the real party in interest and despite having found, on the merits, that all of the asserted

22  claims of the '482 and '111 patents were invalidated by Popp.  IPR2015-01750, Paper 128 (Final

23  Decision on Remand Terminating Institution) at 13-23 (PTAB October 2, 2020).

24       **C.      Description of the Accused Products**

25       The accused products in this case are certain functionalities of Salesforce's Salesforce1 and

26  Force.com platforms.  ECF No 280-12 (Zatkovich's Op. Rpt.) ¶ 1198.  These Salesforce products

27  present a user interface that allows a user to view, change, and delete entries in a database.  *Id.* ¶¶ 116,

28  510-12.  The accused products use metadata to define (and potentially customize) various aspects of

1   that user interface, such as what fields are included in each type of database entry, their content, and

2   how those fields are displayed in the user interface.  *Id.* ¶ 121.

3         Users can modify that metadata, and thereby customize their user interface, using a Metadata

4   API that includes a *deploy* function for storing new metadata to the database.  *Id.* ¶ 309 ("All

5   automated change management utilizes the Metadata API").  ███████████████████████

6   ███████████████████████████████████████████████████████████

7   ███████████████████████████████████   ████████████████

8   ███████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████████

10  ███████████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████

12      **D.     Appropriate Level of Ordinary Skill in the Art**

13        Salesforce's expert Dr. Benjamin Bederson opined that "a person of ordinary skill in the art as

14  of the claimed priority date of each of the asserted patents ('POSITA') would have had at least an

15  undergraduate degree in electrical engineering or computer science (or equivalent field) and at least

16  two years of computer programming experience in developing client-server systems." ECF No. 280-6

17  (Bederson Rpt.) ¶ 19.  AIT's expert, Mr. Zatkovich, opined that "a person of ordinary skill in the art,

18  at the time of the invention of the Asserted Patents, would be someone with a bachelor's degree in

19  computer science or a related field (such as electrical engineering), and either (1) two or more years of

20  industry experience and/or (2) an advanced degree in computer science or a related field."  ECF No

21  280-12 (Zatkovich's Op. Rpt.) ¶¶ 23-24.  These two standards are generally consistent with each

22  other, and neither party in their motion papers asserted that there was any material difference between

23  the two standards.  While the Court adopts Salesforce's standard for a person of ordinary skill in the

24  art, the analysis in this order applies equally had the Court adopted AIT's standard.

25  **II.    <u>LEGAL STANDARD</u>**

26        Summary judgment is appropriate only where the moving party demonstrates there is no

27  genuine dispute as to any material fact such that judgment as a matter of law is warranted. Fed. R. Civ.

28  P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that might affect

the outcome of the case, as defined by the framework of the underlying substantive law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id*. The moving party bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a disputed issue of material fact. *Celotex*, 477 U.S. at 323. In opposing the motion, the non-moving party may not rely merely on the allegations or denials in its pleadings, but must set forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citing Fed. R. Civ. P. 56(e)). The court must construe the evidence in the light most favorable to the non-moving party, making all reasonable inferences that can be drawn. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Intel Corp. v. Hartford Accident & Indem. Co*., 952 F.2d 1551, 1558 (9th Cir. 1991); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1289 (9th Cir. 1987). "If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). "Summary judgment is as appropriate in a patent case as it is in any other case." *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 672 (Fed. Cir. 1990).

### A.    Legal Standards Relevant to Non-Infringement

The party asserting patent infringement has the burden of proving infringement, and thus the burden of establishing that each and every limitation in the asserted claim is met. *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1102 (Fed. Cir. 2001). It is axiomatic that if the accused products fail to satisfy even a single limitation of the claims, they do not infringe. *Hutchins v. Zoll Med. Corp.*, 492 F.3d 1377, 1380 (Fed. Cir. 2007); *Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1301 (Fed. Cir. 2005). While limitations can be met literally or under the doctrine of equivalents, "[t]he doctrine of equivalents applies only in exceptional cases and is not 'simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims." *Amgen Inc. v. Sandoz Inc.*, 923 F.3d 1023, 1029 (Fed. Cir. 2019).

### B.    Legal Standards Relevant to Invalidity

Patents are presumed valid, and the presumption may only be overcome by clear and

convincing evidence.  *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).  "The burden of establishing invalidity of a patent . . . shall rest on the party asserting such invalidity." 35 U.S.C. § 282(a).

Title 35 U.S.C. § 102 establishes the various grounds for invalidation of patents based on anticipation by prior art.  "[A] claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference." *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001) (alteration in original).  "While anticipation is a question of fact, it may be decided on summary judgment if the record reveals no genuine dispute of material fact." *Encyclopaedia Britannica, Inc. v. Alpine Elecs. of Am., Inc.*, 609 F.3d 1345, 1349 (Fed. Cir. 2010) (internal citation omitted).  Additionally, "[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  Pre-AIA 35 U.S.C. § 103(a).  Obviousness is a question of law with "underlying factual considerations."  *Id.* (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966)).

## III.   **ANALYSIS**

### A.   **Salesforce Does Not Infringe the '482 and '111 Patents**

During claim construction, the Court construed all asserted claims to require automatically detecting changes "through the use of one or more intelligent agents."  ECF No. 172 at 24.

Specifically, during prosecution, the asserted claims were ultimately allowed over the "Eager" prior art reference (U.S. Patent No. 5,960,200; ECF No. 68-9) on which the claims stood rejected based on AIT adding to the claims the language requiring "automatically detecting changes."  The patents themselves discuss intelligent agents as an integral component of the claimed invention—and the process for detecting changes—and distinguished the claimed inventions on that basis from the prior art.  ECF No. 172 at 13-14.  Thus, for purposes of obtaining its patents, AIT placed heavy emphasis on "automatically detecting" changes, and in particular doing so using "one or more intelligent agents."  However, AIT failed to put forth evidence sufficient to raise a genuine dispute of

material fact that the that the accused products do not use any such "intelligent agent" to detect changes.

### 1. AIT Failed to Raise a Genuine Dispute of Material Fact That Accused Products Do Not Detect Changes "Through One or More Intelligent Agents"

The asserted claims all require detecting changes "through the use of one or more intelligent agents." ECF No. 172 at 24. There is no dispute that an intelligent agent is not simply a conventional software program, and that not every software program qualifies as an "intelligent agent."

As described in the specification (on which both parties rely), "[a]n 'intelligent agent' is a specialized program that makes decisions and performs tasks based on predefined rules and objectives." '482 patent at 20:1-3; *see id.* at 10:41-48. Both parties' experts testified that this description was consistent with their understanding of the term "intelligent agent." ECF No 323-2 (Zatkovich 8/21/2022 Tr.) at 261:16-25; ECF No. 280-05 (Schmidt Rebuttal Report) ¶ 338. Such "intelligent agents" can be configured, for example, to "cruise the Web" or an Intranet and "identify changes in laws, statutes, ordinances, regulations and related issues" and the provide those changes to other system components for further processing. *See* '482 patent at 9:33-38, 16:18-33, 20:3-6, 24:13-18; ECF No. 172 at 13 (quoting asserted patents' disclosure of "[t]he following examples illustrate how change, made to a regulation, is *identified on the Internet and incorporated and managed by the invention*") (emphasis in ECF No. 172).[2]

Turning to the operation of the accused products, those products include a Metadata API with a *deploy* function for making changes to at least Salesforce's user interface. ECF No 280-12 (Zatkovich's Op. Rpt.) ¶¶ 121, 309; ECF No. 280-05 (Schmidt Rpt.) ¶¶ 341-43. ███████████

████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

---

[2] One of the bases on which AIT distinguished the claimed "automatically detecting" from the prior art cited in the *inter partes* review proceedings was that the claims search for changes "external to the application program" rather than merely propagating changes made via "user input" or some other "purposeful interaction with the application." ECF No 280-05 (Schmidt Rebuttal Report) ¶ 339-40 (quoting statements from AIT's experts in IPR2015-01751).

1 ██████████████████████████████████████████████████████████

2 ████████  The deposition testimony of AIT's expert, Mr. Zatkovich, supports Salesforce's position

3 that the accused products do not use intelligent agents to automatically detect changes. █████████

4 ██████████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████████████

6 █████████████████████████████████  █████████████████████████

7 ██████████████████████████████████████████████████████████

8 ██████████████████████████████████████████████████████████

9 ████████████  ███████████████████████████████████[3]  As a result, the

10 uncontroverted evidence shows that the accused products do not detect changes "through the use of

11 one or more intelligent agents" as required by all of the asserted claims.

12 　　　　In response to its expert's admissions at his deposition, AIT argues that the *deploy* function *as*

13 *a whole* qualifies as an "intelligent agent."  AIT fails, however, to identify any expert analysis or other

14 evidence to support the assertion that the *deploy* function in the accused products is an "intelligent

15 agent," and neither in its briefing nor in its expert's testimony does AIT ever compare the *deploy*

16 function to any aspect of the Asserted Patents' description of an "intelligent agent" or any other

17 explanation of this term.  For example, the report of AIT's expert never addresses whether the *deploy*

18 function is a "specialized program" or whether it "makes decision and performs tasks based on

19 predefined rules and objectives."  *See* '482 patent at 20:1-3.

20 　　　　The conclusory assertion of AIT's expert, Mr. Zatkovich, that the "automatically detecting…"

21 limitation as construed by this Court is met is insufficient to defeat summary judgment.  *See Arthur A.*

22 *Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000) ("[I]t is well settled that

23 an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a

24 genuine issue of material fact. … A party may not avoid that rule by simply framing the expert's

25 conclusion as an assertion that a particular critical claim limitation is found in the accused device.").

26 
_____

27 [3]  The Court notes that Mr. Zatkovic's expert report never sets forth an opinion as to what
specifically in the accused products corresponds to an "intelligent agent."

28

1   Mr. Zatkovich's report and subsequent deposition testimony lacks any expert analysis to show the

2   *deploy* function is an "intelligent agent."  Moreover, the Court specifically considered the passages of

3   Mr. Zatkovich's report identified by AIT in its briefing and at the hearing as to the *deploy* function,

4   but those passages merely describe its operation without analyzing whether it qualifies as an

5   "intelligent agent."  Indeed, Mr. Zatkovich conceded that his report lacks "an explanation of how the

6   deploy function compares" with the description of "intelligent agent" in the specification.  ECF No

7   323-3 (Zatkovich 8/24/2022 Tr.) at 427:15-428:7.

8         At the hearing, AIT's counsel articulated for the first time arguments as to how the "deploy"

9   function purportedly meets the requirements of an "intelligent agent" set forth in the specification ("a

10  specialized program that makes decisions and performs tasks based on predefined rules and

11  objectives").  Hr. Tr. at 59:14-66:17.  None of counsel's analyses regarding "decisions," "tasks,"

12  "rules," or "objectives" is reflected in Mr. Zatkovich's expert report.  AIT's counsel's arguments are

13  no replacement for missing expert analysis or other evidence.  *See, e.g., Invitrogen Corp. v. Clontech*

14  *Labs*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument regarding the

15  meaning of technical evidence is no substitute for competent substantive expert testimony. It does not,

16  and cannot, support [defendants'] burden on summary judgment."); *Enzo Biochem, Inc. v. Gen-Probe*

17  *Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence.").  In

18  addition, counsel's analysis is absent from AIT's opposition and thus waived.  *See Recycle for Change*

19  *v. City of Oakland*, 856 F.3d 666, 673 (9th Cir. 2017) (argument not developed in briefs has been

20  waived); *Harger v. Dep't of Lab.*, 569 F.3d 898, 904 n.9 (9th Cir. 2009) (arguments raised for the first

21  time at oral argument have been waived).[4]

22        Regardless, AIT's new position would treat any conventional software program for detecting

23  changes as an "intelligent agent," rendering this limitation superfluous,  More particularly, AIT's

24  counsel asserted "all software is based on rules" (Hr. Tr. at 61:4-5) and then walked through an

25  _____

26  [4]  AIT's opposition asserts that its expert "will be able to explain what [the 'deploy function'] is,
    the special functions it performs, the rules and objectives that govern its operation, the fact that it
27  is an agent that automatically detects changes" (ECF No 297-1 at 5), but does not set forth the
    anticipated explanation AIT's counsel provided at the hearing.

28

explanation of the operation of the *deploy* function and identified what aspects counsel contends qualify as "performs tasks based on predefined rules and objectives" (Hr. Tr. at 63:3-66:20). But by AIT's standard, any software for detecting changes is always "specialized," follows "rules," and performs "tasks" for the purpose of achieving the "objective" of detecting changes. When the intrinsic evidence distinguished the "invention" from the prior art based on its use of "intelligent agents" (ECF No. 172 at 13-14), it anticipated more than simply requiring that the change detection occur using a software program. AIT's attorney argument, therefore, cannot be correct.

Thus, AIT has not identified any evidence or expert analysis—other than Mr. Zatkovich's conclusory assertion—showing that the *deploy* function in the accused products is an "intelligent agent," or that would otherwise allow a reasonable jury to conclude that the accused products use an "intelligent agent" to detect changes. Because AIT has not identified evidence sufficient to raise a genuine dispute of material fact that the accused products do not use an "intelligent agent" to detect changes, the Court finds that Salesforce is entitled to summary judgment of non-infringement.

### 2.   AIT Cannot Rely on Doctrine of Equivalents Meet the "Intelligent Agent" Requirement

AIT asserts that, even if the accused products do not include an intelligent agent, this claim limitation is still met under the doctrine of equivalents. AIT's argument fails on two independent grounds: (i) AIT's doctrine of equivalents argument is foreclosed as a matter of law; and (ii) AIT cannot overcome its failure to identify *any* "intelligent agent" used to detect changes anywhere in the accused products.

AIT's doctrine of equivalents theory is unavailable as a matter of law. First, AIT cannot use the doctrine of equivalents to recapture subject matter that this Court has already found was "expressly disavow[ed]." The Court construed "automatically detect[ing]" to require "us[ing] one or more intelligent agents." ECF No. 172 at 13-14 ("AIT asserts that the use of intelligent agents is merely a possible mean of automatically detect," but the Court found that "[t]he patents repeatedly discuss intelligent agents as an integral component of the claimed invention."). The Court found that the statement in the specification "[t]he invention … tracking change using one or more intelligent agents" and other similar "statements made in the patents about 'the invention'" constituted "express

disavowal[s]." *Id.* at 13.  Those same "express disavowal[s]" now preclude AIT from re-capturing the disavowed subject matter—detecting changes without using an "intelligent agent"—via the doctrine of equivalents.  *See Astrazeneca AB, Aktiebolaget Hassle, KBI E, Inc. v. Mutual Pharm. Co., Inc.*, 384 F.3d 1333, 1342 (Fed. Cir. 2004) ("The specification's clear disavowal of nonsurfactant solubilizers precludes the application of the doctrine of equivalents to recapture the disavowed solubilizers").

AIT attempts to distinguish *Astrazeneca* and other disavowal cases as being based on "implicit disavowal" or "lexicography," whereas this case involves "express disavowal."  ECF No. 297-1 (AIT Opp.) at 11-12.  AIT identifies no basis for treating implicit versus express disavowal differently – both preclude a finding of infringement under the doctrine of equivalents.  *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1347 (Fed. Cir. 2001) ("[T]he foreclosure of reliance on the doctrine of equivalents in such a case depends on whether the patent clearly excludes the asserted equivalent structure, *either implicitly or explicitly*.") (emphasis added).  Moreover, none of AIT's cited cases applying the doctrine of equivalents involve any finding of disavowal.  *See Arthrex, Inc. v. Smith & Nephew, Inc.*, No. 2:15-CV-01047-RSP, 2016 WL 7049397, at *3 (E.D. Tex. Dec. 5, 2016) ("To be clear, the specification of the '907 patent does not include a disclaimer or disavowal of claim scope."); *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1310 (Fed. Cir. 2007) ("[W]e find nothing in the written description of the '970 patent that amounts to a disavowal sufficient to overturn the jury's finding of infringement."); *Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*, 998 F.3d 917, 923 (Fed. Cir. 2021) (construing "annual cover" consistent based on "[t]he plain language of the claims"); *Cadence Pharms. Inc. v. Paddock Labs Inc.*, 886 F. Supp. 2d 445, 459-60 (D. Del. 2012) (decision below lacking any discussion of disavowal for the "aqueous solution" and "solution" limitations); *Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151, 1169-72 (Fed. Cir. 2012) (finding doctrine of equivalents applied to terms where the "parties agreed" on their constructions).

Second, AIT's doctrine of equivalents argument for "intelligent agent" is also barred by the doctrine of prosecution history estoppel.  "Prosecution history estoppel applies when an applicant during patent prosecution narrows a claim to avoid the prior art," and "bars the applicant from later invoking the doctrine of equivalents to recapture the surrendered ground."  *EMD Millipre Corp. v. AllPure Techs., Inc.*, 768 F.3d 1196, 1203 (Fed. Cir. 2014).  Here, the Examiner rejected the original

claims of the '482 patent.  ECF No. 280-16 ('482 Patent File History) at 137-39.  In response, AIT amended the claims to add the "change management layer for automatically detecting changes that affect an application" limitation and argued that this limitation was missing from the cited prior art. *Id.* at 116-30.  When the Examiner was not persuaded by this argument, AIT filed an appeal brief again arguing that "automatically detecting" was not disclosed or rendered obvious by the prior art. *Id.* at 46-54.  In response to the appeal brief, the Examiner allowed the '482 patent claims because the cited art "fails to teach or suggest a system for providing … a change management layer that automatically detect[s] changes that affect an application."  *Id.* at 25.

Having amended the '482 patent claims during prosecution to require "automatically detect[ing]" and relied on that amendment to overcome the prior art, AIT cannot now use the doctrine of equivalents to expand the scope of that same limitation, including the Court's construction thereof requiring use of an "intelligent agent."  And prosecution history estoppel attaches not only to the specific claims whose amendments give rise to estoppel (*i.e.*, the asserted claims of the '482 patent), but also to any child patent claims containing substantively identical claim language (*i.e.*, the asserted claims of the '111 patent).  *See Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 291 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 1115 (1996) (extending estoppel from parent to patent from continuation application).

Even considering AIT's doctrine of equivalents argument on the merits, it does not defeat summary judgment.  On its face AIT contends that "Mr. Zatkovich's [doctrine of equivalents] opinions are merely addressed to Salesforce's argument that an 'intelligent agent' must be implemented as 'an autonomous, stand-alone, or background program' as Salesforce's experts opined following claim construction."  ECF No. 297-1 (AIT Opp.) at 10; *see also id*. at 12.  But the Court's finding that AIT failed to identify any "intelligent agent" used for change detection in the accused products does not rest on any requirement that the "intelligent agent" must be "an autonomous, stand-alone, or background program."  Rather, it is AIT's complete lack of any expert analysis or other evidence that compels the non-infringement conclusion.

Accordingly, AIT's doctrine of equivalents theory does not raise an a disputed issue of material fact sufficient to withstand summary judgment of non-infringement.

### B.      The '482 and '111 Patents Are Anticipated by Popp and also Rendered Obvious by the Combination of Popp and Amati

Salesforce moves for summary judgment that the asserted claim of the '482 and '111 patents are invalid as anticipated or rendered obvious by Popp, alone or in combination with Amati.

#### 1.   Summary of Popp

U.S. Patent No. 6,249,291 ("Popp") is entitled "Method and Apparatus for Managing Internet Transactions."  ECF No. 280-17 (Popp).  The named inventors are Nicolas Popp, Bruce Ong, and Charles D'Harcourt.  Popp was filed on September 23, 1995 and issued on June 19, 2001.  Therefore, Popp is prior art to the '482 and '111 patents under pre-AIA 35 U.S.C. § 102(e).  AIT does not dispute that Popp is prior art to both patents.

Popp discloses a system to dynamically generate web pages based on user input.  ECF No. 280-17 (Popp) at 3:55-59.  The system in Popp comprises a server domain, which is accessible by a web browser, and is executed on a client device.  *Id.* at Fig. 2.  The server domain has four portions: a database, an object tree, a scriptedControl object, and an inputControl object.  *Id.* at Figs. 2, 6B.  The database contains information about unique aspects of a particular web page application.  *Id.* at 9:56-63.  The object tree contains information about user interface elements such as data entry elements, and functions such as receiving and processing input data.  *Id.* at 11:37-44; 12:21-22; 18:32-43. These functions are common to various web pages, including the particular web page application whose data is stored in the database.  *Id.* at 4:26-34; 4:41-43; 17:54-55; 18:32-43.  The scriptedControl object controls the generation and management of a web page application by retrieving application-specific information from the database and the object tree.  *Id.* at 18:65-9:8; 19:29-38; Figs. 6A, 6B.  The web page user interface and functionality are presented to the user after being downloaded over an established connection between the client and the server.  *Id.* at 31:1-3.  The inputControl object is configured to detect changes, such as modification of a field in a web page, and automatically modifies the database and the object tree, accordingly.  *Id.* at 22:28-62.

#### 2.   Summary of Amati

"A Framework for Filtering News and Managing Distributed Data" (Amati) is an academic

1   paper authored by Gianni Amati, Daniela D'Aloisi, Vittorio Giannini, and Flavio Ubaldini.  ECF No.

2   280-18 (Amati).  Amati was published in the Journal of Universal Computer Science on August 28,

3   1997; therefore, Amati is prior art to the '482 and '111 patents under pre-AIA 35 U.S.C. § 102(b).

4   AIT does not dispute that Amati is prior art to both patents.

5        Amati teaches "[m]ethods of information filtering and fetching."  ECF No. 280-18 (Amati) at

6   1007.  Specifically, Amati discloses an "ABIS (Agent Based Information System)" that "has been

7   designed to assist users in retrieving information in repositories, archives and databases accessible

8   through the network."  *Id.* at 1015.  The ABIS system "follows the software agent metaphor," wherein

9   an "agent is an intelligent entity designed to act on behalf of a user."  *Id.*  The ABIS agent is "not only

10  an intelligent support program, but an entity capable of acting autonomously, facing unexpected

11  events and cultivating a trustful relationship with the user."  *Id.*  When the ABIS "agent autonomously

12  navigates the network looking for relevant documents," the agent "is driven by a Preference Profile

13  that describes the current user interest" and "takes into account the Situation Set, where the whole

14  interaction history is memorized and further used for predicting the user's choices."  *Id.*

### 3.   Popp Anticipates Claims 1, 10, 20-21, 23-26, 30, and 40 of the '482 Patent and Also Renders Them Obvious in Combination with Amati

15

16

17       The Court finds that Popp both anticipates claims 1, 10, 20-21, 23-26, 30, and 40 of the '482

18  patent, and renders them obvious in combination with Amati.

19       Salesforce submitted evidence, including the through its technical expert Dr. Bederson,

20  demonstrating that each limitation of the asserted '482 patent claims was disclosed Popp, and in some

21  instances was also rendered obvious by Popp in view of Amati.  ECF No. 280-6 (Bederson Rpt.) ¶¶

22  398-428.  Although AIT and its technical expert Mr. Zatkovich dispute Dr. Bederson's analysis, the

23  Court finds that their arguments rest on unsupported claim interpretations and are insufficient to raise

24  a dispute of material fact that would preclude granting of summary judgment.

### (a)   Claim 1

25

26       (i)   *Popp discloses "A system for providing a dynamically*

27       *generated application having one or more functions and one*

28       *or more user interface elements; comprising:"*

     Popp discloses that "the present invention is used with an application on the server side of the

connection to dynamically generate Web pages" which "contain application information and provide the ability for the user to specify input," *i.e.* the claimed function and user interface elements.  ECF No. 280-17 (Popp) at 3:55-59, 7:45-49.  Accordingly, Popp discloses this limitation.

AIT contends that Popp does not disclose "providing a dynamically generated application" and instead only "discusses a static, fixed application."  ECF No. 297-1 (AIT Opp.) at 24-25.  However, AIT's expert Mr. Zatkovich testified that Popp does, in fact, "dynamically generate[] a Web page" and that Popp's Web page is an "application."  ECF No. 285-9 (Zatkovich 8/24/2022 Tr.) at 583:10-584:22.  Additionally, Popp itself repeatedly states that it dynamically generates a Web application that is provided to the user of a Web browser.  *See* ECF No. 285-17 (Popp) at Abstract (disclosing that Popp's the Web page "can be generated dynamically using input received in a returned page, generated at runtime, or retrieved from an external data source."); 4:5-6 ("All or some portion of the Web page is dynamically generated."); 7:45-49 ("[T]he present invention can be used to access a Web page (e.g., an HTML Web page) that is dynamically generated using complex queries ….").  Popp therefore discloses a dynamically generated Web page application.  Additionally, Popp's application is the same type of "dynamically generated application" described and claimed in the '482 patent.  *E.g.*, '482 patent at 22:18-39.

(ii)    *Popp discloses "a server computer;"*

Popp discloses an "internal application" that generates Web pages whose contents "can contain data retrieved from a[] . . . database server 318."  ECF No. 280-17 (Popp) at 8:38-46.  AIT and Mr. Zatkovich do not dispute that Popp discloses this limitation.

(iii)    *Popp discloses "one or more client computers connected to the server computer over a computer network;"*

Popp discloses this limitation, including because Popp teaches that "an Automobile Shopper's application . . . provides a series of screens (i.e., Web pages) based on user-input that are designed to facilitate the selection and purchase of an automobile."  ECF No. 280-17 (Popp) at 9:4-12, 9:56-63.  AIT and Mr. Zatkovich do not dispute that Popp discloses this limitation.

(iv)     *Popp discloses "a first layer associated with the server computer containing information about the unique aspects of a particular application;"*

Popp discloses this limitation, including because Popp teaches an "internal application" that generates Web pages whose contents "can contain data retrieved from . . . database server 318." ECF No. 280-17 (Popp) at 8:38-46, 9:4-12, 9:56-63.  For example, Popp discloses that "an Automobile Shopper's application ... provides a series of screens (i.e., Web pages) based on user-input that are designed to facilitate the selection and purchase of an automobile." *Id.* at 9:4-12.  This "application . . . fetches all the data from the database," such as "all of the models of cars that are within the price range and type specifications." *Id.* at 9:56-63.

AIT and its expert Mr. Zatkovich argue that Popp does not disclose "first layer" information because that "Popp's database contains merely the data on which a conventional application operates" and that "[t]he data … does not provide information that defines the Popp application functionality." ECF No. 280-10 (Zatkovich Rbt. Rpt.) ¶ 242-44; *see also* ECF No. 297-3 (Zatkovich 8/24/22 Tr.) at 588:3-19 (Mr. Zatkovich interpreted the word "aspects" in the claim language to mean "features and functionality").  Mr. Zatkovich then argued that data processed and displayed by Popp does not qualify as "first layer" information because it does not define the application's "functionality." ECF No. 280-10 (Zatkovich Rbt. Rpt.) ¶¶ 242-43 ("Popp's database" does not meet the "first layer" limitation because it "contains merely the data on which a conventional application operates" and "does not provide information that defines the Popp application functionality.").

The purported restrictions on the scope of the claim language proposed by AIT and Mr. Zatkovich are inconsistent with the plain and ordinary meaning of "unique aspects of a particular application."  AIT and Mr. Zatkovich do not rely on prosecution disclaimer, lexicography, or disavowal for their interpretation of "information about unique aspects of a particular application." ECF No. 297-3 (Zatkovich 8/24/22 Tr.) at 597:15-21; *see also Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012) ("Absent disclaimer or lexicography, the plain meaning of the claim controls.").  The intrinsic record does not include any statements or evidence suggesting to a person of ordinary skill in the art that the conventionally understood term "aspects" as used in the asserted patents should be limited in the manner AIT and Mr. Zatkovich contend.  Additionally, the

specification of the '482 patent confirms that the claimed "first layer" contains both "functions" and "data" ('482 patent at 12:23-27), thereby contradicting AIT's attempt to limit the "first layer" information to just "features and functionality" at the exclusion of "data."  The asserted claims also distinguish the "first layer" limitation about any "aspect" of an application from the "second layer" information "about the user interface and functions."  Moreover, asserted dependent claim 23 of the '482 patent requires that "the first layer comprises … data," confirming that the claimed "first layer" information is sufficiently broad to encompass "data."  *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F. 4th 1376, 1380 (Fed. Cir. 2022) ("[A]n independent claim is broader than a claim that depends from it, so if a dependent claim reads on a particular embodiment of the claimed invention, the corresponding independent claim must cover that embodiment as well.").

Thus, AIT and Mr. Zatkovich's interpretation of "information about unique aspects of a particular application" cannot be squared with the plain and ordinary meaning of those words to a person of ordinary skill in the art, and is contradicted by the intrinsic evidence.  AIT and Mr. Zatkovich's attempt to distinguish Popp as allegedly lacking a "first layer" thus applies the incorrect claim interpretation, and as such cannot raise a genuine dispute of material fact sufficient to withstand summary judgment.

In addition, AIT and Mr. Zatkovich's characterization of the first layer in Popp as "the data on which an application operates" is incorrect.  For example, Popp discloses that its database data is used to "generate the definitional elements that are used by the shopper's browser to display the Web page." ECF No. 285-17 (Popp) at 10:14-18.  Thus, Popp discloses "information about unique aspects of a particular application" even under AIT and Mr. Zatkovich's proposed claim interpretation.

> (v)    *Popp discloses "a second layer associated with the server computer containing information about the user interface and functions common to a variety of applications, a particular application being generated based on the data in both the first and second layers;"*

Popp discloses this limitation, including because Popp teaches an "application 214 [that] includes objects 216" that "correspond to the HTML elements that define a WWW page."  ECF No. 280-17 (Popp) at 12:21-23; *see also id.* at 2:41-43, 3:56, 4:27-34, 7:47-49, 7:55-58, 11:37-44, 18:34. These HTML elements include information about functions common to various Web page

applications, such as form elements for receiving and processing input data.  *Id.*  Mr. Zatkovich agreed at deposition that Popp disclosed the claimed "second layer."  ECF No. 297-3 (Zatkovich 8/24/2022 Tr.) at 580:22-581:4 ("So sitting here today, you are no longer standing by your previous analysis and conclusion that Popp does not disclose the required second layer; is that right?  A.  I think there is information that indicates that it may meet the second layer."); 581:23-582:4 ("So you no longer dispute that Popp discloses the required second layer, but you maintain that Popp does not disclose the dynamically generating requirement; is that right?   A.   Correct, among others, but yes.").  Additionally, in its opposition brief, AIT does not dispute that Popp discloses this element.  Thus, there is no genuine dispute that Popp discloses the claimed "second layer."

> (vi)   *Popp discloses "a third layer associated with the server computer that retrieves the data in the first and second layers in order to generate the functionality and user interface elements of the application; and"*

Popp discloses this limitation, including because Popp teaches that "the Automobile Shopper application provides an example of the use of dynamic pages."  ECF No. 280-17 (Popp) at 9:27-28, 9:48, 9:56-63.  AIT's opposition raises the same arguments regarding "dynamically generating" as for the '482 patent claim 1 preamble.  For the reasons set forth above, those arguments are unpersuasive.

> (vii)   *Popp discloses "a change management layer for automatically detecting changes that affect an application,"*

The Court construed "automatically detecting" as "detecting without human intervention through the use of one or more intelligent agents."  ECF No. 172 at 24.  As discussed above, the parties and their experts agree upon the relevant disclosure from the specification regarding intelligent agents, including that an "intelligent agent" is "a specialized program that makes decisions and performs tasks based on predefined rules and objectives."  ECF No. 297-2 (Zatkovich 8/21/2022 Tr.) at 261:16-25 (quoting '482 patent at 20:1-3).  AIT does not dispute in its briefing that either Popp or Amati disclose "intelligent agents."

### A)   Anticipation

AIT and Mr. Zatkovich do not dispute that Popp discloses an "intelligent agent,"  and in particular, that as opined by Dr. Bederson, Popp disclosed an "inputControl 664"  that can detect if

"the client may have modified field 632 to specify a new name."  ECF No. 280-17 (Popp) at 22:37-48.
Instead, they argue that Popp does not disclose "changes that affect an application" because the
changes in Popp are to "the data on which the application operates."  ECF No 280-10 (Zatkovich Rbt.
Rpt.) ¶ 253-257.  They contend that the claimed "change management layer" must automatically
detect changes that affect the "functionality" of an application.  ECF No. 297-3 (Zatkovich 8/24/22
Tr.) at 593:20-24 ("Q.  So, in your view, the change management layer must detect changes that affect
the functionality of an application; is that right?  A.  Yes.").  AIT and Mr. Zatkovich argue that
changes to data processed and displayed by an application do not qualify as the claimed "changes"
because they do not change "functionality."  ECF No 280-10 (Zatkovich Rbt. Rpt.) ¶ 255 (arguing that
the Popp prior art reference does not disclose the "change management layer" because Popp's
detected changes are to "the data on which the application operates").[5]

The purported limitations on "changes that affect an application" proposed by AIT and Mr.
Zatkovich are inconsistent with the plain and ordinary meaning of that phrase to a person of ordinary
skill in the art.  As with the earlier term "unique aspects of a particular application," AIT and Mr.
Zatkovich do not rely on prosecution disclaimer, lexicography, or disavowal.  Therefore, the plain and
ordinary meaning of "changes that affect an application" to a person of ordinary skill in the art
controls.  And under that plain meaning, the claimed "changes that affect an application" are clearly
not limited to just "changes that affect *the functionality of* an application."   The claim language is
broader, and encompasses any "changes that affect an application," which include changes to data that
the application operates on, since those changes "affect" the application's behavior and user interface.

---

[5] AIT filed a cross-motion for summary judgment of no anticipation. ECF No 270.  The basis
for AIT's motion was that Salesforce's expert Dr. Bederson could not analyze invalidity of the
limitation "a change management layer for automatically detecting changes that affect an application"[5]
in the alternative, applying each party's apparent interpretations of the claim language.  The Court
denies AIT's motion for summary judgment of no anticipation on the basis that Dr. Bederson's
analysis in the alternative is an acceptable methodology often used in expert invalidity reports.  *01*
*Communique Lab., Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 741-42 (Fed. Cir. 2018) (finding "nothing
improper about this argument" in the alternative); *Stryker Corp. v. Zimmer, Inc.*, 782 F.3d 649, 658
n.4 (Fed. Cir. 2015) (vacated on other grounds by *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93
(2016)) ("[N]othing precludes [defendant] from arguing for a narrower application of the limitation on
the infringement context, while also arguing, in the alternative, that—if the district court were to
disagree—the patent claim would be so broad as to be invalid.").

Claim 13 of the '111 patent further confirms that AIT and Mr. Zatkovich advance an incorrect claim interpretation.  The "fourth portion" limitation of claim 13 "expressly limits the claim to detecting 'changes that *affect the information* in the first portion of the server or the information in the second portion of the server' rather than 'changes that affect an application.'"  ECF No 280-10 (Zatkovich Rbt. Rpt.) ¶ 281 (emphasis added).  The use of the word "or" means that detecting changes to just "first layer" information is sufficient to satisfy this claim limitation.  And, as addressed above, that "first layer" information includes data used by the application.  Accordingly, detecting changes to "data" is sufficient to satisfy the "change management layer" / "fourth portion" claim limitations. Thus, AIT and Mr. Zatkovich's attempt to distinguish Popp as lacking a "change management layer" employs the wrong claim interpretation and as such cannot raise a genuine dispute of material fact.

Accordingly, there is no genuine dispute of material fact that Popp discloses the claim limitation "a change management layer for automatically detecting changes that affect an application." Because Popp also discloses the other limitations of the asserted claims, Popp anticipates the asserted claims.

B)    <u>Obviousness</u>

Amati discloses an "ABIS (Agent Based Information System)" that includes "[a]n agent [that] is an intelligent entity designed to act on behalf of a user" by "agent autonomously navigat[ing] the network looking for relevant documents." ECF No 280-18 (Amati) at 1015.  AIT and Mr. Zatkovich do not dispute that Amati discloses the use of intelligent agents.

A person of ordinary skill in the art would have been motivated to combine Popp and Amati. For example, Dr. Bederson opined that it would have been obvious to incorporate these teachings into Popp such that Popp's "inputControl 664," which for example detects if "the client may have modified field 632 to specify a new name," is an ABIS agent as taught in Amati.  *Id*. ¶ 427 (citing Popp at 22:37-43).  Dr. Bederson further explained that "the combination would enhance the ease with which users would receive information" and that it "would result in improved quality of content with less effort," particularly because "Amati explains that its 'ABIS' intelligent agent 'minimizes user's effort in selecting the huge amount of available documents."  ECF No 280-6 (Bederson Report) ¶¶ 226-27 (quoting Amati at Abstract).

Popp and Amati are analogous art because they are both directed to the same field of information processing.  Popp at Abstract ("An object-oriented approach provides the ability to develop and manage Internet transactions."); Amati at 1007 ("Methods of information filtering and fetching...").  Additionally, a person of ordinary skill in the art would be motivated to combine Popp with Amati because, an intelligent agent such as the ABIS agent is "capable of acting autonomously, facing unexpected events and cultivating a trustful relationship with the user."  Amati at 1015.  Further, a person of ordinary skill in the art would have found that such a combination would be reasonably expected to succeed and yield the predictable result of Popp's inputControl detecting and reacting to changes based on the criteria described in Amati, such as the user's "Preference Profile that describes the current user interest."  ECF No 280-6 (Bederson Rpt.) ¶ 427.

AIT and Mr. Zatkovich unpersuasively argue that Popp and Amati cannot be combined to render the asserted claims obvious.  First, Mr. Zatkovich argues that Popp and Amati are in different fields, but he confuses Amati with a different reference, Kerschberg: "Dr. Bederson states that Popp and Amati are analogous art because they are both directed to the same field of information processing.  However, Popp relates to developing and managing transactions on the Internet, and *Kerschberg* relates to the entirely different field of seeking information to support *Enterprise Information Architectures*."  ECF No 280-10 (Zatkovich Rbt. Rpt.) ¶ 1152 (emphasis added).  The phrase "Enterprise Information Architectures" is from Kerschberg and does not occur in Amati.  Therefore, this opinion is not simply a typographical error, but instead a defect in Mr. Zatkovich's substantive analysis.

Second, Mr. Zatkovich argues that "Amati does not disclose any type of detection of changes made to data in input fields, nor does Dr. Bederson explain how or why that capability could or should be incorporated into Amati."  ECF No 280-10 (Zatkovich Rbt. Rpt.) ¶ 1153.  But here Mr. Zatkovich confuses which reference is the basis of the combination.  Salesforce and Dr. Bederson propose using the entire system of Popp, including its existing change detection of input fields, but augmented using the techniques of Amati.  Moreover, Amati clearly discloses monitoring of user interface controls, like forms.  Amati at 1015 ("ABIS is able to predict the appropriate action the user would fulfill in a particular situation, e.g. store in a folder, delete, print, etc."); *id.* ("The user interacts with the agent

1   through a Web-based interface . . . .").

2       Accordingly, there is no genuine dispute of material fact that a person of ordinary skill in the

3   art would have combined Popp with Amati, in the manner proposed by Salesforce and Dr. Bederson,

4   to render the claim limitation "a change management layer for automatically detecting changes that

5   affect an application" obvious.

6                               (viii)   *Popp discloses "each client computer further comprising a*
                                         *browser application being executed by each client computer,*
7                                        *wherein a user interface and functionality for the particular*
                                         *application is distributed to the browser application and*
8                                        *dynamically generated when the client computer connects to*
                                         *the server computer."*
9

10      Popp discloses this limitation, including at least because Popp teaches that clients connect to

11  the server via HTTP and the server responds with the requested information as a Web page.  ECF No

12  280-17 (Popp) at 1:43-54, 3:53-61.  In its opposition, AIT states that "Mr. Zatkovich disagreed with

13  Dr. Bederson regarding Popp's disclosure of a Java applet."  ECF No 297-1.  But this disagreement

14  does not create a genuine dispute of material fact because Mr. Zatkovich admits that the Web page

15  distributed in Popp includes the user interface and functionality, and therefore there is no need to also

16  consider using a Java applet with Popp.  ECF No. 285-9 (Zatkovich 8/24/2022 Tr.) at 583:15-18

17  ("[Y]ou don't dispute, right, that Popp's Web page includes functionality, do you?  A.  No, I don't

18  dispute that.");  ECF No. 285-10 (Zatkovich Rbt. Rpt. ¶ 251 (admitting that the HTML code" for "the

19  appropriate Web page" contains "functionality and user interface").  AIT also repeats its argument that

20  Popp's Web page is "a static application (application 214) with fixed functionality and a fixed user

21  interface" (ECF No 297-1), which has been addressed above in the context of the "dynamically

22  generated application" claim language.

23      In sum, Salesforce has demonstrated both that claim 1 of the '482 patent is anticipated by

24  Popp, and also that claim 1 is rendered obvious by the combination of Popp and Amati.  No

25  reasonable jury could credit AIT and Mr. Zatkovich's contrary arguments.

26              **(b)     Claim 10**

27      Popp discloses this claim, including because Popp's system includes a builder module for

28  permitting a user to build a particular Web page (application), including its UI, using the shared object

tree components or modules (second layer).  "Development of an internal application can be efficient and flexible . . . .  Developers have the ability to incorporate pre-existing modules into the internal application.  Modules are self-contained to facilitate module maintenance and interaction."  ECF No. 280-17 (Popp) at 8:32-42.

AIT argues that Popp does not disclose a "builder module," as required by claims 10 and 30 of the '482 patent, based solely on a statement by Mr. Zatkovich that "Popp's conventional development techniques do not meet the 'builder module' limitations."  ECF No 297-1 (citing ECF No. 280-10 (Zatkovich Rbt. Rpt. ) ¶ 262.).  However, Mr. Zatkovich's single-sentence conclusory assertion to that effect is insufficient to withstand summary judgment. *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1337 (Fed. Cir. 2010) ("[M]ere denials or conclusory statements are insufficient to survive summary judgment.") (quotation omitted).

### (c)      Claim 20

Popp discloses this claim, including because Popp teaches that database 224 (first layer) and Web page objects 216 (second layer) within application 214 can be distributed across one or more server computers in server domain 208.  ECF No. 280-17 (Popp) at FIG. 2; 7:32-35.  AIT did not dispute that Popp disclosed claim 20.

### (d)      Claim 21

Popp discloses the elements of independent claim 21 of the '482 patent for the same reasons given above in the context of claim 1 of the '482 patent.  AIT did not contend that there were any meaningful differences in the claim language or claim scope when considering the invalidity of claims 1 and 21 in light of Popp.

### (e)      Claims 23-26

Popp discloses claims 23-26 of the '482 patent for the same reasons given below in the context of claim 14-17 of the '111 patent.  In its opposition, AIT argues that there is a genuine dispute of material fact because Salesforce's original expert report did not include separate sections addressing claims 23-26 of the '482 patent.  However, Salesforce moved for leave to serve a supplemental expert report addressing those claims on the basis that any absence of claims 23-26 of the '482 patent was a clerical oversight and did not lead to any prejudice.  ECF No. 353.  The Court therefore GRANTS

Salesforce's motion on the basis that claims 23-26 of the '482 patent are substantively identical to claims 14-17 of the '111 patent, and therefore that Dr. Bederson's original opinions are fully applicable to claims 23-26 of the '482 patent.

The only differences between these two sets of claims identified by AIT are "business content database" (claim 23) and "metadata database" (claims 25-26), but claims 14-17 of the '111 patent already require "information associated with one or more predetermined business applications" (claim 14), "business knowledge" (claim 15), and "metadata" (claims 16-17). Ultimately, AIT provides no explanation of any substantive difference between these two sets of claims and never affirmatively alleges that Popp does not disclose these claim limitations.

### (f)      Claim 30 and 40

Popp discloses claims 30 and 40 of the '482 patent for the same reasons given below in the context of claims 10 and 20 of the '111 patent.

### 4.   Popp Anticipates Claims 13-17 of the '111 Patent and Also Renders Them Obvious in Combination With Amati

Popp anticipates claims 13-17 of the '111 patent and also renders them obvious in combination with Amati.

### (a)      Claim 13

Popp discloses the elements of claim 13 of the '111 patent for the same reasons given above in the context of claim 1 of the '482 patent.

### (b)      Claim 14

Popp discloses this claim, including because Popp teaches that the database "[d]ata source 630 can be, for example, an enterprise's corporate database." ECF No. 280-17 (Popp) at 7:66-67, 22:64-65. AIT did not contend that Popp failed to disclose claim 14.

### (c)      Claim 15

Popp discloses this claim, including because Popp teaches that "[d]ata source 630 can be, for example, an enterprise's corporate database." *Id.* at 19:35-38, 22:37-48, 22:64-65. AIT and Mr. Zatkovich contend that the contents of the corporate database, such as employee names, "are merely user ***data***, not 'business knowledge'" and that "'business knowledge' can be ***metadata*** that defines a

business application." ECF No. 280-10 (Zatkovich Rbt. Rpt.) ¶ 285-87 (emphasis added).  However, AIT does not provide any justification for its claim interpretation of "business knowledge" in its opposition brief, and the plain and ordinary meaning of "business knowledge" is not restricted to the scope urged by AIT and Mr. Zatkovich.  AIT and Mr. Zatkovich's attempt to distinguish Popp as allegedly lacking "business knowledge" thus applies the wrong claim interpretation and as such cannot raise a genuine dispute of material fact sufficient to withstand summary judgment.

### (d)    Claim 16

Popp discloses this claim, including because Popp teaches "[a]n association [that] provides binding information to bind, for example, variables, objects, Web page definitions, and scripts to one another." ECF No. 280-17 (Popp) at 16:48-17:52.  AIT's only response references Mr. Zatkovich's contention that Dr. Bederson was "mixing and matching different portions of Popp to meet the limitations of claim 16."  But this alleged "mixing and matching" was only relevant to Mr. Zatkovich's argument that Popp's "objects 216" do not include "associations."  ECF No. 280-10 (Zatkovich Reb. Rpt.) ¶ 290).  Mr. Zatkovich stated at deposition that "[c]laim 16 doesn't say that the metadata must include the associations." ECF No. 285-9 (Zatkovich 8/24/2022 Tr.) at 598:13-599:7. Accordingly, AIT's argument regarding the alleged "mixing and matching" is irrelevant and cannot defeat summary judgment.

### (e)    Claim 17

Popp discloses this claim, including because Popp teaches "associations," which are metadata about Web page objects. ECF No. 280-17 (Popp) at 20:21-27.  AIT did not contend that Popp failed to disclose claim 17.

### 5.  Secondary Considerations of Non-Obviousness Cannot Sustain Validity of the '482 or '111 Patents

AIT argued that secondary considerations support the non-obviousness of the asserted claims. However, secondary considerations are only applicable to obviousness, not anticipation, and therefore do not affect the Court's finding that the asserted claims are anticipated by Popp. *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1364 (Fed. Cir. 2008) ("[S]econdary considerations are not an element of a claim of anticipation.").

Moreover, AIT has failed to establish that secondary considerations of non-obviousness support validity of its patents. AIT does not contend that the secondary considerations of skepticism of experts, unexpected results, long-felt but unresolved need, or copying apply to its patents. Further, AIT's contention that commercial success supports non-obviousness rests primarily on the alleged commercial success of Salesforce's accused products, which I have found do not infringe (or practice) the asserted claims. AIT also failed to license the patents, which demonstrates the lack of commercial acquiescence via licensing and also tends to show lack of commercial success.

Additionally, even if AIT had established their presence, secondary considerations cannot overcome Salesforce's strong obviousness case. *See Intercontinental Great Brands LLC v. Kellogg N.A. Co.*, 869 F.3d 1336, 1347 (Fed. Cr. 2017) (affirming grant of summary judgment on obviousness notwithstanding patentee's arguments based on secondary considerations); *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, at 1344 (Fed. Cir. 2013) ("[W]here a claimed invention represents no more than the predictable use of prior art elements according to established functions, as here, evidence of secondary indicia are frequently deemed inadequate to establish non-obviousness.); *Western Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1373 (Fed. Cir. 2010) ("[W]eak secondary considerations generally do not overcome a strong prima facie case of obviousness."); *Tyco Healthcare Grp. LP v. Mutual Pharm. Co.*, 642 F.3d 1370, 1377 (Fed. Cir. 2011) (affirming summary judgment where the "district court acknowledged the product's commercial success but properly found that the evidence as a whole did not overcome [defendant's] strong prima facie case of obviousness.").

## IV.   CONCLUSION

For the above reasons, the Court that there is no genuine dispute of material fact and grants summary judgment as to the following:

- Salesforce does not infringe claims 1, 10, 20-21, 23-26, 30, and 40 of the '482 patent.

- Salesforce does not infringe claims 13-17 of the '111 patent.[6]
- Claims 1, 10, 20-21, 23-26, 30, and 40 of the '482 patent are anticipated by the Popp prior art reference.
- Claims 13-17 of the '111 patent are anticipated by the Popp prior art reference.
- Claims 1, 10, 20-21, 23-26, 30, and 40 of the '482 patent are rendered obvious by the Popp prior art reference in view of the Amati prior art reference.
- Claims 13-17 of the '111 patent are rendered obvious by the Popp prior art reference in view of the Amati prior art reference.

Accordingly, the Court GRANTS-IN-PART Salesforce's Motion for Summary Judgment (ECF No. 278) and DENIES AIT's Motion for Summary Judgment of No Anticipation (ECF No. 270). The Court does not rule on the parties' other pending motions (ECF No. 268, 272, 275, 283, 338, 351) except to the extent necessary to resolve the parties' motions for summary judgment.

IT IS SO ORDERED

---

[6] The Court defers ruling on whether Salesforce's "Lightning" user interface and its mobile application infringe any asserted claims, as those issues are rendered moot by the Court granting summary judgment of non-infringement and invalidity.