# Exhibit 2

JOHN FRANKOVICH, NV Bar #667
LEIGH GODDARD, NV Bar #6315
McDonald Carano Wilson LLP
100 West Liberty Street, 10th Floor
P.O. Box 2670
Reno, NV 89505-2670
Telephone:  (775) 788-2000
Facsimile: (775) 788-2020
Email: jfrankovich@mcdonaldcarano.com
lgoddard@mcdonaldcarano.com

KEVIN JOHNSON (*pro hac vice*)
RAY ZADO (*pro hac vice*)
SAM STAKE (*pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100
Email: kevinjohnson@quinnemanuel.com
rayzado@quinnemanuel.com
samstake@quinnemanuel.com

*Attorneys for Defendant salesforce.com, inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| APPLICATIONS IN INTERNET TIME, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SALESFORCE.COM, INC.,<br><br>Defendant. | No. 3:13-CV-00628-RCJ-VPC<br><br>DEFENDANT SALESFORCE.COM, INC.'S NON-INFRINGEMENT, INVALIDITY, AND UNENFORCEABILITY CONTENTIONS |

Defendants salesforce.com, inc. ("Salesforce") hereby provides its Local Rule 16.1-8 disclosures of non-infringement, invalidity, and unenforceability contentions ("Salesforce's Contentions") to Plaintiff Applications In Internet Time, LLC ("AIT").  With respect to each claim asserted by AIT, based on its investigation to date, Salesforce hereby:  (a) provides a detailed description of the factual and legal grounds for its non-infringement contentions; (b) provides a detailed description of the factual and legal grounds for its invalidity contentions; (c) identifies each currently known item of prior art that either anticipates or renders obvious each asserted claim; (d) specifies whether each such item of prior art (or combination thereof) anticipates each asserted claim and/or renders it obvious; (e) submits a chart identifying where in each alleged item of prior art each element of each asserted claim is found; (f) identifies any grounds of invalidity based on indefiniteness under 35 U.S.C. § 112(b) or enablement or written description under 35 U.S.C. § 112(a); and (g) provides a detailed description of the factual and legal grounds for its unenforceability contentions.

In addition, pursuant to Local Rule 16.1-9 and also based on its investigation to date, Salesforce will produce or make available for inspection materials currently in its respective possession, custody, or control required to accompany these Contentions, excluding the prior art disclosed during prosecution of U.S. Patent Nos. 7,356,482 ("the '482 Patent") and 8,484,111 ("the '111 Patent") (collectively, "the Patents-in-Suit").  Salesforce hereby incorporates into its production all documents previously produced.  Salesforce reserves the right to rely on all documents produced by the AIT, any predecessors in interest, the named inventors, and any other third parties, as discovery pertaining to these systems and references is ongoing.

AIT contends in its Disclosure of Asserted Claims and Infringement Contentions ("Infringement Contentions") that Salesforce infringes claims 1, 3, 5, 6, 10, 20, 21, 23, 24, 25, 26, 30, and 40 of the '482 Patent.  AIT also contends that Salesforce infringes claims 1, 2, 3, 4, 5, 7, 8, 9, 11, 13, 14, 15, 16, and 17 of the '111 Patent.

Salesforce reserves its right to supplement these Contentions should AIT assert new claims against Salesforce.  Deficiencies in AIT's Infringement Contentions, including the lack of specificity as to which particular features of the accused products allegedly satisfy each

1  limitation of the asserted patent claims, have made it difficult for Salesforce to understand AIT's

2  claim construction and infringement positions.  The lack of specificity in AIT's Infringement

3  Contentions has prejudiced Salesforce's ability to prepare these Contentions by forcing

4  Salesforce to speculate as to AIT's actual position on the proper interpretation of its asserted

5  claims and Salesforce's alleged infringement of those claims.  Therefore, Salesforce's

6  Contentions are provided in view of its present understanding of the asserted claims and AIT's

7  apparent positions as to the scope of the asserted claims as applied in its Infringement

8  Contentions.  Salesforce reserve its right to modify its Contentions, to the extent that AIT later

9  takes inconsistent positions as to claim construction and scope.  Finally, Salesforce reserves its

10  right to modify or supplement these Contentions in view of additional investigation, discovery,

11  and/or any reason subject in accordance with the Local Rules.

12  **I.    NON-INFRINGEMENT CONTENTIONS**

13          AIT carries the burden of establishing infringement for each asserted claim by a

14  preponderance of the evidence.  Specifically, it is AIT's burden to prove that each and every

15  limitation of each asserted claim is met by each accused Salesforce product or instrumentality,

16  either literally or under the doctrine of equivalents, directly or indirectly.  If AIT fails to meet

17  this burden for any limitation of a claim, then it cannot establish infringement for that claim.

18  Because AIT has not met this burden for at least one limitation of each asserted claim of the

19  Patents-in-Suit, there can be no infringement of the Patents-in-Suit.[1]

20

21          [1] These non-infringement contentions respond only to AIT's May 2, 2014 Infringement

22  Contentions, which are improperly broad in view of the contentions attached to the November 8,
   2013, complaint, and Salesforce reserves the right to contend that AIT's arguments were not

23  timely raised.  Salesforce notes that AIT's Infringement Contentions are wholly insufficient and
   fail to put Salesforce on notice of AIT's infringement theories and the evidence on which in

24  intends to rely.  AIT should be limited to the theories set forth in its contentions.  The Accused

25  Instrumentalities or Products should also be limited to only those identified in the infringement
   charts in Exhibits A and B to the AIT's Infringement Contentions.  Although AIT alleged other

26  Salesforce and third-party applications in Exhibits A and B to Infringement Contentions as
   alleged "embodiments" of infringing instrumentalities, it failed to provide any infringement

27  charts or other evidence explaining how these applications infringe the Patents-in-Suit.

28  Notwithstanding AIT's failure to chart these purported infringing products, for the reasons stated
   (Footnote continues on next page.)

For purposes of responding to AIT's Infringement Contentions, and for the reasons outlined below in footnote 1, Salesforce hereby states that it understands "accused instrumentalit(ies)" as used in AIT's Infringement Contentions to refer to Salesforce's "proprietary computer platform for generating and serving applications to users in a web-browser environment," and more particularly, that AIT has identified "Salesforce1 and Force.com" platforms as embodiments of the accused instrumentality (hereinafter "Accused Instrumentalities").[2]  Salesforce further responds to AIT's asserted claims to the extent they are expressly enumerated in AIT's cover pleading to their Infringement Contentions.

## A.    The '482 Patent

AIT has not proven that the Accused Instrumentalities practice or perform at least the following elements of the '482 Patent either literally or under the doctrine of equivalents for at least the following reasons with respect to Salesforce1, Force.com, Sales Cloud, Service Cloud, Marketing Cloud, and ExactTarget Marketing Cloud:

    1.    "providing a dynamically generated application"; "dynamically generated when the client computer connects to the server computer" (claim 1); "dynamically re-generated each time a client establishes a connection with the server computer" (claim 21)

        a.    Neither the Accused Instrumentalities nor Salesforce practice or provide the "dynamic[] generat[ion]" or "dynamic[] re-generat[ion]" of a "user interface" or an "application" "each time a client establishes a connection with the server computer" or "when a client computer connects to the

---

(Footnote continued from previous page.)

herein, the Salesforce and third-party applications associated with these unsubstantiated infringement allegations do not infringe the Patents-in-Suit.

[2]    Salesforce further understands that AIT identified other Salesforce and non-Salesforce products, presumably in accordance with their use with the Salesforce1 and Force.com platforms, as alleged embodiments of infringing systems.  Specifically, AIT has asserted that "Salesforce.com products that depend on [Salesforce1 and Force.com] and are embodiments of infringing systems and methods are Sales Cloud, Service Cloud, Marketing Cloud, and ExactTarget Marketing Cloud.  In addition, various third-party applications utilize the Salesforce1 and Force.com platform and are embodiments of infringing systems and methods."

server computer."  To the extent AIT's allegations of infringement are based on a third-party's client computer connecting to a Salesforce server, Salesforce does not infringe.  *See Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1286 (Fed. Cir. 2011) ("While Qwest may make the back-end processing elements, it never 'uses' the entire claimed system because it never puts into service the personal computer data processing means.  Supplying the software for the customer to use is not the same as using the system."); *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111, 2119 (2014) ("Because Limelight did not undertake all steps of the '703 patent and cannot otherwise be held responsible for all those steps, respondents' rights have not been violated.").

b.  Further, AIT has presented no evidence that Salesforce's Accused Instrumentalities practice or provide, in connection with the "dynamic[] generat[ion] …" limitations, any responding to or incorporation of "changes in, federal, state, and local laws, statutes, ordinances and regulations . . . and changes in technology in one or more regulated areas of commercial activity."  More particularly, the '482 Patent specification defined "the invention" at column 9, lines 10-17 as "monitor[ing], respond[ing] to, and incorporat[ing] changes in, federal, state and local laws, statutes, ordinances and regulations (referred to collectively herein as 'regulations') and changes in technology in one or more regulated areas of commercial activity, such as environmental health and safety (EH&S), and food, drugs, cosmetics, medical devices and treatments ('FDCMTD')."  Because the relevant disclosure in the specification defines "the invention," this disclosure is limiting in scope, and the Accused Instrumentalities do not meet these claim limitations.  *See Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir.

DEFENDANT SALESFORCE.COM, INC.'S NON-INFRINGEMENT, INVALIDITY, AND UNENFORCEABILITY  CONTENTIONS

2006); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).

c. Moreover, the "develop[ment], packag[ing], deploy[ment], and use" of an "application" and/or a "user interface" based on manual user configuration and coding as set forth in AIT's Infringement Contentions (through, e.g., "Apex cod[ing]" or "point-and-click" declarations) does not constitute the "dynamically generat[ing]" or "dynamically re-generating" of the '482 Patent claims.

d. The Accused Instrumentalities also do not cause or otherwise practice "re-generat[ion]" of a user interface "*each time* a client" connects to a Salesforce server.

2. "client computer" (claim 1); "method for dynamically generating an application using … one or more client computers" (claim 21)

a. The Accused Instrumentalities do not practice or provide "client computers" (referred to in AIT's Infringement Contentions as an "end user's client computer connected to a Salesforce server computer") in the operation of Salesforce1 or Force.com platforms. To the extent that AIT's allegation of infringement is based on an allegation that a third party operates a client computer that connects to a Salesforce server over a computer network, Salesforce does not infringe. *See Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1286 (Fed. Cir. 2011) ("While Qwest may make the back-end processing elements, it never 'uses' the entire claimed system because it never puts into service the personal computer data processing means. Supplying the software for the customer to use is not the same as using the system."); *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111, 2119 (2014) ("Because Limelight did not undertake all steps of the '703 patent and cannot otherwise be held responsible for all those steps, respondents'

-6-

1    rights have not been violated.").

2    3.   "a first layer associated with the server computer containing information" (claim

3        1); "first layer containing information" (claim 21); "first layer" (claim 23)

4        a.   The Accused Instrumentalities do not include a "first layer" associated

5            with a server computer or otherwise.  The '482 Patent claims require (in

6            accordance with the disclosure thereof), at a minimum, a logical

7            distinction between the various "layers" identified as associated with a

8            server computer.  Salesforce does not, in connection with the operation of

9            a server associated with Salesforce1 or Force.com, create and maintain

10           logical distinctions between separate "layers."  As such, Salesforce does

11           not practice or provide the "first layer" limitation of the claims of the '482

12           Patent.

13   4.   "first layer . . . containing information about unique aspects of a particular

14       application" (claim 1); "first layer . . . containing information about the unique

15       aspects of a particular application" (claim 21)

16       a.   The Accused Instrumentalities do not practice or provide a "first layer"

17           containing information about "unique aspects" of a particular application.

18           Neither the "business logic … developed or deployed on the Force.com

19           platform of the Salesforce1 platform" nor the "Model-View-Controller"

20           architecture identified in AIT's Infringement Contentions evidence the

21           existence of a first layer containing  "information about the unique aspects

22           of a particular application."  Notably, AIT does not identify with any

23           specificity any purported "unique aspects", including whether any such

24           alleged "unique aspects" are present in the alleged "view," the alleged

25           "controller," or both.   Likewise, the "static and/or dynamic content of a

26           web-based application developed on the Site.com platform" referenced in

27           AIT's Infringement Contentions does not evidence the existence of a first

28           layer "containing information about the unique aspects of a particular

04554.00001/6085572.5
                                        -7-

application." Indeed, AIT fails to identify, in the Site.com context, with any specificity what comprises the alleged "unique aspects" contained in a "first layer."

5. "second layer associated with the server computer" (claim 2); "second layer(s)" (claims 3, 5, 10, 20, 25, 30, 40); "second layer containing information about the user interface and functions common to a variety of applications" (claim 21)

    a. The Accused Instrumentalities do not practice or provide a "second layer" associated with a server computer or otherwise. The '482 Patent claims require (in accordance with the disclosure thereof), at a minimum, a logical distinction between the various "layers" identified as associated with a server computer. Salesforce does not create or maintain, in connection with the operation of a server associated with Salesforce1 or Force.com, logical distinctions between separate "layers."

    b. The Accused Instrumentalities do not practice or provide a "second layer" containing information "about the user interface and functions common to a variety of applications." The "Model-View-Controller" architecture identified in AIT's Infringement Contentions does not evidence the existence of any alleged "second layer" containing information about "functions common to a variety of applications." AIT's Infringement Contentions do not specify the location of the alleged "standard user interfaces," and in particular, whether they are contained in any particular "layer," much less whether the "layer" in which they are contained includes information about the "unique aspects of a particular application" or "common to a variety of applications." The information and data associated with user interface templates on Salesforce1 and Force.com, when in use by a Force.com application, are not "common to a variety of applications." Further, the alleged "[c]ustomized user interfaces" identified in AIT's Infringement Contentions do not represent

1   "information about the user interface and functions common to a variety

2   of applications."

3      c.   To the extent that AIT's allegation of infringement is based on "third-

4   party application[s that]  implement a web-based user interface"

5   Salesforce does not infringe.  *See Centillion Data Sys., LLC v. Qwest*

6   *Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1286 (Fed. Cir. 2011) ("While

7   Qwest may make the back-end processing elements, it never 'uses' the

8   entire claimed system because it never puts into service the personal

9   computer data processing means.  Supplying the software for the customer

10   to use is not the same as using the system."); *Limelight Networks, Inc. v.*

11   *Akamai Technologies, Inc.*, 134 S. Ct. 2111, 2119 (2014) ("Because

12   Limelight did not undertake all steps of the '703 patent and cannot

13   otherwise be held responsible for all those steps, respondents' rights have

14   not been violated.").

15    6.   "based on the data in . . . the first and second layers" (claims 1 and 21); "first and

16   second layers" (claims 20 and 40)

17      a.   The Accused Instrumentalities do not practice or provide either a "first

18   layer" or "second layer" associated with a server computer or otherwise.

19   The '482 Patent claims require (in accordance with the disclosure thereof),

20   at a minimum, a logical distinction between the various "layers" identified

21   as associated with a server computer.  Salesforce does not, in connection

22   with the operation of a server and associated with Salesforce1 or

23   Force.com, create or maintain logical distinctions between separate

24   "layers."  As such, Salesforce does not practice or provide the "first layer

25   and second layers" of the claims of the '482 Patent, much less perform

26   any action or providing any element "based on the data" contained therein.

27      b.   To the extent that AIT's allegation of infringement is based on "third-

28   party application[s that]  implement a web-based user interface,"

-9-

Salesforce does not infringe.  *See Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1286 (Fed. Cir. 2011) ("While Qwest may make the back-end processing elements, it never 'uses' the entire claimed system because it never puts into service the personal computer data processing means.  Supplying the software for the customer to use is not the same as using the system."); *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111, 2119 (2014) ("Because Limelight did not undertake all steps of the '703 patent and cannot otherwise be held responsible for all those steps, respondents' rights have not been violated.").

    c.  Salesforce further incorporates the analysis set forth above in connection with the "first layer" and "second layer" limitations by reference.

7.  "a third layer associated with the server computer that retrieves the data in the first and second layers" (claim 1); "third layer that retrieves the data in the first and second layers" (claim 21)

    a.  The Accused Instrumentalities do not practice or provide a "third layer" associated with a server computer or otherwise.  The '482 Patent claims require (in accordance with the disclosure thereof), at a minimum, a logical distinction between the various "layers" identified as associated with a server computer.  Salesforce does not, in connection with the operation of a server and associated with Salesforce1 or Force.com, create or maintain logical distinctions between separate "layers."  As such, Salesforce does not practice or provide the "third layer" of the claims of the '482 Patent.

    b.  The "Force.com runtime engine (kernel) and runtime application generator" referenced in AIT's Infringement Contentions are not associated with certain and specific "layers" of a server computer.

    c.  AIT further fails to specify which specific alleged "metadata" relates to

data in the first layer, and which specific alleged metadata relates to data in the second layer.

    d.  Salesforce further incorporates the analysis set forth above in connection with the "first layer" and "second layer" limitations by reference.

8.  "change management layer for automatically detecting changes that affect an application" (claim 1); "automatically detecting changes that affect a particular application" (claim 21)

    a.  The Accused Instrumentalities do not practice or provide a "change management layer for automatically detecting changes that affect an application" or software "automatically detecting changes that affect a particular application."   The '482 Patent claims require (in accordance with the disclosure thereof), at a minimum, a logical distinction between the various "layers" identified as associated with a server computer. Salesforce does not, in connection with the operation of a server and associated with Salesforce1 or Force.com, create or maintain logical distinctions between separate "layers."  As such, Salesforce does not practice or provide the "change management layer" which "automatically detec[ts] changes" of the claims of the '482 Patent.

    b.  The specific developer tools provided by Salesforce, such as the developer sandbox, the Force.com Migration Tool, or the "publisher" tool identified in AIT's Infringement Contentions, do not "automatically detect" changes that affect a particular application.  In each of the alleged instances of "automatically detecting changes" contended by AIT, Salesforce software or products do not actively monitor or otherwise "detect" changes.  The mere act of an application developer or Salesforce administrator making a change to a certain Force.com application, where active instances of said application can be instantly or manually "refreshed" by that application developer or Salesforce administrator, does not constitute "automatically

detecting changes."

   c.   Further, AIT has presented no evidence that Salesforce's Accused Instrumentalities practice or provide, in connection with the "change management layer…" or "automatically detecting …" limitations, any monitoring or responding to "changes in, federal, state, and local laws, statutes, ordinances and regulations . . . and changes in technology in one or more regulated areas of commercial activity."  More particularly, the '482 Patent specification defined "the invention" at column 9, lines 10-17 as "monitor[ing], respond[ing] to, and incorporat[ing] changes in, federal, state and local laws, statutes, ordinances and regulations (referred to collectively herein as 'regulations') and changes in technology in one or more regulated areas of commercial activity, such as environmental health and safety (EH&S), and food, drugs, cosmetics, medical devices and treatments ('FDCMTD')."  Because the relevant disclosure in the specification defines "the invention," this disclosure is limiting in scope, and the Accused Instrumentalities do not meet these claim limitations.  *See Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).

9.   "browser application" (claim 1)

   a.   The Accused Instrumentalities do not practice or provide a "browser application."  To the extent that AIT's allegation of infringement is based on an allegation that a third party operates a "browser application," Salesforce does not infringe.  *See Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1286 (Fed. Cir. 2011) ("While Qwest may make the back-end processing elements, it never 'uses' the entire claimed system because it never puts into service the personal computer data processing means.  Supplying the software for the customer

to use is not the same as using the system."); *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111, 2119 (2014) ("Because Limelight did not undertake all steps of the '703 patent and cannot otherwise be held responsible for all those steps, respondents' rights have not been violated.").

10. "business content database having data about one or more different predetermined business applications " (claims 3, 23); "predetermined business application" (claim 24)

    a. The Accused Instrumentalities do not practice or provide a "second layer" comprising a "business content database" containing information about "one or more predetermined business applications."

    b. The "declarative web interface" of the "Force.com Setup menu," as alleged by AIT in its Infringement Contentions, is not "one or more predetermined business applications."  Further, AIT does not identify the relationship between the alleged "Force.com Database" and the "declarative web interface" of the "Force.com setup menu."

    c. The "features" identified by AIT, "application data persistence, drag-and-drop tools, automatic user interface generation, pre-built components, and pre-designed templates" are not "predetermined business applications." At most, the features identified by AIT are part of a default set of components that developers may use while developing an application, which components such developers may not use at all.

11. "business knowledge, logical designs, physical designs, physical structures and relationships associated with the predetermined business application" (claims 4, 24)

    a. The Accused Instrumentalities do not practice or provide a "business content database" having data that comprises "one or more of business knowledge, logical designs, physical designs, physical structures and

-13-

relationships associated with the predetermined business application."
AIT's assertion that "[r]elationships exist among the database objects
stored in the Force.com Database" is unexplained in terms of how it
relates to this claim limitation.

    b. Further, the Salesforce "features" referenced by AIT, such as "formulas,
validation, triggers, labels, notes and attachments, track field history, etc."
are not "one or more of business knowledge, logical designs, physical
designs, physical structures and relationships associated with the
predetermined business application."  Those alleged "features" are not
"associated with a "predetermined business application."

12. "metadata database comprising data about the structures and functions associated
with any application" (claims 5, 6, 25, and 26)

    a. The Accused Instrumentalities do not practice or provide a "second layer"
that comprises a "metadata database."  AIT does not identify any
connection or relationship between any alleged "second layer," or  more
particularly, the "Model-View-Controller" architecture identified in its
Infringement Contentions in connection with the "second layer"
limitation, and the Force.com Database.

    b. Salesforce incorporates its discussion regarding the "second layer"
limitation by reference.

13. "first and second layers are distributed across one or more server computers"
(claim 20); "distributing the first and second layers across one or more server
computers" (claim 40)

    a. The Accused Instrumentalities do not practice or provide "first and second
layers" associated with one or more server computers.  The '482 Patent
claims require (in accordance with the disclosure thereof), at a minimum,
a logical distinction between the various "layers" identified as associated
with one or more server computers.  Salesforce does not, in connection

with the operation of one or more servers and associated with Salesforce1 or Force.com, create or maintain logical distinctions between separate "layers." As such, Salesforce does not practice or provide this element of the asserted claims of the '482 Patent.

    b. Salesforce incorporates its discussion regarding the "first layer" and "second layer" limitations by reference.

**B.    The '111 Patent**

AIT has not proven that the Accused Instrumentalities practice or perform at least the following elements of the '111 Patent either literally or under the doctrine of equivalents for at least the following reasons with respect to Salesforce1, Force.com, Sales Cloud, Service Cloud, Marketing Cloud, and ExactTarget Marketing Cloud:

14. "unique aspects of a particular application" (claims 1, 7, and 13)

    a. The Accused Instrumentalities do not practice or perform the receipt of "first information" about "unique aspects of a particular application." Neither the "business logic … developed or deployed on the Force.com platform of the Salesforce1 platform" nor the "Model-View-Controller" architecture identified in AIT's Infringement Contentions evidence the receipt of "unique aspects of a particular application." Notably, AIT does not identify with any specificity any purported "unique aspects", including whether any such alleged "unique aspects" are present in the alleged "view", the alleged "controller", or both. Likewise, the "static and/or dynamic content of a web-based application developed on the Site.com platform" referenced in AIT's Infringement Contentions does not evidence the receipt of "unique aspects of a particular application." Indeed, AIT fails to identify, in the Site.com context, with any specificity what comprises the alleged "unique aspects."

15. "second information about user interface elements and one or more functions common to various applications" (claims 1 and 7)

-15-

a. The Accused Instrumentalities do not practice or perform the receipt of "second information about user interface elements and one or more functions common to various applications." The "metadata corresponding to the user interface of a Salesforce product or a third-party application" is not "second information about user interface elements and one or more functions common to various applications." The "metadata corresponding to the standard user interface" referenced by AIT is not "second information about user interface elements and one or more functions common to various applications." The information and data associated with a user interface template, when in use by a Force.com application, is not "common to a variety of applications."

b. The "Model-View-Controller" architecture identified in AIT's Infringement Contentions does not evidence the receipt of "second information about user interface elements and one or more functions common to various applications." The information and data associated with user interface templates on Salesforce1 and Force.com, when in use by a Force.com application, are not "common to various applications." Further, the alleged "[c]ustomized user interfaces" identified in AIT's Infringement Contentions do not represent "second information about user interface elements and one or more functions common to various applications."

16. "upon establishment of a communication connection with a user system that includes the particular application, dynamically generating a functionality and user interface for the particular application" (claim 1); "upon establishment of a communication connection with a user system that includes the particular application, dynamically generate a functionality and a user interface for the particular application" (claim 7)

a. Neither the Accused Instrumentalities nor Salesforce practice or provide

the "dynamic generat[ion]" of functionality and a user interface for "a particular application" "upon establishment of a communication connection."

b. Salesforce's multitenant database architecture does not evidence a "user system that includes the particular application." In reference to Figures 11A and 11B provided by AIT in Exhibit B to its Infringement Contentions, the "end user" or "developer user" is presented with the "HTML Result" of an application having been generated by a diagram labeled "Application Server" and hence is not a "user system that includes the particular application."

c. The "develop[ment], packag[ing], deploy[ment], and use" of an "application" and/or a "user interface" based on manual user configuration and coding as set forth in AIT's Infringement Contentions (through, e.g., "Apex cod[ing]" or "point-and-click" declarations) does not constitute the "dynamically generat[ing]" element of the '111 Patent claims.

d. The Accused Instrumentalities do not provide or include a "user system that includes the particular application" that connects to a Salesforce server. To the extent AIT's allegations of infringement of the claims of the '111 Patent are based on the use or provision of a user system by a third party, Salesforce does not infringe. *See Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1286 (Fed. Cir. 2011) ("While Qwest may make the back-end processing elements, it never 'uses' the entire claimed system because it never puts into service the personal computer data processing means. Supplying the software for the customer to use is not the same as using the system."); *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111, 2119 (2014) ("Because Limelight did not undertake all steps of the '703 patent and cannot otherwise be held responsible for all those steps, respondents'

rights have not been violated.").  Salesforce further notes that AIT has not alleged any indirect infringement of the '111 Patent.

e. Further, AIT has presented no evidence that Salesforce's Accused Instrumentalities practice or provide, in connection with the "dynamic[] generat[ion] …" limitations, any responding to or incorporation of "changes in, federal, state, and local laws, statutes, ordinances and regulations . . . and changes in technology in one or more regulated areas of commercial activity."  More particularly, the '111 Patent specification defined "the invention" at column 9, lines 15-22 as "monitor[ing], respond[ing] to, and incorporat[ing] changes in, federal, state and local laws, statutes, ordinances and regulations (referred to collectively herein as 'regulations') and changes in technology in one or more regulated areas of commercial activity, such as environmental health and safety (EH&S), and food, drugs, cosmetics, medical devices and treatments ('FDCMTD')."  Because the relevant disclosure in the specification defines "the invention," this disclosure is limiting in scope, and the Accused Instrumentalities do not meet these claim limitations.  *See Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).

17. "in response to changes determined to have occurred to information associated with the particular application" (claims 1 and 2); "configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server" (claim 13)

a. The specific developer tools provided by Salesforce, such as the developer sandbox, the Force.com Migration Tool, or the "publisher" tool identified in AIT's Infringement Contentions, do not monitor for "changes determined to have occurred."  In each of the alleged instances of

"automatically detecting changes" contended by AIT, Salesforce software or products do not actively monitor or otherwise "detect" changes. The mere act of an application developer or Salesforce administrator making a change to a Force.com application, where active instances of said application can be instantly or manually "refreshed" by that application developer or Salesforce administrator, does not constitute either (a) determining relevant changes or (b) a server "configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server."

b.   Further, AIT has presented no evidence that Salesforce's Accused Instrumentalities practice or provide, in connection with the "in response to changes…" or "configured to automatically detect changes …" limitations, any monitoring, responding to, or incorporation of "changes in, federal, state, and local laws, statutes, ordinances and regulations . . . and changes in technology in one or more regulated areas of commercial activity." More particularly, the '111 Patent specification defined "the invention" at column 9, lines 15-22, as "monitor[ing], respond[ing] to, and incorporat[ing] changes in, federal, state and local laws, statutes, ordinances and regulations (referred to collectively herein as 'regulations') and changes in technology in one or more regulated areas of commercial activity, such as environmental health and safety (EH&S), and food, drugs, cosmetics, medical devices and treatments ('FDCMTD')." Because the relevant disclosure in the specification defines "the invention," this disclosure is limiting in scope, and the Accused Instrumentalities do not meet these claim limitations. *See Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).

18. "the server including a first portion, a second portion, a third portion, and a fourth

portion" (claims 13, 14, 15, 16, and 17)

    a.  The '111 Patent claims require (in accordance with the disclosure thereof), at a minimum, a logical distinction between portions of a server computer. Salesforce does not, in connection with the operation of a server and associated with Salesforce1 or Force.com, create or maintain logical distinctions between separate "portions" on a server.  As such, Salesforce does not practice or provide the "first portion, a second portion, a third portion, and a fourth portion" of the claims of the '111 Patent.

19. "predetermined business applications" (claim 2, 3, 8, 9, 14, and 15)

    a.  The "declarative web interface" of the "Force.com Setup menu," as alleged by AIT in its Infringement Contentions, does not constitute  a "predetermined business application[]."  Further, AIT does not identify the relationship between the alleged "Force.com Database" and the "declarative web interface" of the "Force.com setup menu."

    b.  The "features" identified by AIT, "application data persistence, drag-and-drop tools, automatic user interface generation, pre-built components, and pre-designed templates" are not "predetermined business applications." At most, the features identified by AIT are part of a default set of components that developers may use while developing an application, which components such developers may not use at all.

20. "business knowledge, logical designs, physical designs, physical structures, and relationships associated with [one or more] predetermined business application[s]" (claim 3, 9, and 15)

    a.  Neither the Accused Instrumentalities nor Salesforce practice or provide a "Force.com Database" or a server having data that comprises "business knowledge, logical designs, physical designs, physical structures and relationships associated with the one or more predetermined business applications."  AIT's assertion that "[r]elationships exist among the

-20-

database objects stored in the Force.com Database" is unexplained in terms of how it relates to this claim limitation.

    b. Further, the Salesforce "features" referenced by AIT, including "formulas, validation, triggers, labels, notes and attachments, track field history, etc." are not "business knowledge, logical designs, physical designs, physical structures, and relationships" associated with a one or more "predetermined business applications."

21. "metadata representative of structures and functions associated with a plurality of applications" (claim 4 and 16)

    a. The Accused Instrumentalities do not practice or provide "metadata representative of structures and functions associated with a plurality of applications." The "metadata model and metadata API" referenced in AIT's Infringement Contentions does not evidence Salesforce's receipt of "metadata representative of structures and functions associated with a plurality of applications."

22. "metadata representative of user interface elements including at least one of tools, worklists, data entry points, reports, documents, processes, formulas, and images" (claims 5, 11, and 17)

    a. The Accused Instrumentalities do not receive or practice "metadata representative of user interface elements including at least one of tools, worklists, data entry points, reports, documents, processes, formulas, and images." AIT points to "components of metadata" it alleges are for "custom user interfaces created using Visualforce, generated page layouts, and Apex classes for custom application functionality," but such "components of metadata" do not evidence either Salesforce's or the Accused Instrumentalities' use or receipt of "metadata representative of user interface elements including at least one of tools, worklists, data entry points, reports, documents, processes, formulas, and images."

04554.00001/6085572.5

### C.      Induced Infringement

AIT contends that Salesforce "induces infringement of each claim of the '482 Patent by making available and promoting its proprietary products, such as Sales Cloud, Service Cloud, Marketing Cloud, and ExactTargeting Marketing Cloud to its clients and customers, and through the instruction, direction, and encouragement of its clients and customers in the use of those products."  AIT further contends Salesforce "induces infringement of each claim by making the Salesforce1 and Force.com platform available to its clients, customers, developers, and other end users, and by instructing, encouraging, and directing such third-parties on practicing the inventions claimed in the '482 Patent."

First, Salesforce does not infringe all claims of the '482 Patent claim or depend on a "client computer", "client", or "browser application."  Salesforce does not practice or provide any of these elements, which precludes the possibility of direct patent infringement.  *See Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1286 (Fed. Cir. 2011) ("While Qwest may make the back-end processing elements, it never 'uses' the entire claimed system because it never puts into service the personal computer data processing means. Supplying the software for the customer to use is not the same as using the system."); *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111, 2119 (2014) ("Because Limelight did not undertake all steps of the '703 patent and cannot otherwise be held responsible for all those steps, respondents' rights have not been violated.").  There can be no induced infringement if there is no direct infringement.  *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111, 2114 (2014) ("Since direct infringement has not occurred, there can be no inducement of infringement under § 271(b).").  Accordingly, Salesforce does not induce infringement of any claims of the '482 Patent that claim or depend on a "client computer", "client", or "browser application" or substantially similar variations thereof.

Further, Salesforce does not induce infringement of any claim of the '482 Patent because induced infringement liability requires proof of "both knowledge of the existence of the patent and "knowledge that the induced acts constitute patent infringement."  *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1367 (Fed. Cir. 2013), *reh'g denied* (Oct. 25, 2013).  AIT must

show that Salesforce "to have knowingly induced infringement . . . not merely knowingly induced the acts that constitute direct infringement." *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). Salesforce does not, and has never, induced any acts that constitute patent infringement. Salesforce was put on notice of the existence of AIT's patents with the filing of this suit, after which Salesforce has developed a good faith belief in the invalidity of the patents in suit, which precludes induced infringement. *See Commil USA*, 720 F.3d at 1368 ("Accordingly, one could be aware of a patent and induce another to perform the steps of the patent claim, but have a good-faith belief that the patent is not valid. Under those circumstances, it can hardly be said that the alleged inducer intended to induce infringement. Thus, a good-faith belief of invalidity is evidence that may negate the specific intent to encourage another's infringement, which is required for induced infringement.").

AIT has also failed to provide any specificity regarding what alleged instructions, directions, or encouragement to Salesforce's clients and customers that Salesforce allegedly provides that constitutes inducement of infringement. More particularly, AIT does not identify any particular "instruction, direction, [or] encouragement" provided by Salesforce that would constitute infringing activity. Moreover, AIT does not explain what acts are taken by any clients or customers of Salesforce that allegedly evidences infringement based upon any such alleged "instruction, direction, [or] encouragement."

### D. Doctrine of Equivalents

AIT states that it broadly "reserves the right to assert infringement under the doctrine of equivalents." Such reservation is not allowed under Local Rule 16.1-6, which required AIT to specify "[w]hether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality." As AIT does not appear to have even attempted to argue infringement by Salesforce under the doctrine of equivalents, any future effort by AIT to assert theories of infringement under the doctrine of equivalents would be untimely and in contravention of the requirements of the local rules.

Moreover, Salesforce does not infringe the Patents-in-Suit because the '482 and '111 Patents are invalid.

## II.    INVALIDITY CONTENTIONS

By including prior art that would anticipate or render obvious claims based on AIT's apparent claim constructions or any other particular claim construction, Salesforce is neither adopting nor acceding in any manner to AIT's apparent positions on claim construction. Salesforce further reserves the right to amend these Invalidity Contentions, for example, should AIT provide any information that it failed to provide in its Local Rule 16.1-6 disclosures, or should AIT attempt to amend its disclosures in any way.  Because discovery has only recently begun, Salesforce also reserves the right to revise, amend, and supplement the information provided herein, including identifying and relying on additional references should Salesforce's further discovery and investigation yield additional information or references, consistent with the Local Rules and the Federal Rules of Civil Procedure.  Moreover, Salesforce reserves the right to revise its ultimate contentions concerning the invalidity and unenforceability of the asserted claims as well as its non-infringement positions, which may change depending upon the Court's construction of the asserted claims, any findings as to the priority date of the asserted claims, or positions that AIT or its fact or expert witness(es) may take concerning claim construction, infringement, or invalidity issues.

Prior art not included in this disclosure, whether known or not known to Salesforce, may become relevant.  In particular, Salesforce is currently unaware of the extent, if any, to which AIT will contend that limitations of the asserted claims are not disclosed in the prior art identified by Salesforce.  To the extent that such an issue arises, Salesforce reserves the right to identify other references that would have made the addition of the allegedly missing limitation to the disclosed device or method obvious.

Salesforce incorporates by reference, in full, all prior art references cited in the Patents-in-Suit and related patents and applications, including U.S. Patent No. 6,341,287 and U.S. Appl. No. 12/098,154, their prosecution histories, reexamination histories, and all references cited therein.  On information and belief, each listed prior art reference became prior art at least as early as the dates given.

Salesforce reserves the right to prove the noninfringement of, the invalidity, and

-24-

unenforceability of the asserted claims on bases other than those required to be disclosed in these Salesforce Contentions pursuant to the Local Rules.  Exhibits A-1 through A-15, referenced below, are attached to these Contentions.

      **A.**      **The Identity of Each Item of Prior Art that Allegedly Anticipates Each Asserted Claim or Renders It Obvious**

      i.      *Patents*

| Number | Title | Filed Date | Inventor(s) | Claim Charts |
|---|---|---|---|---|
| U.S. Patent No. 6,243,717 | "System and method for implementing revision management of linked data entities and user dependent terminology" | Sept. 18, 1998 | Gordon et al. | A-1 |
| U.S. Patent No. 6,064,977 | "Web server with integrated scheduling and calendaring" | June 19, 1998 | Haverstock et al. | A-2 |

04554.00001/6085572.5

| U.S. Patent No. 6,307,572 | "Graphical user interface for travel planning system" | July 2, 1998 | DeMarcken et al. | A-3 |
|---|---|---|---|---|
| U.S. Patent No. 6,154,843 | "Secure remote access computing system" | Mar. 21, 1997 | Hart, Jr. et al. | A-4 |
| U.S. Patent No. 6,314,415 | "Automated forms publishing system and method using a rule-based expert system to dynamically generate a graphical user interface" | Nov. 6, 2001 | Mukherjee | A-5 |
| U.S. Patent No. 6,493,717 | "System and method for managing database information" | Dec. 10, 2002 | Junkin et al. | A-6 |
| U.S. Patent No. 6,442,563 | "Workflow management system, method, and medium that morphs work items" | April 30, 1998 | Bacon et al. | A-7 |
| U.S. Patent No. 5,493,677 | "Computer-implemented process" | June 8, 1994 | Balogh et al. | A-8 |
| U.S. Patent No. 5,550,971 | "Method and system for generating a user interface adaptable to various database management systems" | June 2, 1995 | Brunner et al. | A-9 |
| U.S. Patent No. 5,950,190 | "Dynamic, self-modifying graphical user interface for relational database applications" | May 13, 1997 | Yeager et al. | A-10 |

DEFENDANT SALESFORCE.COM, INC.'S NON-INFRINGEMENT, INVALIDITY, AND UNENFORCEABILITY  CONTENTIONS

ii.    _Non-Patent Printed Publications_

| Title | Publication Date | Publisher | Author | Claim Charts |
|---|---|---|---|---|
| "The Design of A Change Notification Server for Clients Of a Passive Object-Oriented Database Management System" | July 1992 | Simon Fraser University | Kathleen A. Peters | A-11 |
| "Oracle Database Construction Kit" | 1997 | Que | John Palinski | A-12 |
| "Implementing SAP R/3" | 1996 | Manning Publications Co. | Nancy H. Bancroft | A-13 |
| "The JANUS Application Development Environment— Generating More than the User Interface" | 1996 | Proceedings of the Second International Workshop on Computer-Aided Design of User Interfaces, June 5-7, 1996 | Helmut Balzert et al. | A-14 |
| "Pad++: A Zoomable Graphical Sketchpad for Exploring Alternate Interface Physics" | 1996 | Journal of Visual Languages and Computing | Benjamin B. Bederson et al. | A-15 (combined) |
| "A Zooming Web Browser" | 1996 | n/a | Benjamin B. Bederson et al. | A-15 (combined) |

iii.    _Other Prior Art_

| Systems[3] | Dates Known, Used, Sold, or Offered for Sale | Identity of Persons with Knowledge |
|---|---|---|
| SAP R/3[4] | Pre-Dec. 18, 1998 | Nancy H. Bancroft |
| SAP Business | Pre-Dec. 18, 1998 | Nancy H. Bancroft |

---

[3]   Manuals, guides, and textbooks concerning generally the operation of these prior art systems are widely available.

[4]   Details about the operation of the SAP R/3 system can be found in Bradley D. Hiquet, "SAP(R) R/3 Implementation Guide:  A Manager's Guide to Understanding SAP" (1998), and Thomas Curran et al., "SAP R/3:  Business Blueprint (1998).

04554.00001/6085572.5

| Workflow | | |
|---|---|---|
| Oracle Developer 2000 | Pre-Dec. 18, 1998 | John Palinski |
| Oracle 7 | Pre-Dec. 18, 1998 | John Palinski |
| Oracle 8[5] | Pre-Dec. 18, 1998 | John Palinski |
| Oracle Forms | Pre-Dec. 18, 1998 | John Palinski |
| Oracle Browser | Pre-Dec. 18, 1998 | John Palinski |
| JANUS | Pre-Dec. 18, 1998 | Helmut Balzert |
| Pad++ | Pre-Dec. 18, 1998 | Benjamin B. Bederson |

**B.    Anticipation, Obviousness, and Motivation To Combine**

i.    *Anticipation*

Salesforce asserts that the asserted claims are anticipated as indicated below in view of the listed references and the knowledge of one of ordinary skill in the art.  Salesforce's assertions are made in view of AIT's apparent positions on the constructions and scope of the asserted claims, and are not an admission that those constructions are correct or that the claims may be validly applied the Accused Instrumentality.

ii.    *Obviousness*

Prior art references rendering the asserted patents obvious, alone or in combination with other references, and teachings, suggestions, and/or motivations to combine them are outlined below and included in Exhibits A-1 through A-15, and Exhibit B.  In addition, discussed below are specific groups of prior art where members from different groups would be obvious to combine in ways similar to the other obviousness combinations provided.  In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed herein, Salesforce reserves the right to rely on any combination of any prior art references disclosed herein.  These obviousness combinations reflect Salesforce's present understanding of the potential scope of the claims that AIT appears to be advocating and should not be seen as Salesforce's acquiescence to AIT's interpretation of the patent claims.

---

[5]  Details about Oracle 8 can be found in George Koch & Kevin Loney, "Oracle 8 – The Complete Reference" (1997), and Steve Bobrowski, "Oracle 8 – Architecture:  Understand, Plan, and Migrate to Oracle's Revolutionary Database" (1998).

Based on Salesforce's present understanding of the asserted claims of the asserted patents-in-suit and the apparent constructions that Salesforce believes AIT to be asserting based on AIT's Infringement Contentions, Salesforce believes that the anticipation references discussed *supra*, and charted in Exhibits A-1 to A-15 each anticipate the claims of the asserted patents found in the references' respective charts in Exhibits A-1 to A-15. However, if the finder of fact determines that some element of a given claim was not part of an anticipation reference, then Salesforce contends that the anticipation reference in combination with the knowledge and skill of a person of ordinary skill in the art at the time of the alleged invention and/or other prior art disclosing the allegedly missing limitations would have rendered each of the charted claims obvious. Exhibit B contains tables which identify specific examples of where each limitation of the asserted claims is found in a prior art reference. References herein to tables beginning with the letter "B" refer to the tables that appear in Exhibit B.

In several locations in this section and in Exhibit B, different categories of prior art references are presented and a title is provided for each such category. These category titles are provided for convenience only and do not constitute an admission of what the included references are alleged to disclose, nor are the titles a binding characterization of what any reference not in a given category does not disclose.

The Supreme Court has held that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 1739 (2007). When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. *Id.* at 1740. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill. *Id.* In order to determine whether there is an apparent

reason to combine the known elements in the fashion claimed by the patent at issue, a court can look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art.  *Id* at 1740-1741.  For example, obviousness can be demonstrated by showing there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims.  *Id.* at 1743.  Any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.  *Id.*  Common sense also teaches that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle. *Id.*

The motivation, reasons, and market trends that that would provide a basis to combine the teachings of the prior art references disclosed herein is found in the references themselves and: (1) the nature of the problem being solved, (2) the express, implied and inherent teachings of the prior art, (3) the knowledge of persons of ordinary skill in the art, and (4) the predictable results obtained in combining the different elements of the prior art.  For example, the patentee of the Patents-in-Suit identified as the alleged key shortcoming of prior art systems the heavy resource expenditure required to reprogram a business's database software to reflect changes to the database:

> One recurring problem with any database that frequently changes is maintenance of the database as current. Where a database depends upon the current regulatory state, as where an EH&S database is being maintained by a conventional approach, continual reprogramming of the database software is required to reflect a constant stream of changes. This approach is not cost effective and, in effect, mortgages the database maintainer's future.

('482 patent at Col. 8:1-8.)

The prior art in fact fully recognized this problem and addressed it, just like the purported inventions of the Patents-in-suit, through automated generation of database software.  As BRUNNER states:

In the form-based user interface described above, if a new type of data is added or a new relationship is defined among the data stored, ***the software that generates the forms must be recoded and recompiled to reflect changes in the forms produced***. Often the relationships between stored data and the corresponding user interface are subtle and a change may affect the user interface in non-obvious ways. Therefore, a significant amount of debugging may be required before the user interface properly reflects a change made in the underlying database.

To overcome the problem of requiring a user to learn a new user interface and/or the underlying query language of a database before a user can use a database, it is desirable to generate a database user interface that is not tightly coupled to the structure of the underlying data. ***The user interface should be flexible so that if a change is made to the underlying database schema or model, the interface will adapt dynamically to reflect the change without the need to recode and recompile the software that generates the user interface***. Additionally, the database interface should be adaptable to work with various types of database systems, thereby allowing a user to use the same database user interface regardless of the database's query language or underlying modeling constructs."

(BRUNNER, at Col. 2:19-43.)  Further, as MUKHERJEE states:

One approach for solving some of the aforementioned problems is ***to write customized computer software*** that presents a user with a computerized version of each paper form, thus facilitating data entry.

. . .

***There are several problems with the foregoing "brute force" computerized approach to forms processing.*** . . . [T]he software (typically written in C, COBOL, or other high-level language) must be customized, coded, and retested any time there is a change to a form. This recoding and retesting incurs ***high labor costs and requires that companies adopt proprietary systems that can quickly become obsolete or vulnerable to a software vendor who goes out of business***. Even so-called "context-sensitive" user interface techniques, assuming they could be applied to forms processing applications, would not address the foregoing problems. For these and other reasons, reliance on custom software to handle data entry for prompting users for information and for printing the forms is undesirable.

(MUKHERJEE, at Cols. 1:52-2:16.)  Finally, JUNKIN states:

The present invention provides a DataCrawler system. This system furnishes a pre-built framework for web database applications that browse and edit database information directly using an HTML-based Internet browser. . . The barrier to creating and maintaining an HTML web site is ***typically high in terms of cost and technological expertise***. This means that the majority of individuals do not have the capability to provide web content. Further, the HTML model provides limited security options for communal contribution of content. The DataCrawler sub-system has a reusable component based technology that provides a universal methodology for exploring and editing database information. The system combines the flexibility to administer customized interrelated database storage with the ***low maintenance overhea***d of a structured, pre-built interface.

-31-

(JUNKIN, at Cols. 2:65-3:17.)  These publications, as well as the others cited herein, thus recognize that the key problem to be solved in the prior art is minimizing resource exposure in reprogramming database software, including the user interface, in response to changes to the database.  This problem and trend would have motivated one skilled in the art to combine the teachings of the prior art references disclosed herein.

### iii.   _References That Launch an Application Through a Web Browser_

Loading and launching applications in web browser was well known in the prior art.  Web-based applications, often hosted remotely in a server and connected to a client/end-user computer through the Internet or other network, was a commonplace feature of the Internet in the mid- to late-1990s.  As the patentee of the Patents-in-Suit acknowledged, programmers regularly utilized popular programming languages like Java to create programs that "c[ould] be run on any platform having a java interpreter so that Java is portable. . .  The major browsers, Netscape Navigator and Internet Explorer, include a Java interpreter so that a user of those browsers can run Java code."  ('482 Patent at Col. 14:51-58).  The patentee himself understood Web browser technology to be a well-understood component in the prior art and a candidate for combination with other components in the prior art.  ('482 Patent, at Col. 22: 27-29 ("The invention thus combines the connectivity of a Web browser with the data management tools for a selected business activity.")).

Other persons skilled in the art recognized the common integration of web browsing technology into existing technologies and computer systems.  For example, BACON at col. 8:31-34 states:  "[T]he workflow system may leverage the wider availability of the Internet and the increasingly well known and desired 'look and feel' of Internet browser-based systems."  One of ordinary skill in the art would therefore have been familiar with the features and benefits of web browser-based applications in use prior to December 1998.

**Table 2: Non-Exclusive List of Web Browser References**

DEFENDANT SALESFORCE.COM, INC.'S NON-INFRINGEMENT,
INVALIDITY, AND UNENFORCEABILITY  CONTENTIONS

| Web Browser References |
| --- |
| BACON |
| PAD++ (BEDERSON I AND II) |
| HAVERSTOCK |
| JUNKIN |
| MUKHERJEE |
| HART |
| PALINSKI |

Based on AIT's apparent reading of the claims, Salesforce contends that each of the references listed in Section II.A above anticipate asserted claims of the Patents-in-Suit. However, if the finder of fact determines that some element of a given claim is not found in one of these references, Salesforce contends that that reference in combination with the knowledge of one of ordinary skill in the art and/or with one or more of the Web Browser References listed above in Table 2 would have rendered the claim obvious to one of ordinary skill in the art. For example, to the extent any reference listed in Section II.A is found to not expressly or inherently disclose a web-browser based application, the combination of that reference with the disclosure of such a system found in one or more of the Web Browser References in Table 2 above renders the claim obvious.

It would have been obvious to one of skill in the art at the time of the alleged invention to combine a Web Browser Reference with any other reference related to database and application management fields based on at least common sense, routine innovation, and the fact that web browsers and web-browser technology and applications were well-known.

iv.    *References That Generate an Application from Metadata*

Generating and displaying graphical user interfaces based on the metadata of stored data, including the structure of the stored data, was well-known in the prior art.  For example, BRUNNER observed that dynamically linking the user interface to the underlying structure of the database minimized resource-intensive recording of the user interface.  As BRUNNER states:

> [I]f the underlying data structure of the database is changed by adding a new field or changing a relationship between the various items of data stored, the software that generates the user interface must be recoded and recompiled in order to reflect the change in the database structure.
>
> . . .
>
> [T]he database model [of the claimed invention] is easily adaptable to changes that may occur in the remote database. By updating the model, the software which generates the user interface can dynamically be updated to reflect the change in the remote database without having to recode the entire program which generates the user interface.

Likewise, PAD++ discloses a file directory browser with graphical icons representing stored data objects, hierarchies, and folders in a database, and arranging these graphical icons on the graphical user interface based on the metadata of the stored objects and hierarchies:

> The directory browser provides a graphical interface for accessing the directory structure of a filesystem (see Figure 6).  Each directory is represented by a folder icon and files are represented by solid squares colored by file type.  Both directories and files show their filenames as labels when the user is sufficiently close to be able to read them. Each directory has all of its subdirectories and files organized alphabetically inside it.

Prior artists with knowledge of BRUNNER and PAD++, as well as of the additional references set forth below, thus would have been familiar with the features and benefits of generating applications from metadata prior to December 1998.

**Table 3: Non-Exclusive List of Metadata References**

| Metadata References |
| --- |
| PAD++ (BEDERSON I AND II) |
| PALINKSI |

04554.00001/6085572.5

| MUKHERJEE |
| --- |
| JUNKIN |
| HART |
| DEMARCKEN |
| BANCROFT |
| BALZERT |
| PETERS |
| BRUNNER |
| BALOGH |
| YEAGER |

Based on AIT's apparent reading of the claims, Salesforce contends that each of the references listed above and in Exhibits A-1 to A-15 above anticipate asserted claims of the Patents-in-Suit.  However, if the finder of fact determines that some element of a given claim is not found in one of these references, Salesforce contends that that reference in combination with the knowledge of one of ordinary skill in the art and/or with one or more of the Metadata References listed above in Table 3 would have rendered the claim obvious to one of ordinary skill in the art.  For example, to the extent any reference listed above are found to not expressly or inherently disclose generation of user interface or applications from metadata, the combination of that reference with the disclosure of such a system found in one or more of the Metadata References in Table 3 above renders the claim obvious.

It would have been obvious to one of skill in the art at the time of the alleged invention to combine a Metadata Reference with any other reference related to database and application management fields based on at least common sense, routine innovation, and the fact that web browsers and web-browser technology and applications were well-known.

### C.    Claim Charts

Salesforce provides invalidity and obviousness charts of the above prior art references in Exhibits A and B, as noted in the Claim Charts columns of the preceding tables.  All portions of each reference are relied upon to support the disclosure of each claim element, as all portions provide general support.  In an effort to focus the issues, exemplary citations are provided, but these citations do not necessarily represent every place where a particular claim element may be found in the reference.  Persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of their own knowledge as well as other publications and the broader literature.  Where Salesforce cites to a particular figure in a reference, the citation should be understood to encompass the caption and description of the figure and any text relating to the figure.  Similarly, where Salesforce cites to particular text referring to a figure, the citation should be understood to include the corresponding figure as well.  Salesforce may also rely on other documents and information, including cited references and prosecution histories for the Patents-in-Suit, and expert testimony to provide context or to aid in understanding the cited portions of the references.

### D.    Invalidity Under § 101

Salesforce contends that it does not infringe one or more claims of the '482 or '111 patents because the claims of the '482 and '111 patents are directed to non-patentable subject matter.  The '482 and '111 patents are directed to methods and systems related to "[a]n integrated system for managing changes in regulatory and non-regulatory requirements for business activities at an industrial or commercial facility."  ('482 and '111 patents, Abstract.) "Laws of nature, natural phenomena, and abstract ideas are not patentable."  35 U.S.C. § 101. This is because "[p]henomena of nature, . . . mental processes, and abstract intellectual concepts . . . are the basic tools of scientific and technological work."  *Mayo Collaborative Servs. v.*

1    *Prometheus Labs., Inc*., 132 S. Ct. 1289, 1293 (2012) (quotation marks omitted) ("*Mayo*").

2    Simply adding "steps in the claimed process" that "involve well-understood, routine,

3    conventional activity" is insufficient. *Id.* at 1294. Nor can "the prohibition against patenting

4    abstract ideas '[] be circumvented by attempting to limit the use of the formula to a particular

5    technological environment' or adding 'insignificant post solution activity.'" *Bilski v. Kappos*,

6    130 S. Ct. 3218, 3230 (2010).

7       The specifications of the '482 and '111 patent state the technological challenge

8    purportedly addressed by the patent claims:

> Various attempts have been made to manage regulatory compliance, but no
> solution has been developed before that provides a comprehensive, integrated
> framework for (1) absorbing business changes into the application and database
> without affecting the integrity of the system, (2) automatically making application
> and database changes using intelligent agent routines, (3) managing technical and
> business content-related functionality using metadata tables rather than relying on
> traditional programming methods. Other workers have created regulations
> databases, document management systems and other partial solutions for tracking
> changes in, and compliance with, regulations and similar requirements, but these
> partial solutions have not addressed the effects of change across an integrated
> database application or across an integrated framework of technical functions.
> These partial solutions also do not provide a "closed loop" approach to identifying
> changes using intelligent network agents, recommending modifications to the
> business content, and automatically effecting modifications in the system without
> the use of programmers and/or programming.
> ('482 patent, Col. 7:53-6.).

The patents' specification by its terms provide that the "inventive concept" in relation to

the '482 and '111 patents is not that the inventors discovered "regulations databases, document

management systems and other partial solutions for tracking changes in, and compliance with,

regulations and similar requirements." Rather, the alleged inventive concept of the '482 and

'111 patents involves an "integrated framework" for, principally, "automatically making

application and database changes using intelligent agent routines," as is also reflected in the titles

of the patents themselves: "Integrated change management unit." Indeed, the specification

distinguishes over the prior art by claiming that "[t]hese partial solutions also do not provide a

'closed loop' approach to identifying changes using intelligent network agents, recommending

modifications to the business content, and automatically effecting modifications in the system

without the use of programmers and/or programming."

The patent specification provides an example of this purportedly inventive concept:

> The invention begins tracking change using one or more intelligent agents ("IA's"). An "intelligent agent" is a specialized program that resides on a network, or at a server as an applet, and can make decisions and perform tasks based on pre-defined rules. Preferably, two or more IA's used by a business will have sufficiently different assignments that at most modest overlap occurs between the IA's. An IA function is part of the Logic Menu, which is discussed subsequently.

> A change made to landfill waste regulations is identified by an IA on the Internet, and the relevant change information is routed to a selected metadata table in the invention. The change information includes one or more of five recommendations: (1) create a new WorkList; (2) change one or more data entry forms; (3) create one or more new reports; (4) create a new process; and (5) add one or more new document images. Configuration Users can choose to automatically configure the preceding recommendation based on a set of default conditions, or can manually implement the configuration using a configuration toolkit.

Put another way, the core purported inventive concept claimed in the '482 and '111 patents is a system or method that involves (1) identifying changes to relevant external information; (2) reviewing and determining whether those changes affect information stored in a database; and (3) modifying the information stored in a database in response to changes identified in external information.  These steps comprise a purported  inventive concept that the Federal Circuit deemed non-patentable in *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333-34 (Fed. Cir. 2012).  In *Dealertrack*, the Federal Circuit determined that the patent-in-suit, when distilled to its simplest form, involved "receiving data from one source . . . , selectively forwarding the data . . ., and forwarding reply data to the first source . . . ."  *Id.* at 1333.  This and the purported core inventive concept of the '482 and '111 patents, at their respective hearts, are conditional actions that serve as fundamental building blocks for virtually all technological and Internet services provided by companies in a modern economy.  Such concepts are non-patentable abstract ideas, which in turn must render the '482 and '111 patents invalid.  Hence, the claims are directed at a patent-ineligible concept:  the abstract idea of change management.  Independent claims 1 and 7 of the '111 Patent would pre-empt use of change management "in all fields, and would effectively grant a monopoly over an abstract idea." *Bilski*, 130 S. Ct. at 3231.

Determining whether certain patent claims are invalid as being directed to patent ineligible subject matter requires a two-step test:

-38-
DEFENDANT SALESFORCE.COM, INC.'S NON-INFRINGEMENT,
INVALIDITY, AND UNENFORCEABILITY  CONTENTIONS

First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts.  If so, we then ask, "[w]hat else is there in the claims before us?"  To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application.  We have described step two of this analysis as a search for an "'inventive concept'"—*i.e.,* an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Alice Corp.*, 2014 WL 2765283, at *6 (internal citations omitted).

To illustrate:  representative Claims 1 and 7 of the '111 patent here are drawn to a patent-ineligible abstract idea.  Claims 1 and 7 involve a method and media for modifying stored information in response to changes detected in other information.  Specifically, claim 1 requires "modifying at least one of the first information or the second information in response to changes determined to have occurred to information associated with the particular application," where the "first information" is "about unique aspects of a particular application" and the "second information" is about "user interface elements and one or more functions common to various applications."   ('111 Patent at Claim 1).  Similarly, Claim 7 claims media with computer code to "modify at least one of the first information and or the second information in response to changes determined to have occurred to information associated with the particular application." ('111 Patent at Claim 2).  Thus, claims 1 and 7 are broadly directed to the abstract idea of change management.

Further, the limitations contained in Claims 1 and 7 lack an "inventive concept" sufficient to "'transform the claimed abstract idea into patent-eligible application."  *Alice Corp.*, 2014 WL 2765283, at *8.  A claim that recites an "abstract idea must include additional features to ensure that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]."  *Id.* (internal quotations omitted).

Although claim 1 does not so expressly claim, AIT is likely to contend that claim 1's recitation of an "application," "communication connection," and "user interface" requires a computer to perform.  But even assuming that a conventional computer containing these components is required to perform Claim 1, the use of a computer is unavailing under *Alice Corp.*  "The introduction of a computer into the claims does not alter the analysis . . . ."  *Id.* at

*9.  For example, in *Gottschalk v. Benson*, 409 U.S. 63 (1972), the computer implementation claimed alongside the algorithm "did not supply the necessary inventive concept" because "the [claimed] process could be 'carried out in existing computers long in use.'"  *Alice Corp.*, 2014 WL 2765283, at * 9.  In *Parker v. Flook*, the Supreme Court similarly rejected as unpatentable a method for using a mathematical formula to adjust alarm limits for certain operating conditions where the claimed computer implementation was "purely conventional."  *Id.* (discussing *Parker v. Flook*, 437 U.S. 584 (1978)).  Indeed, the Supreme Court has stated that:  "*Flook* stands for the proposition that the prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant post-solution activity.'"  *Bilski*, 130 S. Ct. at 3230.  In sum, "wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself."  *Mayo*, 132 S. Ct. at 1297.

Taking the elements of Claim 1 separately, "the function performed by the computer at each step of the process is [p]urely conventional."  *Alice Corp.*, 2014 WL 2765283, at * 11.  Representative method Claim 1 provides:

A method, comprising:

receiving first information about unique aspects of a particular application;

receiving second information about user interface elements and one or more functions common to various applications, the various applications including the particular application;

upon establishment of a communication connection with a user system that includes the particular application, dynamically generating a functionality and a user interface for the particular application, the functionality and the user interface of the particular application being based on the first information and the second information;

providing the functionality and the user interface of the particular application to the user system; and

modifying at least one of the first information or the second information in response to changes determined to have occurred to information associated with the particular application.

04554.00001/6085572.5

DEFENDANT SALESFORCE.COM, INC.'S NON-INFRINGEMENT, INVALIDITY, AND UNENFORCEABILITY  CONTENTIONS

These functions—receiving information about applications, establishing communication connections, and generating a user interface for and providing functionality to the user of a computer—are "the most basic functions of a computer." *See, e.g.*, *Benson*, 409 U.S., at 65 (noting that a computer "operates ... upon both new and previously stored data"). All of these functions are "'well-understood, routine, conventional activit[ies] previously known to the industry." *Mayo*, 132 S. Ct. at 1297. Such computer implementation is not "enough to transform an abstract idea into a patent-eligible invention." *Alice Corp.*, 2014 WL 2765283, at *14.

Claim 7 fails for substantially the same reasons. Aside from the preamble of claim 7 describing "machine-readable medium storing code representing instructions to cause a machine to perform a method," the claim "add[s] nothing of substance to the underlying abstract idea" and is thus also patent ineligible. *Id.* at *12. Indeed, like in *Alice Corp.*, "the system claims are no different from the method claims in substance." 2014 WL 2765283, at * 12 ("The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea.").

Representative claim 1 of the '482 Patent is similarly directed to unpatentable subject matter. Claim 1 of the '482 Patent is directed to a system containing a server and one or more client computers – indisputably components of a generic computer implementation. The additional elements of the claim 1, "connect[ion] to a server computer over a computer network," "the server computer containing information about the unique aspects of a particular application," "the server computer containing information about the user interface and functions common to a variety of applications," an application being "generated" from that data, a "change management layer for automatically detecting changes," and a "browser application" on the client computer by in which an application and the user interface is displayed. All of these elements were well-known in the field and at best common components of computer systems used to generate applications from information in databases. None of the structure provided in claim 1 is sufficient to "transform the claimed abstract idea into patent-eligible application."

1   *Alice Corp*., 2014 WL 2765283, at *8.  Claim 1 of the '482 Patent is nothing more "than a

2   drafting effort designed to monopolize the [abstract idea]."  *Id.* (internal quotations omitted).

3       **Machine-or-Transformation Test**:  Representative claims 1 of both the '482 and '111

4   patents also fail the "machine-or-transformation" test ("MOT"), under which "[a] claimed

5   process is surely patent-eligible under § 101 if (1) it is tied to a particular machine or apparatus,

6   or (2) it transforms a particular article into a different state or thing."  *Bilski*, 130 S. Ct. at 3224

7   (emphasis added; citations omitted).  The MOT is "a useful and important clue, an investigative

8   tool, for determining whether some claimed inventions are processes under § 101."  *Id.* at 3227.

9   "[A] machine is a concrete thing, consisting of parts, or of certain devices and combination of

10  devices."  *In re Ferguson*, 558 F.3d 1359, 1364 (Fed. Cir. 2009) (internal quotation omitted).

11  "[T]o impart patent-eligibility to an otherwise unpatentable process under the theory that the

12  process is linked to a machine, the use of the machine 'must impose meaningful limits on the

13  claim's scope.' [*Bilski*,] 545 F.3d at 961.  In other words, the machine 'must play a significant

14  part in permitting the claimed method to be performed.'"  *CyberSource Corp. v. Retail*

15  *Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011) (citation omitted).

16      Representative method claim 1 of the '111 patent does not include any mention of a

17  particular device or computer in order to practice the claim.  Each step can be performed by a

18  person within his or her own head, or using pen and paper:  (1) "receiving first information . . .";

19  (2) "receiving second information . . ."; (3) "dynamically generating a functionality and a user

20  interface . . ."; (4) providing the functionality and the user interface to the user system . . ."; (5)

21  "calculating a front-end profit . . ." and (6) "modifying at least one of the first information or the

22  second information in response to changes determined to have occurred to information

23  associated with the particular application."  None of these steps are required to be performed

24  with a particular machine—or even with a machine at all.  The last step of claim 1, "[m]odifying

25  at least one of the first information or the second information in response to changes determined

26  to have occurred to information associated with the particular application," is a prime example.

27  Specifically, the act of determining what changes have occurred to "associated" information can

28

DEFENDANT SALESFORCE.COM, INC.'S NON-INFRINGEMENT,
INVALIDITY, AND UNENFORCEABILITY  CONTENTIONS

be performed by an individual entirely in their head and without the aid of a specific or particular machine.

The terms "user system" ('111 patent, claim 7), "server," and "client device" ('111 patent, claim 13) are the only arguably meaningful limitations in the patent that might limit the scope of the claimed invention.  But these types of generic limitations are exactly the type of "insignificant post-solution activity" the Supreme Court counseled cannot save unpatentable subject matter.  *Bilski*, 130 S. Ct. 3218, 3230.

The independent method claim of the '482 Patent, claim 21, also discloses "well-understood, routine, conventional activity previously engaged in by researchers in the field" bounded by only the arguably machine-specific terms "client computer" and "server computer."  Neither the '482 or the '111 patent satisfy the "machine" prong of the MOT test.

Where a claimed method or process is not tied to a particular machine, the court next determines whether it "transforms a particular article into a different state or thing."  *In re Bilski*, 545 F.3d 943, 962 (Fed. Cir. 2008).  For the transformation in question to satisfy the MOT test, the "transformation must be central to the purpose of the claimed process."  *Id*.  The method claims of the '482 and '111 patents do no such "transformation."  Gathering information from some information source, making a determination of what changes, if any, can or should be applied to stored "first" or "second" information, and then applying those changes, if any, are prototypical examples of data gathering and manipulation that the Federal Circuit has repeatedly stated is unpatentable.  *CyberSource*, 654 F.3d at 1375.  The method claims thus do not satisfy the "transformation" prong of the MOT test.  So too with the system and apparatus claims of the '482 and '111 patents.  *See id.* at 1374 (holding a claim directed to a "computer readable medium," despite its format, should be treated no differently from the comparable process claims held to be patent ineligible under § 101).

In sum, the '482 and '111 patents are directed to non-patentable subject matter.  Accordingly, Salesforce contends that it cannot infringe the claims of those patents.

### E.    Invalidity Under § 112

Notwithstanding Salesforce's argument that the Patents-in-Suit are directed to non-

patentable subject matter, Salesforce also asserts that a number of the claims of the Patents-in-Suit are invalid as indefinite (35 U.S.C. § 112(b)), lacking a proper written description (35 U.S.C. § 112(a)), and/or failing to enable one of ordinary skill in the art at the time the invention was made to make or use the alleged invention (35 U.S.C. § 112(a)).  The following identification of claims and claim elements are only exemplary and Salesforce reserves the right to supplement the identification of claims and claim elements that do not comply with the requirements of 35 U.S.C. § 112, including based on expert analysis or after the Court construes the claims.

Where Salesforce contends that a claim term renders a claim invalid under § 112, such a contention may be made as an alternative to Salesforce's contention that any such claim or claim term is directed to patent-ineligible subject matter, disclosed or rendered obvious by the prior art, or was known to a person of ordinary skill in the art.  No inference is intended nor should any be drawn that by identifying such a claim or claim term, Salesforce is conceding that such claim or term is directed to patent-eligible subject matter, was not disclosed or rendered obvious by the prior art, or known to a person of ordinary skill.

| Claim Term | Patents | Grounds for Invalidity |
|---|---|---|
| "a second layer associated with the server computer containing information about the user interface" | '482 patent | Indefiniteness |
| "changes determined to have occurred" | '482 and '111 patents | Indefiniteness |
| "dynamically" | '482 and '111 patents | Indefiniteness |
| "first layer" | '482 patent | Written Description |
| "unique aspects" | '482 and '111 patents | Indefiniteness; Written Description |

*Indefiniteness*:  Salesforce further states that the '482 and '111 patents are invalid for indefiniteness under 35 U.S.C. § 112(2).  The patent laws require that a patent specification conclude with one or more claims "particularly pointing out and distinctly claiming subject

matter which applicant regards as his invention." 35 U.S.C. § 112(2). The decision of whether to hold a patent invalid for indefiniteness is a question of law. *Exxon Research and Engr. Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001).

All claims of the '482 and '111 patents are invalid as indefinite under 35 U.S.C. § 112(2) for failing to particularly point out and distinctly claim the subject matter for which the applicant regards as his invention. "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). Here, it is simply not possible for a person skilled in the art to ascertain the precise (or even the rough) scope of the claims of the Patents-in-Suit. As the Office examiner observed in U.S. Patent Appl. 12/098,154 (rejecting claims virtually identical to those of the '111 patent):

> If the examiner had not read the application number she never would have realized that these claims went with this specification. The claims are ***extremely generic and broad***[,] there is no mention about regulatory changes or anything that the invention talks about in the first 13 pages of the specification that the invention is trying to solve/ directed at.

The claims of the '482 and '111 patents are not ambiguous or indefinite *merely* by virtue of select claim terms having insufficient definition in the specification, but rather also because the "extremely generic and broad" claims are entirely untethered to the specification. For example, the '111 patent limitations "receiving second information about user interface elements and one or more functions common to various applications, the various applications including the particular application," "upon establishment of a communication connection with a user system that includes the particular application, dynamically generating a functionality and a user interface for the particular application, the functionality and the user interface of the particular application being based on the first information and the second information," and "modifying at least one of the first information or the second information in response to changes determined to have occurred to information associated with the particular application" fail to satisfy 35 U.S.C. § 112(2). Similarly, the '482 Patent limitations "a second layer associated with the server

computer containing information about the user interface and functions common to a variety of applications, a particular application being generated based on the data in both the first and second layers," "a third layer associated with the server computer that retrieves the data in the first and second layers in order to generate the functionality and user interface elements of the application," and "a change management layer for automatically detecting changes that affect an application" fail to satisfy 35 U.S.C. § 112(2).

"A second layer associated with the server computer containing information about the user interface" ('482 patent):  Independent claim 1 of the '482 Patent claims a "second layer associated with the server computer containing information about the user interface."  The language "second layer" having information about "*the* user interface" (emphasis added) as used therein lacks any antecedent basis.  "The requirement of antecedent basis is a rule of patent drafting, administered during patent examination."  *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006).  Neither the specification of the '482 nor the other claims of the '482 Patent provide enough disclosure for a person skilled in the art to determine the scope of the term "*the* user interface" with reasonable certainty.

Other specific claim terms that are insufficiently defined in the specification include the following:

"Changes determined to have occurred" ('111 patent) / "[automatically detecting] changes that affect an application" ('482 patent):  Independent claim 1 of the '111 patent discloses a method including the step of "modifying at least one of the first information or the second information in response to changes determined to have occurred to information associated with the particular application."  Independent claims 7 and 13 recite this limitation with substantially similar language.  As the patent examiner noted, however, "there is no mention about regulatory changes or anything that the invention talks about in the first 13 pages of the specification" in this limitation.  These 13 pages of the specification discuss, among other things, the use of "intelligent agents" to automatically monitor databases for changes, and the subsequent updating of user interfaces when changes are detected.  ('111 Patent at Col. 7:54-59 ("no solution has been developed before that . . . automatically mak[es] application and database

changes using intelligent agent routines"). The specification specifically describes that "[t]he invention begins tracking change using one or more intelligent agents ('IA's'). An 'intelligent agent' is a specialized program that resides on a network, or at a server as an applet, and can make decisions and perform tasks based on pre-defined rules. Preferably, two or more IA's used by a business will have sufficiently different assignments that at most modest overlap occurs between the IA's." ('111 Patent at Col. 10:45-51). Likewise, the specification discloses a "change layer" that "primarily involves an intranet or the Internet and uses one or more intelligent agents (IA's) that continually search on the Web for relevant changes in a selected business area." ('111 Patent at Col. 16:20-24). Figure 2 depicts this high-level architecture in "a flowchart illustrating use of the invention to respond to one or more relevant changes found by an intelligent agent on a network":




FIG. 2

-47-

In contrast with the disclosures of "intelligent agents" in the specification, the term used by claims 1 and 7, "changes determined to have occurred," is completely open-ended. Neither of these claims provide any limitation, context, or scope on either who or what determines that changes have occurred or on where changes are detected. In particular, the claims provide no guidance as to whether change must be detected by "intelligent agents"—as detailed and discussed at length in the specification as integral components of the purported invention—or whether instead changes may be detected by a system administrator or end-user of the system. (*See* '111 Patent at Cols. 7:57-58; 8:1-5; 10:10-14, 45-52; 16:20-35; Figures 1 & 2). Further, the claims provide no guidance as to whether changes are detecting only in specific databases containing relevant "regulatory and non-regulatory information"—as described by the specification (Col. 8:15-20)—or whether instead changes can be detected in any information repository in existence, including anywhere on the Internet, in databases operated by the business itself, and in libraries and other physical data stores. Thus, the term "changes determined to have occurred," when read in light of the specification and prosecution history, fails to sufficiently apprise a person of skill in the art of claim scope.

"Dynamically" ('482 and '111 patents): Independent claim 1 of the '111 Patent requires the step of "dynamically generating a functionality and a user interface for the particular application." Independent claims 7 and 13 of the '111 patent recite limitations with substantially similar language. However, the patent does not define "dynamically generat[e]" or place any meaningful limitations on the construction of the term "dynamically." The patent specification at no point contains the word "dynamic" or "dynamically" or any variation thereof. This renders each of the independent claims and their dependent claims indefinite, because the specification provides insufficient guidance as to the scope of the term "dynamically" as used in the '111

Patent claims.  The claims of the '482 Patent, containing similar claim language, are indefinite for the same reasons.

More particularly, to the extent AIT asserts that the term "dynamically generate" means merely "to generate," this is improper.  Construing "dynamically generate" to mean "to generate" would render superfluous a specific claim term, "dynamically," that is used multiple times in the '111 Patent claims.  It is a well-worn axiom of patent law that courts "should not construe patent claims in a manner that renders claim language meaningless or superfluous." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) (stating that interpretations of claims rendering claim terms superfluous is generally disfavored).

This is not a case where a possibly indefinite claim term has a "well-recognized meanin[g]" that allows a reader to "infer the meaning . . . with reasonable confidence," despite the term not having been mentioned, discussed, or defined in the specification, where in such case a term may properly be deemed not indefinite.  *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.,* 359 F.3d 1367, 1372 (Fed. Cir. 2004).  Here, the patentee neither mentions nor discusses how the purported invention includes the step of "dynamically" generating a functionality or a user interface.  Neither did the patentee make any remarks on or including the term "dynamically" during the prosecution that led to the issuance of the Patents-in-Suit.

The claims of the '482 and '111 Patents, read in light of the specifications and prosecution histories, cannot give a reader "reasonable certainty" as to the scope of the term "dynamically generate" and its variants used in both the '482 and '111 Patent claims.  The patent law's definiteness requirement "mandates clarity."  *Nautilus*, 134 S. Ct. at 2129.  Where the

DEFENDANT SALESFORCE.COM, INC.'S NON-INFRINGEMENT,
INVALIDITY, AND UNENFORCEABILITY  CONTENTIONS

1    specification and prosecution history do not contain a term used in the claims multiple times,

2    such clarity cannot be obtained.

3        "Unique aspects" ('482 and '111 patents):   Even more ambiguous is the "unique aspects"

4    limitation of independent claims 1, 7, and 13 of the '111 patent, and independent claims 1, 21,

5    and 41 of the '482 Patent.  The term is used in conjunction with the term "particular application"

6    such that each independent claim contains "unique aspects of a particular application."  Here,

7    too, the term "unique aspects" appears nowhere in the specification, nor did the patentee use the

8    term in any meaningful way in remarks to the Office during the prosecution history.  The word

9    "aspects" is also similar missing from the intrinsic record.  Although the term "application" as

10   used in the terms may be readily understood well-enough, since the specification discusses an

11   "application component" to the claimed invention.  (see '111 Patent at Col. 12:36-45), the

12   specification and prosecution history provide no clarity on what exactly are "unique aspects" to

13   the application, and how these "unique aspects" affect claim scope.  The untethered nature of the

14   term "unique aspects," along with the term it modifies, "particular application," is impermissibly

15   subjective and thus renders the claims indefinite.  *Datamize, LLC v. Plumtree Software, Inc.*, 417

16   F.3d 1342, 1350 (Fed. Cir. 2005)  ("A purely subjective construction of "aesthetically pleasing"

17   would not notify the public of the patentee's right to exclude since the meaning of the claim

18   language would depend on the unpredictable vagaries of any one person's opinion of the

19   aesthetics of interface screens.").

20       ***Lack of written description***.  Salesforce contends that one or more claims of the '482 and

21   '111 patents are invalid under 35 U.S.C. § 112 ¶ 1 for lack of a written description and/or

22   enablement because the claims are not adequately disclosed, described, or explained in the

23   specification.  The written description test requires "sufficient disclosure in the original

24   disclosure to show that the inventor possessed the invention at the time of the original filing."

25   *Metabolite Labs, Inc. v. Laboratory Corp. of Am. Holdings*, 370 F.3d 1354, 1366 (Fed. Cir.

26   2004).  The written description requirement is assessed "from the viewpoint of one of skill in the

27   art."  *Id*.  The patent disclosure "must allow one skilled in the art to visualize or recognize the

28

-50-

identity of the subject matter purportedly described." *Kioto Manuf. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1154 (Fed. Cir. 2004).

For example, representative claim 1 of the '111 patent purports to cover "dynamically generating a functionality and a user interface for the particular application." The specification does not disclose a method for "dynamically generating" either a functionality or a user interface. Indeed, there is no reference in the specification to what it could mean to "dynamically" generate a functionality or user interface. Thus, there is no disclosure in the specification that would enable a user skilled in the art to understand and practice the "dynamic" generating of functionalities or user interfaces.

Representative claim 1 of the '111 patent also claims "modifying at least one of the first information or the second information in response to changes determined to have occurred to information associated with the particular application." The specification discloses neither a method for detecting when changes occur to "information associated with the particular application," nor does it disclose a method for determining what information is "associated with the particular application" in the first place. Although the specification refers to "Intelligent Agents" programmed to detect certain "changes", there is insufficient disclosure on how a person skilled in the art might replicate such "Intelligent Agents." Thus, there is no disclosure in the specification that would enable a user skilled in the art to understand and practice this step of claim 1 of the '111 patent.

Other terms throughout the claims of AIT's patents are similarly deficient in lacking adequate written description so as to enable a person skilled in the art to practice the claims. For example, the term "unique aspects" used throughout the claims of both the '482 and '111 patents is undefined and untethered to the specification. "The 'written description' requirement implements the principle that a patent must describe the technology that is sought to be patented; the requirement serves both to satisfy the inventor's obligation to disclose the technologic knowledge upon which the patent is based, and to demonstrate that the patentee was in possession of the invention that is claimed." *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir.

2005).  The patentee failed to provide *any* description of what "unique aspects" of "particular applications" were, rendering the pertinent claims invalid for lack of written description.

So, too, with the '482 Patent's use of the term "first layer" in representative claim 1.  The specification is silent on what "first layer" as used in the claims actually means.  The specification provides no corresponding structure that would fit the claims' use of the term "first layer."  This renders the pertinent claims of the '482 Patent invalid as indefinite and for lack of written description.

## III.   UNENFORCEABILITY CONTENTIONS –  INEQUITABLE CONDUCT

Salesforce contends that, on information and belief, and based on the discovery conducted to date, the '111 patent may be unenforceable due to the patentee's inequitable conduct during the prosecution of the '111 patent.[6]  In connection with the prosecution of U.S. Patent Application No. 12/912,375 ("the '375 application"), which matured into the '111 patent, the patentee, "with intent to mislead or deceive the examiner, fail[ed] to disclose material information or submit[ted] materially false information to the PTO during prosecution." *McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 487 F.3d 897, 913 (Fed. Cir. 2007).  All individuals "associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to the individual to be material to patentability as defined in this section." 37 C.F.R. § 1.56(a).  Such duty of candor was not met by the patentee during the prosecution of the '111 patent.

During the prosecution of U.S. Patent Application 12/098,154 ("the '154 application"), which claimed continuity from U.S. Patent Application 09/797,488 ("the '488 application," which matured into the '482 Patent) and was claimed as a parent by the '375 application (and thus the '111 patent), the Examiner rejected virtually the same pending claims that would later issue in substantially similar form through the '111 patent.  The patentee abandoned the '154

---

[6]  Salesforce's contentions related to inequitable conduct are subject to additional discovery yet to take place in this action relating to the Applicant's state of mind in connection with the prosecution of the application that led to the '111 Patent.

application after that Office Action.  Such adverse action, and all related and material prior art references cited by the Examiner, were not disclosed in writing in the prosecution of the '375 application.

In the Office Action mailed April 27, 2010 of the '154 application, pending method claims 2 through 7 of the '154 application were rejected under 35 U.S.C. § 101 by the Examiner as being directed to non-statutory subject matter.  The Examiner observed that the method claims "lack[ed] structure such as on a 'computer readable medium."  The fact of the Office's April 27, 2010 rejection of pending claims 2 through 7 of the '154 application as being directed to non-statutory subject matter grounds was not disclosed by the patentee during the prosecution of the '375 application, despite the respective method claims of the '154 application being virtually identical.

The Examiner further rejected each every pending claim of the '154 application under 35 U.S.C. § 103 as obvious and unpatentable over Dodrill (U.S. Patent No. 6,766,298), McLauchlin (U.S. Patent No. 6,754,672), Tsirigotis (U.S. Patent No. 6,098,096), Wikipedia (http://en.wikipedia.org/wiki/Metadata), and combinations thereof.

The Examiner further commented that, despite not issuing anticipation rejections under 35 U.S.C. § 102, "*[a]lmost all the references* cited in the 'notice of reference cite' by the examiner would full read on the applicants limitations as a 102." (emphasis added.)  The Notice of References Cited, provided concurrently with the Office Action of April 27, 2010, provides in pertinent part (FIGS. 1 and 2):

| | | Application/Control No. | | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|---|
| **Notice of References Cited** | | 12/098,154 | | FRANKLAND ET AL. |
| | | Examiner | Art Unit | |
| | | KIRSTEN S. APPLE | 3694 | Page 1 of 2 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-6,098,096 A | 08-2000 | Tsirigotis et al. | 709/213 |
| * | B | US-6,154,843 A | 11-2000 | Hart et al. | 726/21 |
| * | C | US-6,314,415 B1 | 11-2001 | Mukherjee, Krishna C. | 706/47 |
| * | D | US-6,493,717 B1 | 12-2002 | Junkin, Joseph R. | 1/1 |
| * | E | US-6,678,682 B1 | 01-2004 | Jenkins et al. | 1/1 |
| * | F | US-6,754,672 B1 | 06-2004 | McLauchlin, Andrew William | |
| * | G | US-6,766,298 B1 | 07-2004 | Dodrill et al. | 704/270.1 |
| * | H | US-6,898,645 B2 | 05-2005 | Abujbara, Nabil M. | 710/17 |
| * | I | US-6,920,607 B1 | 07-2005 | Ali et al. | 715/206 |
| * | J | US-6,934,356 B1 | 08-2005 | Satheesan et al. | 378/62 |
| * | K | US-6,973,619 B1 | 12-2005 | Hirose et al. | 715/234 |
| * | L | US-6,990,654 B2 | 01-2006 | Carroll, Jr., Thomas J. | 717/109 |
| * | M | US-7,181,320 B2 | 02-2007 | Whiffen et al. | 700/286 |

**FIG. 1.**

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-7,222,292 B2 | 05-2007 | Ali et al. | 715/236 |
| * | B | US-7,269,795 B2 | 09-2007 | Whittenberger, Kevin | 715/764 |
| * | C | US-7,318,066 B2 | 01-2008 | Kaufman et al. | 1/1 |
| * | D | US-7,320,007 B1 | 01-2008 | Chang, Peter Hon-You | 1/1 |
| * | E | US-7,366,972 B2 | 04-2008 | Baumert et al. | 715/200 |
| * | F | US-7,409,710 B1 | 08-2008 | Uchil et al. | 726/19 |
| * | G | US-7,505,995 B2 | 03-2009 | Grealish et al. | 1/1 |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FIG. 2**

The patentee failed to disclose in writing ***any*** of the above references during the prosecution of the '375 application. The patentee's Information Disclosure Statement in the '375 application is as follows, which omits any prior art reference mentioned in the '154 application (FIGS. 3 and 4):

04554.00001/6085572.5

| | | U.S. PATENT DOCUMENTS | | | |
|---|---|---|---|---|---|
| Examiner Initials* | Cite No.[1] | Document Number | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
| | | Number-Kind Code[2] (if known) | | | |
| | | 5,524,253 | 06-04-1996 | Pham et al. | |
| | | 5,862,325 | 01-19-1999 | Reed et al. | |
| | | 5,966,707 | 10-12-1999 | Van Huben et al. | |
| | | 6,085,220 | 07-04-2000 | Courts et al. | |
| | | 6,167,563 | 12-26-2000 | Fontana et al. | |
| | | 6,266,709 B1 | 07-24-2001 | Gish | |
| | | 6,510,426 B1 | 01-21-2003 | Cohen et al. | |
| | | 6,606,708 B1 | 08-12-2003 | Devine et al. | |
| | | 6,615,258 B1 | 09-02-2003 | Barry et al. | |
| | | 6,654,747 B1 | 11-25-2003 | Van Huben et al. | |

**FIG. 3**

| | | FOREIGN PATENT DOCUMENTS | | | | |
|---|---|---|---|---|---|---|
| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3] Number[4] Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
| | | EP 0861551 B1 | 08-14-2002 | International Business Machines Corp. | | |

**FIG. 4**

As set forth in claim charts Hart, Mukherjee, Junkin, the pending claims of the '375 application—which are nearly identical to the issued claims of the '111 patent—would not have issued had the applicants disclosed the references that they disclosed during the prosecution of the '154 application. Such failure to disclose may be clear and convincing evidence of the patentee's intent to deceive the PTO by withholding information about clearly-relevant prior art references that the Office had previously determined to be directly material to patentability of substantially similar claims.

AIT cannot deny that the claims denied in the '154 application were *identical* to the claims as-first-filed in the '375 application, which themselves were ultimately almost identical to the as-issued claims of the '111 patent. To illustrate:

| '154 application (abandoned on January 6, 2011) (independent claims rejected in April 27, 2010 Office Action) | '375 application (independent claims as-filed on October 26, 2010) | '111 patent (independent claims allowed on March 8, 2013) |
|---|---|---|
| 2.      A method, comprising: receiving first information about unique aspects of a particular application; receiving second information about user | 2.      A method, comprising: receiving first information about unique aspects of a particular application; receiving second information about user | 1.      A method, comprising: receiving first information about unique aspects of a particular application; receiving second information about user |

-55-

| | | |
|---|---|---|
| interface elements and one or more functions common to various applications, the various applications including the particular application;

upon establishment of a communication connection with a user system that includes the particular application, dynamically generating a functionality and a user interface for the particular application, the functionality and the user interface of the particular interface being based on the first information and the second information;

providing the functionality and the user interface of the particular application to the user system; and

modifying at least one of the first and the second information in response to changes determined to have occurred to information associated with the particular application. | interface elements and one or more functions common to various applications, the various applications including the particular application;

upon establishment of a communication connection with a user system that includes the particular application, dynamically generating a functionality and a user interface for the particular application, the functionality and the user interface of the particular interface being based on the first information and the second information;

providing the functionality and the user interface of the particular application to the user system; and

modifying at least one of the first and the second information in response to changes determined to have occurred to information associated with the particular application. | interface elements and one or more functions common to various applications, the various applications including the particular application;

upon establishment of a communication connection with a user system that includes the particular application, dynamically generating a functionality and a user interface for the particular application, the functionality and the user interface of the particular interface being based on the first information and the second information;

providing the functionality and the user interface of the particular application to the user system; and

modifying at least one of the first information or the second information in response to changes determined to have occurred to information associated with the particular application. |
| 8.    A machine-readable medium storing code representing instructions to cause a machine to perform a method, the code comprising code to:

receive first information about unique aspects of a particular application;

receive second information about user interface elements and one or more functions common to various applications, the various applications including the particular application;

upon establishment of a communication connection with a user system that includes the particular application, dynamically generate a functionality and a user interface for the particular | 8.    A machine-readable medium storing code representing instructions to cause a machine to perform a method, the code comprising code to:

receive first information about unique aspects of a particular application;

receive second information about user interface elements and one or more functions common to various applications, the various applications including the particular application;

upon establishment of a communication connection with a user system that includes the particular application, dynamically generate a functionality and a user interface for the particular | 7.    A machine-readable medium storing code representing instructions to cause a machine to perform a method, the code comprising code to:

receive first information about unique aspects of a particular application;

receive second information about user interface elements and one or more functions common to various applications, the various applications including the particular application;

upon establishment of a communication connection with a user system that includes the particular application, dynamically generate a functionality and a user interface for the particular |

| | | |
|---|---|---|
| application, the functionality and the user interface being based on the first information and the second information;<br><br>provide the functionality and the user interface of the particular application to the user system; and<br><br>modify at least one of the first information and the second information in response to changes determined to have occurred to information associated with the particular application. | application, the functionality and the user interface being based on the first information and the second information;<br><br>provide the functionality and the user interface of the particular application to the user system; and<br><br>modify at least one of the first information and the second information in response to changes determined to have occurred to information associated with the particular application. | application, the functionality and the user interface being based on the first information and the second information;<br><br>provide the functionality and the user interface of the particular application to the user system; and<br><br>modify at least one of the first information or the second information in response to changes determined to have occurred to information associated with the particular application. |
| 14.    A system, comprising:<br>a server accessible by a browser executed on a client device, the server including a first portion, a second portion, a third portion, and a fourth portion,<br>the first portion of the server having information about unique aspects of a particular application,<br>the second portion of the server having information about user interface elements and one or more functions common to various applications, the various applications including the particular application,<br>the third portion of the server being configured to dynamically generate a functionality and a user interface for the particular application, the functionality and the user interface of the particular application being based on the information in the first portion of the server and the information in the second portion of the server, the third portion of the server being configured to send the functionality and the user interface for the particular application to the browser upon establishment of the connection between the server | 14.    A system, comprising:<br>a server accessible by a browser executed on a client device, the server including a first portion, a second portion, a third portion, and a fourth portion,<br>the first portion of the server having information about unique aspects of a particular application,<br>the second portion of the server having information about user interface elements and one or more functions common to various applications, the various applications including the particular application,<br>the third portion of the server being configured to dynamically generate a functionality and a user interface for the particular application, the functionality and the user interface of the particular application being based on the information in the first portion of the server and the information in the second portion of the server, the third portion of the server being configured to send the functionality and the user interface for the particular application to the browser upon establishment of the connection between the server | 13.    A system, comprising:<br>a server accessible by a browser executed on a client device, the server including a first portion, a second portion, a third portion, and a fourth portion,<br>the first portion of the server having information about unique aspects of a particular application,<br>the second portion of the server having information about user interface elements and one or more functions common to various applications, the various applications including the particular application,<br>the third portion of the server being configured to dynamically generate a functionality and a user interface for the particular application, the functionality and the user interface of the particular application being based on the information in the first portion of the server and the information in the second portion of the server, the third portion of the server being configured to send the functionality and the user interface for the particular application to the browser upon establishment of a connection between the server |

04554.00001/6085572.5

DEFENDANT SALESFORCE.COM, INC.'S NON-INFRINGEMENT, INVALIDITY, AND UNENFORCEABILITY  CONTENTIONS

| and the client,<br><br>     the fourth portion of the server being configured to automatically detect changes that affect the information in the first portion of the server and the information in the second portion of the server. | and the client,<br><br>     the fourth portion of the server being configured to automatically detect changes that affect the information in the first portion of the server and the information in the second portion of the server. | and the client device,<br><br>     the fourth portion of the server being configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server. |
| --- | --- | --- |

AIT's failure to timely disclose the April 27, 2010 adverse Office Action in the prosecution of the '154 application and the material prior art references cited thereby, where it filed *identical claims* a mere 6 months later, evidences that the patentee may have acted "with intent to mislead or deceive the examiner, fail[ed] to disclose material information or submit[ted] materially false information to the PTO during prosecution."  The patentee may have failed to honor its duty of candor before the PTO which included a "duty to disclose to the Office all information known to the individual to be material to patentability[.]"  Notably, the same Applicants –including the same patent prosecutor– handled both the '154 application and the '375 application – meaning that said Applicants had *actual knowledge* of the materiality of the April 27, 2010 adverse Office Action and the prior art references provided therein.

Neither can AIT argue that the Examiner for the '375 application, having issued the rejection in the '154 application, had knowledge of the prior adverse action or material prior art references.  Federal Circuit law and the MPEP "plainly impose a duty of disclosure beyond citation of the co-pending application." *McKesson*, 487 F.3d at 911.  Patent prosecutors "***cannot assume*** that the examiner of a particular application is necessarily aware of other applications which are 'material to patentability' of the application in question, but must instead bring such other applications to the attention of the examiner.  Similarly, the prior art references from one application ***must be made of record in another subsequent application*** if such prior art references are 'material to patentability' of the subsequent application."  MPEP § 2001.06(b) (emphasis added).  *See also Onstar, LLC v. Micral, Inc.,* 1:08 CV 2047, 2010 WL 1433431 (N.D. Ohio Apr. 7, 2010).  Indeed, patent prosecutors should not "assume that [a PTO examiner] retains details of every pending file in his mind when he is reviewing a particular application . . . and PTO regulations required all disclosures to be in writing[.]" *McKesson*, 487 F.3d at 925.

Although the patentee attempted to later correct the above-described failure by submitting a new Information Disclosure Sheet, this effort was not curative because the Examiner refused to review the new Information Disclosure Statement because it failed to meet the 37 C.F.R. 1.97(e).  *See* Office Action:  Miscellaneous Communication to Applicant dated June 6, 2013, '111 File History:

---

**NOTICE OF NON-COMPLIANT INFORMATION DISCLOSURE STATEMENT**

An Information Disclosure Statement (IDS) filed _5-31-13_ in the above-identified application fails to meet the requirements of 37 CFR 1.97(d) for the reason(s) specified below. Accordingly, the IDS will be placed in the file, but the information referred to therein has not been considered.

The IDS is not compliant with 37 CFR 1.97(d) because:

☑ The IDS lacks a statement as specified in 37 CFR 1.97(e).

---

Despite this clear and continuing deficiency, the patentee did not attempt to cure its failure to disclose either the adverse office action in the related application nor the prior art cited in that Office action.

The patentee's failure to disclose in the '375 application prosecution an indisputably material adverse Office Action, along with material prior art references used by the Office to reject virtually identical claims in the '154 application, evidences that the '111 patent may be unenforceable on the basis of the patentee's inequitable conduct.  Salesforce's investigation into the intent of the Applicants of the '154 application is ongoing, and Salesforce reserves its right to supplement these Contentions and its pleadings as discovery continues.

Dated: July 18, 2014

QUINN EMANUEL URQUHART & SULLIVAN LLP

/s/ Ray Zado
KEVIN JOHNSON
RAY ZADO
SAM STAKE

Attorneys for Defendant salesforce.com, inc.

1

**<u>CERTIFICATE OF SERVICE</u>**

2         I, James Tsuei, hereby certify that on July 18, 2014, the foregoing "DEFENDANT

3    SALESFORCE.COM, INC.'S INITIAL DISCLOSURES" was caused to be served upon the

4    following in the manner indicated:

5    Keegan G. Low
    Barry L. Breslow
6    ROBISON, BELAUSTEGUI, SHARP & LOW
    A Professional Corporation (Resident Counsel)
7    71 Washington Street
    Reno, Nevada 89503                VIA ELECTRONIC MAIL
8
    Christopher D. Banys
9    Richard C. Lin
    Banys, PC
10   1032 Elwell Court, Ste. 100
    Palo Alto, CA 94303              VIA ELECTRONIC MAIL
11
    Steve W. Berman
12   Nicholas S. Boebel
    Hagens Berman Sobol Shapiro LLP
13   1918 Eighth Avenue, Suite 3300
    Seattle, WA 98101              VIA ELECTRONIC MAIL
14

15   DATED:  July 18, 2014

16                       /s/ James Tsuei
                    James Tsuei
17

18

19

20

21

22

23

24

25

26

27

28

04554.00001/6085572.5

-60-