# Exhibit 4

PUBLIC VERSION

Trials@uspto.gov                                          Paper No. 51
571-272-7822                              Entered:  February 25, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

RPX CORPORATION,
Petitioner,

v.

APPLICATIONS IN INTERNET TIME, LLC,
Patent Owner.

_____

Case IPR2015-01750
Patent 8,484,111 B2

_____

Before LYNNE E. PETTIGREW, MITCHELL G. WEATHERLY, and
JENNIFER MEYER CHAGNON, *Administrative Patent Judges*.

CHAGNON, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

PUBLIC VERSION

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

## I.   INTRODUCTION

RPX Corporation ("Petitioner" or "RPX") filed a Petition for *inter partes* review of claims 13–18 ("the challenged claims") of U.S. Patent No. 8,484,111 B2 (Ex. 1001, "the '111 patent").  Paper 1 ("Pet.").  Applications In Internet Time LLC ("Patent Owner") filed a Preliminary Response (Paper 21, Paper 26 (redacted version), "Prelim. Resp.").  Pursuant to our authorization (Paper 23), Petitioner filed a Reply (Paper 28, Paper 29 (redacted version), "Reply") and Patent Owner filed a Sur-Reply (Paper 38, Paper 37 (redacted version), "Sur-Reply").

We have authority to determine whether to institute *inter partes* review.  *See* 35 U.S.C. § 314(b); 37 C.F.R. § 42.4(a).  Upon consideration of the Petition and the Preliminary Response, as well as Petitioner's Reply and Patent Owner's Sur-Reply, and for the reasons explained below, we determine that the information presented shows a reasonable likelihood that Petitioner would prevail with respect to all of the challenged claims. *See* 35 U.S.C. § 314(a).  Accordingly, we institute trial as to claims 13–18 of the '111 patent.

### A.  Related Proceedings

The '111 patent is the subject of the following district court proceeding:  *Applications in Internet Time LLC v. Salesforce.com, Inc.*, No. 3:13-cv-00628 (D. Nev.) ("Salesforce litigation").  Pet. 3; Paper 6, 2.  Petitioner concurrently seeks *inter partes* review of related U.S. Patent No. 7,356,482 B2 ("the '482 patent"), in IPR2015-01751 and IPR2015-01752.  Pet. 3; Paper 6, 2.

PUBLIC VERSION

█████ PUBLIC VERSION █████████████

IPR2015-01750
Patent 8,484,111 B2

### B. The '111 Patent

The '111 patent, titled "Integrated Change Management Unit," relates to an "integrated system for managing changes in regulatory and non-regulatory requirements for business activities at an industrial or commercial facility."  Ex. 1001, Abstract.  The integrated system described in the '111 patent manages data that is constantly changing by (1) "provid[ing] one or more databases that contain information on operations and requirements concerning an activity or area of business," (2) "monitor[ing] and evaluat[ing] the relevance of information on regulatory and non-regulatory changes that affect operations of the business and/or information management requirements," (3) "convert[ing] the relevant changes into changes in work/task lists, data entry forms, reports, data processing, analysis and presentation . . . of data processing and analysis results to selected recipients, without requiring the services of one or more programmers to re-program and/or re-code the software items affected by the change," and (4) "implement[ing] receipt of change information and dissemination of data processing and analysis results using the facilities of a network, such as the Internet."  *Id.* at 8:37–52, 9:4–5.

█████ PUBLIC VERSION █████████████

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

Figure 1 of the '111 patent is reproduced below:



FIG. 1

As shown in Figure 1, the integrated system operates at four layers:  (1) a
change management layer that identifies on the Internet regulatory and
non-regulatory changes that may affect a user's business, (2) a Java data
management layer that generates a user interface ("UI"), (3) a metadata layer
that provides data about the user interface including "tools, worklists, data
entry forms, reports, documents, processes, formulas, images, tables, views,
columns, and other structures and functions," and (4) a business content
layer that is specific to the particular business operations of interest to the
user.  *Id.* at 9:38–52.  According to the '111 patent, because the system of
the invention is "entirely data driven," the need to write and compile new
code in order to update the system is eliminated.  *Id.* at 10:24, 12:44–56.

4

PUBLIC VERSION

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

### C. Illustrative Claim

Of the challenged claims, claim 13 is the only independent claim. Claims 14–18 depend from claim 13.  Claim 13 of the '111 patent, reproduced below, is illustrative of the challenged claims.

13. A system, comprising:

a server accessible by a browser executed on a client device, the server including a first portion, a second portion, a third portion, and a fourth portion,

the first portion of the server having information about unique aspects of a particular application,

the second portion of the server having information about user interface elements and one or more functions common to various applications, the various applications including the particular application,

the third portion of the server being configured to dynamically generate a functionality and a user interface for the particular application, the functionality and the user interface of the particular application being based on the information in the first portion of the server and the information in the second portion of the server, the third portion of the server being configured to send the functionality and the user interface for the particular application to the browser upon establishment of a connection between the server and the client device,

the fourth portion of the server being configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server.

Ex. 1001, 33:19–34:8.

PUBLIC VERSION

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

### D. The Applied References and Evidence

Petitioner relies on the following evidence. Pet. 4–8, 12–45.

| Reference | Date | Exhibit No. |
|---|---|---|
| U.S. Patent No. 6,249,291 B1 ("Popp") | June 19, 2001 | Ex. 1004 |
| Srdjan Kovacevic, *Flexible, Dynamic User Interfaces for Web-Delivered Training*, in AVI '96 PROCEEDINGS OF THE WORKSHOP ON ADVANCED VISUAL INTERFACES 108–18 (1996) ("Kovacevic") | 1996 | Ex. 1005 |
| U.S. Patent No. 5,806,071 ("Balderrama") | Sept. 8, 1998 | Ex. 1006 |
| *Java Complete!*, 42 DATAMATION MAGAZINE 5, 28–49 (March 1, 1996) ("Java Complete") | Mar. 1, 1996 | Ex. 1007 |
| Glenn E. Krasner & Stephen T. Pope, *A Description of the Model-View-Controller User Interface Paradigm in the Smalltalk-80 System*, ParcPlace Systems (1988) ("Krasner") | 1988 | Ex. 1008 |

Petitioner further relies on the Declaration of Mark E. Crovella, Ph.D. (Ex. 1002).

### E. The Asserted Grounds

Petitioner sets forth its challenges to claims 13–18 as follows. Pet. 4–5, 12–45.

| References | Basis | Claims Challenged |
|---|---|---|
| Popp | § 102 | 13–18 |
| Kovacevic | § 102 | 13–18 |
| Balderrama and Java Complete | § 103 | 13–18 |

PUBLIC VERSION

███ PUBLIC VERSION ███████

IPR2015-01750
Patent 8,484,111 B2

## II.   ANALYSIS

### A. *Real Parties-in-Interest*

The statute governing *inter partes* review proceedings sets forth
certain requirements for a petition for *inter partes* review, including that "the
petition identif[y] all real parties in interest."  35 U.S.C. § 312(a); *see also*
37 C.F.R. § 42.8(b)(1) (requirement to identify real parties-in-interest
("RPIs") in mandatory notices).  In accordance with 35 U.S.C. § 312(a)(2)
and 37 C.F.R. § 42.8(b)(1), Petitioner identifies RPX Corporation as the
"sole real party-in-interest in this proceeding."  Pet. 2.  In its Preliminary
Response, Patent Owner raises the issue of whether Petitioner has identified
all RPIs.  *See* Prelim. Resp. 2–20.  In particular, Patent Owner asserts that
Salesforce.com, Inc. ("Salesforce") is an unnamed RPI.  *Id.*

As noted above, the '111 patent has been asserted against Salesforce
in a district court action.  *See* Paper 6, 2.  Patent Owner asserts that
"[b]ecause the Salesforce Litigation is more than one year old, Salesforce is
barred from filing an inter partes review under 37 C.F.R. § 42.101(b)."
Prelim. Resp. 8; *see also* 35 U.S.C. § 315(b) ("An inter partes review may
not be instituted if the petition requesting the proceeding is filed more than 1
year after the date on which the petitioner, real party in interest, or privy of
the petitioner is served with a complaint alleging infringement of the
patent."); Ex. 2003 (showing service of the complaint in the Salesforce
litigation was effected on November 20, 2013 (more than one year prior to
the August 17, 2015 filing date of the instant Petition)).  Thus, as an initial

███ PUBLIC VERSION ███████

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

matter, we must determine whether Salesforce should have been identified as an RPI in this proceeding.

Whether an entity that is not named as a participant in a given proceeding constitutes an RPI is a highly fact-dependent question that takes into account how courts generally have used the terms to "describe relationships and considerations sufficient to justify applying conventional principles of estoppel and preclusion." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012). According to the Trial Practice Guide,

> the spirit of that formulation as to IPR . . . proceedings means that, at a general level, the "real party-in-interest" is the party that desires review of the patent. Thus, the "real party-in-interest" may be the petitioner itself, and/or it may be the real party or parties at whose behest the petition has been filed.

*Id.* As stated in the Trial Practice Guide, there are "multiple factors relevant to the question of whether a non-party may be recognized as" an RPI. *Id.* (citing *Taylor v. Sturgell*, 533 U.S. 880, 893–895, 893 n.6 (2008)). There is no "bright line test." *Id.* Considerations may include, for example, whether a non-party exercises control over a petitioner's participation in a proceeding, or whether a non-party is funding the proceeding or directing the proceeding. *Id.* at 48,759–60.

A petition is presumed to identify accurately all RPIs. *See Zerto, Inc. v. EMC Corp.*, Case IPR2014-01295, slip op. at 6–7 (PTAB Mar. 3, 2015) (Paper 34). When a patent owner provides sufficient evidence prior to institution that reasonably brings into question the accuracy of a petitioner's identification of RPIs, the overall burden remains with the petitioner to

8

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

establish that it has complied with the statutory requirement to identify all
RPIs. *Id.*

Patent Owner argues that RPX is acting as a proxy for Salesforce in
filing the Petition and Salesforce should, therefore, be identified as an RPI.
In this regard, Patent Owner argues that "RPX is in the business of acting as
a proxy for accused infringers like Salesforce." Prelim. Resp. 6. As support
for this assertion, Patent Owner quotes from portions of RPX's website and
public filings. For example, Patent Owner points to a portion of RPX's
website, which indicates "'RPX Corporation is the leading provider of patent
risk solutions, offering defensive buying, acquisition syndication, patent
intelligence, insurance services, and advisory services.'" *Id.* (quoting
Ex. 2016). Patent Owner further argues that "RPX states that its interests are
'100% aligned' with those of clients ▮▮▮▮▮▮▮▮," *id.* at 6–7 (quoting
Ex. 2015); that "RPX serves as 'an extension of the client's in-house legal
team,'" *id.* at 7 (quoting Ex. 2006); and that "RPX . . . act[s] as [its clients']
proxy to 'selectively clear' liability for infringement as part of RPX's 'patent
risk management solutions,'" *id.* (quoting Ex. 2006; Ex. 2008).

We are not persuaded, however, that the evidence supports Patent
Owner's argument that "Petitioner's business model is built upon petitioner
acting as an agent or proxy for third parties in cases just like this." Prelim.
Resp. 6. At the outset, we note that Patent Owner provides several of these
quotations out-of-context and/or mischaracterizes them. Nowhere in the
evidence of record does Patent Owner point to any portion of RPX's website

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

or public filings that expressly indicates that RPX acts as a proxy for its

clients, ████████████████

     Further, in response to additional discovery authorized in this

proceeding (Paper 11), RPX provided declaration testimony that, contrary to

Patent Owner's assertions that RPX is acting as a proxy for Salesforce,



Ex. 1019 ¶ 47; *see* Reply[1] 1, 6–7 (citing Ex. 1019 ¶¶ 7–13, 34–44, 47;

Ex. 1024).  RPX further provided declaration testimony and evidence that

"RPX did not have any contractual obligation to file [this and the related]

IPRs or any 'unwritten,' implicit or covert understanding with Salesforce

that it would do so."  Reply 5 (citing Ex. 1019 ¶ 45); *see also* Exs. 1020–

1022 ███████████████████████ which do not include any

discussion of filing petitions for *inter partes* review).  We are not persuaded

that the generic statements on RPX's website cited by Patent Owner prove

otherwise.

     Patent Owner points to other *inter partes* review proceedings in which

RPX was a petitioner as evidence that "RPX has a history of acting as a

---

[1] The Reply does not include page numbers.  We cite to the Reply counting
the page starting with the "Introduction" section as page 1.

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

proxy." Prelim. Resp. 8–9; *see RPX Corp. v. VirnetX, Inc.*, Case
IPR2014-00171 (and six other related proceedings); *RPX Corp. v.
ParkerVision*, Case IPR2014-00946 (and two other related proceedings).
These cases are distinguishable from the present case. In *RPX Corp. v.
VirnetX, Inc.*, the Board found that Apple (the alleged unnamed RPI) had
both suggested that RPX challenge the specific patents, as well as paid for it
to do so. Case IPR2014-00171, slip op. at 4, 7 (PTAB June 5, 2014)
(Paper 49). Additionally, the petitions included grounds that were
"substantially identical" to those in Apple's time-barred petition. *Id.* at 5–6.
In *RPX Corp. v. ParkerVision*, contrary to Patent Owner's assertion, the
Board did not find that RPX acted as a proxy for any unnamed RPI. Rather,
although the Board authorized additional discovery on this issue,
Case IPR2014-00946 (Paper 25), no additional briefing on the issue of RPI
was ever submitted.

Patent Owner's argument questioning RPX's motives for challenging
only two of three of Patent Owner's patents (i.e., only the two asserted in the
Salesforce litigation) also is unpersuasive. *See* Sur-Reply 4–5. RPX
addresses this third patent (U.S. Patent No. 6,341,287 ("the '287 patent"),
which is the ultimate parent of both the '111 patent and the '482 patent) in
the Petition, stating that "[t]he '287 patent issued with a single independent
claim, which is much narrower than the claims of the '111 patent, and
closely tied to the issues of environmental, health, or safety regulations
described in the specification." Pet. 8 (citing Ex. 1011, 32:9–34:8). We are
not persuaded, based on the facts now before us, that RPX's decision to

PUBLIC VERSION

█ PUBLIC VERSION ███████████████████

IPR2015-01750
Patent 8,484,111 B2

challenge only certain of Patent Owner's patents is evidence sufficient to show that RPX is acting as a proxy on behalf of Salesforce in this IPR proceeding.

Patent Owner further argues that RPX has "adopted a 'willful blindness' strategy" and that "it intentionally operates its business to circumvent the PTAB's RPI case law. Prelim. Resp. 8–10 (citing e.g., Ex. 2018). We are not persuaded that the evidence of record supports this assertion. Further, RPX has provided declaration testimony that explains RPX's "best practices" for identifying RPIs that contradicts Patent Owner's assertion. Ex. 1019 ¶¶ 14–19; Reply 6–8.

As additional evidence that Salesforce should be named an RPI in this proceeding, Patent Owner argues that " ███████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████████████████ Because we find Patent

12

██ PUBLIC VERSION ██████

IPR2015-01750
Patent 8,484,111 B2

Owner's argument to be based on conjecture without evidentiary support, we are not persuaded that Salesforce is funding this proceeding.

      Patent Owner further argues that Mr. Sanford Robinson, who is on the Board of Directors of both RPX and Salesforce, "has the opportunity to exert significant but hidden control over this proceeding."  Prelim. Resp. 12. There is no evidence in the record, however, that Mr. Robinson has exerted any such control.  The fact that "RPX produced nothing," *id.* at 13, in response to a production request to produce "[d]ocuments sufficient to show how [he] separates his fiduciary duties to RPX and Salesforce despite serving simultaneously as a Board Member of RPX and as a Board Member of Salesforce," Ex. 2001, is not dispositive.  *See* Paper 11.  In response to the discovery requests, RPX provided declaration testimony that Mr. Robinson was not involved in the decision to file the instant Petition.  Reply 11–12 (citing Ex. 1019 ¶¶ 51–52).  An overlapping Board member alone, without evidence of his involvement, is not sufficient to demonstrate an unnamed entity had control over or was involved in an IPR.  *See Butamax Advanced Biofuels LLC v. Gevo, Inc.*, Case IPR2013-00214, slip op. at 4 (PTAB Sept. 30, 2013) (Paper 11).

      Patent Owner further provides ███████████████

████████████████████████████████████████
█████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████

██ PUBLIC VERSION ██████████████████

IPR2015-01750
Patent 8,484,111 B2

█████████████████████████████

████████████████████████████████████

███████████████████████████████

██ RPX, however, provides declaration testimony expressly stating that:

> RPX had no communication with Salesforce whatsoever regarding the filing of IPR petitions against [Patent Owner's] patents before [this and the related] IPRs were filed.  Salesforce did not request that RPX file [this and the related] IPRs, was not consulted about the decision by RPX to file the IPRs, and did not communicate with RPX about the searching for or selection of prior art asserted in [this and the related] IPRs, or any other aspect of the IPRs.

Ex. 1019 ¶ 20; *see* Reply 1–2. ███████████████████████

███████████████████████████████

████████████████████████████████████

███████████████████████████████

To summarize, Patent Owner argues that, because ████████████
████████ because the '111 patent has been asserted against Salesforce, and because Salesforce is time-barred under 35 U.S.C. § 315(b) from challenging the '111 patent, RPX must have filed the instant Petition as a proxy for Salesforce, and, thus, Salesforce must be an RPI in this proceeding.  However, as discussed above, Patent Owner has not provided persuasive evidence to support this assertion.  Accordingly, based on the evidence currently before us, we are not persuaded that Salesforce should

14

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

have been identified as an RPI in this proceeding.[2]  We now turn to the
substantive issues presented in the Petition.

    B.  *Claim Construction*

        In an *inter partes* review, claim terms in an unexpired patent are given
their broadest reasonable construction in light of the specification of the
patent in which they appear.  *See* 37 C.F.R. § 42.100(b); *In re Cuozzo Speed
Techs., LLC*, 793 F.3d 1268, 1275–79 (Fed. Cir. 2015), *cert. granted sub
nom. Cuozzo Speed Techs., LLC v. Lee*, 84 U.S.L.W. 3218 (Jan. 15, 2016)
(No. 15-446).  Under the broadest reasonable construction standard, claim
terms generally are given their ordinary and customary meaning, as would
be understood by one of ordinary skill in the art in the context of the entire
disclosure.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir.
2007).  The claims, however, "'should always be read in light of the
specification and teachings in the underlying patent,'" and "[e]ven under the
broadest reasonable interpretation, the Board's construction 'cannot be
divorced from the specification and the record evidence.'"  *Microsoft Corp.
v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) (citations omitted).

---

[2] In its Preliminary Response, Patent Owner also requests we impose
sanctions on Petitioner for "misrepresentation of a fact," 37 C.F.R.
§ 42.12(a)(3), or for "abuse of process," 37 C.F.R. § 42.12(a)(6).
*See* Prelim. Resp. 40–41.  A motion for sanctions based on alleged
misconduct may not be filed without prior Board authorization.
*See* 37 C.F.R. § 42.20(b).  Patent Owner improperly has embedded such a
motion for sanctions within its Preliminary Response, without our
authorization.  Because we are not, at this juncture, persuaded by Patent
Owner's arguments on the issue of RPI, rather than expunge the Preliminary
Response, we deny Patent Owner's unauthorized motion for sanctions.

PUBLIC VERSION

██████ PUBLIC VERSION ████████████████

IPR2015-01750
Patent 8,484,111 B2

Upon review of the parties' contentions and supporting evidence, we determine no issue in this Decision requires express construction of any claim term. *See, e.g.*, *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) ("[C]laim terms need only be construed 'to the extent necessary to resolve the controversy.'") (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999)).  Accordingly, for purposes of this Decision, we do not provide any express claim construction.

### C.  Principles of Law

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).  Although the elements must be arranged or combined in the same way as in the claim, "the reference need not satisfy an *ipsissimis verbis* test," i.e., identity of terminology is not required.  *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *accord In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations including:  (1) the scope and content of the prior art;

██████ PUBLIC VERSION ████████████████

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

(2) any differences between the claimed subject matter and the prior art;
(3) the level of ordinary skill in the art; and (4) objective evidence of
nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

In that regard, an obviousness analysis "need not seek out precise
teachings directed to the specific subject matter of the challenged claim, for
a court can take account of the inferences and creative steps that a person of
ordinary skill in the art would employ." *KSR*, 550 U.S. at 418; *accord*
*In re Translogic Tech., Inc.*, 504 F.3d at 1259. The level of ordinary skill in
the art may be reflected by the prior art of record. *See Okajima v. Bourdeau*,
261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579
(Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978).

We analyze the asserted grounds of unpatentability in accordance with
these principles.

### D. *Asserted Anticipation by Popp*

Petitioner asserts that claims 13–18 are unpatentable under 35 U.S.C.
§ 102(e) as anticipated by Popp. Pet. 13–23. Patent Owner argues that Popp
does not disclose all elements of independent claim 13. Prelim. Resp. 32–
34. We have reviewed the parties' contentions and supporting evidence.
Given the evidence on this record, and for the reasons explained below, we
determine that the information presented shows a reasonable likelihood that
Petitioner would prevail on this asserted ground.

### 1. <u>Summary of Popp</u>

Popp relates to an "object-oriented approach [that] provides the ability
to develop and manage Internet transactions." Ex. 1004, Abstract.

PUBLIC VERSION

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

According to Popp, "[l]ocal applications can be accessed using any
workstation connected to the Internet regardless of the workstation's
configuration." *Id.* Popp describes that "[o]nce [a] connection is
established, the present invention is used with an application on the server
side of the connection to dynamically generate Web pages [that] contain
application information and provide the ability for the user to specify input."
*Id.* at 3:55–59. Web pages can be generated in response to the user input.
*Id.* at 3:61–63.

Figure 2 of Popp is reproduced below:



Figure 2

As seen in Figure 2 of Popp, Client Browser 202 is connected via
Internet 204 to Server Domain 208, which includes among other things
Application 214 and Database 224. Ex. 1004, 6:40–7:23, 7:31–34.
Application 214 includes objects 216 that correspond to the HTML elements

18

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

that define a Web page and are arranged in a tree structure that corresponds
to the hierarchical structure of the HTML elements that they implement. *Id.*
at 12:21–26. The self-contained modules, or components, may be shared by
one or more Web pages in a single application and/or across multiple
applications executing on a server. *Id.* at 4:27–33, 4:41–43, 17:54–18:32.

A scriptedControl object controls generation of a Web page. *Id.* at
18:62–19:19, Fig. 6A. Further, an inputControl object handles pushing and
pulling data to/from the Web page and the external data source (e.g.,
database 224). *Id.* at 21:61–22:67, Fig. 6B. The inputControl object
determines, for example, when a database entry should be updated based on
information input to the Web page and sends an appropriate message to
update the database. *Id.* at 21:37–49.

## 2. *Independent Claim 13*

Claim 13 recites a "system, comprising: a server accessible by a
browser executed on a client device, the server including a first portion, a
second portion, a third portion, and a fourth portion." Petitioner asserts that
"Popp's Server Domain 208 is accessible by Client Browser 202, executed
on a client device." Pet. 18 (citing Ex. 1004, Fig. 2). According to
Petitioner, Server Domain 208 of Popp "includes database 224 (first
portion), object tree 216 (second portion), internal application 214 (third
portion), and inputControl object 664 (fourth portion, used by internal
application 214)," corresponding to the server portions recited in claim 13.
*Id.* (citing Ex. 1004, 7:52–58, 12:21–32, Figs. 2, 6B); *see id.* at 14–17;
Ex. 1002 ¶¶ 31, 34, 35, 40. Popp further discloses that "Database 224 can be

19

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

resident on the same server as application 214," which also includes object tree 216 and inputControl object 664. Ex. 1004, 7:32–33, 7:52–58, 12:21–32; *see* Pet. 17, 18; Ex. 1002 ¶¶ 22, 31, 34, 35, 40. Thus, according to Petitioner, Popp discloses all four claimed "portions" on the same server.

Regarding the claimed "first portion of the server having information about unique aspects of a particular application," Petitioner describes the Web page of Popp as "meet[ing] the 'application' whose functionality and UI are dynamically generated" of the claim. Pet. 13–14 (citing Ex. 1002 ¶ 32). According to Petitioner, Popp discloses that database 224 (first portion) "contain[s] information about unique aspects of a particular Web page (application), e.g., for an Automobile Shopper's application that can be used by a prospective car buyer to select a car." *Id.* at 18 (citing Ex. 1004, 9:4–10, 9:56–61); *see* Ex. 1002 ¶ 31.

The claim further recites "the second portion of the server [has] information about user interface elements and one or more functions common to various applications, the various applications including the particular application." Petitioner describes the following as disclosing this claim feature:

> Web page objects 216 [of Popp that] correspond to HTML elements that define a web page and include component sub-trees representing user interface portions (e.g., text boxes, check boxes, radio buttons) that can be shared across Web pages, and thus contain information about user interface elements (e.g., data entry elements) and functions (e.g., receiving and processing input data) common to various applications (Web pages), including any particular application (Web page) whose data is stored in the database.

PUBLIC VERSION

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

Pet. 15 (citing Ex. 1002 ¶ 34); *see id.* at 18–19 (citing Ex. 1004, 2:33–41,
4:26–33, 4:41–43, 11:37–44, 12:21, 17:54–55, 18:32–43); Ex. 1002 ¶¶ 26,
31.

 Regarding the claimed "third portion of the server being configured to
dynamically generate a functionality and a user interface for the particular
application," Petitioner points to internal application 214 of Popp, which
"includes scriptedControl Object 602 to generate and manage a Web page,"
as disclosing this claim feature.  Pet. 15 (citing Ex. 1004, 8:49–55, 18:62–
65, 19:1–2; Ex. 1002 ¶ 36); *see id.* at 19 (citing Ex. 1004, 3:55–59, 7:45–49,
8:49–55, 18:65–67, 19:29–38, 31:44–49).  According to Petitioner, the
"scriptedControl object 602 retrieves application-specific data from the
database (first portion) and combines it with the object tree (second portion)
in order to dynamically generate the functionality and user interface for the
Web page (application)," thus disclosing the claim limitation that "the
functionality and the user interface of the particular application [are] based
on the information in the first portion of the server and the information in the
second portion of the server."  *Id.* at 15 (citing Ex. 1004, 18:65–67, 19:29–
38, 22:37–42, Figs. 6A, 6B; Ex. 1002 ¶¶ 36–37); *see id.* at 19 (citing
Ex. 1004, 19:18–19, 19:35–38).

 Petitioner further points to the fact that Popp's "Web page can include
a Java applet that, when downloaded over an established connection between
the client and the server and processed by a browser, presents the UI and
functionality to the user," as disclosing that the claimed "third portion of the
server [is] configured to send the functionality and the user interface for the

PUBLIC VERSION

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

particular application to the browser upon establishment of a connection between the server and the client device."  Pet. 16 (citing Ex. 1004, 31:1–3; Ex. 1002 ¶¶ 38, 39); *see id.* at 20 (citing Ex. 1004, 3:55–65, Fig. 2).

Finally, regarding the claimed "fourth portion of the server [that is] configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server," Petitioner relies on Popp's inputControl object 664.  Pet. 16–17. According to Petitioner, inputControl object 664 is responsible for detecting and responding to user input received from the web page user interface, such as a modification of field 632 in Web page 662.  *Id.* (citing Ex. 1004, 22:28–62; Ex. 1002 ¶ 40); *see id.* at 20.  Petitioner further asserts that "[w]hen inputControl object 664 detects a change . . . , the Web page objects (second portion) are automatically modified by storing the data retrieved from the Web page form in text object 654 and/or context object 628, and the database 630 (first portion) is automatically modified to store the changed data."  *Id.* at 17 (citing Ex. 1004, 22:28–62, Fig. 6B; Ex. 1002 ¶ 40).

Patent Owner argues that Popp does not disclose the "fourth portion" recited in claim 13.  Prelim. Resp. 32–34.  In particular, Patent Owner argues that "Popp nowhere discloses detecting changes that affect the unique behavior of the website or its application-specific data, nor the design elements that are generic to the website and other websites," and argues that instead Popp discloses "a controller to operate an ordinary website and webpage controls."  *Id.* at 33.  The language of claim 13, however, is broad and requires only that the fourth portion "automatically detect changes that

22

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

affect the information in the first portion . . . or the information in the second portion." Ex. 1001, 34:5–8. The first portion includes "information about unique aspects of a particular application." *Id.* at 33:23–24. As discussed above, Petitioner relies on database 224 as disclosing the claimed "first portion," and, thus, detecting a change that affects information stored in the database (e.g., an employee name stored in a database) is sufficient to disclose detecting of a change to information about the application, as claimed. *See, e.g.*, Ex. 1001, 12:20–32 (describing the business content layer (i.e., "first portion") as a database that may include data associated with a selected area of business, such as finance or human resources).

Patent Owner also argues that Petitioner's definition of "application," as claimed, is "unreasonably broad." Prelim. Resp. 33. Patent Owner argues instead that an application "is more than just some collection of computer instructions," and that it is a "higher level program for use by an end-user to perform a *specific* kind of work that is useful to the end-user." *Id.* at 23. We are not persuaded, however, based on the evidence before us, that Petitioner's reading of a web page as an example of an "application" as claimed is unreasonable. *See* Ex. 1002 ¶ 21 (Dr. Crovella testifying that a web page is an example of an "application").

Accordingly, for the reasons discussed, we are persuaded, on the current record, that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claim 13 is anticipated by Popp.

PUBLIC VERSION

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

### 3. *Dependent Claims 14–18*

We also have reviewed Petitioner's contentions and supporting evidence regarding claims 14–18, and are persuaded, based on the record now before us, that Petitioner has shown a reasonable likelihood of demonstrating that Popp discloses all elements of these claims. *See* Pet. 20–23 (citing Ex. 1004, 2:25–32, 3:55–63, 16:48–17:52, 18:32–34, 19:50–20:37, 21:61–22:13, 22:37–48, 22:64–65, Fig. 2; Ex. 1002 ¶¶ 41–45). Patent Owner, at this stage of the proceeding, has not presented separate arguments regarding whether Popp discloses the additional limitations of dependent claims 14–18. On the record now before us, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 14–18 are anticipated by Popp.

### 4. *Conclusion*

For the foregoing reasons, we institute an *inter partes* review of whether Popp anticipates claims 13–18 under 35 U.S.C. § 102(e).

### E. *Asserted Anticipation by Kovacevic*

Petitioner asserts that claims 13–18 are unpatentable under 35 U.S.C. § 102(b) as anticipated by Kovacevic. Pet. 24–33. Patent Owner argues that Kovacevic does not disclose all elements of independent claim 13. Prelim. Resp. 34–36. We have reviewed the parties' contentions and supporting evidence. Given the evidence on this record, and for the reasons explained below, we determine that the information presented shows a reasonable likelihood that Petitioner would prevail on this asserted ground.

PUBLIC VERSION

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

### 1. *Summary of Kovacevic*

Kovacevic relates to a system called MUSE that uses a model-based technology to implement an intelligent tutoring system having a flexible user interface. Ex. 1005, Abstract. The system described in Kovacevic includes an application-specific library, which "contains procedural code implementing the functional core of applications whose UIs are to be generated," and an interaction-specific library, which "contains a library of communications primitives—interaction techniques and presentation objects—to be used when assembling UI structures." Ex. 1005, 117. The MUSE program uses these libraries to build and generate a user interface. *Id.* As further discussed in Kovacevic, the libraries, and if desired the entire MUSE program, could be transported over a browser using Java. *Id.* Kovacevic also discusses a sequencing control primitive that monitors and updates the system when something affecting information-flow-control primitives occurs. *Id.* at 114.

### 2. *Independent Claim 13*

Claim 13 recites a "system, comprising: a server accessible by a browser executed on a client device, the server including a first portion, a second portion, a third portion, and a fourth portion." Petitioner asserts that "Kovacevic's SLOOP Server is accessible over the Web by an HTML browser executed on a UI client device." Pet. 28 (citing Ex. 1005, Fig. 1). According to Petitioner, the "SLOOP Server includes the application-specific library (first portion), the interaction-specific library (second portion), the main MUSE program (third portion), and the sequencing

25

PUBLIC VERSION

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

control primitives (fourth portion)," corresponding to the server portions recited in claim 13. *Id.* (citing Ex. 1005, 117 (col. 2 ¶ 7)); *see* Pet. 24–28; Ex. 1002 ¶¶ 50, 51, 53, 58. Thus, according to Petitioner, Kovacevic discloses all four claimed "portions" on the same server.

Regarding the claimed "first portion of the server having information about unique aspects of a particular application," Petitioner describes that a "tutoring course generated with a particular UI is a particular 'application' as recited in the claims." Pet. 24 (citing Ex. 1002 ¶ 50). According to Petitioner, Kovacevic discloses that a "particular tutoring course is represented by an application-specific model with software primitives provided in an application-specific library." Pet. 24 (citing Ex. 1005, 117 (col. 1 ¶ 4, col. 2 ¶ 7); Ex. 1002 ¶ 50); *see* Pet. 28–29.

The claim further recites "the second portion of the server [has] information about user interface elements and one or more functions common to various applications, the various applications including the particular application." Petitioner relies on an interaction-specific library in Kovacevic as disclosing this claim feature. Pet. 24–25, 29. According to Petitioner, the interaction-specific library has "information about user interface elements (e.g., communication UI primitives in the interaction-specific library) and one or more functions (e.g., mapping between external inputs and internal forms) common to various applications (including the particular application represented by a downloaded application-specific library)." *Id.* at 24–25 (citing Ex. 1005, 114 (col. 1 ¶ 2), 115 (col. 1 ¶ 2),

26

IPR2015-01750
Patent 8,484,111 B2

116 (col. 1 ¶ 6), 117 (col. 1 ¶ 5); Ex. 1002 ¶ 51); *see id.* at 29 (citing

Ex. 1005, 113 (col. 2 ¶ 2), 114 (col. 1 ¶ 2), 117 (col. 1 ¶ 5, col. 2 ¶ 7)).

Regarding the claimed "third portion of the server being configured to

dynamically generate a functionality and a user interface for the particular

application," Petitioner points to the "main program" of Kovacevic as

disclosing this claim feature.  Pet. 25, 29.  According to Petitioner,

Kovacevic's main program "generates the tutoring application (including the

functionality and the UI of the tutoring course) using the primitives in the

application-specific library (first portion) and the application-independent

interaction-specific library (second portion).".  *Id.* at 25 (citing Ex. 1005,

117 (col. 1 ¶ 4, col. 2 ¶ 7); Ex. 1002 ¶¶ 52–53); *see id.* at 29 (citing

Ex. 1005, 109 (col. 1 ¶ 3, ¶ 5, col. 2 ¶ 4), 117 (col. 1 ¶ 4, col. 2 ¶ 7)).

According to Petitioner, this generation of the tutoring application "is done

by mapping application model primitives provided in the application-

specific library (first portion) onto UI primitives including the

communication primitives in the interaction-specific library (second portion)

to construct a fully specified UI," thus disclosing the claim limitation that

"the functionality and the user interface of the particular application [are]

based on the information in the first portion of the server and the information

in the second portion of the server."  *Id.* at 25 (citing Ex. 1002 ¶ 54); *see id.*

at 29–30 (citing Ex. 1005, 115 (col. 1 ¶ 2), 116 (col. 1 ¶ 6), Figs 5, 6, 8).

Petitioner further points to the fact that "[h]aving downloaded the

application-specific library for a particular tutoring application,

[Kovacevic's] main MUSE program generates and sends the application's

27

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

functionality and UI to be rendered in the client's browser," as disclosing the limitation that "the third portion of the server [is] configured to send the functionality and the user interface for the particular application to the browser upon establishment of a connection between the server and the client device." Pet. 27–28 (citing Ex. 1005, 110 (col. 1 ¶ 4), 117 (col. 1 ¶ 4, col. 2 ¶ 7); Ex. 1002 ¶¶ 52–56); *see id.* at 30 (citing Ex. 1005, 108 (col. 1 ¶ 2, ¶ 4), 117 (col. 2 ¶ 7)).

Finally, regarding the claimed "fourth portion of the server [that is] configured to automatically detect changes that affect the information in the first portion of the server or the information in the second portion of the server," Petitioner relies on Kovacevic's sequencing control primitives. Pet. 25–26. Kovacevic describes that the "sequencing control primitives maintain and monitor the relevant UI context. They update the context whenever something potentially affecting [information-flow-control] primitives happens, and they constantly evaluate the context to enable/disable those primitives." Ex. 1005, 114 (col. 2 ¶ 6); *see* Pet. 30. According to Petitioner, "[c]hanges such as user input via the UI or selection of UI elements affect the information in the second portion of the server, e.g., by causing certain UI elements to be enabled or disabled," and the sequencing control primitives of Kovacevic monitor for such user input to enable appropriate enable/disable response of the UI element when a user selection is made. Pet. 25–26 (citing Ex. 1005, 114 (col. 2 ¶ 6), 115 (col. 2); Ex. 1002 ¶ 57).

PUBLIC VERSION

██ PUBLIC VERSION ████████████

IPR2015-01750
Patent 8,484,111 B2

Patent Owner argues that Kovacevic does not disclose the "fourth portion" recited in claim 13.  Prelim. Resp. 34–36.  In particular, Patent Owner argues that "Kovacevic does not disclose detecting changes that affect the unique behavior of the website or its application-specific data, nor the design elements that are generic to the website and other websites," and argues that "[w]hile Kovacevic describes making the website changeable, Kovacevic has no disclosure relevant to detecting changes that impact how the website should look or function."  *Id.* at 34.  Patent Owner also argues that Kovacevic does not disclose the claimed "fourth portion," because Kovacevic's sequencing control element is part of its controller, which Petitioner asserts to be the claimed third portion.  *Id.* at 35–36.

As discussed above (*see supra* Section II.D.2.), however, the language of claim 13 is quite broad and requires only that the fourth portion "automatically detect changes that affect the information in the first portion . . . or the information in the second portion."  Ex. 1001, 34:5–8.  Petitioner relies on the UI primitives in the interaction-specific library of Kovacevic as disclosing the claimed second portion.  Based on the record currently before us, we find persuasive Petitioner's assertion that detecting user input (a change) that affects whether certain UI elements are enabled or disabled (i.e., information regarding the UI primitives in the second portion) is sufficient to disclose the fourth portion's claimed function of detecting changes that affect the information in the second portion.  Further the claimed "third portion" and "fourth portion" need not be described as

29

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

separate components in the prior art to meet the limitations recited in the claim.

Accordingly, for the reasons discussed, we are persuaded, on the current record, that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claim 13 is anticipated by Kovacevic.

### 3. *Dependent Claims 14–18*

We also have reviewed Petitioner's contentions and supporting evidence regarding claims 14–18, and are persuaded, based on the record now before us, that Petitioner has a reasonable likelihood of showing that Kovacevic discloses all elements of these claims. *See* Pet. 31–33 (citing Ex. 1005, 110 (col. 1 ¶¶ 4–5, col. 2 ¶ 2), 112 (Fig. 4), 113 (col. 2 ¶ 2), 114 (col. 1 ¶ 2), 117 (col. 1 ¶ 4); Ex. 1002 ¶¶ 59–63). Patent Owner, at this stage of the proceeding, has not presented separate arguments regarding whether Kovacevic discloses the additional limitations of dependent claims 14–18. On the record now before us, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 14–18 are anticipated by Kovacevic.

### 4. *Conclusion*

For the foregoing reasons, we institute an *inter partes* review of whether Kovacevic anticipates claims 13–18 under 35 U.S.C. § 102(b).

### F. *Asserted Obviousness in view of Balderrama and Java Complete*

Petitioner asserts that claims 13–18 are unpatentable under 35 U.S.C. § 103(a) as obvious in view of Balderrama and Java Complete. Pet. 34–45. Patent Owner argues that the cited combination does not teach all elements

PUBLIC VERSION

██ PUBLIC VERSION ███████████

IPR2015-01750
Patent 8,484,111 B2

of independent claim 13.  Prelim. Resp. 37–40.  We have reviewed the parties' contentions and supporting evidence.  Given the evidence on this record, and for the reasons explained below, we determine that the information presented shows a reasonable likelihood that Petitioner would prevail on this asserted ground.

### 1. *Summary of Balderrama*

Balderrama relates to a system that can offer various goods for sale, in a self-service fashion with an "electronic device capable of accepting and transmitting a customer's input," such as a touch-screen display.  Ex. 1006, 1:8–12, Fig. 1.  The system of Balderrama includes template presentations and a database containing items intended for sale at a particular sales outlet.  *Id.* at 2:11–16, Fig. 3; *see also id.* at 6:48–58 (discussing template files), 8:64–9:2 (discussing "transmitted copy" of a template); 9:15–20 (discussing database records).  A "configuring routine" uses information from the template presentation and the database for a particular sales outlet to create a presentation to display on the electronic device at the sales outlet.  *Id.* at 11:37–48, Fig. 3 (element 84).  The system is also configured to handle modifications to the database and/or updates to the presentation template.  *Id.* at 2:17–21, 11:64–67, Fig. 6.  Update/modification detector 82 receives information about updates to the template presentation and/or modifications to the database, and acts accordingly to update the presentation at the customer terminal.  *Id.* at 8:21–64, 9:7–27, 10:11–24, Fig. 3 (arrows 81b, 87b, 83b).

██ PUBLIC VERSION ███████████

██ PUBLIC VERSION ████████████

IPR2015-01750
Patent 8,484,111 B2

### 2. *Summary of Java Complete*

Java Complete is a compilation of several articles in DATAMATION
Magazine, discussing a "new simplified object-based, open-system
[programming] language that allows software developers to engineer
applications that can be distributed over the Internet." *See* Ex. 1007, 1–3,
28. Java Complete provides information about the Java programming
language. For example, as discussed in the magazine, "Java reinvents the
way applications are distributed to clients and executed," and provides "an
easy way to deliver business information broadly." *Id.* at 40. As further
described, "network-centric Java applets . . . don't have to be preinstalled—
they install themselves just in time, on the fly, and deinstall themselves
when they're no longer needed." *Id.* at 42. One example provided in Java
Complete of a type of business application that could be built with Java
applets is an order-entry system. *Id.*

### 3. *Independent Claim 13*

Claim 13 recites a "system, comprising: a server . . . including a first
portion, a second portion, a third portion, and a fourth portion." Petitioner
asserts that "Balderrama's manager station 10 is a server accessible by
customer terminal 20a (client device) over POS LAN 14." Pet. 39 (citing
Ex. 1006, Fig. 1). According to Petitioner, Balderrama's "[m]anager station
10 (server) includes in-store database 86 with records/files 87a (first
portion), transmitted copy template presentation 80 (second portion),
configuring routine 84 (third portion), and update/modification detector 82
(fourth portion)," corresponding to the server portions recited in claim 13.

██ PUBLIC VERSION ████████████

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

*Id.* at 40 (citing Ex. 1006, Fig. 3); *see* Pet. 34–37; Ex. 1002 ¶¶ 71–73, 77.
Petitioner asserts that each of these portions is "disclosed as being stored or
executed on manager station 10." Pet. 37 (citing Ex. 1006, 8:67–9:2, 9:16–
27, 11:38–46). Thus, according to Petitioner, Balderrama teaches all four
claimed "portions" on the same server.

Regarding the claimed "first portion of the server having information
about unique aspects of a particular application," Petitioner describes
Balderrama's "order-entry presentation for a particular sales outlet
(configured presentation 90)," which "is a UI for a user to view items for
sale at the outlet and enter and order in an automated fashion, e.g., via a
touch screen," as the "particular application" of the claim. Pet. 34 (citing
Ex. 1006, 1:8–23, 2:11–16, Fig. 1; Ex. 1002 ¶¶ 64, 71). Balderrama
discloses that in-store database 86 with records/files 87a (i.e., the first
portion) "contain data records/information about items intended for sale at a
particular sales outlet" (i.e., the "particular application"). Ex. 1006, 9:17–
21, Fig. 3; *see* Pet. 34–35, 40; Ex. 1002 ¶¶ 64, 71.

The claim further recites "the second portion of the server [has]
information about user interface elements and one or more functions
common to various applications, the various applications including the
particular application." Petitioner describes Balderrama's disclosure of
"shared-across-outlets template presentation 80 from headquarters is
transmitted to manager station 10 (the outlet's server) for combination with
the outlet-specific data," as disclosing this claim feature. Pet. 35–36 (citing

PUBLIC VERSION

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

Ex. 1006, 6:48–58, 8:67–9:2, 11:43–46; Ex. 1002 ¶ 72); *see id.* at 40–41
(citing Ex. 1006, 6:48–58, 7:19–23, 8:64–9:2, 11:43–46, Figs. 3, 11).

Regarding the claimed "third portion of the server being configured to
dynamically generate a functionality and a user interface for the particular
application," Petitioner describes that "Balderrama employs a configuring
routine 84 . . . to retrieve data from the outlet-specific database 86 (first
portion) and combine it with the generic template presentation 80 (second
portion) in order to generate the functionality and user interface elements of
the configured presentation 90 (application) for presentation to the
customer," thus disclosing this claim feature.  Pet. 36 (citing Ex. 1006,
11:38–46, Fig. 3; Ex. 1002 ¶¶ 73–74); *see id.* at 41 (citing Ex. 1006, 11:38–
46, 14:64–65, 16:20–21, 16:55–17:5, Fig. 3).  According to Petitioner,
"[c]onfiguring routine 84 matches items in the template presentation (second
portion) with items in the database (first portion), activating the sales items
that are sold in the particular sales outlet, and incorporating those items'
prices from the database into the corresponding cells in the template
presentation," thus disclosing the claim limitation that "the functionality and
the user interface of the particular application [are] based on the information
in the first portion of the server and the information in the second portion of
the server."  *Id.* at 36 (citing Ex. 1006, 14:64–65, 16:20–21, 16:55–17:5;
Ex. 1002 ¶ 73); *see id.* at 41 (citing Ex. 1006, 8:67–9:2, 10:10–13, Fig. 3).

Regarding the claimed "fourth portion of the server [that is]
configured to automatically detect changes that affect the information in the
first portion of the server or the information in the second portion of the

PUBLIC VERSION

█████ PUBLIC VERSION █████████

IPR2015-01750
Patent 8,484,111 B2

server," Petitioner relies on Balderrama's update/modification detector 82. Pet. 36–37. According to Petitioner, update/modification detector 82 "automatically detects changes to the outlet-specific database (affecting the information in the first portion of the server) or the generic template presentation (affecting the information in the second portion of the server)." *Id.* at 36 (citing Ex. 1006, 10:14–21, 11:64–67; Ex. 1002 ¶ 77); *see id.* at 42 (citing Ex. 1006, 2:16–21, 10:14–21, 11:64–67, 12:34–38, Fig. 3). Petitioner further asserts that "[i]n response to update/modification detector 82 detecting changes . . . , a currently-running presentation is interrupted and re-configured." *Id.* at 37 (citing Ex. 1006, 9:7–15; Ex. 1002 ¶ 77).

Petitioner relies on Java Complete in combination with Balderrama for teaching that the server is "accessible by a browser executed on a client device," as claimed , and that the claimed "third portion of the server [is] configured to send the functionality and the user interface for the particular application to the browser upon establishment of a connection between the server and the client device" Pet. 38–40. According to Petitioner, Balderrama teaches distributing the application from a server to a client over a LAN network but does not explicitly state that the server is accessible by a browser executed on the client device. *Id.* at 37 (citing Ex. 1002 ¶ 67). Java Complete "describes using browsers for UI delivery over the Internet and within a company's internal network." *Id.* at 38 (citing Ex. 1007, 30, 31, 40; Ex. 1002 ¶ 68). Petitioner asserts that "[i]t would have been obvious to a [person of ordinary skill in the art] to implement a browser on Balderrama's customer terminal for receiving and executing the order-entry application, as

35

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

browsers were commonly used to receive UI applications in client-server systems." *Id.* at 37–38 (citing Ex. 1002 ¶¶ 68–69).

Petitioner further points to Java Complete's teaching that "the client browser executes a Java applet received from the server to dynamically generate the UI functionality of the application," asserting that a person of ordinary skill "would have been motivated to implement Balderrama's order-entry application as a Java applet delivered to a browser executed by the customer terminal (client device) because of the ease-of-implementation benefits of using Java and readily-available web browsers." *Id.* at 38 (citing Ex. 1007, 32, 40, 42; Ex. 1002 ¶¶ 68–69). According to Petitioner, Java applets are delivered in client-server systems by being downloaded upon establishment of a connection between the server and the client device. *Id.* at 39 (citing Ex. 1007, 32). Thus, Petitioner asserts:

> [i]n the obvious combination of Balderrama and Java Complete, customer terminal 20a/94 (client device) executes a browser to access the server (manager station 10), and configuring routine 84 (third portion of the server) is configured to send the functionality and UI for the particular application (configured presentation 85) to the browser upon establishment of a connection between the server and the client device.

*Id.*

Patent Owner argues that Balderrama does not disclose the "fourth portion" recited in claim 13. Prelim. Resp. 37–40. In particular, Patent Owner asserts that Balderrama does not disclose "change management," arguing that update/modification detector 82 of Balderrama (upon which Petitioner relies as teaching the claimed fourth portion) provides only

36

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

notification of a change.  *Id.* at 38–39.  The claim, however, does not recite any action in response to the detection of a change, as Patent Owner appears to assert, but merely recites detecting such a change.  Based on the record now before us, we are persuaded by Petitioner's assertion that notifying Balderrama's update/modification detector 82 of a change in data records or template presentations, *see* Ex. 1006, Fig. 3, constitutes the claimed "fourth portion."

Accordingly, for the reasons discussed, we are persuaded, on the current record, that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claim 13 would have been obvious in view of Balderrama and Java Complete.

### 4.  *Dependent Claims 14–18*

We also have reviewed Petitioner's contentions and supporting evidence regarding claims 14–18, and are persuaded, based on the record now before us, that Petitioner has shown a reasonable likelihood of demonstrating that the cited combination discloses all elements of these claims.  *See* Pet. 42–45 (citing Ex. 1006, 1:8–14, 6:48–63, 9:13–21, 16:55–17:5, Fig. 3; Ex. 1007, 42; Ex. 1002 ¶¶ 78–82).  Patent Owner, at this stage of the proceeding, has not presented separate arguments regarding whether Balderrama and Java Complete disclose the additional limitations of dependent claims 14–18.  On the record now before us, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 14–18 would have been obvious in view of Balderrama and Java Complete.

37

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

### 5. *Conclusion*

For the foregoing reasons, we institute an *inter partes* review of whether claims 13–18 would have been obvious in view of Balderrama and Java Complete under 35 U.S.C. § 103(a).

### *G. Petitioner's Alleged Confidential Information*

The parties have filed several Motions to Seal alleging that certain information provided by Petitioner in response to additional discovery requests authorized in this proceeding (*see* Paper 11) contain Petitioner's confidential information. *See* Papers 19, 27, 31, 36, 45. We will decide these Motions to Seal in due course. In the meantime, the allegedly confidential information will be maintained under seal. Additionally, this Decision, which references several documents designated as "Parties and Board Only," also will be designated as "Parties and Board Only."

## III.   CONCLUSION

As discussed above, we institute an *inter partes* review of claims 13–18 of the '111 patent. At this preliminary stage in the proceeding, we have not made a final determination with respect to the patentability of any challenged claim or the construction of any claim term.

## IV.   ORDER

Accordingly, it is

ORDERED that pursuant to 35 U.S.C. § 314(a), an *inter partes* review is hereby instituted as to claims 13–18 of the '111 patent on the following grounds:

PUBLIC VERSION

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

        Claims 13–18 as anticipated under 35 U.S.C. § 102(e) by Popp;

        Claims 13–18 as anticipated under 35 U.S.C. § 102(b) by
Kovacevic; and

        Claims 13–18 as obvious under 35 U.S.C. § 103(a) in view of
Balderrama and Java Complete;

        FURTHER ORDERED that no other ground of unpatentability is
authorized for this *inter partes* review;

        FURTHER ORDERED that Patent Owner's unauthorized motion for
sanctions is *denied*; and

        FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and
37 C.F.R. § 42.4, notice is hereby given of the institution of a trial; the trial
will commence on the entry date of this decision.

PUBLIC VERSION

PUBLIC VERSION

IPR2015-01750
Patent 8,484,111 B2

PETITIONER:

Richard F. Giunta
Elisabeth H. Hunt
Randy J. Pritzker
WOLF, GREENFIELD & SACKS, P.C.
RGiunta-PTAB@wolfgreenfield.com
EHunt-PTAB@wolfgreenfield.com
RPritzker-PTAB@wolfgreenfield.com

PATENT OWNER:

Jonathan Pearce
M. Kala Sarvaiya
SOCAL IP LAW GROUP LLP
jpearce@socalip.com
ksarvaiya@socalip.com

PUBLIC VERSION