UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

APPLICATIONS IN INTERNET        )
TIME, LLC,                      )
                                )
       Plaintiff,               )
                                )  Case No. 3:13-cv-00628-RCJ-CLB
   vs.                          )
                                )  **ORDER**
SALESFORCE, INC.,               )
                                )
       Defendant.              )
                                )

Pending before the Court are numerous motions[1] concerning the issue of attorney's fees in this case. Defendant, Salesforce, Inc. ("Salesforce"), has filed a sealed motion seeking attorney's fees, (Dkt. 409),[2] which Plaintiff, Applications in Internet Time, LLC ("AIT"), opposes, (Dkt. 416). Relevant to this motion, AIT moves for re-taxation of costs, (Dkt. 429), as does Salesforce, (Dkt. 428), challenging the Clerk's Memorandum Regarding Taxation of Costs, (Dkt. 427). For

---

[1] Pending before the Court are also two unopposed motions to seal. Salesforce has filed a motion to seal, (Dkt. 413), requesting to file under seal the exhibits filed in support of its motion for attorney's fees. And AIT has filed a motion requesting permission to file their response in opposition under seal, (Dkt. 417). The courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. *Courthouse News Serv. v. Planet*, 947 F.3d 581, 591 (9th Cir. 2020). Public access to filed motions and their attachments turns on "whether the motion is more than tangentially related to the merits of the case." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016).
The Court finds it appropriate to grant both unopposed motions considering both that the issue of attorney's fees is not more than tangentially related to the merits of this case and that this is a patent case involving highly sensitive information, which constitutes a compelling reason to seal certain documents from public inspection. *See Moreno v. Adamson*, 2021 WL 76722, at *2 (D. Nev. Jan. 7, 2021); *see also* LR 7-2(d) (under this Court's Local Rules, "[t]he failure of an opposing party to file points and authorities in response to any motion . . . constitutes a consent to granting of the motion").

[2] The docket reflects two pending motions for attorney's fees filed by Salesforce—one sealed, (Dkt. 409), and one unsealed, (Dkt. 412).

the following reasons, the Court denies AIT's motion for re-taxation of costs, (Dkt. 429), grants Salesforce's motion for re-taxation of costs, (Dkt. 428), and grants Salesforce's motion for attorney's fees, (Dkt. 409), without prejudice to refiling following a decision on appeal from the Federal Circuit.

## I.   Background

The Court made the following factual findings in its recent order, (Dkt. 408), granting summary judgment in favor of Salesforce:

### A.   The Patents and Claimed Invention

AIT asserts two patents in this litigation: the '482 patent and the '111 patent. Dkt. 1. Both patents are entitled "Integrated Change Management Unit," and they contain substantially identical specifications. The application for the '482 patent was filed on March 1, 2001, and issued on April 8, 2008. The application for the '111 patent was filed on October 26, 2011, is a continuation of U.S. Pat. Appl. No. 12/098,154, which is a continuation of the application for the '482 patent, and issued on July 9, 2013.

The asserted patents describe a "server computer" with four layers or portions of a server. Dkt. 172 at 6. The first layer, called the "business content layer," contains information about the "specific business operations of concern to the end used." '482 patent at 9:56-591.[3] The second layer, called the "metadata layer," contains "information about the user interface and functions common to a variety of applications," including "tools, worklists, data entry forms, reports, documents, processes, formulas, images, tables, views, columns, and other structures and functions." *Id.* at 9:41-46. The third layer, called the "Java data management layer," "retrieves the data in the first and second layers in order to generate the functionality and user interface elements of the application." *Id.* at 15:5-9. The fourth layer, called the "change management layer," "automatically detect[s] changes that affect an application." *Id.* at 16:18-21. As reflected in the claims, the change management layer is comprised of "one or more" intelligent agents. '482 patent, claims 8, 28. The specification teaches the server may "automatically mak[e] application and database changes using intelligent agent routines..." *Id.* at 7:47-53.

---

[3]   For simplicity, citations are made to the specification of the '482 patent.

B.   **The Asserted Claims, the Court's Claim Construction, and Evidence of the Ordinary Meaning of Certain Claim Terms**

AIT is asserting infringement of claims 1, 10, 20, 21, 23, 24, 25, 26, 30, and 40 of the '482 patent and claims 13-17 of the '111 patent. Of those, claims 1 and 21 of the '482 patent and claim 13 of the '111 patent are independent claims. All other claims depend, directly or indirectly, from one of those three claims.

With respect to the claim term automatically detecting, claim 21 of the '482 Patent requires "automatically detecting changes that affect a particular application." '482 Patent at 33:52–53. Claim 1 of the '482 patent adds an additional requirement that such "automatic" detection occur as part of the "change management layer." 482 Patent at 32:27–28 ("a change management layer for automatically detecting changes that affect an application"). Claim 13 of the '111 Patent adds an additional requirement to claim 21 of the '482 Patent requiring the software for automatic detection to be contained on a "portion" of a server. '111 Patent at 34:5–8.

I addressed the parties' disputes regarding claim construction in my claim construction opinion. Dkt. 172. The parties also agreed on the construction of a number of claim terms. Dkt. 153-4; Dkt. No. 277 at 7.

During claim construction, I found the phrase "automatically detecting changes ..." to require an "intelligent agent." As I explained in my opinion, the "patents repeatedly discuss intelligent agents as an integral component of the claimed invention." Dkt. 172 at 13.[4] I further found the specification distinguished the prior art based on the prior art's failure to contain intelligent agents. *Id.* at 13–14. As such, for the reasons previously explained, I construed "automatic detect[ing]," as it appears in all the claims, to require "detecting without human intervention through the use of one or more intelligent agents." *Id.* at 12, 24.

The shared patent specification provides various descriptions of intelligent agents. As an example, the specification states that "[a]n 'intelligent agent' is a specialized program that makes decisions and performs tasks based on predefined rules and objectives." '482 patent at 20:1-3; *See also Id.* at 10:42–45 ("An 'intelligent agent' is a specialized program that resides on a network, or at a server as an applet, and can make decisions and perform tasks based on pre-defined rules."); *Id.* at 16:22–23 ("[E]ach IA is defined by rules and constraints that focus on the selected business area."). In addition, the parties' respective experts have

---

[4]   In its briefing, Salesforce relies on Mr. Zatkovich's testimony from deposition instead of my claim construction order for this proposition. Dkt. 280 at 2. However, at the time Mr. Zatkovich testified, my claim construction order, including my finding that the specification taught "intelligent agents" were "integral components" of the claimed invention, was the law of the case.

offered various opinions regarding the understanding of this term to a skilled artisan. *See*, e.g., Dkt. 280-6 (Zatkovich Reb. Rpt.) at ¶¶ 52, 60, 79–85, 1104–1116; Dkt. 280-8 (Zatkovich Op. Rpt.) at ¶¶ 1208–1214; Dkt. 280-1, Schmidt Reb. at ¶¶ 39–51; Dkt. 280-2 Bederson Rpt. at ¶¶ 112–121. Ultimately, I did not construe the term "intelligent agent" and the ordinary meaning of this term to a skilled artisan is therefore applicable.

Mr. Zatkovich opined the various descriptions of "intelligent agent" in the specification are consistent with the term's plain meaning as he understood it and with his opinions regarding the "deploy" function of the accused product. Dkt. 280-6 (Zatkovich Reb. Rpt.) at ¶¶ 52, 60, 80, 1110, 1570, 1574; Dkt. 280-8 (Zatkovich Op. Rpt.) at ¶¶ 818, 1209, 1212; Dkt. 297-2 (Zatkovich 8/21/2022 Tr.) at 261:16–25, 270:7-10; Dkt. 297-3 (Zatkovich 8/24/2022 Tr.) at 426:8–25, 431:18–432:3, 434:16–435:3, 437:4–13. In particular, he explained that infringement would not be avoided under the narrowest interpretation in the specification. Dkt. 297-2 (Zatkovich 8/21/2022 Tr.) at 261:16–25.

During claim construction, I further resolved the parties' dispute regarding the terms "layer" and "portion of the server." In particular, I found that the term "layer" shall be construed as "a set of functionally or logically separated software components" and that the term "portion of the server" shall be constructed as "a functionally or logically separately subset of one or more server computers." Dkt. 172 at 24.

As recognized by Salesforce, "the parties [] agreed on constructions for 'application' and 'predetermined business application.'" Dkt. No. 277 at 7 citing 277-2 (Zatkovich Op. Rpt.) ¶ 28; *See* Dkt. 153-4. The agreed construction for "application" is "a software program providing a set of end user functions for performing tasks. Dkt. 153-4. The agreed construction for "predetermined business application is "a software program that provides a predefined set of end user functions for performing tasks relating to the requirements or operations of a business." *Id.*

C.      **Post-Grant Challenges to the '482 and '111 Patents in Light of Popp**

On August 17, 2015, RPX Corporation filed petitions for inter partes review ("IPR") against the asserted claims of the '482 and '111 patents arguing, among other grounds, that the claims were anticipated by U.S. Patent No. 6,249,291 ("Popp"). IPR2015-01750, Paper 1 (Petition) at 13-23 (PTAB August 17, 2015); IPR2015-01751, Paper 1 (Petition) at 16-13 (PTAB August 17, 2015). During the IPR proceedings, AIT disputed whether Popp disclosed "automatically detecting" changes—not any other element. E.g., IPR2015-01750, Paper 63 (Patent Owner Response) at 23-24 (PTAB May 20, 2016). After trial was instituted, the PTAB issued Final Written Decisions rejecting AIT's argument and finding that claims 1,

10, 20-21, 30, and 40 of the '482 patent and claims 13-17 of the '111 patent were anticipated by Popp. Dkt. 280-14 (IPR2015-01751, Paper 82 (Final Written Decision)) at 25-26 (PTAB Dec. 28, 2016); (IPR2015-01750, Paper 80 (Final Written Decision)) at 35 (PTAB Dec. 28, 2016). The PTAB further found that claims 23–26 of the '482 Patent were invalid as obvious over Popp in combination with another publication ("Codd"). Dkt. 280-14 (IPR2015-01751, Paper 82 (Final Written Decision)) at 27–29 (PTAB Dec. 28, 2016).

On appeal before the Federal Circuit, the Court vacated and remanded the PTAB's decision because the PTAB did not apply the proper standard for determining whether Salesforce was a real party in interest. Applications in Internet Time, LLC v. RPX Corp., 897 F.3d 1336 (Fed. Cir. 2018). The PTAB's Final Written Decisions were vacated based on the procedural question regarding the identity of the real party in interest and despite having found, on the merits, that all of the asserted claims of the '482 and '111 patents were invalidated by Popp in combination with various references. IPR2015-01750, Paper 128 (Final Decision on Remand Terminating Institution) at 13-23 (PTAB October 2, 2020).

The Court has reviewed the PTAB's findings regarding the prior art and its conclusions. The Court recognizes the PTAB's decision was vacated and does not rely on the decision itself. However, the Court has independently considered the evidence and arguments of the parties and ultimately, as indicated at the hearing, the Court concludes the PTAB reached the proper result. Dkt. 393 at 157:12–15.

D.   **Description of the Accused Products**

The accused products in this case are certain functionalities of Salesforce's Salesforce1 and Force.com platforms. Dkt 280-8 (Zatkovich Op. Rpt.) ¶ 1198.

The accused products use a metadata-driven architecture in which an application is defined by metadata rather than embodied in program code, so that changing an application can be achieved by changing the metadata rather than code. *Id.* at ¶¶ 119–120. Designers and developers, however, do not enter metadata changes directly into the application that is deployed to customers, i.e., the "production" version of the application. *Id.* at ¶¶ 241–261, 305–309, 814–815. Rather, they work on a development copy of the application metadata stored in a "sandbox" or "scratch organization." *Id.* at ¶ 266; *See also Id.* at ¶¶ 273–309, 814–815. This development version of the metadata is modified through a graphical user interface, an Integrated Development Environment (IDE), or a command line interface (CLI) tool. *Id.* at ¶¶ 242, 248, 309; *See also Id.* at ¶¶ 241–261. Rather than modify metadata associated with a production application directly, potential changes to application metadata are detected and deployed to the production application based on a comparison of the metadata in the production application with a development copy of the code. *Id.* at ¶ 263–264; *See also Id.* at ¶¶ 262–304,

> 541. All automated change management features in the accused products are governed by and utilize the same software functionalities, including a Universal Data Dictionary (UDD) and the Metadata API. *Id.* at ¶¶ 263–265, 315.
>
> With respect to automated change management, the Metadata API includes a "deploy" function that detects changes to the metadata that defines an application. *Id.* at ¶¶ 812–813. Mr. Zatkovich provided a "source code analysis for the claimed layer four includ[ing] a code description and code flow chart for source code reflecting fourth-layer functionality for detecting changes to metadata." Dkt. 280-8, Zatkovich Op. at ¶ 834 (referencing "Flow D" portion of source code analysis, (Dkt 280-15, Appendix C to Zatkovich's Op. Rpt. at 20-24)). Mr. Zatkovich further explained that one step in the "deploy" function includes a "filterOutUnchangedFiles" routine where the changes are identified within the deploy function. Dkt 280-15, Appendix C to Zatkovich's Op. Rpt. at 24 ("Step 3"); Dkt. 297-2 Zatkovich 8/21/2022 Tr. at 257:3-6. With reference to his analysis of the source code of the accused products, Mr. Zatkovich further testified that this one step of the "deploy function" alone would not be considered an intelligent agent. Dkt. 297-2 (Zatkovich 8/21/2022 Tr.) at 256:21–257:2, 272:13–16.
>
> **E.  Appropriate Level of Ordinary Skill in the Art**
>
> Salesforce's expert Dr. Benjamin Bederson opined that "a person of ordinary skill in the art as of the claimed priority date of each of the asserted patents ('POSITA') would have had at least an undergraduate degree in electrical engineering or computer science (or equivalent field) and at least two years of computer programming experience in developing client-server systems." Dkt. 280-6 (Bederson Rpt.) ¶ 19. AIT's expert, Mr. Zatkovich, opined that "a person of ordinary skill in the art, at the time of the invention of the Asserted Patents, would be someone with a bachelor's degree in computer science or a related field (such as electrical engineering), and either (1) two or more years of industry experience and/or (2) an advanced degree in computer science or a related field." Dkt 280-8, Zatkovich Op. at ¶¶ 23-24. These two standards are generally consistent with each other, and neither party in their motion papers asserted that there was any material difference between the two standards. As such, resolution of the experts' dispute is not necessary for my opinion.

(Dkt. 408 at 3–9).

**II.  Re-Taxation of Costs**

Salesforce seeks re-taxation of costs "to update the award of costs … to the total amount of $55,386.50," (Dkt. 428 at 3), pursuant to the Local Rules due to an alleged clerical error. (*Id.*

at 5); *see also* LR 54-12(a) ("A party may obtain review of the clerk's taxation of costs by filing a motion to retax under Fed. R. Civ. P. 54(d), accompanied by points and authorities. A motion to re-tax costs must be filed and served within seven days after receipt of the notice under LR 54-1(f)."). Per the Local Rules, "[a] motion to re-tax must specify the particular portions of the clerk's ruling to which the party objects, and only those portions of the clerk's ruling will be considered by the court. The motion to re-tax will be decided on the same papers and evidence submitted to the clerk." LR 54-12(b).

Having conferred with the Clerk's Office to determine that there was, in fact, a clerical error, the Court grants Salesforce's motion, (Dkt. 428). AIT, on the other hand, asks "that the Court deny taxation of costs to Defendant Salesforce" whatsoever due to Salesforce's "late filing of its bill of costs [] and its failure to provide an excuse for the late filing, or a reason for the Court to waive compliance with the Local Rules." (Dkt. 429 at 5). Alternatively, AIT asks the Court to "stay taxation of costs in view of AIT's pending appeal to the Federal Circuit," pursuant to Local Rule 7-2, "as the balance of the equities tilts in favor of a stay and deferring resolution of this issue will conserve judicial resources." (*Id.*).

In response, Salesforce explains that it "filed its combined motion for fees and costs 20 minutes after midnight" on the day of the deadline, "and its bill of costs and supporting invoices just over two hours after that at 2:48am[.]"). (Dkt. 431 at 5). Application of a court's local rules is discretionary, *Ghazali v. Moran*, 46 F.3d 52, 53 (9th Cir. 1995) (explaining that "[o]nly in rare cases will [appeals courts] question the exercise of discretion in connection with the application of local rules" (citation omitted)), and this obvious accident does not warrant strict enforcement. Therefore, the Court declines to strike the Clerk's Memorandum Regarding Taxation of Costs,

(Dkt. 427), on this basis.  Similarly, the Court, in its discretion, sees no reason why this very limited determination should be delayed pending appeal.  Accordingly, the Court denies AIT's motion for re-taxation of costs, (Dkt. 429).

### III.    Motion for Attorney's Fees

Seeking nearly $7 million total in fees and costs, (Dkt. 409 at 27), Salesforce argues that "this [is an] case exceptional under 35 U.S.C. § 285," that "warrant[s] an award of Salesforce's attorneys' fees and costs incurred[.]" (*Id.* at 8).  It asserts that this is "particularly" the case "after the Court's Claim Construction Order on November 8, 2021, which found an express disclaimer limiting all asserted claims as requiring the use of an 'intelligent agent' for change detection" because, after that point, "AIT could not maintain a viable claim of infringement without either running afoul of the Court's Claim Construction Order, the prior art, or both[.]" (*Id.*).  In response, AIT argues that "Salesforce has not shown that this is an 'exceptional case,'" (Dkt. 417-1 at 17–28), and asserts that the Court should deny the motion "as untimely, as it was filed outside of the 14-day period set by Rule 54," or, in the alternative, "should defer ruling on Salesforce's request for fees and costs until after completion of AIT's appeal to the Federal Circuit." (*Id.* at 8).  For the following reasons, the Court grants the motion.

The Patent Act, codified in Section 285 of Title 35, provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  An exceptional case is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health &*

*Fitness, Inc.*, 572 U.S. 545, 554 (2014). Based on the totality of the circumstances, the determination of whether a case is exceptional is committed to the court's sole discretion. *Id.*

While the Court believes it was reasonable to bring the initial claims in this action, the Court agrees with Salesforce that "AIT's unreasonable litigation tactics render this case exceptional under 35 U.S.C. § 285 and warrant an award of Salesforce's attorneys' fees and expert costs incurred after the Court issued its Claim Construction Order" on November 8, 2021. (Dkt. 420 at 5). Such as the case is here, when the patentee continues to litigate after claim construction ends any reasonable likelihood of prevailing on the merits, an award of attorney's fees under Section 285 is warranted. *AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353, 1360 (Fed. Cir. 2017); *see also Innovation Scis., LLC v. Amazon.com, Inc.*, 2020 WL 4934272, at *1 (E.D. Va. Feb. 18, 2020), *aff'd*, 842 F. App'x 555 (Fed. Cir. 2021) (finding that the case was exceptional based in part on where invalidating claim was "clear and necessary consequence of the claim construction").

Accordingly, Salesforce is entitled to the $6,890,328.28 in attorneys' fees incurred after the Court's Claim Construction Order.[5] (Dkt. 409 at 19, 27). Salesforce has satisfied its burden under the Court's Local Rules to provide a "reasonable itemization and description of the work performed," LR 54-14(b)(1), and the Court finds that the requested amount is reasonable considering the context of the case and the substantial amount in dispute. *See Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996), *opinion amended on denial of reh'g*, 108 F.3d 981 (9th Cir. 1997); *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).

---

[5] Salesforce is also entitled to costs incurred after the Court's Claim Construction Order, with the exact amount to be determined following the Clerk's re-taxation of costs.

# CONCLUSION

IT IS HEREBY ORDERED that Defendant's Motions for Attorney's Fees and Costs, (Dkt. 409); (Dkt. 412), are **GRANTED**. Salesforce is entitled to $6,890,328.28 in attorneys' fees incurred after the Court's Claim Construction Order. Salesforce is also entitled to costs in the amount to be determined by the Clerk's re-taxation of costs.

IT IS FURTHER ORDERED that Defendant's Motion for Re-Taxation of Costs, (Dkt. 428), is **GRANTED**. The Clerk's office is **ORDERED** to re-tax Salesforce's Bill of Costs, (Dkt. 411), and issue an amended Memorandum Regarding Taxation of Costs.

IT IS FURTHER ORDERED that Plaintiff's Motion for Re-Taxation of Costs, (Dkt. 429), is **DENIED**.

IT IS FURTHER ORDERED that Defendant's Motion to Seal, (Dkt. 413), is **GRANTED**.

IT IS FURTHER ORDERED that Plaintiff's Motion to Seal, (Dkt. 417), is **GRANTED**.

IT IS SO ORDERED.

Dated  March 20, 2024.

_____
ROBERT C. JONES
United States District Judge